IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK
_____

GLENN BOOKMAN,

                Plaintiff,           Civil Action No.
                                  9:15-CV-1542 (MAD/DEP)

    v.

JEFFREY LINDSTRAND, *et al.*,

                Defendants.
_____

APPEARANCES:               OF COUNSEL:

FOR PLAINTIFF:

GLENN BOOKMAN, *Pro Se*
86-B-0227
Auburn Correctional Facility
P.O. Box 618
Auburn, New York 13021

FOR DEFENDANTS:

HON. ERIC T. SCHNEIDERMAN      BRIAN W. MATULA, ESQ.
New York State Attorney General    Assistant Attorney General
The Capitol
Albany, NY 12224

DAVID E. PEEBLES
CHIEF U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

Plaintiff Glenn Bookman, a New York State prison inmate who is proceeding *pro se* and *in forma pauperis*, has commenced this civil rights action against several individuals employed by the New York State Department of Corrections and Community Supervision ("DOCCS"), pursuant to 42 U.S.C. § 1983. In his complaint, as amended, plaintiff alleges that certain defendants violated his rights under the First Amendment by retaliating against him, and his rights under the Eighth Amendment by using excessive force against him, ignoring his serious medical needs, and failing to properly supervise staff and protect him from known harm.

Currently pending before the court is a motion by defendants seeking the entry of summary judgment dismissing plaintiff's amended complaint on a variety of grounds including, *inter alia*, his failure to (1) exhaust the available administrative remedies prior to bringing this action, as required by the Prison Litigation Reform Act ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), (2) establish either the existence of a serious medical need or defendants' deliberate indifference to that need, (3) establish an adverse action of a constitutional magnitude sufficient to support a retaliation claim, and (4) identify a specific risk that defendants

2

ignored. For the reasons that follow, I recommend that defendants' motion

be granted in part and denied in part.

I.      BACKGROUND[1]

Plaintiff is a New York State prison inmate currently being held in the

custody of the DOCCS. *See generally* Dkt. No. 16. Although plaintiff's

_____

[1]     Although plaintiff has responded in opposition to defendants' pending motion, he failed to specifically respond to defendants' Local Rule 7.1(a)(3) statement of undisputed material facts. *See* Dkt. No. 62-2. By its terms, Local Rule 7.1 provides, in part, that "[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." N.D.N.Y. L.R. 7.1(a)(3) (emphasis in original). Courts in this district have routinely excused this rule in cases involving a non-moving party's failure to properly respond to a Local Rule 7.1(a)(3) Statement. *See, e.g.*, *Elgamil v. Syracuse Univ.*, No. 99-CV-0611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2010) (McCurn, J.) (listing cases).

To be sure, *pro se* litigants are entitled to some measure of forbearance when defending against summary judgment motions. *Jemzura v. Public Serv. Comm'n*, 961 F.Supp. 406, 415 (N.D.N.Y. 1997) (McAvoy, J.). That deference, however, does not extend to relieving *pro se* plaintiffs of the ramifications associated with the failure to comply with the court's local rules. *Robinson v. Delgado*, No. 96-CV-0169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J., adopting report and recommendation by Hurd, M.J.). Stated differently, "a pro se litigant is not relieved of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Latouche v. Tompkins*, No. 09-CV-0308, 2011 WL 1103045, at *1 (N.D.N.Y. Mar. 23, 2011) (Mordue, J.).

Plaintiff was specifically warned of the consequences of failing to properly respond to defendants' Local Rule 7.1 Statement. Dkt. No. 62-1. Despite this pointed warning, he nonetheless has failed to provide "specific citation[s] to the record where the factual issue arises." Instead, plaintiff merely denied all allegations in defendants' Local Rule 7.1(a)(3) statement beyond his "name, that he was under DOCCS care/custody, and grievances processed by DOCCS[.]" Dkt. No. 72.

As a result, I recommend that the court deem the facts contained in defendants' Local Rule 7.1(a)(3) Statement as having been admitted to the extent they are supported by accurate record citations. *See, e.g., Latouche*, 2011 WL 1103045, at *1; *see also Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). As to any facts not contained in defendants' Local Rule 7.1(a)(3) Statement, in light of the procedural posture of this case, the court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of plaintiff. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

amended complaint is far from the model of clarity, it appears to allege that the incidents giving rise to plaintiff's claims occurred during the time that he was confined at the Great Meadow Correctional Facility ("GMCF"), located in Comstock, New York, and the CVPH Medical Center, in Plattsburgh, New York. *Id.*; *see* Dkt. No. 62-12. The relevant incidents, as they relate to each of the named defendants, are described in more detail below.

A.   Defendant Dr. Michael Cook

Plaintiff suffers from a variety of medical conditions, including back pain, neck pain, right elbow pain, and light sensitivity in his right eye.[2] Dkt. No.62-12 at 35, 46; *see* Dkt. No. 16-1 at 1. On March 18, 2014, plaintiff submitted a sick call request to address, *inter alia*, painful muscle cramps that he was experiencing, and which he believed were caused by his Celebrex usage. Dkt. No. 62-6 at 2; *see* Dkt. No. 16 at 5. Plaintiff was examined by defendant Dr. Michael Crook that same day, and he concedes that this examination was the "one . . . and only time" he encountered Dr. Crook. Dkt. No. 62-12 at 44.

---

[2]   Although the course of discovery resulted in the production of 800 pages of plaintiff's medical records, covering nearly twenty-one years of medical treatment, with the exception of one progress note, the parties have not produced those medical records in connection with the pending summary judgment motion Dkt. No. 62-4 at 3; *see* Dkt. No. 62-11.

Dr. Crook expressed skepticism that plaintiff's Celebrex would be the cause of the plaintiff's muscle cramps. Dkt. No. 62-6 at 2; Dkt. No. 62-12 at 40, 43, 81-82; *see* Dkt. No. 16 at 5-6; Dkt. No. 62-11 at 2-3. Nonetheless, he discontinued plaintiff's Celebrex and prescribed plaintiff a new medication, Neurontin, in its place. Dkt. No. 62-11 at 2-3; Dkt. No. 62-12 at 42-43, 84-85. Plaintiff alleges that Dr. Crook failed to take the time to explain this new medication to him. Dkt. No. 16 at 6. However, the progress note from that session indicates that when Dr. Crook explained that some of plaintiff's symptoms were inconsistent with the objective medical findings, he abruptly stormed out of the examination room stating that he would "go through Albany again." Dkt. No. 62-11 at 2-3; Dkt. No. 62-9 at 18.

On March 28, 2014, an unidentified nurse delivered the newly-prescribed Neurontin to plaintiff's cell. Dkt. No. 62-11 at 2-3. Plaintiff refused the prescription, believing that Neurontin's sole use was for the treatment of seizures, and not pain management.[3] Dkt. No. 62-12 at 42-43, 84-85; *see* Dkt. No. 16 at 6.

B.   Defendant Sean Corrigan

---

[3]   Following plaintiff's initial misunderstanding, he was again prescribed Neurontin and he concedes that the prescribed medication effectively treats his pain. Dkt. Not. 62-12 at 43.

In 2013, plaintiff filed a complaint with the Public Integrity Bureau of the New York State Attorney General's Office regarding his treatment by various corrections officers employed at the GMCF, including defendant Sean Corrigan. Dkt. No. 16-1 at 2; *see* Dkt. No. 16 at 6; Dkt. No. 62-12 at 52-53. Although the precise nature of that complaint is not made clear from the present record before the court, it appears that plaintiff generally complained that he felt threatened by various corrections officers, including defendant Corrigan.[4] Dkt. No. 16 at 6; Dkt. 16-1 at 2.

Between April 25 and April 27, 2014, plaintiff was taunted by several unidentified, fellow inmates. Dkt. No. 16 at 10; Dkt. No. 62-12 at 12, 102-103. One inmate stated to plaintiff that "he had something [for plaintiff] from [Corrigan]" and that plaintiff should "play [in] the yard." Dkt. No. 16 at 6; Dkt. No. 62-12 at 12-13, 102-103. In addition, ten to fifteen other unidentified inmates went past plaintiff's cell and told him that he should "[p]lay [in] the yard." Dkt. No. 62-12 at 102-103. Plaintiff was never assaulted by any of these unidentified inmates, although he alleges that

---

[4]     Defendants allege that plaintiff filed that complaint in November 2013, and that the complaint failed to mention defendant Corrigan by name. Dkt. No. 62-2 at 5 (citing Dkt. No. 16-1 at 2). Although it is true that the November 3, 2013 letter to the Public Integrity Board does not mention defendant Corrigan by name, that letter appears to have been written in follow-up to two separate complaints that plaintiff made with the Public Integrity Board. Dkt. No. 16-1 at 2 (No. 13-1912, 11-2138). Neither of those two complaints are contained in the record presently before the court, nor is a third complaint that plaintiff references in his amended complaint. Dkt. No. 16 (No. 14-0659).

those inmates were making threats at the behest of defendant Corrigan.

Dkt. No. 62-12 at 12-13.

Several days later, on April 30, 2014, defendant Corrigan stopped at plaintiff's cell and stated to him, "You [are] writing me up? You just made a fucking mistake." Dkt. No. 62-12 at 64; Dkt. No. 16-1 at 5, 10. Defendant Corrigan left and within five minutes of the encounter, the electricity in plaintiff's cell was turned off, and remained off for approximately eighteen hours. Dkt. No. 16-1 at 5, 13; Dkt. No. 62-12 at 64.

On May 7, 2014, Officer D. Corentto observed plaintiff throw a shampoo bottle at defendant Corrigan, and issued plaintiff an inmate misbehavior report concerning the incident. Dkt. No. 62-2 at 11-12, 49, 65-67, 85; Dkt. No. 16-1 at 3. Plaintiff alleges that this misbehavior report was falsified, noting that the shampoo bottle that he is alleged to have thrown was not entered into evidence at his subsequent disciplinary hearing. Dkt. No. 62-2 at 49; Dkt. No. 16-1 at 12 ("Where is this so[-]called bottle I threw?"). As a result of the charge, plaintiff was confined to the facility's special housing unit ("SHU") for approximately four months.[5] Dkt. No. 16 at 7.

---

[5]    Plaintiff unsuccessfully challenged the results of his disciplinary hearing by instituting an Article 78 proceeding. See Dkt. No. 62-12 at 68-70; see generally Bookman v. Annucci, 141 A.D.3d 1060 (3d Dept.), lv denied 28 N.Y.3d 906 (2016).

On May 5, 2015, following a suicide attempt by overdose, plaintiff was taken for treatment to the CVPH Medical Center in Plattsburgh, New York, where he remained for approximately five days. Dkt. No. 1 at 7; Dkt. No. 62-12 at 73-74, 78. Plaintiff alleges that defendant Corrigan "was in [his] hospital room and made further threats and assaulted [him]." Dkt. No. 1 at 7; Dkt. No. 62-12 at 73-76. According to the plaintiff, defendant Corrigan assaulted Bookman for five to ten minutes by punching him in the arms, back, and legs, and then injected him with Haldol. Dkt. No. 62-12 at 73-77; see Dkt. No. 16 at 7. Although plaintiff was transferred to the Clinton Correctional Facility ("Clinton") following the encounter, plaintiff did not tell anyone about the assault, alleging that he was too afraid to report the incident. Dkt. No. 62-12 at 78-80.

C.    Defendant Shawn Molesky[6]

During the four-month period plaintiff was confined in the SHU at the GMCF, plaintiff was seen by a rehabilitation counselor, defendant Shawn Molesky, for treatment. Dkt. No. 62-12 at 23-24; Dkt. No. 16 at 7. During that time, Bookman began to experience what he describes as "adverse

---

[6]    The precise spelling of defendant Molesky's name is not apparent from the present record, as the parties use "Mileski," "Moleski," and "Molesky" interchangeably in their papers. For the sake of clarity, I will refer to her as "defendant "Molesky," consistent with the spelling utilized by Judge D'Agostino.

reactions" to his medication, including suicidal ideations, self-harming urges, and difficulty using the bathroom. Dkt. No. 16 at 7; Dkt. No. 62-12 at 24-26, 88-89.

He reported these feelings to defendant Molesky, but she "basically just shrugged her shoulders at everything." Dkt. No. 16 at 7. Although plaintiff concedes that defendant Molesky lacked the authority to prescribe or discontinue his medications, he does not know whether she relayed the signs and symptoms that he was experiencing to a person with the requisite authority to make changes to his medical treatment. Dkt. No. 62-12 at 25-26, 88-93. Afraid of the reaction that he was having to the medication, plaintiff elected to stop taking the medication by August 1, 2014. Dkt. No. 62-10 at 3, 4.

D.    Defendant Jeffrey Lindstrand

Plaintiff complains that defendant Jeffrey Lindstrand, the Deputy Superintendent of Administration at the GMCF, "knew everything" but did not take any action. Dkt. No. 62-12 at 11; Dkt. No. 16 at 8-10. Plaintiff made defendant Lindstrand aware of the issues that he was having by sending him letters and speaking to him face-to-face when defendant Lindstrand made his rounds. Dkt. No. 62-12 at 13-16, 20-21, 39-40, 5f9, 60; Dkt. No. 16-1 at 8-9; *see also* Dkt. No. 16-1 at 2, 5-9. Despite being

made aware of plaintiff's problems, defendant Lindstrand failed to take any action "to correct and stop the retaliation," failed to protect him from harm, and failed "to supervise workers under him." Dkt. No. 16 at 8-9.

E.    Plaintiff's Grievances

Plaintiff is generally familiar with the DOCCS grievance process. Dkt. No. 62-12 at 62-63. On February 26, 2014, he submitted a grievance in which he complained that he had not been examined by a doctor despite having submitted several sick call requests (the "February 2014 grievance"). Dkt. No. 62-5 at 2; *but see* Dkt. No. 62-9 at 6. Specifically, plaintiff complained that he needed to be seen so that he could renew his prescription for "right eye medication" and discuss his arthritis medication. *Id.* On March 17, 2014, following the initial denial of his grievance, plaintiff submitted an appeal to the superintendent and, thereafter, requested review by the DOCCS Central Office Review Committee ("CORC"), on April 25, 2014. *See generally* Dkt. No. 62-9.

On March 18, 2014, following plaintiff's visit with Dr. Cook, he filed a grievance, requesting that he no longer be treated by Dr. Cook (the "March 2014 grievance"). Dkt. No. 62-6 at 2. In that grievance, plaintiff indicated that he did "not know if in fact the muscle cramps [he] experience[d were] in fact caused by the [Celebrex,]" but that he preferred

to have that prescription renewed. *Id.* Plaintiff did not appeal the initial denial of that grievance. *See generally* Dkt. No. 62-9.

Finally, on April 15, 2014, plaintiff submitted a grievance in which he claimed that he was being retaliated against (the "April 2014 grievance"). Dkt. No. 62-7 at 2. Specifically, plaintiff alleged that he had submitted "several grievances" concerning Dr. Cook and prescriptions. Dkt. No. 62-7 at 2. He claims that as a result, "[t]he course of [his] treatment was altered for no other reason but retaliation for using the grievance procedure." Dkt. No. 62-7 at 2. Like the March 2014 grievance, the denial of this grievance was not appealed. *See generally* Dkt. No. 62-9.

## II.   PROCEDURAL HISTORY

Plaintiff commenced this action on or about December 30, 2015 by filing a complaint and accompanying application for leave to proceed *in forma pauperis* ("IFP"). Dkt. Nos. 1, 2. Following an initial review of plaintiff's complaint pursuant to 28 U.S.C. §§ 1915(e), 1915A, District Judge Mae A. D'Agostino issued a decision and order on February 25, 2016, in which she granted plaintiff's IFP application but dismissed the complaint, with leave to amend, based upon his failure to state a claim upon which relief may be granted. Dkt. No. 7. On or about September 27, 2016, plaintiff availed himself of that opportunity and filed an amended

11

complaint. Dkt. No. 16. After reviewing the amended complaint for facial sufficiency, Judge D'Agostino accepted it for filing, dismissed the amended complaint without prejudice as to three named defendants, and required the remaining defendants to respond. Dkt. Nos. 22, 30.

As a result of the foregoing, the only viable claims that remain for consideration are (1) an Eighth Amendment deliberate medical indifference claim, asserted against defendants Crook and Molesky; (2) a First Amendment retaliation claim, asserted against defendants Crook and Corrigan; (3) an Eighth Amendment excessive force claim, asserted against defendant Corrigan; and (4) a failure to supervise/protect claim, asserted against defendant Lindstrand. Dkt. No. 22 at 5.

On July 31, 2017, following the close of discovery, defendants filed a motion for summary judgment, seeking dismissal of plaintiff's remaining claims. Dkt. No. 62. In support of their motion, defendants argue that (1) plaintiff failed to exhaust his administrative remedies; (2) plaintiff has not shown that defendants Dr. Crook and Molesky were deliberately indifferent to his medical needs; (3) plaintiff cannot show that he suffered an adverse action of constitutional magnitude; and (4) plaintiff has failed to identify a specific risk that he was subjected to that defendant Lindstrand ignored. *See generally* Dkt. No. 62-3. Plaintiff has responded in opposition to the

motion, Dkt. No. 72,[7] which is now fully briefed, and has been referred to

me for the issuance of a report and recommendation, pursuant to 28

U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule

72.3(c). *See* Fed. R. Civ. P. 72(b).

III.   DISCUSSION

> A.   Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal

Rules of Civil Procedure. Under that provision, the entry of summary

judgment is warranted "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S.

317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247

(1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391

F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this

inquiry if it "might affect the outcome of the suit under the governing law."

*Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549,

553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence

---

7       According to his opposition papers, "further action is being filed with this court"
regarding "further threats and further injuries." Dkt. No. 72 at 2. The court notes that
plaintiff did, in fact, commence a new action on or about October 16, 2017. *See
generally Bookman v. Lowry et al*, 9:17-cv-01143-GTS-ATB.

is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Emp'rs' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

14

B.    Exhaustion of Available Administrative Remedies

In support of their motion for summary judgment, defendants contend that certain claims are ripe for dismissal based upon plaintiff's failure to exhaust the available administrative remedies prior to commencing suit. Dkt. No. 62-3 at 8-12. Specifically, defendants argue that all claims against defendants Corrigan, Lindstrand, and Cook must be dismissed on this ground.[8] *Id.*

In opposition, plaintiff implicitly admits that he failed to satisfy his exhaustion obligation prior to filing this action, but argues that he should be excused from the requirement because he was told that an outside agency would be handling his complaints, further alleging that the DOCCS "selectively filed" his grievances. Dkt. No. 72 at 1-2. In addition, with respect to one of his claims, plaintiff argues that he should be excused from the exhaustion requirement because he was too afraid to utilize the grievance process. Dkt. No. 62-12 at 77-80.

1.    Legal Standard

The PLRA, which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly provides that

---

[8]    Defendants have not advanced the exhaustion argument for the claims asserted against defendant Molesky, instead arguing that those claims should be dismissed on the merits. *See*, *infra*.

"[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016). Section 1997e(a)'s exhaustion provision is mandatory and applies to all inmate lawsuits regarding the conditions of their confinement. *Ross*, 136 S. Ct. at 1856; *Woodford v. Ngo*, 548 U.S. 81, 84 (2006); *Porter v. Nussle*, 534 U.S. 516, 524, 532 (2002); *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 122 (2d Cir. 2016). In the event a defendant establishes that the inmate-plaintiff failed to fully comply with the administrative process prior to commencing an action in federal court, the plaintiff's complaint is subject to dismissal. *See Woodford*, 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."); *see also Wilson v. McKenna*, 661 F. App'x 750, 752 (2d Cir. 2016). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." *Woodford*, 548 U.S. at 95; *accord, Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007).[9]

---

[9]    While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion "'in a substantive sense,'" an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his available

In New York, state prison inmates have available to them a grievance procedure, which is designated as the Inmate Grievance Program ("IGP"). *Williams*, 829 F.3d at 119. The IGP is comprised of three steps, which inmates must satisfy when they have a grievance regarding prison conditions. 7 N.Y.C.R.R. §§ 701.1 701.5; *Williams*, 829 F.3d at 119. The IGP requires that an inmate first file a grievance with "the clerk" within twenty-one days of the alleged occurrence giving rise to his complaint. 7 N.Y.C.R.R. § 701.5(a)(1). "The complaint may only be filed at the facility where the inmate is housed even if it pertains to another facility." *Id.* Representatives of the inmate grievance resolution committee ("IGRC")[10] have up to sixteen days after the grievance is filed to informally resolve the issue. *Id.* at § 701.5(b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen days after receipt of the grievance. *Id.* at § 701.5(b)(2).

A grievant may then appeal the IGRC's decision to the facility's superintendent within seven days after receipt of the IGRC's written

---

administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias*, 495 F.3d at 43 (quoting *Johnson v. Testman*, 380 F.3d 691, 697-98 (2d Cir. 2004) (emphasis omitted)).

[10]    The IGRC is comprised of "two voting inmates, two voting staff members, and a non- voting chairperson." 7 N.Y.C.R.R. § 701.4(a).

decision. 7 N.Y.C.R.R. § 701.5(c). The superintendent must issue a written decision within a certain number of days after receipt of the grievant's appeal.[11]  *Id.* at § 701.5(c)(3)(i)(ii).

The third and final step of the IGP involves an appeal to the DOCCS CORC, which must be taken within seven days after an inmate receives the superintendent's written decision. 7 N.Y.C.R.R. § 701.5(d)(1)(i). The CORC is required to render a written decision within thirty days of receipt of the appeal. *Id.* at § 701.5(d)(2)(i)(ii).

As can be seen, at each step of the IGP process, a decision must be rendered within a specified time period. 7 N.Y.C.R.R. § 701.5. Where the IGRC and/or superintendent do not timely respond, an inmate is permitted to appeal "to the next step." *Id.* at § 701.6(g)(2). Generally, if a plaintiff fails to follow each of the required three steps of the above-described IGP prior to commencing litigation, he has failed to exhaust his administrative remedies as required under the PLRA. *See Ruggerio v. Cnty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the

---

[11]     Depending on the type of matter complained of by the inmate, the superintendent has either seven or twenty days after receipt of the appeal to issue a decision. 7 N.Y.C.R.R. § 701.5(c)(3)(i), (ii).

merits)." (quotation marks omitted)).

While the PLRA mandates exhaustion of available administrative remedies, it also "contains its own, textual exception to mandatory exhaustion." *Ross*, 136 S. Ct. at 1858. More specifically, section 1997e(a) provides that only those administrative remedies that "are available" must first be exhausted. 42 U.S.C. § 1997e(a); *see also Ross*, 136 S. Ct. at 1858 ("[T]he exhaustion requirement hinges on the availability of administrative remedies." (quotation marks omitted)). In the PLRA context, the Supreme Court has determined that "availability" means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Ross*, 136 S. Ct. at 1859 (quotation marks omitted).

In *Ross*, the Supreme Court identified three circumstances in which a court could find that internal administrative remedies are not available to prisoners under the PLRA.[12]  *Ross*, 136 S. Ct. at 1859-60. Under the first, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end – with officers unable or consistently unwilling to provide any

---

[12]    According to the Second Circuit, "the three circumstances discussed in *Ross* do not appear to be exhaustive[.]" *Williams*, 829 F.3d at 123 n.2.

relief to aggrieved inmates." *Id.* at 1859. In addition, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* The Court explained that, "[i]n this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* The third scenario in which administrative remedies are deemed unavailable to prisoners is when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860

2.   <u>Analysis</u>

Plaintiff, who has been in the custody of the DOCCS since 1986, is not unfamiliar with the IGP. During his deposition, he expressed a general understanding of how the grievance process works, including where grievance mailboxes were located at the GMCF, that an IGRC decision should be appealed to the superintendent, and that the superintendent's decision should be further appealed to CORC. Dkt. No. 62-12 at 60-63. Plaintiff also testified to an awareness during his deposition that if he did not hear back from the IGRC or the superintendent in response to a grievance, he can proceed with appeals. Dkt. No. 62-12 at 61 ("I just wrote the appeal."), 63 ("I wrote [CORC] directly and said, 'I'm not getting a response. I want to appeal this.'"); *see Murray*, 2010 WL 1235591, at *2.

In addition, the record demonstrates that between 2012 and December 6, 2016, plaintiff filed five grievances, including the February 2014, March 2014, and April 2014 grievances, which were previously referenced.[13] Dkt. No. 62-9 at 4, 5, 25-26. Of those five grievances, only the February 2014 was fully exhausted. Dkt. No. 62-9 at 5.

Plaintiff also demonstrated his familiarity with the grievance process in connection with the exhaustion of his February 2014 grievance. When he received an initial decision from the IGRC on March 8, 2014, he appealed to the superintendent within seven calendar days. Dkt. No. 62-9 at 10; *see* 7 N.Y.C.R.R. § 701.5(c). In turn, when plaintiff received the superintendent's decision on April 11, 2014, he appealed within seven calendar days to the CORC. Dkt. No. 62-9 at 11; *see* 7 N.Y.C.R.R. § 701.5(d)(1)(i).

In opposition to defendants' motion, plaintiff implicitly concedes that he failed to exhaust his administrative remedies pursuant to the PLRA. Dkt. No. 72 at 1-2. He contends, however, that his failure to exhaust should be excused by this court. Plaintiff does not allege that the applicable grievance procedure "operate[d] as a simple dead end—with

---

[13]   One grievance included a complaint regarding the use of the shower, while the last grievance was related to complaints regarding the "radio room schedule." Dkt. No. 62-9 at 5.

officers unable or consistently unwilling to provide any relief to aggrieved inmates" or that the grievance procedure was "so opaque" as to be "practically speaking, incapable of use." *See Ross*, 136 S. Ct. at 1859. Instead, plaintiff has advanced several different arguments, which appear to present variations of the third scenario described in *Ross*.

In support of his contention that the court should overlook his failure to fully exhaust available administrative remedies, plaintiff argues that the grievance procedure was effectively unavailable to him because "prison administrators thwart[ed] inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross*, 136 S. Ct. 1860. More specifically, he contends that the grievance process was effectively unavailable because (1) he was informed that an outside agency was investigating his complaints, and this caused him to forego the grievance process; (2) the "DOCCS file[d] certain grievances at their own discretion"; and (3) he was afraid to file a grievance.[14] Dkt. No. 72 at 1-2; Dkt. No. 62-12 at 60-61, 78-80. Each allegation that plaintiff advances as a reason to excuse his failure is insufficient to show that the grievance procedure was unavailable. I will address these in turn.

---

[14]     The court notes that the last contention was made only in the context of plaintiff's failure to grieve defendant Corrigan's purported use of excessive force.

### a.   Investigation by Outside Agency

First, plaintiff argues that his failure to exhaust should be excused since defendants' actions "chilled" him into foregoing the grievance process because he was told that an "outside agency" would investigate his complaints. Dkt. No. 72 at 1-2; *see* Dkt. No. 16-1 at 8. Plaintiff's argument is misplaced, as his perception is not tantamount to unavailability of the grievance process. *See Yeldon v. Ekpe*, 159 F. App'x 314, 316 (2d Cir. 2005) *Hayes v. Herb*, No. 9:11-cv-1271 (GLS/DEP), 2014 WL 1292235, at *13 (N.D.N.Y. Mar. 31, 2014) (Sharpe, J. *adopting report and recommendation of* Peebles, M.J.); *Bennett v. James*, 737 F. Supp. 2d 219, 227 (S.D.N.Y. 2010) (observing that a plaintiff's "perception" that filing a grievance would be "futile" is not sufficient to render the administrative remedies "unavailable"). Notably, although plaintiff contends that he was informed that an outside agency was investigating his complaints, he fails to provide any other specifics. He does not, for example, identify who told him this—and whether it was another inmate or a prison administrator—and does not state when or where he was told this. In his opposition he also has not specified which of his complaints were being investigated by the agency, or even which outside agency was conducting the investigation. Plaintiff's conclusory statement that he was

"chilled" from pursing grievances, standing alone and devoid of any factual specificity, is insufficient to withstand summary judgment.

To the extent that plaintiff may be relying on defendant Lindstrand's memorandum, dated November 5, 2013 to support his arguments, the conclusion remains the same. Dkt. No. 16-1 at 8; Dkt. No. 62-12 at 61. In that memorandum, which predated all of the incidents that plaintiff now complains of in this action, defendant Lindstrand indicated that the Public Integrity Bureau was conducting an investigation of plaintiff's "complaints" and that he had no plans to meet with plaintiff. Dkt. No. 16-1 at 8. Defendant Lindstrand's memorandum does not instruct plaintiff to forego the grievance process, and indeed makes no reference to the IGP. Dkt. No. 16-1 at 8. In addition, although defendant Lindstrand was the Deputy Superintendent of Administration at the GMCF, there is no evidence that defendant Lindstrand was involved in the grievance procedure at the facility.[15] *Id.*

b.    Selective Filing of Grievances

The precise reason that plaintiff alleges as a basis for the assertion

---

[15]    The record does reflect, however, that defendant Lindstrand was a hearing officer who conducted inmate disciplinary proceedings. Dkt. No. 62-12 at 14. Christopher Miller, who is not a party to this action, was the facility superintendent responsible for issuing written decisions at the second step of the IGP. Dkt. No. 62-9 at 11.

that he should be excused from his failure to exhaust is not entirely clear. Plaintiff alleged in his amended complaint, and during his deposition, that certain grievances were "ignored," Dkt. No. 16 at 3; Dkt. No. 62-12 at 60, 62. In his opposition to defendants' motion for summary judgment, plaintiff contends that his grievances were ignored, and that the "DOCCS file[d] certain grievances at their own discretion." Dkt. No. 72 at 1. In any event, plaintiff has not introduced any evidence that any member of the prison staff was responsible for disposing of his grievances and he has, therefore, failed to establish that the grievance process was unavailable. *Rawls v. Rosenfield*, No. 9:16-CV-0582 (LEK/CFH), 2017 WL 7050648, at *9 (N.D.N.Y. Nov. 28, 2017), *adopted by* 2017 WL 6459512 (N.D.N.Y. Jan. 23, 2018) (citing *Belilie v. Griffin*, No. 9:11-CV-0092 (TJM/DEP), 2013 WL 1776086, at *8 (N.D.N.Y. Feb. 12, 2013) ("mere threadbare allegations that his grievances were intercepted and discarded, without evidence to support such allegation . . . are insufficient to excuse his failure to comply with the IGP.")).

"Courts in this Circuit have continuously held that mere contentions or speculation of grievances being misplaced [or discarded] . . . do not create a genuine issue of material fact when there is no evidence to support the allegations." *Rodriguez v. Cross*, 9:15-CV-1079 (GTS/CFH),

25

2017 WL 2791063, at *7 (N.D.N.Y. May 9, 2017), *adopted by* 2017 WL 2790530 (N.D.N.Y. Jun. 27, 2017) (citing *Khudan v. Lee*, No. 12-cv-8147 (RJS), 2016 WL 4735364, at *6 (S.D.N.Y. Sept. 8, 2016)); *see also Crichlow v. Fischer*, 9:17-cv-00194 (TJM/TWD), 2017 WL 6466556, at *10-*11 (N.D.N.Y. Sept. 5, 2017), *adopted by* 2017 WL 6459512 (N.D.N.Y. Sept. 18, 2017); *Crichlow v. Fischer*, 6:15-CV-06252 EAW, 2017 WL 920753, at *6 (W.D.N.Y. Mar. 7, 2017) ("Plaintiff's wholly conclusory and unsupported allegation that grievances are tampered with at [the facility] do not create a material issue of fact in this case"); *Rosado v. Fessetto*, No. 9:09-cv-67 (DNH)(ATB), 2010 WL 3808813, at *7 (N.D.N.Y. Aug. 4, 2010) ("Courts have consistently held . . . that an inmate's general claim that his grievance was lost or destroyed does not excuse the exhaustion requirement."), *adopted by* 2010 WL 3809991 (N.D.N.Y. Sept. 21, 2010). "

Plaintiff has provided the court with a number of letters sent by him to various prison officials and a variety of outside entities regarding his complaints. In contrast, plaintiff has not provided any copies of the grievances that he alleges were either ignored or not filed by the DOCCS, nor has he alleged anything specific about the contents of those grievances. In addition, to the extent that the DOCCS may have ignored his grievances, plaintiff was still required to complete steps two and three

of the grievance process, appealing both to the superintendent and to the CORC if the superintendent had adversely disposed of his grievance or failed to timely respond. *See* 7 N.Y.C.R.R. §§ 701.5(c)-(d), 701.6(g); *see* Dkt. No. 62-12 at 61, 63. In contrast, defendants have provided the court with a copy of plaintiff's grievance file, which shows that plaintiff filed five grievances in 2014, only one of which was fully exhausted, and that grievance is unrelated to any of plaintiff's present claims.

Under these circumstances, plaintiff's suppositions are supported by only his bare, speculative, self-serving, and unsubstantiated allegations and cannot excuse his failure to exhaust his administrative remedies prior to commencing this suit.

c.    Fear of Retaliation for Filing Grievances

Turning to plaintiff's complaint regarding fear of retaliation, when plaintiff was questioned during his deposition about whether he filed a grievance in connection with defendant Corrigan's assault, he testified as follows:

> Q.    Did you report [the assault] to anybody?
>
> A.    I was afraid to. I was afraid to. I don't know how the hell [defendant Corrigan] wound up in my [hospital] room in Plattsburgh.
>
> Q.    Okay. Did you report this to anybody in

27

Plattsburgh?

A. No, I was afraid to. I was just coming off the overdose. I wanted to kill myself. I was scared to death. All right. Because I don't know how he wound up in Plattsburgh and I had bruises. I'm in an [observation] cell, so I had no clothes and I didn't see nobody. I couldn't see nobody.

Q. Okay. And then how long were you in the hospital facility?

A. From May 5th to May 9th, [and then] I believe I went [to Clinton].

Q. You didn't tell anybody about the assault from May 5th to May 9th?

A. No, I was scared to.

Q. Okay. And then what happened after May 9th, where'd you go?

A. I went back to Clinton and I went straight to an [observation] cell.

Q. Okay. And once you were back in the [observation] cell, or back to Clinton, did you tell anybody about the assault?

A. No. I was afraid to. And like I said, I was more -- I wanted more to kill myself. So I was making plans for another suicide attempt.

Q. Now, the officers at Clinton said they had no problems with you, right?

28

A.    Yeah. They said -- they asked me what happened, what's going on with this dude. I said, 'Look, I got a history with him." And they said, you know, "It's a different facility. We don't care. We ain't got no problem with you.'

Q.    So then once you were back at Clinton and you were with officers who don't care about that history, why were you still afraid?

A.    Still afraid because stuff happens in here. Stuff happens. You don't know if they're going to flip a knob on you.

Dkt. No. 62-12 at 78-79.

Plaintiff's claim that he failed to file a grievance regarding the alleged assault because he was too "afraid" and "scared" amounts to nothing more than a "generalized fear of retaliation," which is insufficient to excuse his failure to exhaust his administrative remedies. *White v. Dishaw*, Civ. No. 9:14-CV-0002 (GLS/DJS), 2017 WL 4325770, at *3 (N.D.N.Y. Jun. 20, 2017), *adopted by* 2017 WL 4326074 (N.D.N.Y. Sept. 27, 2017); *see Aviles v. Tucker*, No. 14-cv-08636 (NSR), 2016 WL 4619120, at *4 (S.D.N.Y. Sept. 1, 2016); *Brown v. Napoli*, 687 F. Supp. 2d 295, 297 (W.D.N.Y. 2009) ("[P]laintiff's mere allegation of a generalized fear of retaliation is insufficient to excuse his failure to file a grievance."). Plaintiff has failed to adduce any evidence that he was subjected to any specific,

affirmative threats of retaliation for utilizing the grievance procedure.

*Rodriguez v. Cty. of Suffolk*, No. CV 13-2070(SJF)(GRB), 2014 WL

3531897, at *5 (E.D.N.Y. June 30, 2014) ("Courts tend to find mere

'generalized fear' when no actual threat was made." (quoting *Brown*, 687

F. Supp. 2d. at 297)).

Even assuming that defendant Corrigan's statement to plaintiff on

April 30, 2014 to the effect that Bookman made "a . . . mistake" by filing

grievances against him, could be construed as creating an issue of fact

with respect to the availability of administrative remedies at the GMCF, it

does not create an issue of fact with respect to the availability of the

grievance process at Clinton, where plaintiff was housed in the immediate

aftermath of the alleged assault. *See Wallace v. Fisher*, 9:13-CV-1208

2015 WL 9275001, at *4 (N.D.N.Y. Dec. 18, 2015) (concluding that that

even if administrative remedies were unavailable to the plaintiff at first

correctional facility, there was no issue of material fact that they were

available following his transfer to a second correctional facility); *Newman

v. Duncan*, No. 04-CV-395 (TJM/DRH), 2007 WL 2847304, at *4 (N.D.N.Y.

Sept. 26, 2007) (finding that administrative remedies were available to

inmate where he was transferred out of facility where officer had

threatened him).

In sum, I recommend a finding that the undisputed record evidence before the court establishes plaintiff failed to comply with the PLRA requirement that he exhaust available administrative remedies prior to commencing the present action. I also recommend that the court finds no basis to conclude that plaintiff's administrative remedies under the IGP were unavailable to him with respect to his claims against defendants Corrigan, Crook, and Lindstrand. Accordingly, I recommend that defendants' motion for summary judgment be granted on those claims.

C.    Deliberate Indifference to Serious Medical Needs

The sole remaining cause of action, which defendants do not contend is unexhausted, is plaintiff's claim asserted against defendant Molesky. *See generally* Dkt. No. 62-3. Defendants contend that plaintiff's claim that his Eighth Amendment rights were violated as a result of defendant Molesky's deliberate indifference to his serious medical needs must be dismissed because defendant Molesky is not a medical doctor, and as such lacked the authority to prescribe and discontinue medication. Dkt. No. 62-3 at 14-18. Defendants also argue that the claim must be dismissed because plaintiff stopped taking the medication that caused his adverse reaction and had access to medical provides that had the appropriate authority to make changes to his medication. Dkt. No. 62-3 at

14-18. Plaintiff does not specifically respond to these argument. Dkt. No. 72.

### 1.    Legal Standard

The Eighth Amendment prohibits punishment that is "incompatible with the evolving standards of decency that mark the progress of a maturing society[,] or which involve the unnecessary and wanton infliction of pain[.]" *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976) (quotation marks and citations omitted)). While the Eighth Amendment "does not mandate comfortable prisons, . . . neither does it permit inhumane ones[.]" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quotation marks and citation omitted). "These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration." *Estelle*, 429 U.S. at 103. Failure to provide inmates with medical care, "[i]n the worst cases, . . . may actually produce physical torture or lingering death, [and] . . . [i]n less serious cases, . . . may result in pain and suffering which no one suggests would serve any penological purpose." *Id.* (quotation marks and citations omitted).

A claim alleging that prison officials have violated an inmate's Eighth Amendment rights by inflicting cruel and unusual punishment must satisfy both objective and subjective requirements. *Wright v. Goord*, 554 F.3d

32

255, 268 (2d Cir. 2009); *Price v. Reilly*, 697 F. Supp. 2d 344, 356 (E.D.N.Y. 2010). To meet the objective requirement, the alleged deprivation must be "sufficiently serious." *Farmer*, 511 U.S. at 844; *see also Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) ("[T]he objective test asks whether the inadequacy in medical care is sufficiently serious."). Factors informing this inquiry include "whether a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain." *Salahuddin*, 467 F.3d at 280 (quotation marks and alterations omitted). Determining whether a deprivation is sufficiently serious requires a court to examine the seriousness of the deprivation, and whether the deprivation represents "a condition of urgency, one that may produce death, degeneration, or extreme pain[.]" *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (quotation marks omitted). Importantly, it is "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes." *Smith v. Carpenter*, 316 F.3d 178, 186 (2d Cir. 2003).

　　　To satisfy the subjective requirement, a plaintiff must demonstrate

that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.'" *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999). "In medical-treatment cases . . ., the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin*, 467 F.3d at 280. "Deliberate indifference," in a constitutional sense, "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.*; *see also Farmer*, 511 U.S. at 837 ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin*, 467 F.3d at 280 (citing *Farmer*, 511 U.S. at 839-40).

It should be noted that the Eighth Amendment does not afford prisoners a right to medical treatment of their choosing; the question of what diagnostic techniques and treatments should be administered to address an inmate's medical condition is a "classic example of a matter for medical judgment" and, accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to

provide to their patients. *Estelle*, 429 U.S. at 107, 97 S. Ct. at 293; *Chance*, 143 F.3d at 703 (citation omitted); *Rosales v. Coughlin*, 10 F. Supp. 2d 261, 264 (W.D.N.Y. 1998) (citation omitted). Accordingly, mere disagreement with prison officials about a course of treatment does not give rise to a constitutional right or sustain a claim under section 1983. *United States ex rel. Hyde v. McGinnis*, 429 F.2d 864, 867 (2d Cir. 1970) (citation omitted).

Although deliberate indifference claims are most often asserted against medical personnel, non-medical personnel can also be held liable for deliberate indifference to a plaintiff's serious medical needs. "Non-medical personnel engage in deliberate indifference where they 'intentionally delayed access to medical care when the inmate was in extreme pain and has made his medical problem known to attendant prison personnel.'" *Baumann v. Walsh*, 36 F. Supp. 2d 508, 512 (N.D.N.Y. 1999) (quoting *Hodge v. Coughlin*, No. 92 Civ. 0622, 1994 WL 519902, at * 11 (S.D.N.Y. Sept. 22, 1994), *aff'd*, 52 F.3d 310 (2d Cir. 1995) (table)); *see Jean v. Barber*, No. 09-CV-430, 2011 WL 2975218, at *5 (N.D.N.Y. July 21, 2011); *Zimmerman v. Burge*, No. 9:06-cv-176, 2009 WL 3111429, at *8 (N.D.N.Y. Sept. 24, 2009).

2.    Analysis

35

a.    Serious Medical Need

Although defendants acknowledge that a plaintiff must establish a

medical condition which is "sufficiently serious" for purposes of an Eighth

Amendment claim for deliberate indifference, they have not addressed

whether plaintiff's self-described "adverse reaction," which plaintiff

attributes to his medication, would meet this standard. Dkt. No. 62-3 at 12-

18. The "adverse reaction" that plaintiff complains of involves suicidal

ideations, self-harming urges, and difficulty using the bathroom during the

four-month period that he was housed in the SHU in 2014. . Dkt. No. 16 at

7; Dkt. No. 62-12 at 24-26, 88-89.

Case law in this district and elsewhere has recognized that mental

disorders can constitute a serious medical need, particularly when

accompanied by suicidal ideations and attempts. *See, e.g.*, *Loadholt v.

Lape*, No. 09-CV-0658, 2011 WL 1135934, at *3 (N.D.N.Y Mar. 3, 2011)

(Treece, M.J.); *Zimmerman v. Burge*, No. 9:06–CV–0176 (GLS/GHL),

2009 WL 3111429, at *8 (N.D.N.Y. Sept. 24, 2009) (collecting cases);

*Hamilton v. Smith*, No. 06-CV-805, 2009 WL 3199531, at *14 (N.D.N.Y.

Jan. 13, 2009) (Homer, M.J.); *Guglielmoni v. Alexander*, 583 F. Supp. 821,

826 (D.Conn. 1984) ("Treatment of mental disorders of mentally disturbed

inmates is . . . a 'serious medical need' under *Estelle*."). Here, after a

careful review of the record, I recommend a finding that plaintiff's claimed history of suicidal thoughts and self-harming urges is sufficient to, at a minimum, raise a question of fact as to a serious medical need.

### b    Deliberate Indifference

The parties do not dispute that defendant Molesky, a rehabilitation counselor, lacked the requisite authority to change plaintiff's prescription regime. Dkt. No. 62-12 at 91-92, 96. Despite the lack of authority to change plaintiff's prescribed medication, the record currently before the court raises a triable issue of fact with respect to whether defendant Molesky, as a non-medical employee, was deliberately indifferent to plaintiff's serious medical needs.

Plaintiff was confined to the SHU for approximately four months following the issuance of the inmate misbehavior report. Dkt. No. 62-12 at 67. During this confinement, plaintiff saw defendant Molesky on three or four occasions, most likely in June or July 2014. Dkt. No. 62-12 at 29. Plaintiff testified that he expressed to her the difficulties that he was having, but defendant Molesky, stated in response, "You're joking. You're not suicidal" and shrugged her shoulders in response to his complaints. Dkt. No. 62-12 at 32-33. Although plaintiff concedes that defendant Molesky did not have the authority to change his medication since she

was not a medical doctor, he believed that, as his therapist, she should

have been "telling [his complaints] to the doctor." Dkt. No. 62-12 at 33, 90.

The court is not persuaded by the argument that defendant Molesky

cannot be held liable because plaintiff volitionally stopped taking the

medication, which he believed was causing his issues, and because he

had access to other medical providers that had the requisite authority to

make medication changes.[16] Plaintiff made defendant Molesky aware on

three or four occasions of the issues that he was experiencing. By August

1, 2014, plaintiff was continuing to express that he "still need[s] help" and

that he was "still not right yet." By October 8, 2014, plaintiff expressed that

he "had a bad weekend . . . as far as thoughts are concerned," implying

that he was still experiencing suicidal ideations. Dkt. No. 62-10 at 5.

Defendants have not submitted any medical records from this time

period, which might demonstrate that plaintiff was merely disagreeing over

medical treatment, in which case he would not be able to establish a

cognizable constitutional claim. Instead, the court is left with plaintiff's

deposition testimony, the allegations in his verified complaint—which are

---

[16]      Defendants seem to take plaintiff's word that the medication was the cause of
plaintiff's issues. However, the record indicates that even after he stopped taking those
medications, he continued to experience the same issues for several weeks or months
later. Dkt. No. 62-10 at 3, 4.

the functional equivalent of an affidavit and may be relied upon to oppose defendants' summary judgment motion—and letters that he sent to various prison personnel consistently complaining of his failure to be seen by doctors and about the "thoughts" he was having over the course of serval months that he was housed in the SHU Dkt. No. 62-10 at 3-5. Plaintiff's testimony that defendant Molesky shrugged her shoulders and told plaintiff that he was "joking" and "not suicidal," Dkt. No. 62-12 at 32-33, is sufficient to create a question of fact with respect to whether she intentionally delayed plaintiff's access to medical care. *See Hodge*, 1994 WL 519902, at * 11.

Accordingly, drawing all inferences in favor of plaintiff, as the court must at this procedural juncture, I recommend a finding that there is sufficient record evidence to at least give rise to a genuine dispute of material fact as to whether plaintiff can satisfy the subjective element of the relevant Eighth Amendment test. I therefore recommend that defendants' summary judgment motion on this issue be denied.

IV.   SUMMARY AND RECOMMENDATION

In plaintiff's remaining causes of action, he alleges that (1) defendants Crook and Molesky were deliberately indifferent to his serious medical needs, in violation of the Eighth Amendment, (2) defendants

Crook and Corrigan retaliated against him in violation of the First Amendment, (3) defendant Corrigan used excessive force against him in violation of the Eighth Amendment, and (4) defendant Lindstrand failed to supervise and protect the plaintiff. Based upon the record now before the court, it is clear that plaintiff failed to satisfy his obligation under the PLRA to exhaust available administrative remedies before commencing this action in connection with his claims against defendants Crook, Corrigan, and Lindstrand. Defendants have not advanced the exhaustion argument with respect to defendant Molesky and, as to that claim, the present record discloses the existence of material issues of fact with respect to whether she was deliberately indifferent to plaintiff's serious medical needs. Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 62) GRANTED, in part, and DENIED, in part, and that all claims in plaintiff's complaint, except those asserted against defendant Molesky, which will remain for trial, be DISMISSED.

ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge

40

written objections to the foregoing report. Such objections must be filed

with the clerk of the court within FOURTEEN days of service of this

report.[17]  FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE

APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d),

72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this

report and recommendation upon the parties in accordance with this

court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated:    February 14, 2018
          Syracuse, New York

---

17    If you are proceeding *pro se* and are served with this report and
recommendation by mail, three additional days will be added to the fourteen-day
period, meaning that you have seventeen days from the date the report and
recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If
the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then
the deadline is extended until the end of the next day that is not a Saturday, Sunday, or
legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

2016 WL 4619120
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Michael Aviles, Plaintiff,
v.
C.O. Bruce David Tucker, Defendant.

No. 14-cv-08636 (NSR)
|
Signed August 31, 2016
|
Filed 09/01/2016

**Attorneys and Law Firms**

Michael Aviles, Fallsburg, NY, pro se.

Daniel A. Schulze, Attorney General of the State of New York, New York, NY, for Defendant.

**Opinion**

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

**\*1** Plaintiff Michael Aviles brings this action *pro se* pursuant to 42 U.S.C. § 1983 against Defendant Correction Officer Bruce David Tucker relating to Defendant's allegedly inappropriate frisk of Plaintiff. Presently before the Court is Defendant's motion to dismiss the Complaint. (ECF No. 18.)[1] For the following reasons, Defendant's motion to dismiss is GRANTED.

**BACKGROUND**[2]

Plaintiff alleges that while he was an inmate at Sullivan Correctional Facility,[3] Defendant frisked him "very [inappropriately] and very aggressively" by "swiping and grabbing [Plaintiff's] privates" and "[shoving] [Plaintiff] against the wall." (Compl. at 2.) Defendant also made threats to Plaintiff and Plaintiff's family regarding money. (*Id.* at 3.) Though Plaintiff alleges that he called the New York City Sexual Abuse Prevention, which has a record of his complaints,[4] he explicitly states in the Complaint

that he did not file a grievance because he was scared that officers in the facility would "beat" him. (Compl. at 2, 4.) He describes that he "felt very scared and feared for [his] life." (*Id.*)

**STANDARD ON A MOTION TO DISMISS**

**\*2** "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 554, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 566 U.S. at 678. Although "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Stan v. Sony BMG Music Entm'l*, 592 F.3d 314, 321 (2d Cir. 2010). A court should accept non conclusory allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Ruotolo v. City of N.Y.*, 514 F.3d 184, 188 (2d Cir. 2008). "[T]he duty of a court 'is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.' " *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 113 (2d Cir. 2010) (quoting *Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir. 1998)).

"*Pro se* complaints are held to less stringent standards than those drafted by lawyers, even following *Twombly and Iqbal.*" *Thomas v. Westchester*, No. 12-cv-6718, 2013 WL 3357171, at \*2 (S.D.N.Y. July 3, 2013); *see also Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009). The court should read *pro se* complaints "to raise the strongest arguments that they suggest." *Pabon v. Wright*, 459 F.3d 241, 248 (2d Cir. 2006). Even so, "*pro se* plaintiffs ... cannot withstand a motion to dismiss unless their pleadings contain factual allegations sufficient to raise a right to relief above the speculative level." *Jackson v. N. Y.S. Dep't of Labor*, 709 F. Supp. 2d 218, 224 (S.D. NY. 2010) (internal quotation marks omitted). Dismissal is justified where "the complaint lacks an allegation regarding an element necessary to obtain relief," and the "duty to liberally construe a plaintiff's complaint [is not] the equivalent of a

duty to re-write it." *Geldzahler v. N.Y. Med Coll.*, 663 F. Supp. 2d 379, 387 (S.D.N.Y. 2009) (internal citations and alterations omitted).

## DISCUSSION

Defendant argues that the present action should be dismissed because Plaintiff failed to comply with the administrative exhaustion requirement of the Prison Litigation Reform Act of 1995 (the "PLRA"). The Court agrees.

Under the PLRA, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "The PLRA's exhaustion requirement 'applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.' " *Giano v. Goord*, 380 F.3d 670, 675 (2d Cir. 2004) (quoting *Porter v. Nussle*, 534 U.S. 516, 532 (2002)).

Exhausting all remedies "means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits)." *Washington v. Chaboty*, No. 09-cv-9199, 2015 WL 1439348, at *6 (S.D.N.Y. Mar. 30, 2015) (quoting *Hernandez v. Coffey*, 582 F.3d 303, 305 (2d Cir. 2009)) (internal quotation marks and citations omitted). A plaintiff must invoke all available administrative mechanisms, including appeals, "through the highest level for each claim." *Varela v. Demmon*, 491 F. Supp. 2d 442, 447 (S.D.N.Y. 2007); *Veloz v. N.Y.*, 339 F. Supp. 2d 505, 514 (S.D.N.Y. 2004). The defendants bear the burden of demonstrating that the plaintiff's claim is not exhausted. *Key v. Toüissant*, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009). "[A] motion to dismiss pursuant to Rule 12(b)(6) for failure to exhaust should be granted only if 'non-exhaustion is clear from the face of the complaint.' " *Lopez v. Cipolini*, 136 F. Supp. 3d 570, 580 (S.D.N.Y. 2015) (citing *Lovick v. Schriro*, No. 12-cv-7419, 2014 WL 3778184, at *4 (S.D.N.Y. July 25, 2014) (alterations and internal quotation marks omitted)). *See also Lee v. O'Harer*, No. 9:13-cv-1022, 2014 WL 7343997, at *3 (N.D.N.Y. Dec. 23, 2014) ("Dismissal under Rule 12(b)(6) for failure to exhaust is appropriate if such failure is evidenced on the face of the complaint and incorporated

documents."); *Sloane v. Mazzuca*, No. 04-cv-8266, 2006 WL 3096031, at *4 (S.D.N.Y. Oct. 31, 2006) ("[B]y characterizing non-exhaustion as an affirmative defense, the Second Circuit suggests that the issue of exhaustion is generally not amenable to resolution by way of a motion to dismiss." (internal quotation marks omitted)).

**\*3** A person detained or incarcerated at a DOCCS facility must exhaust all of the steps of the DOCC Inmate Grievance Resolution Program ("IGRP"). *See Robinson v. Henschel*, No. 10-cv-6212, 2014 WL 1257287, at * 10 (S.D.N.Y. Mar. 26, 2014) ("the PLRA requires complete exhaustion in accordance with the administrative procedures within [DOCCS]") (internal quotation marks and citations omitted). The IGRP provides a three-tiered process for adjudicating inmate complaints: (1) the prisoner files a grievance with the IGRC, (2) the prisoner may appeal an adverse decision by the IGRC to the superintendent of the facility, and (3) the prisoner then may appeal an adverse decision by the superintendent to the CORC. *See Espinal v. Goord*, 558 F.3d 119, 125 (2d Cir. 2009) (citing N.Y. Comp. Codes R. & Regs, tit. 7, § 701.7 (1999)).

It is clear from the face of the Complaint that Plaintiff did not exhaust his administrative remedies. Indeed, the Complaint explicitly states that Plaintiff did not file a grievance. (Compl. at 4.) Accordingly, Plaintiff failed to satisfy the PLRA's exhaustion requirement.

The Court next considers whether there is any basis for excusing Plaintiff's failure to exhaust his administrative remedies. Recently, "the Supreme Court forcefully disapproved of judge-made exceptions to the PLRA's exhaustion requirement, stressing the mandatory language of the statute." *Mena v. City of New York*, No. 13-cv-2430 (RJS), 2016 WL 3948100, at *4 (S.D.N. Y, July 19, 2016) (citing *Ross v. Blake*, 136 S. Ct. 1850, 1862 (2016)). Prior to the Supreme Court's decision in *Blake*, the Second Circuit had recognized a special circumstances exception to exhaustion. *See Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004). However, in *Blake*, the Supreme Court rejected the special circumstances exception, holding that "mandatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion." 136 S. Ct. at 1857. Therefore, the only viable exception to the exhaustion requirement is that a prisoner need not exhaust *unavailable* administrative remedies. *Blake*, 136 S. Ct. at 1852. [5]

In *Blake*, the Supreme Court enumerated three, nonexhaustive circumstances in which grievance procedures would be unavailable. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." 136 S. Ct. at 1859. Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* Third, "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation [,]" a prisoner's failure to exhaust may be excused. *Id.* at 1860.

**\*4** In the present case, Plaintiff has not alleged that the administrative procedures at Sullivan Correctional Facility were unavailable to him. The Complaint contains no allegations that the prison grievance process operated as a dead end or was so opaque as to render it unavailable. Instead, Plaintiff alleges in conclusory fashion that he was afraid to file a grievance. Such an allegation may, in some circumstances, implicate the third example of unavailability enumerated by the Supreme Court in *Blake*—unavailability due to the "machination, misrepresentation, or intimidation" of the inmate by prison administrators. 136 S. Ct. at 1860. However, the conclusory allegation in the Complaint that Plaintiff was afraid to file a grievance, absent any explanation of the reason for Plaintiff's fear or descriptions of prior scenarios of intimidation by correction officers, cannot support a finding that the grievance process was unavailable to Plaintiff. Courts in this Circuit are clear that "[a] general fear of retaliation is not an exception to the PLRA's exhaustion requirement." *See Hines v. Valhalla Cty. Corr.*

*Facility*, No. 0C-cv-6935 (SAS), 2002 WL 1822740, at \*3 (S.D.N.Y. Aug. 8, 2002); *Brown v. Napoli*, 687 F. Supp. 2d 295, 297—98 (W.D.N.Y. 2009) (collecting cases); *Harrison v. Stallone*, No. 9:06-cv-902 (LEK) (GJD), 2007 WL 2789473, at \*5-6 (N.D.N.Y. Sept. 24, 2007) ("It has been held that a general fear of retaliation is *not* sufficient to excuse the exhaustion requirement. If an inmate could simply state that he feared retaliation, there would [be] no point in having a grievance procedure ....") (internal citation omitted) (emphasis in original). *But see Thomas v. Cassleberry*, No. 03-cv-6394L, 2007 WL 1231485, at \*2 (W.D.N.Y. Apr. 24, 2007) ("allegations concerning widespread beatings and shacklings shortly after the incident giving rise to this lawsuit, coupled with his assertion that he was afraid for his life," in conjunction with the fact that the "plaintiff waited until he had been transferred from Southport to a different facility before filing the complaint in this action" are sufficient to suggest that the prison grievance process was unavailable to the plaintiff). As it is clear from the face of the Complaint that Plaintiff did not exhaust his grievance and that the prison grievance process was available to Plaintiff, Defendant is entitled to dismissal of Plaintiff's claim.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED. The Court respectfully directs the Clerk to terminate the motion at ECF No. 18 and close the case.

SO ORDERED.

Dated: August 31¶# 2016.

**All Citations**

Not Reported in F.Supp.3d, 2016 WL 4619120

Footnotes

1   By letter dated May 13, 2016, Defendant notified the Court that Plaintiff did not serve Defendant with papers opposing Defendant's motion to dismiss. (ECF No. 20.) The Court also did not receive opposition papers from Plaintiff. Defendant further noted that Plaintiff was released from custody of the New York Department of Corrections and Community Supervision to parole on January 7, 2016 but never notified the Court of his new address. (ECF No. 20.) Defendant sent copies of its motion papers to Plaintiff at Sullivan Correctional Facility—the address listed on the docket—and at Bronx Psychiatric Center—the last known address of Plaintiff in the possession of the New York State Department of Corrections and Community Supervision. Even though Plaintiff is proceeding *pro se* in this action, it is his responsibility to notify the Court if his address changes. The Court informed Plaintiff that if he failed to notify the Court of an address change, his case could be dismissed. (ECF No. 9 at 2.) Furthermore, Plaintiff received an FRCP 4 Service Package on November

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Aviles v. Tucker, Not Reported in F.Supp.3d (2016)
Case 9:15-cv-01542-MAD-DEP    Document 79    Filed 02/14/18    Page 45 of 227
2016 WL 4619120

23, 2015, which contained easy-to-use change of address postcards. As Plaintiff failed to update the Court with his new address or submit opposition papers, Defendant's motion was deemed unopposed by the Court. (ECF No. 20.)

2    The following facts are derived from the Complaint (ECF No. I) and are taken as true for purposes of this motion.

3    In response to the question on the form Section 1983 Complaint regarding whether the events took place while Plaintiff was confined in a jail, prison, or other correctional facility, Plaintiff checked "No." (Compl. at 3.) However, elsewhere in the Complaint, Plaintiff describes the events as taking place at Sullivan Correctional Facility.

4    The Complaint states that Plaintiff called New York City Sexual Abuse Prevention in May, June, and July, but does not specify the year. (Compl. at 2.)

5    Post-*Blake*, the Second Circuit had the occasion to revisit its framework for analyzing the PLRA's exhaustion requirements in *Williams v. Correction Officer Priatno*, No. 14-4777, 2016 WL 3729383 (2d Cir. July 12, 2016). After noting that *Blake* abrogated the Second Circuit's "special circumstances" exception, 2016 WL 3729383, at *4, the Court went on to conclude that the plaintiff in that case was excused from exhausting his grievance because "the process to appeal an unfiled and unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it." *Id.* at *6. In that case, the plaintiff was housed in the special housing unit ("SHU") and alleged that the officer responsible for collecting grievances from SHU never filed his grievance. The Second Circuit concluded that the prison's regulations did not address adequately the procedure for exhausting an administrative remedy in this situation, thus rendering the administrative grievance process unavailable to the plaintiff.

---

**End of Document**                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2018 Thomson Reuters. No claim to original U.S. Government Works.    4

2013 WL 1776086
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Joseph J. BELILE, Plaintiff,
v.
C.O. GRIFFIN, et al., Defendants.

Civ. Action No. 9:11–CV–0092 (TJM/DEP).
|
Feb. 12, 2013.

**Attorneys and Law Firms**

Joseph J. Belile, Attica, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of the State
of New York, James Seaman, Esq., Assistant Attorney
General, Albany, NY, for Defendants.

**Opinion**

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** *Pro se* plaintiff Joseph J. Belile, a New York
State prison inmate, has commenced this action against
several corrections employees stationed at the facility in
which he was housed at the relevant times, including
its superintendent, pursuant to 42 U.S.C. § 1983,
complaining of multiple violations of his civil rights. In
his amended complaint, plaintiff alleges that, as a result
of being denied his request for placement into protective
custody, he was attacked by a fellow inmate. Belile also
alleges that some of the named-defendants encouraged
other inmates to attack him, and that he was assaulted by
other named-defendants on two separate occasions.

Currently pending before the court in connection
with this action is a motion by the defendants for
the entry of summary judgment dismissing plaintiff's
amended complaint. Defendants base their motion on
(1) plaintiff's alleged failure to exhaust his administrative
remedies before commencing suit, (2) their contention
that plaintiff's claims fail on the merits, and (3) in
the alternative, their claim of entitlement to qualified
immunity. For the reasons set forth below, I recommend

that plaintiff's amended complaint be dismissed for failure
to exhaust available administrative remedies.

I. *BACKGROUND* [1]

Plaintiff Joseph Belile is a prison inmate currently being
held in the custody of the New York State Department
of Corrections and Community Supervision ("DOCCS").
Am. Compl. (Dkt. No. 37) at 1. Although now confined
elsewhere, at the times relevant to this action, plaintiff
was held in keeplock confinement at the Great Meadow
Correctional Facility ("Great Meadow"), a maximum
security prison located in Comstock, New York. [2] Plf.'s
Dep. Tr. (Dkt. No. 55, Attach.2) at 18; Kelly Decl. (Dkt.
No. 55, Attach.9) at ¶ 1. Upon his arrival at Great
Meadow, plaintiff was assigned to a cell located on the
fourth tier of the B-block, a housing unit comprised of
four floors of cells, all of which are oriented in the same
direction and face an open area. Plf.'s Dep. Tr. (Dkt. No.
55, Attach.2) at 18.

On or about April 23 or 24, 2009, while in his cell on B-
block, Belile overheard two inmates yelling that he would
be killed if he came out of his cell. Plf.'s Dep. Tr. (Dkt.
No. 55, Attach.2) at 19–20. Although plaintiff was not
able to identify any of the inmates involved because of
the orientation of the cells in B-block, he believes that the
threats came from one floor below his cell. *Id.* at 19, 85–86.
The next day, plaintiff wrote letters to defendant Charles
F. Kelly, Jr., the Deputy Superintendent of Security at
Great Meadow, and the B-block sergeant, requesting that
he be placed in protective custody ("PC"). *Id.* at 16,
19; Am. Compl. (Dkt. No. 37) at 9; Kelly Decl. (Dkt.
No. 55, Attach.9) at ¶ 8; Kelly Decl. Exh. A (Dkt. No.
55, Attach.10). That same day, defendant Kelly assigned
defendant Donald Maguire, a corrections sergeant at the
facility, to investigate the matter. Kelly Decl. (Dkt. No.
55, Attach.9) at ¶ 9.

**\*2** After receiving the assignment to review plaintiff's PC
request and obtaining relevant background information,
defendant Maguire interviewed Belile on the evening of
April 27, 2009. Maguire Decl. (Dkt. No. 55, Attach.12)
at ¶¶ 5, 8. During that interview, plaintiff was unable to
provide specific information to support his belief that he
was in danger, or to identify any inmate at Great Meadow
that might want to harm him. [3] *Id.* at ¶¶ 9–10; Plf.'s Dep.
Tr. (Dkt. No. 55, Attach.2) at 23–25. Finding no basis
to conclude that plaintiff faced a credible threat to his

safety, defendant Maguire denied plaintiff's request for PC, had him returned to his keeplock cell, and prepared a report to defendant Kelly concerning the results of his investigation. Maguire Decl. (Dkt. No. 55, Attach.12) at 2; Kelly Decl. (Dkt. No. 55, Attach.9) at ¶ 10; Kelly Decl. Exh. B (Dkt. No. 55, Attach.11); Plaintiff's Dep. Tr. (Dkt. No. 55, Attach.2) at 26, 29.

Upon completion of the interview by defendant Maguire, plaintiff was escorted back to his B-block cell by a corrections officer identified by him as defendant Griffin, a corrections officer at Great Meadow. Am. Compl. (Dkt. No. 37) at 10; Plf.'s Dep. Tr. (Dkt. No. 55, Attach.2) at 29. When plaintiff arrived at the foot of the stairs leading to his fourth-floor cell, he dropped the bags that he was carrying "to catch [his] breath." Plf.'s Dep. Tr. (Dkt. No. 55, Attach.2) at 31. At that moment, defendant Griffin asked plaintiff what he was convicted of that resulted in his incarceration, and, when plaintiff answered him, defendant Griffin kicked plaintiff in the left thigh area and told him to move up the stairs. *Id.* at 31. Plaintiff felt what he describes as a sharp pain for a few moments after being kicked by the corrections officer, but the pain subsided by later that night, and he never sought medical treatment for the injury. *Id.* at 33.

On or about April 27, 2009, the day after plaintiff's interview with defendant Maguire, defendant Murphy, a corrections officer assigned to supervise B-block inmates' transit to the Great Meadow mess hall for breakfast, stated to his accompanying officer, identified John Doe # 1, when reaching plaintiff's cell for escort, "Belile B–4–29 is a rapo and he tried to sign into PC last night." Plf.'s Dep. Tr. (Dkt. No. 55, Attach.2) at 33–34; Am. Compl. (Dkt. No. 37) at 10. Plaintiff claims that, while defendant Murphy pretended to direct that statement to defendant John Doe # 1 standing next to him, he actually said it loud enough so that other inmates could hear him as well. Plf.'s Dep. Tr. (Dkt. No. 55, Attach.2) at 34–35. Later on April 28, 2009, after the evening meal, an unknown inmate screamed out "29 Cell tried to sign into PC. He's a rat. We'll get him when he comes out." *Id.* at 21–22.

On May 1, 2009, while plaintiff was watching television, another inmate splashed a hot liquid into his cell, causing him to suffer burns that required medical treatment. Am. Compl. (Dkt. No. 37) at 10; Plf.'s Dep. Tr. (Dkt. No. 55, Attach.2) at 44–47. After receiving treatment for his injuries, plaintiff was escorted to PC, which is located on

the D-block of Great Meadow. Am. Compl. (Dkt. No. 37) at 10; Plf.'s Dep. Tr. (Dkt. No. 55, Attach.2) at 53–55.

**\*3** Following his arrival in PC, plaintiff received four bags of personal property from defendants Dimick and Brockley, two other corrections officers at the facility, both of whom were known to plaintiff from an earlier period in 2006 when plaintiff was confined in a Behavioral Health Unit program at Great Meadow. Am. Compl. (Dkt. No. 37) at 10–11; Plf.'s Dep. Tr. (Dkt. No. 55, Attach.2) at 56–59. After delivering plaintiff's property, defendants Dimick and Brockley kicked plaintiff in the genitals and punched him in the head. Am. Compl. (Dkt. No. 37) at 11; Plf.'s Dep. Tr. (Dkt. No. 55, Attach.2) at 61. The officers then threw the four property bags at plaintiff and left his cell. Am. Compl. (Dkt. No. 37) at 11; Plf.'s Dep. Tr. (Dkt. No. 55, Attach.2) at 62. Plaintiff did not seek medical treatment for the injuries resulting from the actions of defendants Dimick and Brockley. Plf.'s Dep. Tr. (Dkt. No. 55, Attach.2) at 62.

Within a couple of days of arriving in PC, plaintiff wrote a grievance and placed it in the meal slot of his cell gate to be picked up by a corrections officer. Plf.'s Dep. Tr. (Dkt. No. 55, Attach.2) at 64, 66. The grievance was, in fact, picked up, but plaintiff does not know precisely who retrieved it. *Id.* at 66, 67. On or about May 20, 2009, after plaintiff did not receive a response to his first grievance, he wrote a second grievance, which again was picked up from his meal slot by an unknown individual. *Id.* at 66, 67. Plaintiff did not receive a response to the second grievance. *Id.* at 66. Other mail that plaintiff placed in his meal slot to be sent out while he was in PC did reach its destination. *Id.* at 69–70. There is no DOCCS record of plaintiff filing these two grievances, nor is there a record that plaintiff appealed any grievance relating to the matters now in issue to the relevant appellate entity within DOCCS. Hoagland Decl. (Dkt. No. 55, Attach.15) at ¶ 8; Hale Decl. (Dkt. No. 55, Attach.14) at ¶ 9.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on January 26, 2011. Complaint (Dkt. No. 1). Following a period of pretrial discovery, during which plaintiff attempted to identify the defendants previously sued only as "Doe" defendants, he filed an amended complaint on November 8, 2011. Am. Compl. (Dkt. No. 37). Plaintiff's amended complaint names, as defendants, Great Meadow Superintendent

Bezio;[4] Great Meadow Deputy Superintendent of Security Kelly; Corrections Sergeant Maguire; and Corrections Officers Griffin, Murphy, Dimick, Brockley, and defendant "John Doe # 1." *Id.* at 2–3. Construed with the utmost liberality, plaintiff's amended complaint asserts a due process claim under the Fourteenth Amendment, and excessive force, failure to protect, and deliberate indifference claims under the Eighth Amendment, all pursuant to 42 U .S.C. § 1983. *Id.* at 12–13.

On May 31, 2012, following the completion of discovery, defendants filed a motion for summary judgment seeking dismissal of plaintiff's amended complaint based on several grounds, generally arguing that plaintiff failed to exhaust his administrative remedies, that plaintiff's amended complaint fails on the merits, and, alternatively, that all defendants are entitled to qualified immunity. Defs.' Memo. of Law (Dkt. No. 55, Attach.19) at 4–17. On June 7, 2012, plaintiff filed his opposition to that motion, Plf.'s Resp. (Dkt. No. 56), and defendants subsequently filed their reply on June 14, 2012, Defs.' Reply (Dkt. No. 58).

**\*4** Defendants' motion, which is now fully briefed and ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local 72.3(c). *See* Fed.R.Civ.P. 72(b).

### III. *DISCUSSION*

#### A. *Summary Judgment Standard*
Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material" for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4; *Sec. Ins. Co.,* 391 F .3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324; *Anderson,* 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

#### B. *Failure to Exhaust*
Defendants argue that plaintiff is precluded from pursuing his claims in this action as a result of his failure to exhaust available administrative remedies before filing suit. Defs.' Memo. of Law (Dkt. No. 55, Attach.19) at 4–5. In support, defendants offer declarations from Jeffrey Hale, Assistant Director of the DOCCS Inmate Grievance Program ("IGP"), and Jason Hoagland, Acting IGP Supervisor at Great Meadow. Dkt. No. 55, Attachs. 14, 15. Hale avers that, based upon a search of available DOCCS records, plaintiff did not, in accordance with the available grievance procedures in place at Great Meadow while plaintiff confined there, pursue an appeal to the DOCCS Central Office Review Committee ("CORC") related to the denial of plaintiff's request to be placed in PC. Hale Decl. (Dkt. No. 55, Attach.14) at ¶ 9. Similarly, Hoagland avers that a search of the grievance records at Great Meadow does not reveal any grievance filed by plaintiff "at any time." Hoagland Decl. (Dkt. No. 55, Attach.15) at ¶ 8. In response, plaintiff argues that "there is not any available administrative remedie[s] when an assault and harm have already occurred," and that the exhaustion requirement only applies to " 'prison

conditions' under the P.L.R.A.," which plaintiff is not challenging. Plf. Resp. (Dkt. No. 57) at ¶ 2.

1. *Legal Principles Governing Exhaustion*

**\*5** The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996), which imposes restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Woodford v. Ngo,* 548 U.S. 81, 84 (2006) ("Exhaustion is ... mandatory. Prisoners must now exhaust all 'available' remedies[.]" (internal citations omitted)); *Hargrove v. Riley,* No. 04–CV–4587, 2007 WL 389003, at \*5 (E.D.N.Y. Jan. 31, 2007) ("The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983."). [5] "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002). [6]

In the event the defendant establishes that the inmate-plaintiff failed "to fully complete[ ] the administrative review process" prior to commencing the action, the plaintiff's complaint is subject to dismissal. *Pettus v. McCoy,* No. 04–CV–0471, 2006 WL 2639369, at \*1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford,* 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." [7] *Woodford,* 548 U.S. at 95; *see also Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir.2007) (citing *Woodford* ).

In accordance with the PLRA, the DOCCS has made the IGP available to inmates, which is comprised of a three-step procedure that inmates must use when they have a grievance regarding prison conditions. 7 N.Y.C.R.R. § 701.5; *Mingues v. Nelson,* No. 96–CV–5396, 2004 WL 234898, at \*4 (S.D.N.Y. Feb. 20, 2004). The IGP procedure is accurately described in Hale's declaration, Dkt. No. 55, Attach. 14, and embodied in 7 N.Y.C.R.R. §

701. Under the IGP, an inmate must first file a complaint with the facility's IGP clerk within twenty-one days of the alleged occurrence. 7 N.Y.C.R.R. § 701.5(a)(1). If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. *Id.* A representative of the facility's inmate grievance resolution committee ("IGRC") has up to sixteen days after the grievance is filed to informally resolve the issue. *Id.* at § 701.5(b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen days after receipt of the grievance. *Id.* at § 701.5(b)(2).

A grievant may then appeal the IGRC's decision to the facility's superintendent within seven days after receipt of the IGRC's written decision. *Id.* at § 701.5(c). The superintendent must issue a written decision within a certain number of days of receipt of the grievant's appeal. [8] *Id.* at § 701.5(c)(i), (ii).

**\*6** The third and final step of the IGP involves an appeal to the CORC, which must be taken within seven days after receipt of the superintendent's written decision. *Id.* at § 701.5(d)(1)(i). The CORC is required to render a written decision within thirty days of receipt of the appeal. *Id.* at § 701.5(d)(2)(i).

Accordingly, at each step of the IGP process, a decision must be entered within a specified time period. Significantly, "[a]ny failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can—and must—be appealed to the next level, including CORC, to complete the grievance process." *Murray v. Palmer,* No. 03–CV–1010, 2010 WL 1235591, at \*2 (N.D.N.Y. Mar. 31, 2010) (Hurd, J. adopting report and recommendation by Lowe, M.J.) (citing, *inter alia,* 7 N.Y.C.R .R. § 701.6(g)(2)).

Generally speaking, if a plaintiff fails to follow each of the required three steps of the above-described procedure prior to commencing litigation, he has failed to exhaust his administrative remedies. *See Ruggerio v. County of Orange,* 467 F.3d 170, 176 (2d Cir.2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." (internal quotation marks omitted)).

2. *Application of Legal Principles*

Belile v. Griffin, Not Reported in F.Supp.2d (2013)
Case 9:15-cv-01542-MAD-DEP Document 79 Filed 02/14/18 Page 50 of 227
2013 WL 1776086

Initially, the court notes that plaintiff alleges that he only filed two grievances on or about May 2, 2009, and May 20, 2009, both of which, when liberally construed, complain that, as a result of denials by defendants Maguire and Kelly of his request to be placed in PC, he was assaulted by another inmate. Am. Compl. (Dkt. No. 37) at 5–6. The grievances also complain that defendants Murphy and Doe improperly disclosed to other inmates that plaintiff was convicted of rape in the third degree, and allege that defendants Dimick and Brockley assaulted plaintiff immediately after arriving in PC. *Id.* Because these two grievances do not include any complaints about defendant Griffin's assault on plaintiff when he escorted plaintiff back from defendant Maguire's office, and because there is no record evidence that plaintiff ever filed a grievance as it relates to this allegation, I find that plaintiff failed to exhaust his available administrative remedies regarding any excessive force claim against defendant Griffin, in violation of the Eighth Amendment. However, because each of the other named-defendants are implicated in plaintiff's grievances, the court proceeds to discuss whether plaintiff exhausted available administrative remedies as it relates to the claims asserted against the remaining named-defendants.

After carefully reviewing the record evidence, I find that there is a dispute of fact as to whether plaintiff actually filed a grievance with the IGP clerk that relates to any of the allegations giving rise to this action. [9] Specifically, plaintiff's amended complaint alleges that, while he filed two grievances, both were intercepted by correctional officers at Great Meadow. Am. Compl. (Dkt. No. 37) at 3. Similarly, at his deposition, plaintiff testified that he placed two written grievances in his meal slot to be filed by corrections officers. Plf.'s Dep. Tr. (Dkt. No. 55, Attach.2) at 66–67. According to plaintiff, after a corrections officer retrieves a grievance from an inmate, the grievance is supposed to be forwarded to the appropriate officials. Am. Compl. (Dkt. No. 37) at 3. However, Hoagland, the Acting IGP Supervisor at Great Meadow, avers that a search of the grievance records at Great Meadow does not reveal any grievance filed by plaintiff "at any time." Hoagland Decl. (Dkt. No. 55, Attach.15) at ¶ 8. Moreover, Hale, the DOCCS IGP Assistant Director, states that a search of the relevant DOCCS records shows that plaintiff did not file an appeal to CORC arising from any incident while at Great Meadow. Hale Decl. (Dkt. No. 55, Attach.14) at ¶ 9. These conflicting pieces of evidence demonstrate that there is a dispute of fact as to whether

plaintiff initiated the IGP process at Great Meadow by filing a grievance relating to the allegations giving rise to this action.

**\*7** Whether or not plaintiff did attempt to lodge grievances in accordance with the IGP, however, is immaterial because there is no dispute that he failed to "properly exhaust" his administrative remedies by complying with the IGP's requirement that he appeal any denial to the superintendent of the facility, and then appeal any unfavorable decision from the superintendent to CORC. *Woodford,* 548 U.S. at 95; *Ruggerio,* 467 F.3d at 176. Plaintiff does not argue, nor does he offer any proof in his amended complaint, at his deposition, or in opposition to defendants' motion for summary judgment, that he pursued his grievances to completion. For this reason, I find that no reasonable factfinder could conclude that plaintiff exhausted available administrative remedies as it relates to any of the allegations giving rise to this action. *See Goodson v. Silver,* No. 09–CV–0494, 2012 WL 4449937, at \*4 (N.D.N.Y. Sept. 25, 2012) (Suddaby, J.) ("[I]f a prisoner has failed to follow each of the required ... steps for the ... grievance procedure prior to commencing litigation, he has failed to exhaust his administrative remedies.").

Despite finding that plaintiff did not file and pursue to completion a grievance regarding the claims he now raises in this action, the exhaustion inquiry is not ended. In a series of decisions rendered since the enactment of the PLRA, the Second Circuit has crafted a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted for failure to satisfy the PLRA's exhaustion requirement. [10] *Macias,* 495 F.3d at 41; *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004). Under the Second Circuit's test, a court must first determine whether administrative remedies were available to the plaintiff at the relevant times. *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686. If such remedies were available to the plaintiff, the court must next examine "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust defense." *Hemphill,* 380 F.3d at 686, *accord, Macias,* 495 F.3d at 41. Finally, in the event the proffered defense survives these first two levels of scrutiny, the court must examine whether

special circumstances "have been plausibly alleged" to justify the plaintiff's failure to comply with the applicable administrative procedural requirements.[11] *Id.*

a. *Availability of Remedy*
As was discussed above, in New York, the DOCCS has implemented the three-step IGP in accordance with the requirements under the PLRA. 7 N.Y.C.R.R. § 701.5. Despite an inmate's entitlement in most instances to file and pursue a grievance in accordance with the IGP, there are circumstances in which the grievance procedure nonetheless is deemed unavailable to an inmate plaintiff. *Hemphill,* 380 F.3d at 686. For example, "[e]xhaustion may be considered unavailable in situations where plaintiff is unaware of the grievance procedures or did not understand it, or where defendants' behavior prevents plaintiff from seeking administrative remedies." *Hargrove,* 2007 WL 389003, at *8 (internal citation omitted); *see also Abney v. McGinnis,* 380 F.3d 663 (2d Cir.2004) (holding that, where a prisoner's favorable decision is not properly implemented, and the time to appeal the decision has expired, the prisoner's available administrative remedies had been exhausted).

**\*8** Here, plaintiff does not argue that he was "unaware of the grievance procedures or did not understand it." *Hargrove,* 2007 WL 389003, at *8. *See* Plf.'s Dep. Tr. (Dkt. No. 55, Attach.2) at 72 ("Q: So you're familiar with the Inmate Grievance Program; right? A: Yes."). Rather, he alleges that the grievance procedure was unavailable to him because corrections officers intercepted and discarded the two grievances that he left in his meal slot shortly after arriving in PC. Am. Compl. (Dkt. No. 37) at 3–4; Plf.'s Dep. Tr. (Dkt. No. 55, Attach.2) at 64–68. Plaintiff admitted at his deposition, however, that he is only speculating when he alleges that the officers who picked up his mail discarded those grievances. *Id.* at 70–71. Similarly, plaintiff admitted that he does not know who retrieved his grievances, which means he does not know whether any of the named-defendants were responsible for, or aware of, the alleged interception of his grievances. *Id.* at 68. Plaintiff also acknowledged that other mail that he sent from PC did reach the intended addressees. *Id.* at 69–70.

Plaintiff's mere threadbare allegations that his grievances were intercepted and discarded, without evidence to support such allegation, including any evidence that identifies which defendant, in particular, is responsible for

discarding the grievances, are insufficient to excuse his failure to comply with the IGP. *See Butler v. Martin,* No. 07–CV–0521, 2010 WL 980421, at *5 (N.D.N.Y. Mar. 15, 2010) (Scullin, J.) (finding that the plaintiff was not excused from failing to avail himself of the administrative procedures where he alleged that his grievances were discarded but did not offer any evidence "that a particular officer discarded the[m]"); *Winston v. Woodward,* No. 05–CV–3385, 2008 WL 2263191, at *10 (S.D.N.Y. May 30, 2008) ("In light of Plaintiff's failure to put forth any corroborating evidence, either direct or circumstantial, to support his claims that he suffered ... mail tampering, ... the Court finds, even taking the evidence in the light most favorable to Plaintiff, that he has not put forth sufficient evidence to sustain his burden [.]"); *Veloz v. New York,* 339 F.Supp.2d 505, 514 (S.D.N.Y.2004) ("Even assuming [the plaintiff] did submit grievances, he offers no evidence that any particular officer thwarted his attempts to file[.]"); *Nunez v. Goord,* 172 F.Supp.2d 417, 429 (S.D.N.Y.2001) (finding the plaintiff's allegation that his failure to file grievances was due to " 'the practice of certain officers' " to destroy them "stand[s] alone and unsupported").

In any event, there is no dispute that, even assuming that any of the defendants did, in fact, intercept and discard plaintiff's grievances, there were other avenues available to plaintiff for pursuing his grievances. For example, in his declaration, Hoagland notes that, at least weekly, either the IGP supervisor or the sergeant assigned to the grievance office at Great Meadow makes rounds through the entire facility, including in D-block, where PC inmates are confined, to address grievance-related questions or issues. Hoagland Decl. (Dkt. No. 55, Attach.15) at ¶ 5. During those rounds inmates may hand grievances directly to the person making the rounds.[12] *Id.* at ¶ 6. Accordingly, even assuming that plaintiff's grievances were intercepted, there was an available, alternative avenue for submitting those grievances directly to the IGP supervisor.

**\*9** Finally, under the IGP, even if plaintiff's grievances were intercepted and not filed with the IGP clerk, "he had the ability—and the duty to—file an appeal regarding the non-processing of th[ose] grievance[s]." *Sidney,* 2012 WL 1380392, at *5 (collecting cases and finding that the plaintiff failed to exhaust available administrative remedies where he argued that a second grievance was " 'pilfered by thievery hands' "); *Butler,* 2010 WL 980421, at *6 ("Plaintiff was obligated to appeal to the next

administrative level once it became clear to him that a response to his grievances was not forthcoming." (citing, inter alia, 7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."))); Veloz, 339 F.Supp.2d at 516 ("[P]laintiff's allegation that these particular grievances were misplaced or destroyed by correctional officers ultimately does not relieve him of the requirement to appeal these claims to the next level once it became clear to him that a response to his initial filing was not forthcoming."); Reyes v. Punzal, 206 F.Supp.2d 431, 433 (W.D.N.Y.2002) ("Even assuming that plaintiff never received a response to his grievance, he had further administrative avenues of relief open to him.").

For all of these reasons, I conclude that the grievance process was available to plaintiff.

### b. *Estoppel*

The second prong of the *Hemphill* analysis focuses upon "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill*, 380 F.3d at 686 (internal citations omitted). Exhaustion of remedies is an affirmative defense that must be raised by a defendant in response to an inmate suit. *Jones v. Block*, 549 U.S. 199, 216 (2007). Here, defendants have properly preserved the exhaustion defense by asserting it as an affirmative defense in their answers. Answer (Dkt. No. 39) at ¶ 15; Answer (Dkt. No. 45) at ¶ 15. Turning to estoppel, I find no basis in the record to support a finding that defendants should be precluded from relying upon the defense. "Estoppel will be found where an inmate reasonably understands that pursuing a grievance through the administrative process will be futile or impossible." *Winston*, 2008 WL 2263191, at *9 (internal quotation marks omitted) (collecting cases). "[A] plaintiff's failure to exhaust all administrative remedies may be excused on the grounds of estoppel where the plaintiff was misled, threatened, or otherwise deterred from fulfilling the requisite procedures." *Id.* (citing, inter alia, *Hemphill*, 380 F.3d at 688–89).

As was discussed above, although plaintiff argues that the two grievances he left in his meal slot were discarded by corrections officers, for all of the same reasons that this argument fails when analyzing whether administrative remedies were "available" to plaintiff, it similarly falls short in establishing that defendants should be estopped from asserting the exhaustion defense. *See Giano*, 380 F.3d at 677 n. 6 ("We note that the case law on the PLRA's exhaustion requirement does not always distinguish clearly between (a) cases in which defendants are estopped from asserting non-exhaustion as an affirmative defense, [and] (b) situations in which administrative remedies are not 'available' to the plaintiff[.]"); *see also Hargrove*, 2007 WL 389003, at *8 n. 14. The court would only add that, because plaintiff does not allege, or provide any evidence that, a named-defendant acted to interfere with his ability to exhaust in order to establish a basis to estop that defendant from invoking the exhaustion defense, he has failed to establish a dispute of material fact as to whether any of defendants are estopped from asserting the exhaustion defense. *See Atkins v. Menard*, No. 11–CV–9366, 2012 WL 4026840, at *3 (N .D.N.Y. Sept. 12, 2012) (Suddaby, J.) ("Generally, a defendant in an action may not be estopped from asserting the affirmative defense of failure to exhaust administrative remedies based on the actions (or inactions) of other individuals.").

### c. *Special Circumstances*

**\*10** The third, catchall factor to be considered under the Second Circuit's exhaustion test focuses upon whether special circumstances exist to justify excusing a plaintiff's failure to exhaust available administrative remedies, notwithstanding the fact that the administrative remedies were available, and the defendants are not estopped from asserting the defense. *Hemphill*, 380 F.3d at 689; *Giano*, 380 F.3d at 676–77. Among the circumstances potentially qualifying as "special" under this prong of the test include where a plaintiff's reasonable interpretation of applicable regulations regarding the grievance process differs from that of prison officials, and leads the plaintiff to conclude that the dispute is not grievable. *Giano*, 380 F.3d at 676–77, accord, *Hargrove*, 2007 WL 389003, at *10.

Here, there is no allegation that special circumstances exist to excuse plaintiff's failure to exhaust available administrative remedies, nor does plaintiff offer any evidence of potentially applicable special circumstances. As a result, I find that plaintiff is not excused from his failure to exhaust administrative remedies before commencing this action, and I recommend that his amended complaint be dismissed on this procedural basis alone. [13]

IV. *SUMMARY AND RECOMMENDATION*

It is undisputed that, prior to commencing this action, plaintiff failed to exhaust his administrative remedies by pursuing to completion any grievance related to the events giving rise to this action. In light of this failure, and finding no basis to conclude that plaintiff's compliance with the IGP should be excused, I recommend dismissal of plaintiff's amended complaint in its entirety on this basis alone, without addressing either the merits of his claims, or the qualified immunity argument advanced by defendants in support of their motion for summary judgment. Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 55) be GRANTED, and that plaintiff's amended complaint be DISMISSED in its entirety.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 1776086

Footnotes

1   Although plaintiff opposed defendants' motion for summary judgment, he did not file an opposition to defendants' Local Rule 7.1 statement of material facts that complies with Local Rule 7.1(a) (3). Specifically, defendants filed an eleven-page statement of material facts that contains forty-two paragraphs and complies with the citation requirements of Local Rule 7.1(a)(3). Defs.' L.R. 7.1 Statement (Dkt. No. 55, Attach.18). In response, plaintiff filed a two-page statement of material facts that contains only five paragraphs, neither admits nor denies any of the paragraphs contained in defendants' statement of material facts, and fails to cite to any record evidence. Dkt. No. 57 at 6–7. Plaintiff was warned of the consequences of failing to properly respond to defendants' statement of material facts. Dkt. No. 56, Attach. 1. The court therefore accepts defendants' facts to the extent that they are supported by accurate citations to the record. *See* N.D .N.Y. L.R. 7.1(a)(3) (*"The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."* (emphasis in original)); *see also, e.g., Elgamil v. Syracuse Univ.,* No. 99–CV–0611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2010) (McCurn, J.) (listing cases and deeming all of the facts asserted in the defendant's statement of material facts as admitted where the plaintiff did not specifically admit or deny any of the assertions and "failed to contain a single citation to the record").

2   "Keeplock" is a form of confinement through which an "inmate is confined to his cell, deprived of participation in normal prison routine, and denied contact with other inmates." *Gittens v. LeFevre,* 891 F.2d 38, 39 (2d Cir.1989), *accord, Warburton v. Goord,* 14 F.Supp.2d 289, 293 (W.D.N.Y.1998); *Tinsley v. Greene,* No. 95–CV–1765, 1997 WL 160014, at *2 n. 2 (N.D.N.Y. Mar. 31, 1997) (Pooler, J., adopting report and recommendation by Homer, M.J.) (citing *Green v. Bauvi,* 46 F.3d 189, 192 (2d Cir.1995)). "The most significant difference between keeplock and general population inmates is that the former do not leave their cells for out-of-cell programs unless they are a part of mandatory educational programs and general population inmates spend more time out of their cells on weekends." *Lee v. Coughlin,* 26 F.Supp.2d 615, 628 (S.D.N.Y.1998). Although, as a keeplocked inmate, plaintiff was entitled to leave his cell for one hour each day for the purpose of exercise, *Lee,* F.Supp.2d at 628, he did not avail himself of that opportunity. Plf.'s Dep. Tr. (Dkt. No. 55, Attach.2) at 51–52.

3   Although Belile named two inmates, defendant Maguire determined that neither was presently confined at Great Meadow. Maguire Decl. (Dkt. No. 55, Attach.12) at ¶ 9.

4   While Norman Bezio is named by Belile as a defendant, and is identified as the superintendent at the facility in issue, during his deposition, Belile acknowledged that Bezio was not in fact the superintendent at any time relevant to the events giving rise to this action. Plf.'s Dep. Tr. (Dkt. No. 55, Attach.2) at 90.

5   Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

2013 WL 1776086

6   In this case, the Supreme Court's decision in *Porter* effectively forecloses plaintiff's argument that claims of the past-use of excessive force are not subject to the exhaustion requirement. *Porter,* 534 U.S. at 532.

7   While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion " 'in a substantive sense,' " in order to satisfy the PLRA, an inmate-plaintiff nonetheless must meet the procedural requirement of exhausting his available administrative remedies by complying with the grievance procedures in place at the relevant correctional facility. *Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir.2007) (quoting *Johnson v. Testman,* 380 F.3d 691, 697–98 (2d Cir.2004) (emphasis omitted)).

8   Depending on the type of matter complained of by the grievant, the superintendent has either seven or twenty days after receipt of the grievant's appeal to issue a decision. *Id.* at § 701.5(c) (i), (ii).

9   As will be discussed more completely below, however, because Belile failed to pursue the alleged grievance to completion, this fact is not material in that it does not preclude the entry of summary judgment against him on this issue.

10  Whether the Second Circuit's test in *Hemphill* survives following the Supreme Court's decision in *Woodford* has been a matter of some speculation. *See, e.g., Newman v. Duncan,* No. 04–CV–0395, 2007 WL 2847304, at *2 n. 4 (N.D.N.Y. Sept. 26, 2007) (McAvoy, J., adopting report and recommendation by Homer, M.J.).

11  Though distinct in theory, in practice, the application of the three prongs of the prescribed test admit of overlap. *Giano v. Goord,* 380 F.3d 670, 677 n. 6 (2d Cir.2004); *see also Hargrove v.. Riley,* No. CV–04–4587, 2007 WL 389003, at *8 n. 14 (E.D.N.Y. Jan. 31, 2007) ("Case law does not clearly distinguish between situations in which defendants' behavior renders administrative remedies 'unavailable' to the plaintiff and cases in which defendants are estopped from asserting non-exhaustion as an affirmative defense because of their behavior. As such, there will be some overlap in the analyses.").

12  Again, because plaintiff has not disputed defendants' Local Rule 7.1 statement of material facts, which is, in part, supported by Hoagland's declaration, the court assumes the truth of the statements made in Hoagland's declaration.

13  In recommending dismissal of plaintiff's amended complaint in its entirety, I include the defendant identified as "John Doe # 1" who has neither been identified nor appeared in the action. Because that defendant is not specifically alleged to have been, nor is there record evidence to establish that he was, involved in the interception and discarding of plaintiff's grievances, I find he would not be estopped from asserting the exhaustion defense and thus, like the named-defendants, would be entitled to dismissal on the basis of plaintiff's failure to exhaust. Alternatively, I recommend dismissal of all claims against defendant Doe, *sua sponte,* based upon plaintiff's failure to properly identify and serve him, as required under both Federal Rules of Civil Procedure and this court's local rules, despite the fact that this case has been pending for more than two years, and based on plaintiff's failure, prior to the close of discovery, to ascertain the identity of that individual. Fed.R.Civ.P. 41(b),(m); *see also Butler,* 2010 WL 980421, at *6–7.

---

**End of Document**                                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 6466556
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Kevin Damion CRICHLOW, Plaintiff,
v.
Brian FISCHER, et al., Defendants.

9:17-cv-00194 (TJM/TWD)
|
Signed 09/05/2017

**Attorneys and Law Firms**

Kevin Damion Crichlow, Romulus, NY, pro se.

Nicole E. Haimson, New York State Attorney General, Albany, NY, for Defendants.

Attorney General, Dept. of Law, The Capital, Albany, New York, pro se.

**Opinion**

**REPORT-RECOMMENDATION AND ORDER**

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

**\*1** *Pro se* Plaintiff Kevin Damon Crichlow, an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), commenced this action by filing a complaint pursuant to 42 U.S.C. § 1983 in the Southern District of New York on October 16, 2012. (Dkt. No. 2.) Plaintiff filed an amended complaint, the operative pleading, on June 17, 2013, seeking relief against more than 100 defendants. (Dkt. No. 12.) Plaintiff alleges violations of the First, Eighth, and Fourteenth Amendments, Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq.* ("ADA"), and the Rehabilitation Act of 1973, 29 U.S.C. § 794(a), while confined at Downstate Correctional Facility ("Downstate"), Eastern New York Correctional Facility ("Eastern"), Auburn Correctional Facility ("Auburn") and Wende Correctional Facility ("Wende"). On April 28, 2015, the action was transferred to the Western District of New York. (Dkt. No. 168.) Thereafter, on February 21, 2017, Plaintiff's claims arising from his incarceration at Auburn and Eastern were transferred to this District.

(Dkt. No. 225.) The Honorable Thomas J. McAvoy, Senior United States District Judge, has referred the matter to this Court for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and L.R. 72.3(c).

Presently before the Court is Defendants' motion for summary judgment in lieu of an answer pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Dkt. No. 177.) Plaintiff has opposed the motion. (Dkt. No. 209.) Also before the Court is Plaintiff's motion for substitution of a party pursuant to Rule 25(a) of the Federal Rules of Civil Procedure. (Dkt. No. 231.) For the reasons explained below, it is recommended that the District Court grant summary judgment to all Defendants, including those who have not been named and/or served, and that Plaintiff's Rule 25(a) motion be denied as moot.

**I. PROCEDURAL HISTORY**

Plaintiff's original complaint, comprising of 163 pages, was filed in the Southern District on October 16, 2012, against more than 100 defendants arising from his incarceration at four DOCCS facilities from 2008 through 2012. (Dkt. No. 2.) On March 19, 2013, Plaintiff was ordered to file an amended complaint that complied with Rules 8 and 10 of the Federal Rules of Civil Procedure. (Dkt. No. 6.) On June 17, 2013, Plaintiff filed an amended complaint seeking relief against 136 defendants, namely DOCCS employees and medical providers, arising from his confinement at Downstate, Auburn, Eastern, and Wende. (Dkt. No. 12.) On February 13, 2015, the Southern District Court *sua sponte* dismissed numerous defendants and ordered Plaintiff to show cause why the case should not be transferred to the Western District of New York. (Dkt. No. 164.) On April 28, 2015, the action was transferred to the Western District. (Dkt. No. 168.)

On November 20, 2015, Defendants filed a motion for summary judgment in lieu of an answer, arguing all claims were time-barred, unexhausted, vague, or due process claims that did not implicate a liberty interest. (Dkt. No. 177-5.) Plaintiff initially responded with an opposition totaling more than 900 pages with exhibits, and Defendants filed a reply. (Dkt Nos. 188 and 189.) Thereafter, Plaintiff was granted permission to file an amended opposition to Defendants' motion. (Dkt. Nos. 192 and 198.) Plaintiff filed his amended opposition, totaling more than 200 pages with exhibits. (Dkt. No. 209.) Defendants filed a reply to Plaintiff's amended opposition. (Dkt. No. 210.) Without obtaining permission

from the Court, Plaintiff filed a sur-reply, along with numerous exhibits that it appears Plaintiff inadvertently failed to file with his amended opposition. (Dkt. No. 211.)

**\*2** On February 10, 2017, Western District Judge Elizabeth A. Wolford severed the action into three separate actions based upon the location where each claim allegedly arose, transferred those claims arising in the Southern and Northern Districts, and retained the claims arising in the Western District. (Dkt. No. 223.[1]) On February 21, 2017, Plaintiff's claims arising during his confinement at Auburn and Eastern were transferred to this District. (Dkt. No. 225.) On April 26, 2017, Senior Judge McAvoy severed and transferred all claims arising at Wende that were mistakenly transferred to this District back to the Western District, Case Number 6:15-CV-6252. (Dkt. No. 228.)

Remaining Defendants in this action are Corrections Officer ("C.O.") Daniel Bauer, C.O. Christopher Clarke, Dr. Mikhail Gusman, RN Denise Falzon, Nurse II Ellenjane Aversano, Dr. Ann L. Andola, Lieutenant ("Lt.") Karl Simmons, Senior Counselor Thomas Briggs, C.O. Donielle Allison, C.O. Kevin Rosa, Counselor Ariel Escobar, C.O. Jill Friedman, C.O. Kelly Jamil, Captain Anthony Russo, Acting Superintendent Rosemarie Wendland, C.O. Jeffrey Brewer, C.O. Merrill Conner, Sergeant ("Sgt.") Daniel Parkhurst, C.O. Scott Navitsky, Lt. Edward Madison, D.M.D. Marlon K. Moore, C.O. Nathan Vevone, Sgt. Berndt J. Leifeld, Nurse LaPenna, and Dr. Jeffrey Arliss. (Dkt. No. 227.)

## II. BACKGROUND

### A. Plaintiff's Allegations

At all times relevant to this action, Plaintiff was incarcerated at Auburn and Eastern. (Dkt. Nos. 12, 223, and 225.[2]) Generally, Plaintiff alleges violations of his constitutional and statutory rights under the First, Eighth, and Fourteenth Amendments, the ADA, and Rehabilitation Act while confined at Auburn and Eastern from November 16, 2010, through February 16, 2012. (*See generally* Dkt. No. 12.) For a complete statement of Plaintiff's claims related to Auburn and Eastern, reference is made to Plaintiff's amended complaint.

### 1. Auburn

On November 16, 2010, Plaintiff was transferred from Wende to Eastern. (Dkt. No. 12-1 at ¶ 71.) Plaintiff's transfer route stopped at Auburn for 72 hours. *Id.* While confined at Auburn, Plaintiff alleges he was verbally threatened and denied medical care. *Id.* Specifically, on November 19, 2010, at 8:00 a.m., while in the first floor transfer area Plaintiff was threatened by C.O. Clarke to "give up" his medical wrist brace "or get beat up." *Id.* C.O. Clark took Plaintiff's wrist brace, causing "more damages" to Plaintiff's wrist. *Id.* Plaintiff was without a wrist brace for approximately six weeks. *Id.*

### 2. Eastern

#### a. Medical Indifference Claims

Plaintiff alleges inadequate or nonexistent medical care, and claims he was treated "unprofessionally" because of his race, ethnicity, weakened immune system, and hearing disability. *Id.* at ¶¶ 75-76. Specifically, in December 2010, Plaintiff alleges he was denied dental care, pain medication, and batteries for his hearing aid. *Id.* at ¶¶ 76-77. On December 13, 2010, Plaintiff was denied pain medication and emergency dental treatment. *Id.* at ¶ 77. Although x-rays revealed Plaintiff has two cavities in February 2011, and he was in extreme pain, Plaintiff was denied emergency extraction and was forced to wait several months for dental extractions. *Id.* at ¶ 101, 105. Plaintiff was also denied a "soft food diet or Ensure" even though he had difficulty eating. *Id.* at ¶ 103.

**\*3** On April 18, 2011, Dr. Arliss operated on Plaintiff's wrist at Foxhall Ambulatory Surgery Center, which took much longer than planned. *Id.* at ¶ 124. Thereafter, on August 3, 2011, "a pin came out of the bottom" of Plaintiff's right wrist. *Id.* at ¶ 152. Although Plaintiff was taken to the facility's hospital, Plaintiff claims he should have been transported immediately to Dr. Arliss. *Id.* Plaintiff alleges he was in extreme pain for over thirty-one hours and received inadequate and negligent medical care at the facility's hospital before he was transported to an outside facility to have Dr. Arliss remove the broken pin. *Id.*

On October 21, 2011, Plaintiff was denied medical treatment after a use of force incident. *Id.* at ¶ 194.

### b. Conditions of Confinement Claims

Plaintiff also brings conditions of confinement claims while confined to keeplock on the S.D.U. Block and in the Segregated Housing Unit ("SHU"). Plaintiff claims he was denied showers and recreation, laundry services and clean linen, special religious meals, personal hygiene products, fresh drinking and bathing water, commissary, and legal supplies. Plaintiff alleges senior officials were all aware and tolerated these unconstitutional practices by subordinate employees. *Id.* at ¶ 91.

Specifically, Plaintiff claims from January 12, 2011, through January 31, 2011, and from February 3, 2011, through February 5, 2011, while on keeplock, he was denied medical care, batteries for his hearing aids, recreation, showers, medical sick calls, and religious meals in retaliation for filing grievances against C.O. Jamil, C.O. Friedman, and C.O. Brewer. *Id.* at ¶¶ 81-84, 90-91, 140. On January 14, 2012, C.O. Friedman denied Plaintiff toilet paper and soap. *Id.* at ¶ 84. On January 24, 2011, and January 25, 2011, C.O. Allison denied Plaintiff outside exercise and fresh air because it was "to [sic] cold." *Id.* at ¶ 87. C.O. Friedman and C.O. Jamil routinely denied Plaintiff recreation if he attended a "medical call out" in retaliation for filing grievances against them. *Id.* at ¶¶ 113, 114.

On March 6, 2011, Plaintiff claims he was discriminated against due to his disability and was subject to inhumane conditions of keeplock confinement for fifty-eight days. *Id.* at ¶ 106. While keeplocked, Plaintiff claims he was denied laundry and clean linens "at least once a week" in violation of DOCCS Directives. *Id.* Plaintiff also was denied a "commissary buy sheet." *Id.* Plaintiff claims he was denied soap, shampoo, deodorant, stationary supplies, adequate nutrition, clothing, shelter, sanitation, medical care, and personal safety. *Id.* at ¶ 107.

On March 3, 2011, C.O. Friedman told Plaintiff "if you go to a call out that would be considered your keeplock rec." *Id.* at ¶ 113. On March 7, 2011, C.O. Friedman refused to let Plaintiff wash his laundry or change his sheets on his "meds run." *Id.* at ¶ 108. On March 25, 2011, after attending a medical call out, C.O. Friedman denied

Plaintiff recreation and told Plaintiff that his "medical call out" was his "keeplock rec." *Id.* at ¶ 114. Plaintiff claims he was denied recreation in retaliation for filing grievances. *Id.* Plaintiff also claims he was "always" denied outdoor exercise and fresh air. *Id.* at ¶ 113.

On April 14, 2011, Plaintiff claims Defendant C.O. Brewer threatened to extend his keeplock because he requested to speak to the block sergeant about his housing conditions. *Id.* at ¶ 123. Plaintiff claims he was denied packages on May 16, 2011. *Id.* at ¶¶ 133-34. On July 27, 2011, Plaintiff claims he was deprived of fresh drinking water. *Id.* at ¶ 141.

From July 28, 2011, through November 13, 2011, Plaintiff was subjected to excessive noise from other inmates yelling and "banging" in their cells. *Id.* at ¶ 147. Throughout September 2011, Plaintiff alleges he was exposed to "infectious diseases" and forced to live in unsanitary and unhygienic conditions with rusty brown water. *Id.* at 175. Due to a maintenance error, Plaintiff's cell flooded on October 6, 2011. *Id.* at ¶ 184.

**\*4** Regarding his food, Plaintiff alleges C.O. Jamil and C.O. Friedman "tampered" with his religious meals and deprived Plaintiff of adequate nutrition by failing to provide Plaintiff with the carton of milk included with his meals. *Id.* at ¶ 114. Further, while confined to keeplock, C.O. Friedman and C.O. Jamil would often delay his first meal by over two hours. *Id.* at ¶ 85. On May 24, 2011, C.O. Friedman and C.O. Jamil deprived Plaintiff of his "Jewish kosher breakfast." *Id.* at ¶ 131. That same day, Plaintiff was deprived commissary and was not provided with toothpaste, deodorant, soap, shampoo, and legal postage. *Id.* at ¶ 132. Throughout September and October of 2011, Plaintiff also claims he was given the "wrong food" on numerous occasions and therefore was deprived of his religious meals. *Id.* at ¶¶ 177, 178, 180. Plaintiff was denied Jewish food and commissary on October 4, 2011 and October 5, 2011. *Id.* at ¶ 183.

### c. Excessive Force Claims

Plaintiff alleges he was subjected to excessive force on October 21, 2011. *Id.* at ¶¶ 188-91. At approximately 3:30 p.m., on the way to the evening "meds run," C.O. Navitsky asked Plaintiff for his identification care and medical card. *Id.* at ¶¶ 187-88. Plaintiff explained that he did not have a medical card because he had only been

released from the SHU a few hours prior. *Id.* at ¶ 188. C.O. Navitsky instructed Plaintiff to "sit the fuck down." *Id.* Plaintiff waited for approximately fifteen minutes and then requested to return to his housing unit. *Id.* C.O. Navitsky stated in a very loud voice, "what are you fucking dumb or are you deaf too[?]" *Id.* Plaintiff sat back down. *Id.* Ten minutes later, Plaintiff told C.O. Navitsky he was going to miss evening chow. *Id.* C.O. Navitsky stated, "I'm going to fucking kill you." *Id.* at ¶ 189. C.O. Navitsky left the area and returned with a "black hammer mallet." *Id.* at ¶¶ 189-90. Thereafter, C.O. Navitsky struck Plaintiff with a "black hammer mallet" and C.O. Wilson punched Plaintiff on the right side of his head. *Id.* at ¶ 190; Dkt. No. 12 at ¶ 5. Plaintiff states he was hit on the right side of his head, body, hand, and hip. (Dkt. No. 12-1 at ¶ 190.) After the assault, C.O. Navitsky and C.O. Wilson started screaming, ran into the control room, and pressed a button. *Id.* A response team arrived and Plaintiff was escorted to his cell, and approximately two hours later, to the SHU. *Id.* at ¶ 191. The next day, Plaintiff was issued an inmate misbehavior report, charging Plaintiff with violet conduct, harassment, refusing a direct order, threat, being out of place, and noncompliance. *Id.*

#### d. Due Process Claims

Plaintiff also raises Fourteenth Amendment due process claims. *Id.* at ¶¶ 77-80, 86, 89, 100, 117, 119, 120, 161-66, 193. Plaintiff claims his due process rights were violated when he was denied witnesses during disciplinary hearings and sentenced to keeplock and subjected inhumane conditions of confinement. *Id.* at ¶¶ 77-80. On January 12, 2011, Plaintiff alleges he was denied witnesses that would have proven his innocence. *Id.* at ¶ 86. On February 11, 2011, during a Tier II disciplinary hearing, Lt. Simmons sentenced Plaintiff to 60 days of keeplock for refusing his programs even though the maximum penalty was 30 days under DOCCS directive. *Id.* at ¶ 89.

On February 24, 2011, Plaintiff was sentenced to "30 more days" without due process after being found guilty of "obstruction." *Id.* On April 1, 2011, Lt. Simmons denied Plaintiff an inmate witness, and sentenced Plaintiff to an additional 30 days of keeplock for contraband. *Id.* at ¶ 117. During the April 1, 2011, disciplinary hearing, Plaintiff told Lt. Simmons he was being denied packages and was "not getting" showers, commissary, and recreation. *Id.* On April 2, 2011, Lt. Simmons found

Plaintiff guilty of refusing a direct order, and added 30 days of keeplock. *Id.* at ¶ 120. Lt. Simmons told Plaintiff that DOCCS was getting "rich" from all of the $5.00 surcharges related to Plaintiff's misbehavior reports. *Id.*

**\*5** On August 6, 2011, while housed in the medical clinic following his wrist surgery, Plaintiff was summoned to a disciplinary hearing even though he had not been issued an inmate misbehavior report twenty-four hours in advance. *Id.* at ¶ 161. At the hearing, Lt. Madison provided Plaintiff with a copy of a false July 27, 2011, inmate misbehavior report. *Id.* at ¶¶ 161-62. Lt. Madison threatened Plaintiff with physical harm for objecting to the late notice. *Id.* at ¶¶ 163-64. During the hearing, Plaintiff was denied a witnesses and was found guilty of DOCCS violation 102.10 (threats). *Id.* at ¶ 164. Plaintiff was sentenced to 120 days in the SHU with a corresponding loss of privileges. *Id.* at ¶ 165.

On November 12, 2011, at the disciplinary hearing related to the October 22, 2011, use of force incident, Plaintiff was found guilty of "being out of place." *Id.* at ¶ 193. Plaintiff alleges the involved parties conspired to cover up the use of force incident, thereby depriving Plaintiff of his due process rights. *Id.*

#### e. Access to Courts

Plaintiff also claims he was denied the opportunity to access the courts. On March 29, 2011, C.O. Vevone searched Plaintiff's cell for over three hours, while making sexual and derogatory comments to Plaintiff. *Id.* at ¶ 110. During this search, C.O. Vevone found a blueprint of Eastern, which was an exhibit to Plaintiff's *coram nobis* petition. *Id.* at ¶¶ 110-11. Plaintiff was charged with "contraband" and denied his exhibit. *Id.*

On or about November 10, 2011, while confined in the SHU, Plaintiff gave unknown officers legal mail to be sent to the Southern District, in Action No. 11 Civ. 833. *Id.* at ¶ 197. Instead of mailing Plaintiff's legal documents to the Southern District, DOCCS destroyed his amended pleading. *Id.* at ¶ 198.

#### f. Reasonable Accommodation Claims

Plaintiff argues Defendants failed to provide reasonable accommodations for his hearing disability. Plaintiff alleges on December 13, 2010, Nurse Aversano denied Plaintiff batteries for his hearing aids, thereby forcing Plaintiff to "get batteries from other inmates." *Id.* at ¶ 77. From April 18, 2011, through April 25, 2011, C.O. Jamil, C.O. Brewer, and C.O. Friedman refused to escort Plaintiff to the package room, thereby denying Plaintiff two packages containing reading material for his "reasonable accommodation" to learn sign language. *Id.* at ¶ 127. On August 8, 2011, Plaintiff was deprived of a typewriter, even though he was issued a permit. *Id.* at ¶ 135. Plaintiff also alleges he was denied his "shake awake" alarm and batteries for his hearing aid while he was recovering from his second wrist surgery. *Id.* at ¶ 159.

*g. Retaliation and Conspiracy Claims*

Plaintiff alleges all of the above conduct was in retaliation for filing grievances and lawsuits. *Id.* at ¶ 166. Plaintiff also alleges Defendants conspired to cover up evidence of the above conduct. *Id.* at ¶ 112. Lastly, Plaintiff alleges he was transferred from Eastern to Wende on February 16, 2012, in retaliation for filing grievances. *Id.* at ¶ 166.

### B. Parties' Briefing on Defendants' Motion for Summary Judgment

In their pre-answer motion for summary judgment, Defendants maintain that Plaintiff failed to exhaust his administrative remedies. (Dkt. No. 177-5 at 4-6. [3] ) In that regard, Defendants argue Plaintiff only exhausted a single grievance relevant to this action. *Id.* In that grievance, Plaintiff complained of the conditions of his keeplock confinement at Eastern, stating he was being denied laundry, soap, shampoo, deodorant, and writing papers. *Id.* at 6-7. Defendants contend such claims do not give rise to an Eighth Amendment conditions of confinement claim. *Id.* Defendants also contend Plaintiff's generalized allegations in that grievance, to the effect that he faced discrimination based on a disability, and was denied adequate nutrition, clothing, shelter, medical care, and security while keeplocked, failed to provide Defendants with enough information to rectify the problem at the administrative level, and therefore, is also unexhausted. *Id.* at 7.

**\*6** In his opposition to Defendants' motion, Plaintiff claims, among other things, that he exhausted his administrative remedies by filing over 300 grievances and by complaining to supervisory prison officials and Commissioner Fischer. (Dkt. Nos. 209-3 at 7 and 211 at 1.) Plaintiff further argues his grievances and appeals were lost, destroyed, or ignored by prison officials and DOCCS. *Id.* As to his conditions of confinement claim, Plaintiff explains he had been keeplocked for fifty-eight days and was deprived of his "basic human needs," such as showers and recreation. (Dkt. No. 209-2 at 21.)

### III. LEGAL STANDARD

Pursuant to Rule 56(b) of the Federal Rules of Civil Procedure, "a party may file a motion for summary judgment at any time until 30 days after the close of all discovery." Fed. R. Civ. P. 56(b). "The standard for granting summary judgment is the same whether the motion is made in lieu of an answer or after discovery has occurred." *Crichlow v. Fischer*, No. 6:15-cv-06252 EAW, 2017 WL 920753, at \*3 (W.D.N.Y. Mar. 7, 2017 [4] ) (citing *Anderson v. Rochester-Genesee Reg'l Transp. Auth.*, 337 F.3d 201, 206 (2d Cir. 2003)).

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 273 (citations omitted). The nonmoving party must do more than "rest upon the mere allegations ... of [the plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Conclusory allegations, conjecture and speculation ... are insufficient to create a

genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

"To defeat summary judgment, ... nonmoving parties may not rely on conclusory allegations or unsubstantiated speculation." *Id.* (citation and internal quotation marks omitted). "[T]o satisfy Rule 56(e), affidavits must be based upon 'concrete particulars,' not conclusory allegations." *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (citation omitted). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991).

## IV. DISCUSSION

### A. Exhaustion of Administrative Remedies

#### 1. Legal Standard

**\*7** Under the Prison Litigation Reform Act of 1995 ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 of this title or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion is required for "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). This rule applies to an inmate's constitutional claims, as well as claims under the ADA and Rehabilitation Act. *Carlson v. Parry*, No. 06-CV-6621P, 2012 WL 1067866, at \*12 (W.D.N.Y. Mar. 29, 2012) (ADA and Rehabilitation Act claims "must be

exhausted administratively prior to raising them in federal court"); *Carrasquillo v. City of N. Y.*, 324 F. Supp. 2d 428, 442 (S.D.N.Y. 2004) (ADA and Rehabilitation Act claims "fall within the rubric of 'any other federal law.'").

In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular institution to which they are confined. *Jones v. Bock*, 549 U.S. 199, 218 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)); *see also Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (exhaustion necessitates "using all steps that the [government] agency holds out, and doing so properly").

In New York state prisons, DOCCS has a well-established three-step Inmate Grievance Program ("IGP"). N.Y. Comp. Codes R. & Regs. ("N.Y.C.R.R.") tit. 7, § 701.5 (2013). Generally, the DOCCS IGP involves the following procedure for the filing of grievances. First, an inmate must file a complaint with the facility's IGP clerk within twenty-one calendar days of the alleged occurrence. *Id.* § 701.5(a). A representative of the facility's inmate grievance resolution committee ("IGRC") has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id.* § 701.5(b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance, *id.* § 701.5(b)(2), and issues a written decision within two working days of the conclusion of the hearing. *Id.* § 701.5(b)(3).

Second, a grievant may appeal the IGRC decision to the facility's superintendent within seven calendar days of receipt of the IGRC's written decision. *Id.* § 701.5(c)(1). If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal. *Id.* § 701.5(c)(3)(ii). Grievances regarding DOCCS-wide policy issues are forwarded directly to the central office review committee ("CORC") for a decision under the process applicable to the third step. *Id.* § 701.5(c)(3)(i).

Third, a grievant may appeal to CORC within seven working days of receipt of the superintendent's written decision. *Id.* § 701.5(d)(1)(i). CORC is to render a written decision within thirty calendar days of receipt of the appeal. *Id.* § 701.5(d)(3)(ii).

Grievances claiming employee harassment "are of particular concern to the administration of [DOCCS] facilities," and subject to an expedited procedure whereby the grievance goes directly to the facility superintendent. [5] *Id.* § 701.8. The superintendent is required to initiate an in-house investigation by higher ranking supervisory personnel; request an investigation by the inspector general's office; or request an investigation by the New York State Police Bureau of Investigation if the superintendent determines that criminal activity may be involved. *Id.* § 701.8(d). A grievance referred to the superintendent and determined to be an allegation of harassment, may not be withdrawn and must be addressed by the superintendent. *Id.* § 701.8(d). The superintendent is required to render a decision on the grievance within twenty-five calendar days, and extensions may be granted only with the consent of the grievant. *Id.* § 701.8(f). If the superintendent fails to respond within the required twenty-five days, the grievant may appeal the grievance to CORC by "filing a notice of decision to appeal (form #2133) with the inmate grievance clerk." *Id.* § 701.8(g).

**\*8** If a prisoner has failed to properly follow each of the applicable steps, including receipt of a decision from CORC prior to commencing litigation, he has failed to exhaust his administrative remedies and is barred from commencing a federal lawsuit. *Woodford*, 548 U.S. at 93.

Because failure to exhaust is an affirmative defense, the defendant bears the burden of showing by a preponderance of the evidence that the plaintiff has failed to exhaust administrative remedies. *See Murray v. Palmer*, No. 9:03-CV-1010 (GTS/GHL), 2010 WL 1235591, at \*4 (N.D.N.Y. Mar. 31, 2010); *Bailey v. Fortier*, No. 9:09-CV-0742 (GLS/DEP), 2012 WL 6935254, at \*6 (N.D.N.Y. Oct. 4, 2012) (the party asserting failure to exhaust bears the burden of proving its elements by a preponderance of the evidence).

Whether a plaintiff has exhausted his administrative remedies is a question of law. *Snider v. Melindez*, 199 F.3d 108, 113-14 (2d Cir. 1999). Thus, an inmate's failure to exhaust administrative remedies is properly considered on a motion for summary judgment in lieu of an answer. *Crichlow v. Fischer*, No. 6:15-CV-06252 EAW, 2017 WL 920753, at \*5 (W.D.N.Y. Mar. 7, 2017) (citing *Mckinney v. Prack*, 170 F. Supp. 3d 510, 514 (W.D.N.Y. 2016) (granting a motion for summary judgment made in lieu of

an answer where inmate failed to exhaust administrative remedies)); *see also Crichlow v. Crowley*, No. 13-CV-6624 CJS, 2015 WL 1808626, at \*6-7 (W.D.N.Y. Apr. 21, 2015) (same); *Crenshaw v. Syed*, 686 F. Supp. 2d 234, 236 (W.D.N.Y. 2010) (same).

### 2. Analysis

Defendants contend summary judgment should be granted because Plaintiff failed to comply with the administrative exhaustion requirement of the PLRA. (Dkt. No. 177-5 at 4-7.) In support of their motion, Defendants have submitted the declaration of Jeffery Hale, Assistant Director of DOCCS IGP. (Dkt. No. 177-3.) In that capacity, Hale is a custodian of the records maintained by CORC. *Id.* at ¶ 1. The CORC computer database contains records of all appeals received from the facility IGP offices and which were heard and decided by CORC since 1990. *Id.* at 2. These grievances are referred to as "exhausted." *Id.*

Hale declares that he has reviewed the records for all grievances appealed to CORC by Plaintiff from his incarceration in 2008, through commencement of this action in October 2012. *Id.* at ¶¶ 3-4. In total, Plaintiff exhausted twenty-seven grievances to CORC, only one of which is relevant to this action. *See id.* at 5-7.

On March 14, 2011, Plaintiff filed a six-page grievance dated March 6, 2011, assigned Grievance No. ECF-24381-11:

> I'VE BEEN ON KEEPLOCK FOR 58 DAYS I'M BEING DISCRIMINATED AGAINST CAUSE OF MY HARD HEARING HL20 HEARING LOSS DEPRIVED OF THE OPPORTUNTIY FOR LAUNDRY SERVICES ALSO TO PROVIDE CLEAN CHANGE OF CLOTHING OR SHEETS AT LEAST ONCE A WEEK IN ACCORDANCE WITH ITS OWN DOCS ALSO COMMISARY BUYSHEET FOR KEEP LOCK INMATES NO SOAP SHAMPOO OR DEODORANT OR LEGAL PAD OR PENS TO DO LAW WORK ALSO STAMPS, AND HAD INSUFFICIENT HEALTH & HYGIENE SUPPLIES, I CRICHLOW WAS DEPRIVED OF THESE BASIC HUMAN NECESSITIES. AND ITS EFFECTS INCLUDING INADQEUATE NUTRITION, CLOTHING,

SHELTER, SANITATION, MEDICAL CARE, AND PERSONAL SAFETY, AND CAUSE GENUINE DEPRATION AND HARDSHIP OVER AN EXTENDED PERIORD OF TIME. FOR I, CRICHLOW, SUCH HARSH CONDITIONS & RESTRICTIONS ARE INCOMPATIBLE WITH CONTEMPROARY STANDARDS OF DECENCY, CAUSE WANTON AND UNNECESSARY INFLICTION OF PAIN, AND ARE NOT REASONABLY RELATED TO ANY LEGITIMATE PENOLOGICAL OBJECTIVES. AS A RESULT OF THE FORGOING, I, CRICHLOW OF B-3-32-25 S.D.U., WAS SUBJECTED TO CRUEL AND UNUSUAL PUNISHMENT IN VIOALTION OF THE EIGHTH AMENDMENT AND FORTHEENTH AMDNENDMNT. ALSO IN VIOLATION OF THE F.R.A. 1973 & A.D.A. OF 1990.

**\*9** ALSO TODAY OFFICER FREEMAN REFUSED TO LET ME WASH CLOTHING 3,7,2011 OR CHANGE MY SHEET THIS BEEN GOING ON FOR OVER 2 WEEKS BY OFFICERS WORKING 7 TO 3 TOUR IN S.D.U., THE EFFECT OF ALL ABOVE THESE DEPRIVATIONS WAS ONLY COMPOUNDED, BY THE UNSANITARY LIVING CONDITIONS ALSO VERY UNHEALTHY TO ME WITH MY FRAGILE HEALTH CONDITION.

I KNOW NEXT 7 TO 3 FEMALE OFFICERS ARE GOING TO SAY I TRY TO BRUTAL ATTACKS THEM OR PUT A GUN IN MY CELL OR SET ME UP. ALSO MIGHT SAY I'LL THREATING HER SO I BE PUT IN S.H.U. ALSO ON 3,8,2011 I TALK TO DEPUTY ABOUT NOT GETTING NONE OF THE ABOVE TIME 10:00 AM ALSO ABOUT OFFICER FREEMAN.

(Dkt. No. 177-4 at 12-17 (original unaltered text).)

On April 8, 2011, the Superintendent found "no merit" to Plaintiff's grievance:

> Grievant alleges harassment by security staff regarding his clothing, laundry, medical, and toiletries. The involved staff have taken the appropriate steps to explain how keeplocked inmates receive services

including recreation, medical, laundry, etc. The grievant has failed to follow staff direction. As a result, the grievant has misbehavior reports pending resolution. Grievant must follow staff direction. Staff direction should not be viewed as harassment. Grievance has no merit."

*Id.* at 18.

In his appeal statement to CORC, Plaintiff alleged: "OFFICER FREEMAN & OFFICER JAHMEL ARE NOT LET ME OUT FOR SHOWER OR RECRECATION AND WHEN I GO TO MEDS RUN THEY SAYING THAT MY REC AND SHOWER." *Id.* (original unaltered text).

On June 15, 2011, CORC upheld the Superintendent's decision for the reasons stated. *Id.* at 9. In addition:

> CORC notes that that the facility administration has conducted a proper investigation, and that sufficient evidence has not been presented to substantiate that the grievant was denied appropriate hygiene items, medical treatment, meals, or laundry services. CORC notes that keeplock inmates are permitted to purchase soap, shampoo, deodorant and stamps from the commissary. Further, CO F ... indicates that she observed the grievant several times attempting to wash his clothing in the slop sink on the way to medication. CORC notes that in accordance with facility P&P 639 Section VI.B.1. laundry services for B/3 are conducted on Wednesday mornings. CORC advises him to follow facility P&P regarding laundry procedures in order to avoid future similar difficulties. ... With respect to the grievant's appeal, CORC asserts that all relevant information must be presented at the time of filing in order for a proper investigation to be conducted at the facility level.

*Id.*

As such, Defendants seek summary judgment on all claims that were not raised in Grievance No. ECF-24381-11. (Dkt. No. 177-5 at 4-6.)

In his opposition, Plaintiff claims he has filed over 300 grievances, and seems to suggest that this is sufficient to exhaust his administrative remedies. (Dkt. No. 209-3 at 8.) Plaintiff misunderstands the exhaustion requirement. The filing of a grievance is but the first step in exhausting administrative remedies. To exhaust DOCCS administrative remedies, a prisoner must appeal to CORC. *See Woodford*, 548 U.S. at 93. "Plaintiff's filing of 300 grievances, even if true, is insufficient to exhaust his remedies under the PLRA." *See Crichlow v. Fischer*, 2017 WL 920753, at 5.

Plaintiff has also suggested alternative means to exhaust administrative remedies, all of which have been previously rejected by the Western District. *Crichlow v. Crowley*, 2015 WL 1808626, at *5-6 (granting summary judgment and dismissing Plaintiff's First, Eighth, and Fourteenth Amendment claims, and ADA and Rehabilitation Act claims without prejudice for failure to exhaust administrative remedies). For example, Plaintiff argues that his claims should be deemed exhausted when the Inspector General "takes over" and investigates a claim. (Dkt. No. 209-3 at 9.) Plaintiff also claims he exhausted his administrative remedies by "filing outside grievances" and complaining to Commissioner Fischer, wardens, and senior staff. *Id.* at 7. Lastly, Plaintiff contends inmates do not have to exhaust "favorable" determinations to CORC. *Id.* at 44. The Court also finds Plaintiff's contentions to be meritless.

**\*10** Indeed, "the law is clear that prisoners 'cannot satisfy the PLRA's exhaustion requirement solely by ... making informal complaints to prison staff.' " *Khudan v. Lee*, No. 12-cv-8147 (RJS), 2016 WL 4735364, at *5 (S.D.N.Y. Sept. 8, 2016) (quoting *Macias v. Zenk*, 495 F.3d 37, 44 (2d Cir. 2007)); *see also Rodriguez v. Cross*, No. 15-CV-1079 (GTS/CFH), 2017 WL 2791063, at *4 (N.D.N.Y. May 9, 2017) ("such correspondence does not satisfy exhaustion and falls outside of the grievance procedures."). Furthermore, contrary to Plaintiff's contention, an investigation conducted by the Inspector General regarding an inmate's claim does not exhaust nor excuse the inmate from exhausting

his grievance to CORC. *See Dabney v. Pegano*, 604 Fed.Appx. 1, 4 (2d Cir. 2015) ("The [Inspector General's] of [the inmate's] claims does not constitute such a special circumstance [excusing exhaustion].").

Based upon the foregoing, the Court finds Defendants have adequately supported the affirmative defense of non-exhaustion as to all claims not addressed in Grievance No. ECF-24381-11. However, as recognized by the Supreme Court in *Ross v. Blake*, a finding of failure to exhaust does not end a court's exhaustion review because "the PLRA contains its own, textual exception to mandatory exhaustion." *Ross v. Blake*, 136 S. Ct. 1850, 1588 (2016).[6]

Under the PLRA, "the exhaustion requirement hinges on the 'availab[ility]' of administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones." *Id.* Thus, courts are tasked with determining whether or not a prisoner's administrative remedies are, in fact, "available." The Supreme Court found the ordinary meaning of the word "available" to be " 'capable of use for the accomplishment of a purpose,' and that which 'is accessible or may be obtained.' " *Id.* (quoting *Booth v. Churner*, 532 U.S. 731, 737-38 (2001)). "Accordingly, an inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.' " *Id.* at 1859 (citation omitted).

To guide courts in this analysis, the Supreme Court identified "three kinds of circumstances" in which an administrative remedy, "although officially on the books," is not "available."[7] *Id.* at 1859. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates. *Id.* "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* To meet this high bar, the administrative remedy must be "essentially 'unknowable.' " *Id.* Finally, an administrative remedy is not available "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

**\*11** In response to Defendants' assertion that Plaintiff failed to exhaust his administrative remedies for all claims not addressed in Grievance No. ECF-24381-11, Plaintiff

claims that DOCCS lost or destroyed his grievances. (Dkt. No. 209-3 at 19 (claiming that DOCCS destroyed meritorious grievances); *see also* Dkt. No. 211 at 1.) Western District Judge Wolford rejected this argument in Case No. 6:15-CV-06252, finding that "Plaintiff's wholly conclusory and unsupported allegation that grievances are tampered with at Wende do not create a material issue of fact in this case." *Crichlow v. Fischer*, 2017 WL 920753, at *6 (quoting *Mims v. Yehl*, Nos. 13-CV-6405-FPG, 14-CV-6304-FPG, 14-CV-6305-FPG, 2014 WL 4715883, at *4 (W.D.N.Y. Sept. 22, 2014)). This Court also finds that Plaintiff's general claim of grievance tampering at Eastern fails to create a material issue of fact in this action.

Indeed, "[c]ourts in this Circuit have continuously held that mere contentions or speculation of grievances being misplaced by officers do not create a genuine issue of material fact when there is no evidence to support the allegations." *Rodriguez v. Cross*, 2017 WL 2791063, at *7 (citing *Khudan*, 2016 WL 4735364, at *6 (citations omitted) (holding under *Ross*, mere "stand alone" accusations that prison officials routinely interfered with his attempts to file grievances are "insufficient" to withstand summary judgment)); *see also Veloz v. New York*, 339 F. Supp. 2d 505, 516 (S.D.N.Y. 2004) (granting summary judgment where the plaintiff claimed prison officers misplaced his grievances but offered no evidence to support his contention) (citing *Nunez v. Goord*, 172 F. Supp. 2d 417, 428 (S.D.N.Y. 2001) (inmate's unsupported claims that his grievances were lost or destroyed by officers thereby rendering his attempts to grieve futile, fails to excuse inmate from fully grieving remedies)); *Rosado v. Fessetto*, No. 9:09-cv-67 (DNH)(ATB), 2010 WL 3808813, at *7 (N.D.N.Y. Aug. 4, 2010) ("Courts have consistently held ... that an inmate's general claim that his grievance was lost or destroyed does not excuse the exhaustion requirement."), *adopted by* 2010 WL 3809991 (N.D.N.Y. Sept. 21, 2010).

In his sur-reply, Plaintiff claims in conclusory fashion that Captain Russo and Acting Superintendent Wendland "conspired" with other staff at Eastern to "destroy" Grievance Nos. ECF-242710-10, ECF-24275-10, ECF-24281-10, and ECF-24287-10, so as to "cover-up their own misconduct." (Dkt. No. 211 at 19.) Plaintiff speculates that because only one grievance was appealed to CORC while he was confined at Eastern (ECF-24381-11), all of his grievances must have been destroyed by DOCCS. However, as set forth above,

"[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer*, 156 F.3d at 400.

Plaintiff has also challenged the veracity of Hale's declaration. (Dkt. No. 209-3 at 8, 16-17.) Specifically, Plaintiff contends Hale's declaration is "inadequate" because several grievances are "missing" from CORC's records and thus omitted from Hale's declaration and attached exhibits, including Grievance Nos. ECF-24713-11, ECF-24515-11, ECF-24607-11, ECF-24622-11 and ECF-24782-11. (Dkt. No. 209-3 at 8.) However, as set forth in Hale's declaration, "[t]he CORC computer database contains records of all appeals received from the facility Inmate Grievance Program Officers *and* which were heard and decided by CORC since 1990. (Dkt. No. 177-3 at ¶ 2 (emphasis added).) The five grievances Plaintiff claims were omitted from Hale's declaration do not bear the Grievance Clerk's Signature. (*See* Dkt. No. 211-1 at 18, 27, 28, 29, 30.)

Lastly, to the extent Plaintiff relies on *Hemphill* and *Giano* to argue "special circumstances" justify and excuse his failure to comply with the exhaustion requirement (*see* Dkt. No. 211 at 4), "that avenue has been foreclosed." *Riles v. Buchanan*, 656 Fed.Appx. 577, 581 (2d Cir. 2016).

**\*12** Based upon the forgoing, the Court finds Plaintiff exhausted a single grievance before commencing this action. Therefore, the Court recommends granting Defendants' motion for summary judgment on all claims not addressed in ECF-24381-11 for failure to exhaust administrative remedies.

### B. Grievance No. ECF-24381-11

Defendants also seek summary judgment on Plaintiff's claims addressed in ECF-2431-11, which pertain to the conditions of Plaintiff's keeplock confinement. (Dkt. No. 177-55 at 6-7.) As an initial matter, Defendants contend that Plaintiff's exhausted claims of being denied laundry, soap, shampoo, deodorant, and writing paper while in keeplock do not give rise to an Eighth Amendment claim. *Id.* Defendants further argue that Plaintiff's generalized allegations, to the effect that he faced discrimination based on a disability, and was denied adequate nutrition, clothing, shelter, medical care, and security, fails to provide Defendants with enough information to rectify the problem at the administrative level as to have exhausted those claims associated with Plaintiff's keeplock

confinement. *Id.* In response to Defendants' motion, Plaintiff claims he was "deprived of basic human necessities." (Dkt. No. 210-2 at 21.)

### 1. Conditions of Confinement

The Eighth Amendment protects prisoners from "cruel and unusual punishment" in the form of "unnecessary and wanton infliction of pain" at the hands of prison officials. *Wilson v. Seiter*, 501 U.S. 294, 297 (1991); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). The constitutional prohibition against cruel and unusual punishment includes the right to be free from conditions of confinement that impose an excessive risk to an inmate's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). To establish an Eighth Amendment conditions of confinement claim, a plaintiff must establish that (1) he was incarcerated under conditions which posed a substantial risk of serious harm, and (2) prison officials acted with deliberate indifference to his health or safety. *See Farmer*, 511 U.S. at 834.

The required culpable state of mind of the prison official is one of deliberate indifference. *Farmer*, 511 U.S. at 834; *Trammell v. Keane*, 338 F.3d 155, 162 (2d Cir. 2003). "Deliberate indifference" requires more than negligence, but less than conduct undertaken for the very purpose of causing harm. *Farmer*, 511 U.S. at 835. The prison official must know that the inmate faces "a substantial risk of serious harm and [must disregard] that risk by failing to take reasonable measures to abate it." *Bolton v. Goord*, 992 F. Supp. 604, 626 (S.D.N.Y. 1998) (quoting *Farmer*, 511 U.S. at 847).

The Supreme Court has held that the Eighth Amendment requires that inmates not be deprived of their "basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety." *Helling v. McKinney*, 509 U.S. 25, 32 (1993) (internal citation and quotation omitted). However, "[b]ecause society does not expect or intend prison conditions to be comfortable, only extreme deprivations are sufficient to sustain a conditions of confinement claim." *Blyden v. Mancusi*, 186 F.3d 252, 263 (2d Cir. 1999). "The conditions themselves must be evaluated in light of contemporary standards of decency." *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012) (citation and internal quotation marks omitted).

### 2. Analysis

**\*13** Plaintiff alleges while keeplocked for fifty-eight days, he was subjected to conditions in violation of the Eighth Amendment. (Dkt. No. 12-1 at ¶ 106-07.[8]) Specifically, Plaintiff claims he was denied laundry, soap, shampoo, deodorant, and stationary supplies such as writing paper, and pens. *Id.* Such claims do not give rise to an Eighth Amendment claim. *See, e.g.*, *Chavis v. Kienert*, No. 9:03-CV-0039 (FJS/RFT), 2005 WL 2452150, at \*21 (N.D.N.Y. Sept. 30, 2005) (denial of toiletries for a two month period did not rise to the level of deliberate indifference to the prisoner's health or safety); *Thomas v. Smith*, 559 F. Supp. 223, 224 (W.D.N.Y. 1983) (denial of basic hygiene items such as deodorant, soap, shampoo while confined in disciplinary segregation dismissed as frivolous); *see also Trammell v. Keane*, 338 F.3d at 165 (holding that "[d]eprivation of other toiletries for approximately two weeks—while perhaps uncomfortable—does not pose such an obvious risk to an inmate's health or safety to suggest that the defendants were 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and [that they also drew] the inference.' " (quoting *Farmer*, 511 U.S. at 837)); *Fernandez v. Armstrong*, No. 3:02-CV-2252, 2005 WL 733664, at \*5 (D. Conn. Mar. 30, 2005) (denial of hygiene items including a toothbrush, toothpaste, soap, and shampoo for a period of sixteen days does not allege a violation of Eighth Amendment rights (citations omitted); *McCorkle v. Walker*, 871 F. Supp. 555, 557 (N.D.N.Y. 1995) (no Eighth Amendment violation where plaintiff was not given a change of underwear for fifteen days); *Chavis v. Fairman*, No. 94-1503, 1995 WL 156599, at \*5 (7th Cir. Apr. 6, 1995) (no Eighth Amendment violation where inmate was forced to wear same uniform for three weeks).

Furthermore, to the extent Plaintiff relies on alleged violations of DOCCS regulations regarding laundry services and commissary buy sheets, "[a] violation of a state law or regulation, in and of itself, does not give rise to liability under 42 U.S.C. § 1983." *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 482 (N.D.N.Y. 2009) (collecting cases).

In his opposition, Plaintiff claims he "was not getting commissary" at all. (Dkt. No. 209-3 at 11.) However, as Defendants correctly note, the record evidence

demonstrates loss of commissary was part of Plaintiff's disciplinary sentences. (*See* Dkt. No. 177-4.)

Regarding Plaintiff's general allegation of being deprived of adequate nutrition, clothing, shelter, sanitation, medical care, and personal safety while keeplocked, Defendants challenge whether Grievance No. ECF-24381-11 is sufficient on its face to exhaust Plaintiff's administrative remedies. (Dkt. No. 177-5 at 6-7.)

Second Circuit case law is clear that the grievance standard is similar to notice pleading in that a grievance "must contain allegations sufficient to alert the defendants to the nature of the claim and to allow them to defend against it." *Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205, 234 (2d Cir. 2004). Although it is appropriate to afford *pro se* inmates a liberal grievance pleading standard, the grievance may not be so vague as to preclude prison officials from taking appropriate measures to resolve the complaint internally. [9] *Brownell v. Krom*, 446 F.3d 305, 310 (2d Cir. 2006). Thus, "a prisoner must allege facts sufficient to alert corrections officials 'to the nature of the claim,' and 'provide enough information about the conduct' at issue 'to allow prison officials to take appropriate responsive measures.' " *Singh v. Lynch*, 460 Fed.Appx. 45, 47 (2d Cir. 2012) (quoting *Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004)).

**\*14** Furthermore, the plaintiff's claim and grievance must be predicated on the same injury. *Rentas v. Nason*, No. 09-cv-5528, 2010 WL 3734086, at \*1 (S.D.N.Y. Sept. 22, 2010); *see Turner v. Goord*, 376 F. Supp. 2d 321, 324 (W.D.N.Y. 2005) ("[T]he mere fact that [the] plaintiff filed some grievance, and fully appealed all the decisions on that grievance, does not automatically mean that he can now sue anyone who was in any way connected with the events giving rise to that grievance.").

In this instance, Defendants contend Plaintiff's generalized allegations in Grievance No. ECF-24381-11, to the effect that Plaintiff faced discrimination based on a disability, and was denied adequate nutrition, clothing, shelter, medical care and security, fails to provide Defendants with enough information to rectify the problem at the administrative level as to have exhausted the claims associated with Plaintiff's keeplock confinement. (Dkt. No. 177-5 at 6-7.) Although the Court tends to agree with Defendants, the decisions issued by the Superintendent and CORC suggest Plaintiff's grievance

provided enough information to investigate and conduct a proper investigation regarding "hygiene items, medical treatment, meals, or laundry services" while keeplocked. (Dkt. No. 177-3 at 9, 18.)

Regardless, upon a thorough review of Plaintiff's amended complaint and opposition papers, the Court finds Plaintiff's alleged deprivations of adequate nutrition, clothing, shelter, medical care, do not meet, neither singularly nor collectively, the objective standard of the Eighth Amendment. Simply put, "the Constitutional does not require comfortable prison conditions." *Walker*, 717 F.3d at 125.

As to his alleged denial of medical care, Plaintiff's allegations are belied by his claims. (*See* Dkt. No. 12-1 at ¶¶ 106-07.) Throughout his keeplock confinement, Plaintiff states he attended sick calls, received emergency dental services and pain medication, and had wrist surgery and follow-up care appointments. Specifically, the day after he was confined to keeplock, Plaintiff went to a medical call on January 12, 2011. *Id.* at ¶ 80. Thereafter, Plaintiff "went to emergency dental" on February 27, 2011, and claims to have been to "emergency dental" over "10 times" and "also emergency sick call over 8 times." *Id.* at ¶ 101. On March 1, 2011, Plaintiff again went to "emergency dental" and received antibiotics. *Id.* at ¶ 105. Plaintiff attended medical call out on March 7, 2011, March 24, 2011, March 25, 2011, April 9, 2011, and April 14, 2011. *Id.* at ¶¶ 108, 121, 128. Furthermore, on April 18, 2011, Plaintiff was transported to Foxhall Ambulatory Surgery Center for wrist surgery performed by Dr. Arliss. *Id.* at ¶ 124. Plaintiff received medical services on April 29, 2011, and follow-up care with Dr. Arliss on May 2, 2011. *Id.* at ¶ 129-30. Plaintiff received medication on May 24, 2011. *Id.* at ¶ 131.

Regarding inadequate nutrition, the "limited denial of food ... on keeplock confinement does not rise to the level of cruel and inhuman punishment." *Barclay v. New York*, 477 F. Supp. 2d 546, 554 (N.D.N.Y. 2007) (being denied food for two or three days for a messhall violation did not constitutional a constitutional violation). At most, Plaintiff alleges meals were withheld on an isolated basis. "[S]uch conduct, though not necessarily to be condoned, does not typically rise to a level of constitutional significance." *Cruz v. Church*, No. 05-CV-1067, 2008 WL 4891165, at \*12 (N.D.N.Y. Nov. 10, 2008). While Plaintiff complains on January 11, 2011, January 12,

2017 WL 6466556

2011, and January 14, 2011, that he was provided with "general population" food instead of his "special Jewish diet," Plaintiff has not alleged a total deprivation of food for an extended period of time. Further as discussed above, Plaintiff's claims regarding religious meals were not exhausted. *Id.* at ¶ 84.

**\*15** Plaintiff also maintains he was regularly denied recreation and showers while keeplocked. [10] Specifically, Plaintiff claims he was denied outdoor exercise and fresh air on January 24, 2011, and January 25, 2011, because C.O. Allison said it was "to [sic] cold" even though general population was permitted in the "yard." *Id.* at ¶ 87. On February 3, 4, and 5, 2011, Plaintiff claims he was denied recreation and shower. *Id.* at ¶ 91. Plaintiff claims he was denied recreation and showers on February 8, 9, 11, and 13, 2011. *Id.* at ¶ 92. Plaintiff claims he was denied recreation on March 7, 2011, March 24, 2011, March 25, 2011, April 9, 2011, and April 14, 2011, because he attended medical call out. *Id.* at ¶¶ 108, 121, 128.

Even if these claims were exhausted, a conditions of confinement claim concerning the denial of showers rises to the level of an Eighth Amendment violation only "when such a denial deprives the prisoner of basic human needs." *Dillon v. City of New York*, No. 12 Civ. 7112(LAP), 2013 WL 3776167, at \*2 (S.D.N.Y. July 18, 2013) (citing *McCoy v. Goord*, 255 F. Supp. 2d 233, 260 (S.D.N.Y. 2003)). As such, "courts are reluctant to consider the temporary deprivation of showers a constitutional violation." *Id.*; *see, e.g.*, *Myers v. City of N.Y.*, No. 11 Civ. 8525(PAE), 2012 WL 3776707, at \*8 (S.D.N.Y. Aug. 29, 2012) (temporary deprivations of personal hygiene do not deny plaintiff basic human needs and thus are not constitutional violations). Specifically, the denial of showers for as long as two weeks is not sufficiently serious to state a constitutional claim. *See McCoy*, 255 F. Supp. 2d at 260 (a two-week suspension of shower privileges does not rise to the level of an Eighth Amendment violation); *Cruz v. Jackson*, No. 94 Civ. 2600(RWS), 1997 WL 45348, at \*6 (S.D.N.Y. Feb. 5, 1997) (same).

As to his alleged denial of outdoor exercise and recreation, such claims also fall short of the Eighth Amendment standard. *See, e.g.*, *Barnes v. Craft*, No. 04-CV-1269, 2008 WL 3884369, at \*9 (N.D.N.Y. Aug. 18, 2008) (denial of outdoor exercise "for six days [was] simply not sufficiently severe and prolonged to rise to the level of an

Eighth Amendment violation."); *Gibson v. City of N.Y.*, 96 Civ. 3409, 1998 WL 146688, at \*3 (S.D.N.Y. Mar. 25, 1998) (finding the "deprivation of the opportunity to participate in recreation for eight days in a sixty day period, even when coupled with the deprivation of an opportunity to exercise on two consecutive days," not sufficiently serious); *Davidson v. Coughlin*, 968 F. Supp. 121, 131 (S.D.N.Y. 1997) (deprivation of outdoor exercise for fourteen days did not violate Eighth Amendment). Indeed, "an occasional day without exercise when weather conditions preclude outdoor activities ... is not cruel and unusual punishment." *Anderson v. Coughlin*, 757 F.2d 32, 36 (2d Cir. 1985).

Even considering the totality of Plaintiff's alleged conditions while keeplocked, such claims still fall far short of the Eighth Amendment objective standards. *See, e.g.*, *McNatt v. Unit Manager Parker*, No. 99-CV-1397, 2000 WL 307000, at \*4 (D. Conn. Jan. 18, 2000) (holding that the totality of conditions in restrictive housing unit, including stained, smelly mattresses, unclean cell, no bedding for six days, no cleaning supplies for six days, no toilet paper for one day, no toiletries or clothing for six days, no shower shoes, dirty showers, cold water that did not function properly; and smaller food portions, while not pleasant, did not rise to level of Eighth Amendment violation)).

**\*16** In light of the above, the Court finds Plaintiff has failed to raise a triable issue of fact as to the objective element of his Eighth Amendment claim. Even if Plaintiff had satisfied the objective element, Plaintiff offers no evidence and only his conclusory allegations of retaliatory animus and harassment to support the subjective element claim that Defendants acted with deliberate indifference to his health or safety. Indeed, Plaintiff cannot rely on conclusory allegations and speculation to defeat a motion for summary judgment. *Kerzer*, 156 F.3d at 400.

Based on the foregoing, the Court recommends granting summary judgment to Defendants on Plaintiff's Eighth Amendment conditions of confinement claim.

**WHEREFORE**, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment in lieu of an answer (Dkt. No. 177) be **GRANTED**; and is further

**RECOMMENDED** that Plaintiff's motion for substitution of a party (Dkt. No. 231) be **DENIED** as moot; and it is hereby

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[11] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

**All Citations**

Slip Copy, 2017 WL 6466556

**Footnotes**

1   At the time of the severance and transfer, Judge Wolford noted that there were a number of pending motions, including Defendants' fully brief motion for summary judgment. (Dkt. No. 223 at 7-8.) Judge Wolford left the transferee courts in the Northern and Southern District to decide whether to grant the pending motions vis-à -vis those Defendants and claims transferred to each of them. *Id.*

2   Plaintiff's amended complaint spans 137 pages. (Dkt. No. 12.) Plaintiff's claims relating to Auburn and Eastern are set forth in Dkt. No. 12-1 at ¶¶ 71-147 and Dkt. No. 21-2 at ¶¶ 148-202.

3   Page references to documents identified by docket number are to the page assigned by the Court's electronic filing system.

4   Copies of all unpublished decisions cited herein will be provided to Plaintiff in accordance with *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

5   Section 701.8 has been found applicable to claims of excessive force. *See, e.g., Torres v. Carry*, 691 F. Supp. 2d 366 (S.D.N.Y. 2009).

6   Not long after the parties filed their briefs, the Supreme Court rejected the "special circumstances" exception to mandatory exhaustion applied by many circuits and held that "[c]ourts may not engraft an unwritten 'special circumstance' onto the PLRA's exhaustion requirement." *Ross*, 136 S. Ct. 1850, 1862 ("mandatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion"); *see also Williams v. Priatno*, 829 F.3d 118, 123 (2d Cir. 2016) (*Hemphill v. New York*, 380 F.3d 680 (2d Cir. 2004) and *Giano v. Goord*, 380 F.3d 670 (2d Cir. 2004) have been abrogated by *Ross* to the extent those decisions established the "special circumstances" exception from the exhaustion of administrative remedies requirement in the PLRA). As the Second Circuit explained in *Williams*, "*Ross* largely supplants our *Hemphill* inquiry by framing the exception issue entirely within the context of whether administrative remedies were actually available to the aggrieved inmate." *Williams*, 829 F.3d at 123.

7   In a footnote in *Williams*, the Second Circuit noted that "the three circumstances discussed in *Ross* do not appear to be exhaustive, given the Court's focus on three kinds of circumstances that were 'relevant' to the facts of the case." 829 F.3d 118, 123 n.2. Because the same three circumstances were relevant to the PLRA exhaustion issue in *Williams*, the Second Circuit did not "opine on what other circumstances might render an otherwise available administrative remedy actually incapable of use." *Id.*

8   Defendants also argue that facility records show that on March 6, 2011, Plaintiff was a mere "three weeks into serving a 30-day keeplock sentence, which had begun on February 11, 2011." (Dkt. No. 177-5 at 6; *see* Dkt. No. 177-4 at 8.) In his opposition, Plaintiff explains that he had been keeplocked since January 11, 2011. (Dkt. No. 209-3 at 9-10.) In this instance, each position is supported by the record evidence. (*See* Dkt. No. 177-4 at 7.) Plaintiff's inmate disciplinary record indicates Plaintiff was keeplocked from January 11, 2011, through May 11, 2011, for various infractions. (Dkt. No. 177-4 at 8.) On March 6, 2011, Plaintiff was in the midst of serving a 30-day keeplock sentence, which he served from February 11, 2011 to March 13, 2011. *Id.*

9   New York regulations provide that "[i]n addition to the grievant's name, department identification number, housing unit, program assignment, etc., the grievance should contain a concise, specific description of the problem and the action requested and indicate what actions the grievant has taken to resolve the complaint, *i.e.*, specific persons/areas contacted and responses received." 7 N.Y.C.R.R. § 701.5(a)(2).

2017 WL 6466556

10   The Court finds that inasmuch as Plaintiff claimed he was deprived of recreation and showers for the first time in his appeal statement to CORC, such claims are also unexhausted. (Dkt. No. 177-3 at 12-18.)

11   If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

---

**End of Document**                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

---

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.   15

Crichlow v. Fischer, Slip Copy (2017)

2017 WL 6459512

KeyCite Blue Flag – Appeal Notification

Appeal Filed by CRICHLOW v. FISCHER, 2nd Cir., January 18, 2018

2017 WL 6459512
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Kevin Damion CRICHLOW, Plaintiff,
v.
Brian FISCHER, et al., Defendants.

9:17-cv-00194 (TJM/TWD)
|
Signed 12/18/2017

**Attorneys and Law Firms**

Kevin Damion Crichlow, Romulus, NY, pro se.

Nicole E. Haimson, New York State Attorney General, Albany, NY, for Defendants.

Attorney General, Dept. of Law, Albany, NY, pro se.

**Opinion**

**DECISION & ORDER**

Thomas J. McAvoy, Senior, U.S. District Judge

**I. INTRODUCTION**

**\*1** This pro se action brought pursuant to 42 U.S.C. § 1983 was referred to the Hon. Thérèse Wiley Dancks, United States Magistrate Judge, for a Report and Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). In her September 5, 2017 Report-Recommendation and Order (Dkt. No. 233), Magistrate Judge Dancks recommends that Defendants' motion for summary judgment in lieu of an answer (Dkt. No. 177) be granted, and that Plaintiff's motion for substitution of a party (Dkt. No. 231) be denied as moot. Plaintiff filed objections to the Report-Recommendation and Order. See Obj., Dkt. No. 236. On November 29, 2017, Plaintiff filed a motion for a preliminary injunction. Dkt. No. 238.

**II. DISCUSSION**

**a. Objections to Report-Recommendation and Order**

When objections to a magistrate judge's report and recommendation are lodged, the district court makes a "de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." See 28 U.S.C. § 636(b)(1); see also United States v. Male Juvenile, 121 F.3d 34, 38 (2d Cir. 1997) (The Court must make a de novo determination to the extent that a party makes specific objections to a magistrate's findings.). After reviewing the report and recommendation, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions." 28 U.S.C. § 636(b).

Having considered Plaintiff's objections and having completed a de novo review of the issues raised by the objections, the Court has determined to accept Magistrate Judge Dancks's recommendations for the reasons stated in her thorough report. Accordingly, Defendants' motion for summary judgment in lieu of an answer (Dkt. No. 177) is granted, and Plaintiff's motion for substitution of a party (Dkt. No. 231) is denied as moot.

**b. Preliminary Injunction**

Plaintiff's motion for a preliminary injunction complains of conduct subsequent to the allegations underlying the claims in this action, see Dkt. No. 238-1, pp. 1-3 (complaining about his medical treatment in October 2017), p. 5 (claiming that he was retaliated against because he filed "grievances ... with DOCS Office of Special Investigations since 2016-2017"), and appears to assert new claims for retaliation and denial of medical care based on this subsequent conduct. See id., pp. 3-5. Plaintiff cannot amend the Amended Complaint by bringing a motion for a preliminary injunction complaining about subsequent conduct. Accordingly, the motion for a preliminary injunction is denied without prejudice to being asserted in a new action complaining about the conduct underlying the motion.

**III. CONCLUSION**

For the reasons discussed above, the Court accepts and adopts Magistrate Judge Dancks's Report-Recommendation and Order (Dkt. No. 233) in its entirety. Defendants' motion for summary judgment in lieu of an answer (Dkt. No. 177) is **GRANTED**, and the action is

**DISMISSED** against all remaining Defendants, including those who have not been specifically identified [1] and/or served. Further, Plaintiff's motion for substitution of a party (Dkt. No. 231) is **DENIED AS MOOT**.

**\*2** Plaintiff's motion for a preliminary injunction (Dkt. No. 238) is **DENIED WITHOUT PREJUDICE** to being asserted in a new action complaining about the conduct underlying the motion.

The Clerk of the Court may enter final judgment and close the file in this matter.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2017 WL 6459512

Footnotes

1   Plaintiff names several "Doe" defendants, as well as defendants identified only by position or badge number (such as defendant "B-3 A Officer S.D.U.").

**End of Document**                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 920753
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Kevin Damion CRICHLOW, Plaintiff,

v.

Brian FISCHER et al., Defendants.

6:15-CV-06252 EAW
|
Signed March 7, 2017

**Attorneys and Law Firms**

Kevin Damion Crichlow, Romulus, NY, pro se.

Hillel David Deutsch, NYS Attorney General's Office Department of Law, Rochester, NY, for Defendants.

**Opinion**

### DECISION AND ORDER

ELIZABETH A. WOLFORD, United States District Judge

### INTRODUCTION

**\*1**  Plaintiff Kevin Damion Crichlow ("Plaintiff") filed this action pursuant to 42 U.S.C. § 1983 in the Southern District of New York on October 16, 2012. (Dkt. 2). Plaintiff filed an amended complaint seeking relief against 136 Defendants on June 17, 2013. (Dkt. 12). The action was transferred to this Court on April 28, 2015. (Dkt. 168). The action was then severed by this Court on February 10, 2017. (Dkt. 223). Following severance, 35 Defendants (together "Defendants") remain. (See id. at 5-6).

Presently before the Court are: Defendants' motion for summary judgment (Dkt. 177); Plaintiff's motion for discovery (Dkt. 182); Plaintiff's motion to appoint counsel (Dkt. 182); Plaintiff's motion for a stay (Dkt. 182); Plaintiff's motion for a medical exam (Dkt. 187); Plaintiff's motion for reconsideration (Dkt. 192); Plaintiff's motion to amend (Dkt. 192); Plaintiff's motion for a hearing (Dkt. 192); Defendants' motion for sanctions (Dkt. 195); and Plaintiff's motion for sanctions (Dkt. 198).

For the reasons stated below, Defendants' motion for summary judgment is granted in part and denied in part; Plaintiff's motion for discovery is denied without prejudice; Plaintiff's motion to appoint counsel is denied without prejudice; Plaintiff's motion for a stay is denied without prejudice; Plaintiff's motion for a medical exam is denied; Plaintiff's motion for reconsideration is denied; Plaintiff's motion to amend is denied as moot; Plaintiff's motion for a hearing is denied; Defendants' motion for sanctions is denied without prejudice; and Plaintiff's motion for sanctions is denied.

### I. Plaintiff's Allegations

Plaintiff's amended complaint spans 142 pages. (See Dkt. 12). Following severance of the action into three separate parts, this Court retained Plaintiff's claims in which he asserts violations of his constitutional rights by Defendants relating to Plaintiff's incarceration at the Wende Correctional Facility ("Wende") and treatment at Wyoming Community Hospital. (See Dkt. 223).

Plaintiff alleges actions occurring at Wende beginning on or about September 27, 2008—the date Plaintiff was transferred to Wende—through his transfer to Eastern Correctional Facility on November 16, 2010. (See Dkt. 12 at 14-36; Dkt. 12-1 at 1-12).

Plaintiff alleges inadequate or nonexistent medical care throughout his incarceration at Wende, in violation of the Eighth Amendment. Plaintiff argues that he was not provided mental health treatment as required (Dkt. 12 at 19), and that he was "unreasonably exposed to infectious disease" (id. at 25, 36; Dkt. 188 at 35-36, 38-39). Plaintiff alleges deficient dental care from "2008 into 2013 at 3 [New York Department of Corrections and Community Supervision] prisons." (Dkt. 12 at 36). He contends he was not provided care for "alot of pain hip, jaw, hand, tooth's also need replacement of four's lost teeths & restoration of function and 'oral surgery & periodontics.'" (Id. at 31; see, e.g., Dkt. 12-1 at 1). Plaintiff further alleges that he was denied dental care at Wende on June 30, 2008, to fix a "broken jaw." (Dkt. 12 at 36). As to his medical care, Plaintiff states that Defendant George Boucher, M.D., was grossly negligent in misdiagnosing an injury to Plaintiff's hand, which led to Plaintiff's receiving the "wrong surgery" on January 13, 2010. (Dkt. 12-1 at 2). Plaintiff complains that he was denied treatment for "injuries hip, back, shoulder, head" for "about 68 months." (Id. at 3). Plaintiff also asserts that he was

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.   1

subjected to a risk of disease due to asbestos in Wende. (Dkt. 12 at 21-24, 31; Dkt. 188 at 35).

**\*2** Plaintiff also charges he was deprived of adequate nutrition and hygiene while incarcerated at Wende. Plaintiff claims that from April to September 2009, Defendants C.O. Bartels and C.O. Kevin Barlow "routinely deprived [Plaintiff] ... meaningful opportunities for yard, food, shower, exercise, adequately nutrition." (Dkt. 12 at 25). He makes similar claims against Defendants C.O. Richard Brooks ("Brooks") (*id.* at 32), and C.O. Alicia Humig ("Humig") (*id.* at 26). Plaintiff complains that he was "taken off" of a mandatory religious diet for months because he was not allowed to go to the mess hall. (*Id.* at 32). Plaintiff also alleges that because he is H.I.V. positive, a nutritious diet is critical to his health, and he was deprived of such a diet. (Dkt. 12-1 at 1, 3). Plaintiff asserts that on November 11, 2009, Humig and Defendant Sergeant Paul Olszewski ("Olszewski") refused to let him out of his cell, and placed him in keeplock for about six weeks. (Dkt. 12 at 32). Plaintiff further alleges that he was refused basic laundry services from 2008 through November 1, 2009. (*Id.* at 27).

Plaintiff complains that Defendant T.M.C. Christopher Zaluski ("Zaluski") and others failed to provide reasonable accommodations for Plaintiff's hearing disability. (Dkt. 12 at 14-16; Dkt. 12-1 at 1). Plaintiff alleges that he was in New York Department of Corrections and Community Supervision ("DOCCS") custody for six months before receiving hearing aids. (Dkt. 12 at 30; Dkt. 12-1 at 1). He also claims that he was denied equal access to opportunities and recreation in Wende because of his hearing disability, and that the failure to accommodate his hearing disability was retaliation for his standing up for himself and other disabled inmates. (Dkt. 12 at 33-35; Dkt. 12-1 at 11-12).

Plaintiff claims he was harassed and verbally abused while at Wende. He alleges numerous instances of sexual harassment by Defendant C.O. Attea, and states that he reported such harassment to others, including the superintendent of Wende. (*Id.* at 17-18, 19, 31). Plaintiff claims that on June 18, 2010, Brooks verbally abused and threatened Plaintiff. (Dkt. 12-1 at 8-9). Plaintiff asserts C.O. Corey Petties verbally abused and threatened Plaintiff on July 12, 2010. (*Id.* at 9-10). Plaintiff alleges that DOCCS has a "common practice to encourage and further its employee's, and officers discrimination and harassment

and assault and [deprivation] of proper nutrition." (Dkt. 12 at 20).

Plaintiff also raises Fourteenth Amendment due process claims. Plaintiff complains of unspecified disciplinary proceedings that led a total of 180 days of disciplinary confinement between 2008 and 2010. (*Id.* at 29). Plaintiff claims his due process rights were violated because of the handling of "over 150" grievances filed through November 16, 2010, by Defendants Director Karen Bellamy ("Bellamy") and Sergeant William Scott ("Scott"). (*Id.* at 27-30). Plaintiff asserts that he was retaliated against for filing grievances and that no investigations were conducted into his claims. (*Id.* at 28). Plaintiff states that he filed over 300 grievances. (Dkt. 209-3 at 8; *see, e.g.,* Dkt. 211 at 1).

He also alleges that on July 4, 2010, C.O. Hojsan destroyed Plaintiff's legal documents in the Wende law library, thereby depriving Plaintiff of an opportunity to be heard by the courts. (Dkt. 12-1 at 10-11). Hojsan also allegedly denied Plaintiff access to the law library. (*Id.* at 11).

Plaintiff complains that a fire broke out in his cell block on April 12, 2010, and that the correctional officers in the area, including Olszewski, failed to respond to calls for help. (*Id.* at 6-7). Plaintiff claims that he was denied "fresh-air" and was thereafter denied medical care. (*Id.* at 7).

Plaintiff further contends that on some unspecified date Zaluski instructed others not to let Plaintiff out of his cell, in retaliation for Plaintiff's filing of grievances against Zaluski. (Dkt. 12 at 30).

Plaintiff complains that Defendant Brian Fischer ("Fischer")—the commissioner of DOCCS during Plaintiff's incarceration at Wende—knew of constitutional violations against Plaintiff and failed to take action. (Dkt. 12-1 at 4-5). Plaintiff states that he personally sent "several letters" detailing inadequate health care and assault. (*Id.* at 4). Plaintiff also contends that Defendants "disregarded conditions posing an excessive risk to [his] health and safety ...," and that prison staff was inadequately trained. (*Id.*).

## II. Defendant's Motion for Summary Judgment

### A. Standard of Review

**\*3** Federal Rule of Civil Procedure 56 provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, the court finds that no rational jury could find in favor of that party. *See Scott v. Harris,* 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986)). The standard for granting summary judgment is the same whether the motion is made in lieu of an answer or after discovery has occurred. *See Anderson v. Rochester-Genesee Reg'l Transp. Auth.,* 337 F.3d 201, 206 (2d Cir. 2003).

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*" *Caldarola v. Calabrese,* 298 F.3d 156, 160 (2d Cir. 2002) (emphasis in original) (quoting *Matsushita Elec.,* 475 U.S. at 586-87). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment...." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986) (emphasis in original).

"[A] party may file a motion for summary judgment at any time until 30 days after the close of all discovery." Fed. R. Civ. P. 56(b). But, summary judgment is generally not appropriate until after some discovery has occurred. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986) (stating that summary judgment is appropriate on the proper showing "after adequate time for discovery"); *see, e.g., Hellstrom v. U.S. Dep't of Veterans Affairs,* 201 F.3d 94, 97 (2d Cir. 2000) ("[S]ummary judgment should only be granted if *after discovery,* the nonmoving party has failed to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof." (emphasis original) (internal quotation marks and citations omitted)). "Only in the rarest of cases may summary judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery." *Hellstrom,* 201 F.3d at 97; *see also Trebor Sportswear Co. v. The Ltd. Stores, Inc.,* 865 F.2d 506, 511 (2d Cir. 1989) ("The nonmoving party should not

be 'railroaded' into his offer of proof in opposition to summary judgment." (citing *Celotex,* 477 U.S. at 326)).

**B. Statute of Limitations**

Defendants argue that some of Plaintiff's claims are time-barred by the statute of limitations. (Dkt. 177-5 at 3). "In [§] 1983 actions, the applicable limitations period is found in the 'general or residual state statute of limitations for personal injury actions....' " *Pearl v. City of Long Beach,* 296 F.3d 76, 79 (2d Cir. 2002) (quoting *Owens v. Okure,* 488 U.S. 235, 249-50 (1989)). A § 1983 action filed in New York is subject to a three-year statute of limitations. *Hogan v. Fischer,* 738 F.3d 509, 517 (2d Cir. 2013).

Here, Plaintiff filed this action October 16, 2012. (Dkt. 1). Therefore, any claim arising before October 16, 2009, is barred by the statute of limitations. Plaintiff points to the "continuing violation doctrine" to save his otherwise time-barred claims. (Dkt. 209-3 at 21-22).

> [The continuing violation doctrine] applies to claims composed of a series of separate acts that collectively constitute one unlawful practice. The continuing violation doctrine thus applies not to discrete unlawful acts, even where those discrete acts are part of a serial violation, but to claims that by their nature accrue only after the plaintiff has been subjected to some threshold amount of mistreatment. Accordingly, where the continuing violation doctrine applies, the limitations period begins to run when the defendant has engaged in enough activity to make out an actionable claim. A claim will be timely, however, only if the plaintiff alleges some non-time-barred acts contributing to the alleged violation.

**\*4** *Gonzalez v. Hasty,* 802 F.3d 212, 220 (2d Cir. 2015). Although the continuing violation doctrine generally applies to claims "composed of a series of separate acts that collectively constitute one unlawful practice," *id.* at 220, a plaintiff "must allege both the existence of an ongoing policy of discrimination and some non-time-

barred acts taken in furtherance of that policy." *Fahs Constr. Grp., Inc. v. Gray,* 725 F.3d 289, 292 (2d Cir. 2013) (quoting *Harris v. City of N. Y.,* 186 F.3d 243, 250 (2d Cir. 1999)); *see, e.g., Shomo v. City of N. Y,* 579 F.3d 176, 182 (2d Cir. 2009).

Here, Plaintiff alleges four patterns of conduct which occurred both before and after October 16, 2009: (1) denial of adequate medical and dental treatment; (2) denial of adequate nutrition and hygiene; (3) discrimination and failure to accommodate based on Plaintiff's disability; and (4) denial of due process rights.

The continuing violation doctrine applies to Eighth Amendment claims for deliberate indifference to medical needs. *See Shomo,* 579 F.3d at 182 ("[T]he continuing violation doctrine can apply when a prisoner challenges a series of acts that together comprise an Eighth Amendment claim of deliberate indifference to serious medical needs."). Plaintiff raises a number claims that he was denied adequate medical and dental treatment, which, taken together, could comprise an Eighth Amendment claim for deliberate indifference to serious medical needs. Plaintiff also complains of ongoing deprivations of adequate food and access to showers and laundry. Prison officials' Eighth Amendment obligations require that they "ensure that inmates receive adequate food, shelter, and medical care...." *Farmer v. Brennan,* 511 U.S. 825, 833 (1994).

Defendants argue that Plaintiff failed to allege the existence of a policy of deliberate indifference. (Dkt. 196-2 at 10). The Court disagrees. Plaintiff's amended complaint includes allegations that senior prison officials, including Fischer, knew of ongoing violations related to Plaintiff's inadequate heath care but failed to take action. Plaintiff claims he sent letters to Fischer to point out the inadequacies of his health care at Wende. Plaintiff also attaches a reply letter from Bellamy in which Bellamy states that she is responding to Plaintiff's letters on behalf of "governor Cuomo and Commissioner Fischer." (Dkt. 209-4 at 2). Plaintiff also asserts that the practices complained of "are widespread, longstanding, and deeply embedded in the culture of all [DOCCS] agenc[ies], constitut[ing] unwritten [DOCCS] policies & customs." (Dkt. 12-1 at 5).

Similarly, the amended complaint can be read as alleging a continuing violation as to Defendants' indifference

to Plaintiff's nutrition and hygiene needs. Plaintiff alleges that he was routinely deprived of meaningful opportunities to shower and exercise, and was not provided adequate nutrition. (Dkt. 12 at 25; *see, e.g., id.* at 26). Plaintiff states that while he was in keeplock, corrections officers were told not to feed him. (*Id.* at 26). He also claims that he was only allowed to shower six times in a nine-month period, and that "his clothing and linen's [sic] were never laundered." (*Id.* at 27).

Plaintiff's allegations are sufficient to establish a plausible claim of "an ongoing policy of deliberate indifference and acts taken in accordance with that policy." *See Taylor v. Goord,* Civil Action. No. 9:09-CV-1036 (FJS/DEP), 2010 WL 3825661, at *7 (N.D.N.Y. Sept. 2, 2010), *report and recommendation adopted by* No. 9:09-CV-1036 (FJS/DEP), 2010 WL 3825656 (N.D.N.Y. Sept. 24, 2010). *Cf. Bussey v. Fischer,* Civil Action No. 9:10-CV-1021 (NAM/DEP), 2011 WL 4862478, at *5 (N.D.N.Y. Aug. 1, 2011) (finding a plaintiff failed to allege an ongoing policy of deliberate indifference sufficient to show a continuing violation where the alleged unwritten policy was inconsistent with written policies and requirements), *report and recommendation adopted by* No. 9:10-CV-1021 (NAM/DEP), 2011 WL 4499324 (N.D.N.Y. Sept. 27, 2011). Thus, particularly at this stage of the proceedings, Plaintiff's pre-October 16, 2009, claims as to inadequate medical and dental treatment, as well as inadequate food and hygiene, survive Defendants' statute of limitations defense.

**\*5** Similarly, Plaintiff alleges ongoing discrimination because of his hearing disability in violation of the Eighth and Fourteenth Amendments, as well as the "Rehabilitation Act" and the Americans with Disabilities Act.[1] (Dkt. 12-1 at 1). Plaintiff alleges a pattern of discriminatory conduct, arguing that DOCCS and individual Defendants at Wende failed to accommodate his hearing disability. The last complained-of act of discrimination at Wende occurred on August 18, 2010, well within the three-year statute of limitations. Plaintiff alleges that prison staff at Wende continuously failed to provide him reasonable accommodations, such as providing working hearing aids. Plaintiff also states that other disabled prisoners were not provided reasonable accommodations. Such *pro se* allegations are sufficient, at this stage, to state the existence of an ongoing policy of disability discrimination against Plaintiff.

Plaintiff also claims due process violations related to the processing of his grievances and disciplinary hearings. In this context, the continuing violation doctrine does not apply to Plaintiff's Fourteenth Amendment due process claims because "[e]ach decision made without due process is a discrete violation, and the statute of limitations begins to run from the date that the plaintiff was denied the full and fair hearing he was entitled to." *Bunting v. Fischer*, 14-CV-0578-RJA-MJR, 2016 WL 4939389, at *3 (W.D.N.Y. Aug. 4, 2016) (citing *Gonzalez*, 802 F.3d at 223), *report and recommendation adopted by* 14-CV-578A, 2016 WL 4804099 (W.D.N.Y. Sept. 14, 2016). Thus, all of Plaintiff's claimed due process violations which occurred before October, 16, 2009, are subject to the statute of limitations and must be dismissed.

In sum, at this stage in the proceedings, Plaintiff's claims of deliberate indifference to medical care, inadequate food and hygiene, and the failure to provide reasonable accommodations for his hearing disability all survive Defendants' statute of limitations challenge. Plaintiff's due process claims which are based on the processing of his grievances and which arose before October 16, 2009, are time barred and must be dismissed.

**C. Failure to Exhaust Administrative Remedies**

Next, Defendants argue that many of Plaintiff's claims must be dismissed for failure to exhaust administrative remedies. (Dkt. 177-5 at 4-6). An inmate's failure to exhaust administrative remedies is properly considered on a motion for summary judgment made in lieu of an answer. *See Crenshaw v. Syed,* 686 F. Supp. 2d 234, 236 (W.D.N.Y. 2010) (granting a summary judgment motion made in lieu of answer where inmate failed to exhaust administrative remedies). Pursuant to 42 U.S.C. § 1997e, "[n]o action shall be brought with respect to prison conditions under [§ 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).

> To satisfy that requirement, prisoners in New York must ordinarily follow a three-step [DOCCS] grievance process. The first step in that process is the filing of a grievance with the Inmate Grievance Resolution Committee. Next, the inmate may appeal an adverse decision to the prison superintendent. Finally, the inmate may appeal the superintendent's decision to the Central Office Review Committee ("CORC"). In general, it is only upon completion of all three levels of review that a prisoner may seek relief in federal court under § 1983.

*Crenshaw,* 686 F. Supp. 2d at 236 (citations omitted). "Exhaustion is mandatory—unexhausted claims may not be pursued in federal court." *Amador v. Andrews,* 655 F.3d 89, 96 (2d Cir. 2011). "[D]efendants bear the burden of proof and prisoner plaintiffs need not plead exhaustion with particularity." *McCoy v. Goord,* 255 F. Supp. 2d 233, 248 (S.D.N.Y. 2003). Pursuant to the Second Circuit's decision in *Hemphill v. New York,* 380 F.3d 680 (2d Cir. 2004), a failure to exhaust administrative remedies may be excused where: "(1) the administrative remedies were not in fact available; [or] (2) prison officials have forfeited, or are estopped from raising, the affirmative defense of non-exhaustion; or (3) 'special circumstances justify the prisoner's failure to comply with administrative procedural requirements.' " *Dabney v. Pegano,* 604 Fed.Appx. 1, 3 (2d Cir. 2015) (quoting *Hemphill,* 380 F.3d at 686). However, the third prong of *Hemphill,* relating to "special circumstances" was abrogated by the Supreme Court's decision in *Ross v. Blake,* 136 S. Ct. 1850 (2016). *Williams v. Corr. Officer Priatno,* 829 F.3d 118, 123 (2d Cir. 2016). The inquiry which used to be under the third prong of *Hemphill,* is now considered "entirely within the context of whether administrative remedies were actually available to the aggrieved inmate." *Id.*

**\*6** Here, Plaintiff claims he filed over 300 grievances, and seems to suggest that this is sufficient to exhaust his administrative remedies. (*See* Dkt. 209-3 at 8; *see, e.g.,* Dkt. 211 at 1). Plaintiff misunderstands the exhaustion requirement. The filing of a grievance is but the first step in exhausting administrative remedies. To exhaust DOCCS administrative remedies, a prisoner must appeal to CORC. Plaintiff's filing of 300 grievances, even if true, is insufficient to exhaust his remedies under § 1997e.

In response to Defendants' assertion that Plaintiff failed to exhaust his administrative remedies for most of his claims, Plaintiff claims that DOCCS lost or destroyed his grievances. (Dkt. 209-3 at 19 (claiming that DOCCS destroyed meritorious grievances); Dkt. 211 at 1

(same)). "Plaintiff's wholly conclusory and unsupported allegations that grievances are tampered with at [Wende] do not create a material issue of fact in this case." *See Mims v. Yehl,* Nos. 13-CV-6405-FPG, 14-CV-6304-FPG, 14-CV-6305-FPG, 2014 WL 4715883, at *4 (W.D.N.Y. Sept. 22, 2014).

However, Defendants' submissions show that Plaintiff has satisfied the exhaustion requirement for some potential claims. Defendants' sworn declaration from Jeffery Hale—the Assistant Director of the DOCCS Inmate Grievance Program—states that Plaintiff exhausted 25 grievances between the beginning of his incarceration in 2008 and the filing of this action in October 2012. (Dkt. 177-3 at 2). Of those 25 exhausted grievances, 23 relate to Plaintiff's incarceration at Wende. (*See id.* at 5-6). Defendants provide only a printout listing the titles and grievance numbers of the 23 exhausted grievances that arose at Wende (*see id.*); they did not submit any paperwork relating to the grievances themselves or the final resolution of any exhausted grievance. (*See* Dkt. 177).

Plaintiff clearly exhausted some potential claims which could be raised in federal court pursuant to § 1997e. However, the Court cannot determine whether the claims Plaintiff raises in this action are those which have been exhausted because neither party submitted sufficient information which would allow the Court to make such a determination. It is possible that none of Plaintiff's exhausted grievances relate to the named Defendants in this action; it is equally possible that all 23 exhausted grievances relate to actions taken by the named Defendants. Since Defendants seek summary judgment on this basis, it is their burden to establish the lack of any issue of material fact on the exhaustion argument. They have failed to meet this burden. Thus, Defendants' motion based upon Plaintiff's alleged failure to exhaust is denied.

### D. Plaintiff's Due Process Claims

Regardless of whether grievances were exhausted or whether the claims were timely asserted, Plaintiff's due process claims relating to disciplinary confinement and grievance processing fail as a matter of law and summary judgment is appropriate.

### 1. SHU Confinement

Plaintiff alleges due process claims related to disciplinary proceedings which led to disciplinary confinement. (Dkt. 12 at 29). "[A] prisoner asserting a § 1983 claim for denial of due process at a disciplinary hearing must first identify a liberty interest protected by the Due Process Clause of which he was deprived, and then show that he was deprived of that interest without due process of law." *Aguirre v. Kendra,* 123 F. Supp. 3d 419, 422 (W.D.N.Y. 2015). "Prison discipline implicates a liberty interest when it 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Ortiz v. McBride,* 380 F.3d 649, 654 (2d Cir. 2004) (quoting *Sandin v. Conner,* 515 U.S. 472, 484 (1995)). Where a prisoner alleges that he was confined to the Special Housing Unit ("SHU") as the result of a disciplinary hearing, the court considers how long the confinement lasted, along with "the conditions of the prisoner's segregated confinement relative to the conditions of the general prison population," in determining whether a liberty interest is implicated. *Vasquez v. Coughlin,* 2 F. Supp. 2d 255, 259 (N.D.N.Y. 1998). "Both the conditions and their duration must be considered, since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical." *Sealey v. Giltner,* 197 F.3d 578, 586 (2d Cir. 1999) (internal citation omitted).

**\*7** There is no "bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights." *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir. 2004). However, the Second Circuit has held that confinement for fewer than 101 days under "normal" SHU conditions does not amount to an atypical and significant hardship and thus does not implicate a liberty interest under the Due Process Clause. *Ortiz,* 380 F.3d at 654-55; *see also Tafari v. McCarthy,* 714 F. Supp. 2d 317, 375 (N.D.N.Y. 2010) (stating that SHU confinements of up to 90 days "fall within the 'short range' of disciplinary confinement and thus implicate a liberty interest only if 'the conditions were more severe than the normal SHU conditions.' " (quoting *Palmer,* 364 F.3d at 65)).

Here, Defendants argue that none of Plaintiff's disciplinary confinements violated Plaintiff's due process rights. (Dkt. 177-5 at 6-7). Defendants submitted Plaintiff's prison disciplinary record. (*See* Dkt. 177-4). The records show Plaintiff was subjected to only one non-time-barred SHU confinement at Wende. (*See id.* at 8). That SHU confinement was for 30 days. (*Id.*). Plaintiff

does not argue that the conditions of his confinement were in any way abnormal or atypical. Because Plaintiff's disciplinary confinement fell within the "short" range and did not involve any abnormalities, it did not implicate any liberty interest sufficient to raise a due process violation. Plaintiff's due process claims as to disciplinary confinement at Wende fail as a matter of law.

## 2. Grievance Processing

Plaintiff also raises due process complaints about the handling of his grievances. (*See* Dkt. 12 at 27-30; Dkt. 209-2 at 21). It is well-established that inmates do not have a protected liberty interest in the processing of their prison grievances. *See Torres v. Mazzuca*, 246 F. Supp. 2d 334, 342 (S.D.N.Y. 2003). "[Although] there is a First Amendment right of meaningful access to the courts and a right to petition the government for redress, inmate grievance procedures are not required by the Constitution and therefore a violation of such procedures does not give rise to a claim under § 1983." *Cancel v. Goord*, No. 00 CIV 2042 LMM, 2001 WL 303713, at *3 (S.D.N.Y. Mar. 29, 2001) (internal citations omitted).

Plaintiff has no liberty interest in the prison grievance program. Even if Defendants violated their own procedures in processing Plaintiff's grievances, Plaintiff cannot find relief under § 1983. A prisoner may raise due process claims related to disciplinary hearings. *Montalvo v. Lamy*, 139 F. Supp. 3d 597, 608 (W.D.N.Y. 2015); *Richard v. Fischer*, 38 F. Supp. 3d 340, 358-59 (W.D.N.Y. 2014). However, Plaintiff's allegations here relate only to allegedly faulty grievance processing; Plaintiff makes no allegations of due process violations related to disciplinary hearings. Therefore, these claims fail as a matter of law.

Plaintiff's only claim against Defendants Bellamy and Scott are the due process claims related to the grievance process. Because Plaintiff's claims fail, Defendants Bellamy and Scott must be dismissed from the action.

### E. Retaliation

Finally, Plaintiff alleges that he was retaliated against because he filed grievances. (Dkt. 12 at 28).

A prisoner has a substantive due process right not to be subjected to false misconduct charges as

retaliation for his exercise of a constitutional right such as petitioning the government for redress of grievances. Retaliating against inmates for filing grievances by filing false disciplinary reports violates the First Amendment. In fact, our Circuit has held that the filing of a false disciplinary report is a serious enough action that temporal proximity between an inmate grievance and the filing of a report is enough to state a retaliation claim. Accordingly, a plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action.

**\*8** *Richard v. Fischer,* 38 F. Supp. 3d 340, 358 (W.D.N.Y. 2014) (internal quotation marks and citations omitted). Here, Plaintiff asserts that because of his filing of numerous grievances, unspecified Defendants retaliated by filing false misbehavior reports. (*See* Dkt. 12 at 28). Defendants have not raised any argument related to Plaintiff's retaliation claim. (*See* Dkt. 177-5). Therefore, the Court will not dismiss the retaliation claim.

### F. Summary

For the foregoing reasons, Defendants' motion for summary judgment is granted with respect to Plaintiff's alleged due process claims, but is denied as to Plaintiff's Eighth Amendment claims related to the alleged denial of adequate medical treatment and adequate food and nutrition, and it is also denied with respect to Plaintiff's claims alleging retaliation and the failure to provide reasonable accommodations for Plaintiff's disability.

## III. Plaintiff's Motion for Discovery

Plaintiff moves this Court to open discovery. (Dkt. 182). Plaintiff states that he is "asking for interrogatory answers and other evidence [to] show that the material facts are in dispute." (*Id.* at 2). Plaintiff also states that discovery will allow him to show that he filed "over 300 grievances." (*Id.*).

The Court construes Plaintiff's motion as one under Fed. R. Civ. P. 56(d). In opposing a summary judgment

motion, if a nonmovant "shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d).

A party seeking to delay resolution of a summary judgment motion on grounds that he has been deprived of certain discovery materials "must show that the material sought is germane to the defense, and that it is neither cumulative nor speculative, and a bare assertion that the evidence supporting a plaintiff's allegation is in the hands of the defendant is insufficient."

Alphonse Hotel Corp. v. Tran, 828 F.3d 146, 151 (2d Cir. 2016) (quoting Paddington Partners v. Bouchard, 34 F.3d 1132, 1138 (2d Cir. 1994)).

Here, Plaintiff has not submitted any sworn affidavit or declaration requesting particular information, nor has he described how the material requested is germane to his defense related to the due process claims (the only claims on which the Court has granted summary judgment). As discussed above, the due process claims are barred as a matter of law, and Plaintiff has not made a showing that discovery would alter that conclusion. Therefore, the motion for discovery is denied without prejudice to Plaintiff seeking discovery with respect to the claims that remain.

## IV. Plaintiff's Motion to Appoint Counsel

As part of Plaintiff's motion for discovery, he also moves this Court to appoint counsel "to assist [Plaintiff] in preparing his case...." (Dkt. 182 at 5). Under 28 U.S.C. § 1915(e), the Court may appoint counsel to assist indigent litigants, see, e.g., Sears, Roebuck & Co. v. Charles Sears Real Estate, Inc., 865 F.2d 22, 23-24 (2d Cir. 1988), and the assignment of pro bono counsel in civil cases is within the trial court's discretion. In re Martin-Trigona, 737 F.2d 1254, 1260 (2d Cir. 1984). The court must evaluate "the merits of [the] plaintiff's case, the plaintiff's ability to pay for private counsel, his efforts to obtain a lawyer, the availability of counsel, and the plaintiff's ability to gather the facts and deal with the issues if unassisted by counsel." Cooper v. A. Sargenti Co., Inc., 877 F.2d 170, 172 (2d Cir. 1989). Particular attention must be paid to the merits of the plaintiff's claim. Id. ("Even where the claim is not frivolous, counsel is often unwarranted where the

indigent's chances of success are extremely slim." (quoting Hodge v. Police Officers, 802 F.2d 58, 60 (2d Cir. 1986))). Additionally, for prison inmates, the court must also give weight to the plaintiff's lack of practical access to attorneys. Id. at 173-74.

**\*9** Plaintiff was in prison when he filed the complaint, and remains in custody. (See Dkt. 1; Dkt. 4). Plaintiff has already been granted in forma pauperis status in this case. (Dkt. 5). In his in forma pauperis motion, Plaintiff stated that he was incarcerated, had not worked in the past 12 months, and did not have any cash or other assets. (Dkt. 4 at 1-2). A prison official certified that Plaintiff's average account balance for the previous six months was $1.07. (Id. at 3). Plaintiff has conclusively shown that he is indigent, and has met the threshold test for appointing counsel.

However, the Cooper factors all weigh against appointing counsel at this time. Plaintiff's motion papers provide no information suggesting that he attempted to obtain counsel to assist in his case. (See Dkt. 182 at 5). As the Second Circuit has noted, "[t]he vast majority of litigation on behalf of personal claimants is financed initially by lawyers who accept the representation for a contingent fee in the expectation of being rewarded by a share of the winnings." Cooper, 877 F.2d at 173. In the absence of an affirmative statement by Plaintiff otherwise, the Court assumes that he has not sought an attorney to represent him. This weighs against the appointment of counsel.

The Court also finds that the Plaintiff has failed to show anything more than a remote possibility of success on the merits. Plaintiff's ultimate success on the merits faces significant hurdles, including Defendants' defense that Plaintiff failed to exhaust his administrative remedies. This too weighs heavily against the appointment of counsel.

Balancing the factors set forth in Cooper, the Court finds that appointing counsel is inappropriate at this time, and Plaintiff's motion is denied without prejudice.

## V. Plaintiff's Motion for a Stay

Plaintiff moves this Court to stay the action while he undergoes surgery on his wrist, arm, and back. (Dkt. 182 at 6). Plaintiff does not disclose the date of the surgery, or any further information which would allow the Court to evaluate the necessity of such a stay. (See id.). Plaintiff has

2017 WL 920753

not sufficiently shown a need for a stay in the litigation. Therefore, the motion is denied without prejudice.

## VI. Plaintiff's Motion for a Medical Exam

Plaintiff asks this Court, pursuant to Fed. R. Civ. P. 35, to order a medical examination so that he can access medical care for currently occurring medical issues. (Dkt. 187). Rule 35 permits a court to order "a party whose ... condition ... is in controversy to submit to a physical or mental examination by a suitably licensed or certified examiner. The court has the same authority to order a party to produce for examination a person who is in its custody...." Fed. R. Civ. P. 35. "In order to obtain a medical examination under Rule 35, the moving party must establish 'good cause....' " *Kelly v. Times/review Newspapers Corp.,* CV 14-2995 (JMA) (SIL), 2016 WL 2901744, at *1 (E.D.N.Y. May 18, 2016). " 'Rule 35 does not, however, authorize a party to file a motion for his own physical examination.' Neither may a plaintiff invoke Rule 35 in order to receive medical care." *Rodriguez v. Conway,* No. 10-CV-6243L, 2011 WL 4829725, at *3 (W.D.N.Y. Sept. 6, 2011) (citations omitted), *affirmed in relevant part by* No. 10-CV-6243L, 2011 WL 4829869 (W.D.N.Y. Oct. 12, 2011).

Here, Plaintiff's current medical condition is not "in controversy." Plaintiff has already submitted records regarding his medical and dental maladies for the time period at issue in this action. (*See* Dkt. 209-5 at 1-27). Defendants have in no way challenged the substance of Plaintiff's claimed medical needs during his incarceration at Wende from 2008 to 2010. Further, Plaintiff cannot use Rule 35 to receive medical care. Therefore, Plaintiff's motion is denied.

## VII. Plaintiff's Motion for Reconsideration

 *10 Plaintiff titles his motion at Dkt. 192 as a "motion for reconsideration," however, he does not point to any order or decision of the Court for which he seeks reconsideration. Although the Court has the inherent power to reconsider and modify interlocutory orders prior to the entry of judgment, *see* Fed. R. Civ. P. 54(b) ("[A]ny order or other ... that adjudicates fewer than all the claims ... does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."); *Williams v. Cty. of Nassau,* 779 F. Supp. 2d 276, 280 & n.2 (E.D.N.Y. 2011) ("A district

court retains absolute authority to reconsider or otherwise affect its interlocutory orders any time prior to appeal."), *aff'd,* 581 Fed.Appx. 56 (2d Cir. 2014), Plaintiff has not provided sufficient information to allow the Court to decide his motion. Therefore, Plaintiff's motion is denied.

## VIII. Plaintiff's Motion to Amend

Plaintiff also filed a motion which, in essence, asks the Court to allow Plaintiff to amend his response to Defendants' motion for summary judgment. (Dkt. 192). The Court granted such relief already (Dkt. 208), and Plaintiff already filed amended response papers (Dkt. 209; Dkt. 211). Therefore, Plaintiff's motion is denied as moot because he has already received the requested relief.

## IX. Plaintiff's Motion for a Hearing

Plaintiff further asks the Court to hold a hearing "to cover several issue[s] that Plaintiff [does not] fully[ ] understand." (Dkt. 192 at 3). Plaintiff also seeks scheduling conferences or orders pursuant to Fed. R. Civ. P. 16(b) and 26(f). The Court finds that neither a hearing nor a scheduling order is necessary at this time. If Plaintiff has legal questions, he may retain an attorney or do further legal research to answer those questions. It is not the Court's role to answer such questions. Thus, Plaintiff's motion is denied. Once an answer is filed, the case will proceed to discovery.

## X. Defendant's Motion for Sanctions

Defendants move this Court to impose sanctions on Plaintiff pursuant to Fed. R. Civ. P. 11. (Dkt. 195). Defendants argue that, as part of his response to the motion for summary judgment, Plaintiff filed a grievance exhausted by another inmate, claiming the grievance as one Plaintiff had himself exhausted. (Dkt. 195-2 at 1-2 (citing Dkt. 188-8 at 2)). Plaintiff allegedly did so in an attempt to show that the Jeffery Hale declaration was knowingly false and that Defendants had destroyed Plaintiff's grievances. (*Id.* (citing Dkt. 188 at 12)).

A party or counsel for a party is required by the Federal Rules of Civil Procedure to certify that, to the best of their knowledge, the factual contentions made have evidentiary support. Fed. R. Civ. P. 11(b)(3). Rule 11 allows the court to "impose an appropriate sanction on any attorney, law firm, or party that violated [Rule 11(b)] or is responsible for the violation." Fed. R. Civ. P. 11(c)(1). "Sanctions

may be—but need not be—imposed when court filings are used for an 'improper purpose,' or when claims are not supported by existing law, lack evidentiary support, or are otherwise frivolous." *Ipcon Collections LLC v. Costco Wholesale Corp.,* 698 F.3d 58, 63 (2d Cir. 2012) (citation omitted). "Further, even when a district court finds a violation of Rule 11, 'the decision whether to impose a sanction is committed to the district court's discretion.' " *Id.* (quoting *Perez v. Posse Comitatus,* 373 F.3d 321, 325 (2d Cir. 2004)).

Defendants argue that "the only appropriate sanction in this matter is dismissal." (Dkt. 195-2 at 3). The Court disagrees. The grievance at issue relates to a complaint which arose during 2012 and 2013. (Dkt. 188-8 at 2). Even if Plaintiff was the grievant, the grievance itself would be irrelevant to this Court's inquiry into Plaintiff's incarceration conditions from 2008 until 2010. Indeed, the grievance at issue was not taken into account during the Court's review of the motion for summary judgment because it is irrelevant to the time frame at issue. Further, although the filing of false documents in bad faith to a court can, in egregious cases, result in dismissal, *see Ceglia v. Zuckerberg,* No. 10-CV-00569A(F), 2013 WL 1208558 (W.D.N.Y. 2013), *report and recommendation adopted by* 2014 WL 1224574 (W.D.N.Y. 2014), *aff'd,* 600 Fed.Appx. 34 (2d Cir. 2015), such an extreme sanction is not warranted at this time. However, **Plaintiff is hereby warned that any future violation of Rule 11 may result in dismissal of the action or other appropriate sanctions.**

**\*11** Defendants' motion is denied without prejudice.

## XI. Plaintiff's Motion for Sanctions

Finally, Plaintiff asks this Court to impose sanctions on Defendants for making materially misleading and false statements to the Court in its response in opposition (Dkt. 174) to Plaintiff's letter motion (Dkt. 172). (Dkt. 198). The Court denied Plaintiff's motion as unrelated to the claims at issue in this action. (Dkt. 176).

Read generously, Plaintiff argues that Defendants' counsel failed to acknowledge in his response that one of the individuals named in the letter motion was also a named Defendant in this action. (*See* Dkt. 198 at 1-2). Such a misstatement is immaterial and does not warrant

sanctions. As Plaintiff failed to assert any material violation of Rule 11, sanctions are inappropriate, and Plaintiff's motion is denied.

## CONCLUSION

For the foregoing reasons, the Court

GRANTS IN PART AND DENIES IN PART Defendants' motion for summary judgment (Dkt. 177);

INSTRUCTS the Clerk of Court to terminate Defendants Bellamy and Scott from this action;

DIRECTS Defendants to answer the complaint within 30 days of the filing of this Decision and Order;

DENIES Plaintiff's motion for discovery (Dkt. 182) without prejudice;

DENIES Plaintiff's motion to appoint counsel (Dkt. 182) without prejudice;

DENIES Plaintiff's motion for a stay (Dkt. 182) without prejudice;

DENIES Plaintiff's motion for a medical exam (Dkt. 187);

DENIES Plaintiff's motion for reconsideration (Dkt. 192);

DENIES Plaintiff's motion to amend (Dkt. 192) as moot;

DENIES Plaintiff's motion for a hearing (Dkt. 192);

DENIES Defendants' motion for sanctions (Dkt. 195) without prejudice; and

DENIES Plaintiff's motion for sanctions (Dkt. 198).

SO ORDERED.

**All Citations**

Slip Copy, 2017 WL 920753

Footnotes

2017 WL 920753

1    Defendants have not made any statute-of-limitations arguments regarding Plaintiff's claims under the Rehabilitation Act or the Americans with Disabilities Act. (*See* Dkt. 177-5 at 3). Thus, the Court only addresses Defendants' statute-of-limitation argument as it relates to Plaintiff's constitutional claims of discrimination under § 1983.

---

**End of Document**                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2018 Thomson Reuters. No claim to original U.S. Government Works.    11

KeyCite Yellow Flag - Negative Treatment

Report and Recommendation Adopted as Modified by Hamilton v. Smith, N.D.N.Y., September 30, 2009

2009 WL 3199531
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Derrick HAMILTON, Plaintiff,

v.

J.T. SMITH, Superintendent, Shawangunk
Correctional Facility; J. Maly, Deputy
Superintendent of Security; William M. Gonzalez,
Deputy Counsel; M. Genovese, Medical Doctor; M.
Skies, Registered Nurse; Donald Selsky, Director
of Special Housing; D. Parisi, Mail Room Clerk;
F. Chiapperino, Counselor; and Elaine Davis,
Steward, Attica Correctional Facility, Defendants.

No. 06–CV–805 (GTS/DRH).
|
Jan. 13, 2009.

**Attorneys and Law Firms**

Derrick Hamilton, Wallkill, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the
State of New York, Christina L. Roberts–Ryba, Esq.,
Assistant Attorney General, of Counsel, Albany, NY, for
Defendants.

**Opinion**

## REPORT–RECOMMENDATION AND ORDER [1]

DAVID R. HOMER, United States Magistrate Judge.

**\*1** Plaintiff pro se Derrick Hamilton ("Hamilton"), an
inmate in the custody of the New York State Department
of Correctional Services ("DOCS"), brought this action
against nine DOCS employees [2] pursuant to the Civil
Rights Act, 42 U.S.C. § 1983; the Religious Land Use
and Institutionalized Persons Act of 2000, 42 U.S .C. §
2000cc et seq. ("RLUIPA"); [3] and the Health Insurance
Portability and Accountability Act, 29 U.S.C. § 1182
("HIPAA"). Hamilton alleges that defendants violated
his rights to religious freedom and confidentiality as well

as his constitutional rights under the First, Eighth, and
Fourteenth Amendments. Am. Compl. (Docket No. 17).
Presently pending is defendants' motion for summary
judgment pursuant to Fed.R.Civ.P. 56. Docket No. 51.
Hamilton opposes the motion. Docket No. 58. For the
following reasons, it is recommended that defendants'
motion be granted in part and denied in part.

## I. Background

The wide-ranging facts asserted by Hamilton are related
herein in the light most favorable to Hamilton as the non-
moving party. See subsection II(A) infra. At all times
relevant herein, Hamilton was incarcerated first at the
DOCS facility at Attica and then at the DOCS facility at
Shawgunk. Am. Compl. ¶ 2.

## A. Family Court Proceedings

On October 10, 2003, while Hamilton was still
incarcerated at Attica, he was ordered to be produced in
Kings County Family Court for a paternity proceeding.
Docket No. 58–2 at 3. On December 29, 2003, defendant
Gonzalez, a DOCS Deputy Counsel, wrote to that
court advising that "certain security and logistical
impediments ... ma[d]e it impractical for [DOCS] to
produce [Hamilton] personally at the Court." Id. at 4; Am.
Compl. ¶ 19; Docket No. 51–5 at 220. Gonzalez requested
that Hamilton be allowed to appear telephonically on the
appointed date. Am. Compl. ¶ 9; Docket No. 51–5 at 221;
Docket No. 58–2 at 3. On January 7, 2004, Hamilton
participated telephonically in the court proceedings,
which were adjourned to April 28, 2004. Am. Compl.
¶ 20. Facility records indicated that "on March 3, 2006
[Hamilton] refused to attend the teleconference scheduled
for March 21, 2006." J. Smith Decl. (Docket No. 53–3) ¶¶
42–43.

On April 28, 2004, "[b]oth parties failed to appear ... and
[pursuant to a court order dated July 23, 2004,] the petition
was dismissed without prejudice." Docket No. 51–5 at
217; Docket No. 58–2 at 8. The court advised Hamilton
that his "remedies [we]re to make a motion before the
Support Magistrate to vacate the default and reargue the
matter, file a new petition, or appeal the dismissal ."
Docket No. 51–5 at 217; Docket No. 58–2 at 8. Hamilton
filed a grievance complaining that defendants interfered

Case 9:15-cv-01542-MAD-DEP    Document 79    Filed 02/14/18    Page 84 of 227

with his court proceeding and their failure to produce him on April 28, 2004 which resulted in the dismissal of his paternity suit. Docket No. 58–2 at 11. The grievance was denied on the ground that "[t]here [wa]s no record of a request being made for [a conference] call after [January 7, 2004]." *Id.* at 12.

## B. Medical Treatment

### 1. Mental Health Assessment

**\*2** On March 17, 2005, Hamilton arrived at Shawangunk and was given a health screening interview by defendant Skies. Am. Compl. ¶ 21; Docket No. 58–2 at 16. During the interview, Hamilton stated that he had previously attempted suicide and was feeling suicidal during the inquiry. Am. Compl. ¶ 21; Docket No. 58–2 at 16. Hamilton testified that while he has had suicidal thoughts before, he has never harmed himself nor attempted to commit suicide. Hamilton Dep. (Docket No. 51–5) at 19–20. Skies did not recommend Hamilton for a mental health referral or place him on suicide watch. Am. Compl. ¶ 21.

### 2. Confidentiality

On or about January 24, 2006, Hamilton filed a grievance for defendants' alleged failure to treat him. Am. Compl. ¶ 37. Hamilton alleged that the medical department failed to (1) order blood tests,[4] (2) determine whether the medication that Hamilton was taking would cause or contribute to liver damage, and (3) whether his diagnoses of high blood pressure, high cholesterol, and hepatitis A were causing or contributing to Hamilton's other medical ailments. *Id.* On or about February 1, 2006, the medical department disclosed Hamilton's medical records to the grievance department in connection with the grievance. *Id.* ¶ 38; Hamilton Dep. at 38, 78–80. The disclosure was made without Hamilton's prior consent. Am. Compl. ¶ 38. Hamilton filed another grievance on February 3, 2006, arguing that the rules which surrounded his medical confidentiality had been violated. Docket No. 51–5 at 208; Docket No. 58–2 at 31. On February 9, 2006, the grievance was denied because "when the grievant files a grievance concerning medical care or treatment he [or she] affirmatively puts the issue into contention resulting in an

implied waiver of confidentiality." Docket No. 58–2 at 33; J. Smith Decl. ¶¶ 28–30; Hamilton Dep. at 38–39.

### 3. Drug Addiction

Hamilton is allergic to marijuana and even second-hand inhalation contaminates his urine.[5] Am. Compl. ¶ 84; Hamilton Dep. 62–63; Docket No. 58–5 at 2–4. This allergy was the basis of a complaint of medical indifference for a failure to treat Hamilton's drug addiction disease. Hamilton Dep. at 111–12. While in the Special Housing unit (SHU),[6] Hamilton was exposed to marijuana smoke from other unidentified inmates. *Id.* at 113. Additionally, the policy of ordering all windows closed in SHU and allowing the smoke to linger resulted in an aggravation of Hamilton's allergy and his positive urinalysis tests. *Id.* at 115–16. After moving to a different unit, Hamilton's urinalysis tests were negative and he has not felt the effects he experienced in SHU. *Id.* at 113–15.

### 4. Water Treatment

Hamilton also contends that the facility's water was treated with chemicals with deliberate indifference to their effects on his health in light of other medications which Hamilton regularly took. Am. Compl. ¶ 54; Hamilton Dep. at 51–52, 77–78. More specifically, Hamilton asserts that the sodium in the water interfered with the treatment of his high blood pressure and cholesterol. Docket No. 51–5 at 229. On October 10, 2006, Hamilton's grievance was denied on the ground that the "facility water sodium level is below the 20 mg/l benchmark for individuals on severely restricted sodium diet[s]." *Id.*

## C. Living Conditions

### 1. Contaminated Drinking Water

**\*3** Additionally, on March 17, 2005, Hamilton was placed in a cell which had a "plumbing problem that caused feces and other bacteria to contaminate the water." Am. Compl. ¶ 22; Hamilton Dep. at 65–66. Hamilton remained in that cell for more than sixty days, from March 17 to July 1, 2005, and suffered severe stomach aches and pains and contracted Hepatitis A. *Id.* ¶¶ 22, 52;

Hamilton Dep. at 27–30. Hamilton alleges that he received no medical treatment for his Hepatitis. Am. Compl. ¶ 23; Hamilton Dep. at 30–32.

Hamilton filed a grievance on March 29, 2006, complaining that since his return to SHU five days earlier, the water was "tinted yellowish-brown ... [and he had been] unable to drink the water because it [wa]s obvious [that] it [wa]s contaminated with bacteria." Docket No. 58–5 at 23. Additionally, on September 11, 2008, a memorandum was sent to defendant Smith complaining about the water, stating that it "was jet black and full of dross and sediment .... " Docket No. 58–5 at 12. Despite the appearance of the water, correctional facility staff indicated that it was still safe to consume. *Id.* Complaints about the water had persisted for a substantial period of time and stated that there had been multiple inquiries from prisoners to the administrators as to why the "water [wa]s either beige, brown, or black, and reeks the scent of sewage," on a daily basis. *Id.* at 13.[7]

Defendants did not provide bottled water to the inmates during these occurrences and also did not allow SHU prisoners who had lost commissary privileges to buy bottled water from the commissary. Am. Comp. ¶ 43. The water at Shawangunk is regularly tested and "[a]t all times relevant to this litigation ... has met all standards established by the Department of Health." J. Smith Decl. ¶ 22, Docket No. 53–3 at 64–68; *see also* Docket No 51–5 at 235 ("[A] complete battery of tests were performed on [the] facilit[y's] drinking water. There was no lead or copper detected and only a trace amount of iron .... [T]hus the f]acility water ... meets all standards as established by the Department of Health.")

Hamilton still suffers from minor gas pains and bowel irregularities attributed to the water. Hamilton Dep. at 71–72. The only treatment given Hamilton was a topical ointment for his legs and feet. *Id.* at 72, 134–35. Additionally, he contends that the high iron levels in the water have compromised his nervous system, but he has not sought medical attention for that specific ailment. *Id.* at 135.

### 2. Ventilation

From November 30, 2005 until March 25, 2006, Shawangunk policy dictated that all windows in the unit remain closed. Am. Compl. ¶ 36; Hamilton Dep. at 35–36. The lack of ventilation caused Hamilton to suffer nose bleeds and a watering throat and eyes. Am. Compl. ¶ 36. On December 15, 2005, Hamilton, and the other inmates were given a memorandum stating that (1) the current heating and cooling system was in excellent working condition, (2) windows must remain closed at all times during the winter months, and (3) during these winter months, inmates received fresh air from the ventilation system and the inner courtyards. Docket No. 51–5 at 245; Docket No. 58–3 at 51; J. Smith Decl. ¶¶ 10–11; Hamilton Dep. at 36. On or about January 10, 2006, Hamilton filed a grievance relating to the ventilation system claiming that its constant malfunction was causing him medical problems. Docket No. 58–3 at 12.

**\*4** From March 24 until May 6, 2006, the ventilation vents and grates were saturated "with dust, soot and carbon dioxide," and the light fixtures were extremely dusty and dirty. Am. Compl. ¶ 44. Also, between approximately July 14 and July 23, 2008, fifty complaints were lodged by inmates pertaining to the cleanliness and functionality of the ventilation system. Docket No. 58–3 at 13–50. Moreover, Hamilton complained that the recreational area was covered with mold and dust. Hamilton Dep. at 92–95. The mold was green, black, and brown, and covered the walls and gates. *Id.* at 93. The mold also caused Hamilton to suffer bloody noses, an irritated throat, and a burning sensation in his eyes. *Id.* at 94–95.

### 3. Lighting

From March 24 until approximately May 7, 2006, the lights were not turned off in the SHU galley. Am. Compl. ¶ 45; Hamilton Dep. at 56–58. The exposure to bright lights[8] all night caused Hamilton to lose sleep. Am. Compl. ¶ 45. Hamilton spoke to the medical staff about his insomnia, and they recommended doing exercises to assist him with falling asleep. Hamilton Dep. at 57. Correctional facility staff explained that the lights remained on in the SHU for security reasons. Hamilton Dep. at 56–58.

### D. Disciplinary Hearing and Rehearing

On January 12, 2005, Hamilton was selected for a random drug test and tested positive.[9] Selsky Decl. (Docket No. 53–3 at 33–36) ¶ 8; Docket No. 58–3 at 53. Hamilton was found guilty of violating Rule 113.24[10] at a disciplinary hearing at Attica on January 31, 2005. Selsky Decl. ¶¶ 8–9. Hamilton appealed the decision and on April 7, 2005, a rehearing was ordered for April 12, 2005 at Shawangunk. *Id.* ¶ 10; Docket No. 58–4 at 29.

Hamilton refused to attend the rehearing. Docket No. 58–3 at 53. Hamilton alleges "that the rehearing was perfunctory and ... violated more due process rights than the first hearing ..." because (1) he was not provided with appropriate employee assistance to retrieve information sufficient to defend his case, (2) Hamilton was still unable to call the witnesses he deemed necessary which had led to the reversal of the first hearing,[11] and (3) over three months had passed since the time of the incident and in the interim Hamilton had been transferred, a witness had been released from custody, requested documents were difficult to locate or recall, the case was irreparably flawed, and DOCS should have been found at fault. Docket No. 58–4 at 30–38. Hamilton took issue with DOCS' refusal to contact D. Mathis, a former inmate, who eventually submitted an affidavit admitting that an Officer Fix told Mathis to provide him with what they both knew was dirty urine, attached Hamilton's name on Mathis' sample, tested the sample with positive results, and wrote Hamilton an unwarranted disciplinary charge for alleged drug use. Mathis Aff. (Docket No. 58–4 at 50–51) ¶¶ 2, 4, 6; Hamilton Dep. at 96–98, 121–23.

**\*5** Defendants determined that Hamilton refused to attend the rehearing and proceeded in his absence. Selsky Decl. ¶¶ 13, 15. Hamilton was ultimately found guilty of the charges and sentenced to eighteen months in SHU, loss of package privileges, commissary, telephone privileges, and twelve months loss of good time credit. *Id.* ¶ 15; Am. Compl. ¶ 25. On June 13, 2005, the conviction was affirmed, but the SHU penalty was modified to twelve months. Am. Compl. ¶ 26. Hamilton ultimately served ten months of the sentence. Am. Compl. ¶ 27. Hamilton was removed from the drug and alcohol treatment program in which he was enrolled pursuant to facility rules.

**E. Mail Tampering**

On May 18, 2005, Hamilton was sent a letter from Brooklyn Law School responding to a request for legal assistance from Hamilton on March 21, 2005. Am. Compl. ¶ 28; Docket No. 58–3 at 5. The law school's response referred to other communications which Hamilton contends he never received. Am. Compl. ¶ 28; Docket No. 58–3 at 5. However, the law school "informed [Hamilton] in July 2002 that it could not be of assistance ... [and requested that s]ince [they would] not be able to assist [him, that he] please refrain from sending [them] any further papers." Docket No. 58–3 at 5.

Additionally, in June 2005, Nicole Esters sent Hamilton the Mathis affidavit,[12] but Hamilton did not receive it. Am. Compl. ¶ 29. On July 27, 2005, Esters sent Hamilton a letter stating that "on two separate occasions [she] mailed ... a notarized affidavit ...." to him at Shawangunk. Docket No. 58–3 at 2. The document was mailed on June 21 and July 5, 2005, both times by first class mail. *Id.* The documents were never returned to Esters. *Id.* On August 25, 2005, Hamilton wrote a letter requesting an investigation regarding mail being stolen from several inmates by staff. Docket No. 58–3 at 6; Am. Compl. ¶ 31.

In December 2005, Nicole Saunders sent Hamilton legal documents via Federal Express. Am. Compl. ¶ 34. The documents never reached Hamilton, but they were assigned a tracking number. *Id.* When Saunders tracked the items, she discovered that the items were received at the Shawangunk facility. *Id.* She was informed by mail room staff that defendant Maly was in possession of the documents and that if the documents did not comply with facility protocol, they would be sent back to her with a letter. *Id.* ¶ 35; Hamilton Dep. at 32–33. Saunders never received either the letter or the legal documents. Am. Compl. ¶ 35.[13]

While Saunders was attempting to send Hamilton the legal documents, Hamilton was placed on mail watch "[d]ue to an investigation involving all inmate correspondence with Prisoner Legal Services of Buffalo New York." J. Smith Decl. ¶ 6. The mail watch lasted from December 12, 2005 to March 10, 2006. *Id.* During that period, any mail which met the DOCS criteria articulated in Directives 4422 and 4421 would be delivered to Hamilton. *Id.* ¶ 7.

**F. Religious Meals**

**\*6** On July 20, 2005, Hamilton declared that "after religious counseling, [he] profess[ed] to be of the Jewish faith and not of the Roman Catholic faith as previously listed." Docket No. 58–2 at 19. Sometime thereafter, Hamilton was diagnosed with high blood pressure and cholesterol and was placed on a low-sodium medical diet. Am. Compl. ¶ 40; Hamilton Dep. at 41–42. Hamilton filed a grievance on January 27, 2006 alleging that Shawangunk refused to provide him with a medical diet which also complied with his religious tenets. Docket No. 58–2 at 24; Hamilton Dep. at 101–103. The grievance was denied because, pursuant to Directive 4311, "[i]nmate requests for religious foods/diets, shall not be prescribed by the health care provider ... [and thus i]t is [Hamilton's] option to select either a religious diet or a medically prescribed diet." Docket No. 58–2 at 24 (internal citations omitted); J. Smith Decl. ¶¶ 32–35 (explaining that the religious diet is a state-wide menu provided by an outside vendor and, as such, there is currently no religious diet option for those practicing Judaism who require the therapeutic standards of meals which are low in fat, cholesterol, and sodium); Hamilton Dep. at 43–44.

On October 13, 2006, Hamilton complained that Shawangunk "refuse[d] to allow [him] to receive kosher foods low in sodium, [w]hich [he is] required to eat due to religious and medical dietary needs." Docket No. 58–2 at 23. Hamilton requested that he be allowed either to purchase foods through the commissary to supplement his diet or that the facility order an additional low-sodium, kosher, cold, alternative diet tray. *Id.* Again, Hamilton's grievance was denied. Docket No. 51–5 at 237; Docket No. 58–2 at 22. Hamilton appealed the denial, but that appeal was denied. Docket No. 58–2 at 25–26.

While Hamilton was receiving the religious and not the therapeutic diet, his blood pressure and cholesterol levels elevated. Hamilton Dep. 43. Because Hamilton was unable to receive a religious meal that complied with his therapeutic conditions, he was forced to change his religion. [14] *Id.* at 44.

### G. Notification of the Death of a Family Member

Hamilton's son, Andrell Napper, died while Hamilton was incarcerated at Shawangunk. *See generally* Docket No. 58–5 at 40. Hamilton had never listed Napper as one of his children when he entered DOCS custody and Napper did not identify himself as Hamilton's son when he visited Hamilton in prison. Hamilton Dep. at 124–26, 128–29. Additionally, Hamilton was not legally recognized as Napper's father until January 3, 2000 when the child was approximately fifteen years old. Docket No. 58–5 at 44.

Hamilton was thus unable to request leave to attend Napper's funeral. On August 24, 2006, Hamilton was advised by Napper's mother of the circumstances surrounding Napper's death. Hamilton Dep. at 138–39. "Maly reports that the facility made every reasonable effort to verify the relationship between [Hamilton] ... and [the] deceased. Unfortunately, no documentary evidence was found to confirm a relationship." Docket No. 51–5 at 252; Docket No. 58–5 at 45, Hamilton Dep. at 136–38. Hamilton appealed the denial, claiming that he was never questioned about his relationship to Napper. *Id.;* Hamilton Dep. at 131–34 On appeal, the request was again denied. Docket No. 51–5 at 254; Docket No. 58–5 at 46–47.

### H. Placement in Close Supervision Unit

**\*7** On June 1, 2006, Hamilton was placed in Shawangunk's Close Supervision Unit (CSU) without a hearing or an opportunity to dispute the placement. Am. Compl. ¶ 81. This placement was based on false information given by Smith. Hamilton Dep. at 104–11. Hamilton's placement in CSU was "based on ... [his] proven inability to coexist in the general population evidenced by [his] disruptive conduct, poor custodial adjustment and ... involvement in an unusual incident which resulted in the stabbing death of another inmate." Docket No. 58–5 at 27; Hamilton Dep. at 104–05. Hamilton contends that he was not involved in the stabbing, an assertion with which Smith concurred but did nothing to to correct in Hamilton;s records. Hamilton Dep. at 110–11.

While in CSU, Hamilton lost the opportunity to engage in employment in the mess hall. However, Hamilton did not want a job and, if he did, CSU permitted employment as a porter. *Id.* at 108–09. Hamilton was still permitted to go to the library and commissary. *Id.* at 109.

### II. Discussion

In his amended complaint, Hamilton alleges multiple violations of federal statutes and constitutional rights. First, Hamilton asserts that his First Amendment rights were violated when defendants (1) disclosed his confidential medical information to other staff in retaliation for Hamilton filing grievances, (2) tampered with his mail, (3) failed to produce him for his Family Court proceedings, and (4) refused to provide him with a therapeutic meal which also complied with his religious tenets. Second Hamilton asserts that his Eighth Amendment rights were violated when defendants (1) subjected him to contaminated water, dusty cells, broken ventilators, and mold-infested recreation areas; (2) failed to protect his medical confidentiality; (3) refused to provide him with medical treatment for his mental health ailments, drug addiction, or Hepatitis A; and (4) deliberately treated the drinking water with chemicals that aggravated his underlying medical problems. Finally, Hamilton asserts that his Fourteenth Amendment rights were violated when defendants, (1) improperly conducted his disciplinary rehearing, (2) failed to notify him of the death of his son, and (3) inappropriately placed him in CSU.

Defendants move for summary judgment on the grounds that (1) there is no merit to Hamilton's HIPPA, RLUIPA, or constitutional claims; (2) defendants Gonzales, Slesky, Parisi, Genovese, and Davis were not personally involved; and (3) defendants are entitled to qualified immunity.

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed.R.Civ.P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir.1997).

*8 The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. Gallo v. Prudential Residential Servs. 22 F.3d 1219, 1223–24 (2d Cir.1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir.1988).

When, as here, a party seeks summary judgment against a pro se litigant, a court must afford the non-movant special solicitude. Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir.2006); see also Sealed Plaintiff v. Sealed Defendant # 1, 537 F.3d 185, 191 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds pro se, ... a court is obliged to construe his pleadings liberally.' " (citations omitted)). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. Anderson, 477 U.S. at 247–48.

### C. First Amendment

#### 1. Retaliation

Hamilton contends that defendants disclosed his confidential medical information in retaliation for filing grievances. To establish a claim for retaliation, a plaintiff must first demonstrate that the plaintiff's conduct was constitutionally protected and that this protected conduct was a substantial factor that caused the adverse action against plaintiff. Graham v. Henderson, 89 F.3d 75, 79 (2d Cir.1996). "Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone." Jackson v. Onondaga County, 549 F.Supp.2d 204, 215 (N.D.N.Y.2008) (citing Graham v. Henderson, 89 F.3d 75, 79 (2d Cir.1996)). Additionally, courts must view retaliation claims with care and skepticism to avoid judicial intrusion into prison administration matters. Id. Conclusory allegations alone are insufficient. Id. (citing Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir.1983).

In this case, Hamilton has failed to demonstrate facts sufficient to support a retaliation claim. Filing grievances is an activity protected by the First Amendment. However, as discussed *infra,* there is no evidence to support the contention that defendants disclosed any medical information as retaliation rather than for proper purposes. To investigate effectively and thoroughly the grievances Hamilton submitted concerning the medical treatment which he received, the staff and inmate representatives which needed to view his medical records to assess whether there was validity to his claim. Docket No. 58–2 at 33; J. Smith Decl. ¶¶ 28–30; Hamilton Dep. at 38–39. When viewing the facts in the light most favorable to Hamilton, no evidence has been presented to support a claim that any disclosure was motivated by retaliation.

**\*9** Accordingly, defendants' motion should be granted on this ground.

### 2. Denial of Access to Courts

"It is now established beyond a doubt that prisoners have a constitutional right of access to the courts." *Bounds v. Smith,* 430 U.S. 817, 821 (1977). "Interference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U .S. Constitution." *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). In order to state a claim of denial of access to the courts, including those premised on interference with legal mail, a plaintiff must allege "that a defendant caused 'actual injury,' i.e. took or was responsible for actions that 'hindered [a plaintiff's] efforts to pursue a legal claim.' " *Id.* (*citing Monsky v. Moraghan,* 127 F.3d 243, 247 (2d Cir.1997) (*quoting Lewis v. Casey,* 518 U.S. 343, 351 (1996)).

"[R]egardless of the type of legal access claim, the plaintiff would have to show actual harm to a legal claim ... [and t]he cause of the injury must be the inadequacy of the method of access." *Bowe v. Barkley,* No. 95–CV–247 (RSP/GJD), 1997 WL 204311, at \*2 (N.D.N.Y. Apr, 15, 1997) (*citing Lewis,* 518 U.S. at 351). "[A]n isolated incident of mail tampering is usually insufficient to establish a constitutional violation .... Rather, the inmate must show that prison officials regularly and unjustifiably interfered with the incoming legal mail." *Id.* (citations omitted); *see also Washington v. James,* 782 F.2d 1134, 1139 (2d Cir.1986) (explaining that an action may not give rise to damages if there was "no showing ... that the inmate's right of access to the courts was chilled or the legal representation was impaired."); *Morgan v. Montanye,* 516 F.2d 1367, 1371 (2d Cir.1975) (holding that a single instance of mail tampering which did not lead the plaintiff to suffer any damage was insufficient to support a constitutional challenge).

Defendants allegedly precluded Hamilton from attending a court proceeding telephonically. Docket No. 58–2 at 11. The failure to appear resulted in a dismissal of the case. *Id.* However, this dismissal was without prejudice and permitted reinstated at any time. Docket No. 5105 at 217; Docket No. 58–2 at 8. Therefore, Hamilton has failed to show that he suffered an actual injury. At best, he has suffered a delay in the resolution of the ongoing legal proceedings, but he was not prohibited from re-instituting the proceeding and carrying it forward to conclusion. Therefore, defendants' motion for summary judgment as to this claim should be granted on this ground.

Additionally, Hamilton contends that defendants interfered with the delivery to him of Mathis' affidavit and legal papers from Brooklyn Law School. Docket No. 58–4 at 30–38. First, Hamilton only alleged one instance involving mail from the law school, which is insufficient to establish a First Amendment violation. *See Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003) ( "[A]n isolated incident of mail tampering is usually insufficient to establish a constitutional violation .... Rather, the inmate must show that prison officials regularly and unjustifiably interfered with the incoming legal mail."). Furthermore, Hamilton eventually received the paperwork from the law school which indicated that they had previously assessed Hamilton's case in 2002 and determined that there was no assistance which the law school could provide. Docket No. 58–3 at 5. Thus, even viewing Hamilton's allegations in the light most favorable to him, he had already received notice that the law school would not assist him in his case and suffered no actual injury. *See GonzalezCifuentes v. Torres,* No. 04–CV–1470 (GLS/DRH), 2007 WL 499620, at \*6 (N.D.N.Y. Feb. 13, 2007) (stating that plaintiff "identifies no particular case or claim which was impeded or how any defendant's conduct impeded his litigation of a claim or defense [and h]e has thus failed sufficiently to allege any actual injury from this alleged incident, much less that [the] conduct was deliberate and malicious.") (internal citations and quotations omitted). Thus, defendants'

motion for summary judgment should be granted on this ground.

**\*10** However, the alleged denial of Mathis' affidavit yields a different result. When Hamilton was sent the affidavit, he was on mail watch. J. Smith Decl. ¶ 6. Viewing the facts in the light most favorable to Hamilton, defendants received the affidavit, reviewed it, and were obligated either to forward it to Hamilton or return it to the sender. Am. Compl. ¶ 39; Hamilton Dep. at 32–33. The delivery of mail to Hamilton stopped multiple times at the second stage of review. Am. Compl. ¶ 35. As Hamilton was never given the Mathis affidavit nor was Esters instructed on how to resend the affidavit to comply with DOCS regulations, a question of fact is raised as to whether defendants intentionally interfered with Hamilton's ability to receive the exculpatory evidence in the Mathis affidavit. While it is unclear whether the affidavit would have altered the outcome of the proceeding, viewing the evidence in the light most favorable to Hamilton, it reasonably likely that it would have. Thus, if proven, these repeated incidents of seizing the Mathis affidavit rather than delivering it or returning it constitute more than mere negligence and indicate intentional interference sufficient to raise a material question of fact. *See generally Holmes v. Grant,* No. 03–CV–3426 (RJH/RLE), 2006 WL 851753, at *12 (S.D.N.Y. Mar. 31, 2006) ("Mere negligence resulting in the loss of legal papers, ... does not state an actionable claim [as] plaintiff must allege facts demonstrating that defendants deliberately and maliciously interfered with his access to the courts ... [such as allegations] that the defendants deliberately stole his legal papers.") (internal quotations and citations omitted). Therefore, defendants' motion for summary judgement should be denied on this ground as to Maly for his failure to either deliver or return the mail and Smith for alleged negligent supervision and the procedures followed with respect to such packages but granted as to all other defendants.

### 3. Religious Meals

Hamilton alleges that his First Amendment right to the free exercise of his religion was violated when defendants failed to provide him with kosher meals which were also low in sodium and cholesterol as required by his therapeutic diet.

"The First Amendment ... guarantees the right to the free exercise of religion." *Johnson v. Guiffere,* No. 04–CV–57 (DNH), 2007 WL 3046703, at *4 (N.D.N.Y. Oct. 17, 2007) (*citing Cutter v. Wilkinson,* 544 U.S. 709, 719 (2005). "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (*citing Pell v. Procunier,* 417 U.S. 817, 822 (1974)). This right "is not absolute or unbridled, and is subject to valid penological concerns ...." *Johnson,* 2007 WL 3046703, at * 4.

The Free Exercise Clause extends "into other aspects of prison life including ... that of an inmate's diet ...." *Id.* The Second Circuit has held that it is "clearly established that a prisoner has a right to a diet consistent with his or her religious scruples ...." *Ford,* 352 F.3d at 597 (citations omitted). Therefore, to "deny prison inmates the provision of food that satisfies the dictates of their faith ... unconstitutionally burden[s] their free exercise rights." *McEachin v. McGuinnis,* 357 F.3d 197, 203 (2d Cir.2004).

> **\*11** A party asserting a free exercise claim bears the initial burden of establishing that the disputed conduct infringes on his or her sincerely held religious beliefs.... [T]he burden then shifts to the defendant to identify a legitimate penological purpose justifying the decision ... [and i]n the event such a[n] interest is articulated, its reasonableness is then subject to analysis under ... *Turner* ....

*Johnson,* 2007 WL 3046703, at * 4–5 (citations omitted).

In this case, defendants first contend that Hamilton's conversion to Judaism and request for kosher meals was not the result of his sincerely held religious beliefs but only his curiosity. Defs. Mem. of Law (Docket No. 51–6) at 11–12. To determine the sincerity of a religious belief, "the relevant inquiry is not whether, as an objective matter, the belief is accurate or logical ... [but] ... whether the beliefs ... are sincerely held and whether they are, in his own scheme of things, religious." *Jackson v. Mann,* 196 F.3d 316, 320 (2d Cir.1999); *see also Jolly v. Coughlin,* 76 F.3d 468, 476 (2d Cir.1996) (holding that a court's inquiry is limited to "whether the belief is religious in nature").

An inquiry any more intrusive would be inconsistent with our nation's fundamental commitment to individual religious freedom; thus, courts are not permitted to ask whether a particular belief is appropriate or true-however unusual or unfamiliar the belief may be. While it is a delicate task to evaluate religious sincerity without questioning religious verity, our free exercise doctrine is based upon the premise that courts are capable of distinguishing between these two questions.)

*Jolly,* 76 F.3d at 476. Therefore, courts are instructed to "[v]iew ... [the question] through the prism of sincerity, [examining whether an inmate] ... has produced sufficient evidence to raise a genuine issue of material fact as to whether his religious beliefs are 'sincerely held.' " *Jackson,* 196 F.3d at 320.

It is clear that Hamilton has produced sufficient evidence to raise a question of material fact as to whether his beliefs were sincerely held as he (1) listed his religious preference as Jewish, (2) participated in the kosher meal program, and (3) attended religious services. *See id.* (finding a material issue of fact when plaintiff listed his religious preference as Jewish, participated in kosher meal programs in several other correctional facilities, and abstained from eating for several days to avoid eating non-kosher food). Thus, defendants' contention on this ground should be rejected.

Additionally, Hamilton has raised an issue of fact as to whether defendants imposed a substantial burden on his exercise of his religious beliefs because he effectively was forced to choose between his religion and his health. The applicability of the substantial burden test has been much discussed in this circuit, but as long as "an asserted claim [is not] so bizarre, [or] clearly nonreligious in motivation, [it is] ... entitled to protection under the Free Exercise Clause." *Thomas v. Review Bd. of Ind. Employment Sec.,* 450 U.S. 707, 725; *see also Ford,* 352 F.3d at 591–93 (discussing the development of the substantial burden test in Free Exercise challenges). [15]

**\*12** In this case, Hamilton has sufficiently demonstrated a First Amendment violation. Subscription to a kosher diet constitutes a material tenet of Judaism consistently found entitled to protection under the Free Exercise Clause. *See, e.g., Jackson v. Mann,* 196 F.3d 316, 320–21 (2d Cir.1999) (denying government's motion for summary judgment on claim for denial of kosher meals for Jewish prisoner because, *inter alia,* prisoners are "entitled to a reasonable accommodation of [their] religious beliefs ... includ [ing their] religious dietary beliefs ... [mandating] prison officials [to] provide a prisoner a diet that is consistent with his religious scruples.") (internal quotations and citations omitted). Defendants have not challenged the validity of this religious practice. The denial of such meals on a constant basis infringes Hamilton's religious beliefs.

However, defendants did not refuse Hamilton a kosher diet but stated that they could not provide him with the low-sodium, low cholesterol kosher diet he required for his health. Defendants assert that DOCS policy required an inmate either to choose a religious or a therapeutic meal as medical staff were responsible for prescribing therapeutic meals but have no authority to provide kosher meals. Docket No. 58–2 at 24; J. Smith Decl. ¶¶ 32–35. Defendants advise that DOCS contracted with outside providers for the preparation and delivery of religious and therapeutic meals and that these providers did not offer an option for low-sodium, low-cholesterol kosher food. Thus, DOCS lacked the ability to provide inmates with meals which were kosher as well as low-sodium and low-cholesterol. J. Smith Decl. ¶¶ 32–35. However, defendants have proffered no legitimate penological reason other than administrative inconvenience why Hamilton could not receive a meal that was both therapeutic and kosher. Defendants' refusal required Hamilton to elect between his health needs and his religious beliefs. This burden on Hamilton's exercise of his religious beliefs creates a question of fact on this issue. *See Bass v. Coughlin,* 976 F.2d 98, 99 (2d Cir.1992) (stating that "as early as 1975, it was established that prison officials must provide a prisoner a diet that is consistent with his religious scruples" and noting that this precedent "remains the law.") (*citing Kahane v. Carlson,* 527 F.2d 492, 495 (2d Cir.1975) and *Benjamin v. Coughlin,* 905 F.2d 571, 579 (2d Cir.1990)).

Even assuming that economic or administrative convenience constituted a legitimate penological interest in these circumstances, forcing Hamilton to this choice here remained unreasonable. *See Moore v. Goord,* No. 01–CV–1607(GLS/GJD), Mem.-Decision & Order (Docket No. 60) at 22–35 (N.D.N.Y. filed Sept. 28, 2005) (assessing the reasonableness of mandating a prisoner to choose between his health and religion and finding that the weight of the *Turner* factors precluded a grant of summary judgment for defendants). [16]

**\*13** Accordingly, defendants' motion for summary judgment should be denied on this ground as to Smith for his alleged failure to create a procedure for inmates with low-sodium and low-cholesterol needs to receive religious meals and granted as to all other defendants.

### E. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. CONST. amend. VIII.

### 1. Medical Treatment

The Eighth Amendment provision against cruel and unusual punishment includes the provision of medical care. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citations omitted). A prisoner advancing an Eighth Amendment claim for denial of medical care must demonstrate deliberate indifference to a serious medical need. *Wilson v. Seiter,* 501 U.S. 294, 297 (1991); *Hathaway,* 37 F.3d at 66. More than negligence is required "but less than conduct undertaken for the very purpose of causing harm." *Hathaway,* 37 F.3d at 66. The test for a § 1983 claim is twofold. First, the prisoner must show that there was a sufficiently serious medical need. *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer v. Brennan,* 511 U.S. 825, 844 (1994).

" 'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Hudson v. McMillian,* 503 U.S. 1, 9 (1992)). Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Brock v. Wright,* 315 F.3d 158, 162–63 (2d Cir.2003) (citing *Chance,* 143 F.3d at 702). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. *Smith,* 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance,* 143 F.3d at 702. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. 97, 104, (1976). "Mere disagreement over proper treatment does not create a constitutional claim," as long as the treatment was adequate. *Id* . at 703. Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists ... are not adequate grounds for a § 1983 claim." *Magee v. Childs,* No. 04–CV1089 (GLS/RFT), 2006 WL 681223, at \*4 (N.D.N.Y. Feb. 27, 2006). Furthermore, allegations of negligence or malpractice do not constitute deliberate indifference unless the malpractice involved culpable recklessness. *Hathaway v.. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

### a. Mental Health Treatment

**\*14** "Treatment of mental disorders of mentally disturbed inmates is ... a serious medical need" as contemplated by *Estelle. Guglielmoni v. Alexander,* 583 F.Supp. 821, 826 (D.Conn.1984). Thus, Hamilton's contentions that he had a history of suicidal thoughts, including the evening he reported to Shawangunk, are sufficient to raise a question of fact as to a serious medical need. Am. Compl. ¶ 21; Hamilton Dep. at 19–20.

However, Hamilton has failed to demonstrate facts sufficient to support a finding of deliberate indifference. Hamilton underwent a mental health examination upon his arrival at Shawangunk and, in defendant Skies' professional opinion, further observation was not necessary because Hamilton was not displaying harmful tendencies despite his statements. Skies Aff. ¶ 11. Hamilton testimony that he had never attempted suicide despite his depression and suicidal thoughts corroborates this evidence. Hamilton's claim here reduces to a disagreement over the course of treatment Hamilton underwent. This is insufficient to establish a claim under the Eighth Amendment. Because Hamilton received an entrance interview and Skies appropriately evaluated him, the record is devoid of any evidence that Skies was either deliberately indifferent or intentionally delayed access to care or treatment options. Hamilton's conclusory allegations are insufficient to withstand a motion for summary judgment.

Accordingly, defendants' motion for summary judgement on this ground should be granted.

### b. Hepatitis A

Hamilton also contends that his Eighth Amendment rights were violated when defendants refused to treat his Hepatitis A. [17] Am. Compl. ¶ 23; Hamilton Dep. at 30–32. First, it does not appear that Hamilton was suffering from any severe symptoms which would render his Hepatitis a severe medical condition. However, even viewing the facts in the light most favorable to Hamilton and regardless of the fact that asymptomatic Hepatitis A may not constitute a serious medical condition, Hamilton has failed to raise an issue of fact whether defendants were deliberately indifferent. No treatment exists for Hepatitis A, the disease must run its course, and the individual will never again be infected by the disease. It is unclear what medical intervention Hamilton contends that defendants should have undertaken, but, again, the basis of Hamilton's claim here is a dispute over the medical treatment rendered by defendants. Because there was no known treatment or cure for Hepatitis A and in the absence of any demonstrated treatment offered by Hamilton, there can be no dispute that defendants acted pursuant to generally accepted medical guidelines. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

Therefore, defendants' motion for summary judgment on this ground should be granted.

### c. Substance Abuse

To the extent that Hamilton attempts to assert that defendants improperly dealt with his addiction because they did not mandate substance abuse treatment, it is noted that "[t]he claim to a constitutional right to treatment for narcotics addiction has no basis in either the provisions of the Constitution or the decisions of the courts ...." *Smith v. Follette,* 445 F.2d 955, 961 (2d Cir.1971); *see also Doe v. Goord,* No. 04–CV–570 (GBD/AJP), 2005 WL 3116413, at *16 (S.D.N.Y. Nov. 22, 2005). Thus, defendants' motion for summary judgment should be granted on this ground.

### d. Confidentiality

**\*15** Hamilton has alleged that defendants' disclosure of his medical records constituted a deliberate indifference to his serious medical needs. As previously discussed, Hamilton's Hepatitis A was not a serious medical need. Additionally, while high blood pressure and cholesterol may require medical treatment, they do not substantially affect an individual's quality of life or leave an individual in pain and agony. Thus, these ailments, which are controllable with medication, without more serious indications of decline or deterioration, does not warrant Eighth Amendment protection.

However, even if the conditions reflected in Hamilton's records constituted serious medical needs, the disclosure of that information to staff and inmate representatives did not constitute malicious interference or deliberate indifference. The disclosures were necessary to investigate the pending grievances to determine their validity. The disclosures were limited in scope and purpose and, at most, could be categorized as negligent if others viewed them. As previously discussed, negligent behavior is not actionable under § 1983. *Hathaway,* 99 F.3d at 553. [18]

Therefore, defendants' motion for summary judgment in this respect should be granted.

### e. Water Treatment

Liberally construing the amended complaint, Hamilton also contends that defendants' treatment of the water left its saline content at dangerously high levels, jeopardizing his high blood pressure and cholesterol and leading to neurological damage. As discussed above, Hamilton's high blood pressure and cholesterol was well monitored and controlled with medication. Thus, his conclusory assertions, without more, are insufficient to establish a serious medical condition. In the same vein, Hamilton has offered no proof of any neurological conditions he has suffered as a result of the water. Hamilton Dep. at 135. Conclusory allegations are insufficient to withstand a motion for summary judgment.

Additionally, to the extent that defendants treated the water, they neither did so in a deliberately indifferent manner. The water readings, as confirmed by state agencies regularly checking the water, indicate that the facility was appropriately purifying the water and that it was within state-mandated specifications. Docket No. 51–5 at 229. Hamilton has offered no evidence to the contrary. Thus, the record demonstrates that defendants' water treatment nullified and eradicated potential toxins. Their efforts were tested, confirmed, and authenticated by state agencies also responsible for providing potable water. J. Smith Decl. ¶ 22; Docket No. 51–5 at 235; Docket No. 53–3 at 64–68.

Therefore, defendants' motion on this ground should be granted.

### 2. Living Conditions

Hamilton alleges that he was confined in inhumane conditions in violation of the Eighth Amendment. "The Constitution does not mandate comfortable prisons but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Farmer v. Brennan,* 511 U.S. 825, 832 (1970); *see also Johnson v. Smith,* No. 03–CV–1050 (FJS/DEP), 2006 WL 1843292, at *8 (N.D.N.Y. June 29, 2006). As with other Eighth Amendment claims, a "plaintiff must satisfy both an objective ... and subjective test." *Jolly v. Coughlin,* 76

F.3d 468, 480 (2d Cir.1996) (citations omitted). Thus, "[c]onditions of confinement only constitute an Eighth Amendment violation if they involve the deprivation of a single identifiable human need or denial of the minimum civilized measure of life's necessities, and the defendants' state of mind was one of deliberate indifference to that deprivation." *Johnson,* 2006 WL 1843292, at *9 (citations omitted).

**\*16** The objective prong can be satisfied by

> conditions of confinement ... [which] in combination [constitute an Eighth Amendment violation] when each would not do so alone ... [such as] when the conditions have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure to issue blankets.

*Davidson v. Murray,* 371 F.Supp.2d 361, 370 (W.D.N.Y.2005) (citations omitted). However, "[n]othing so amorphous as overall conditions can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Id.* (*citing Wilson v. Seiter,* 501 U.S. 294, 304–05 (1991)). The subjective prong requires "a prison official [to] have a sufficiently culpable state of mind ..., of deliberate indifference to inmate health or safety" *Farmer,* 511 U.S. at 834 (citations omitted).

In this case, Hamilton has alleged facts sufficient to satisfy the objective prong of the analysis concerning the water and ventilation at Upstate. The objective prong is satisfied as to the contaminated water claim because multiple inmates have corroborated Hamilton's complaints of (1) non-potable water, (2) the refusal of DOCS to provide inmates with bottled water, and (3) the inability of inmates in SHU to purchase bottled water from the commissary. Am. Compl. ¶ 43; Docket No. 58–5 at 12, 13, 16, 22, 25. If proven, these facts, in combination, are separately, suffice to constitute a constitutional violation as they result in the deprivation of a single, identifiable human need, fresh water fit for consumption.

Additionally, the objective prong is satisfied as to the ventilation claim because multiple inmates have corroborated Hamilton's complaints of (1) poorly or non-functional ventilation units, (2) poor air quality and breathing conditions, (3) poor cleaning and sanitary services to clean the resulting dust which was not properly circulated from the cells. Am. Compl. ¶ 44; Docket No. 58–3 at 13–50. If proven, these facts, in combination, suffice to constitute a constitutional violation as they result in the deprivation of a single, identifiable need, air with a quality which is breathable and does not result in nose bleeds, headaches, and colds.

However, Hamilton has not offered evidence sufficient to satisfy the objective prong of the analysis concerning the lights that remained on in SHU and the growth of mold in the recreation areas. When Hamilton testified concerning the lights, he admitted that the claim was dramatic and overstated. Hamilton Dep. 141–42. This claim, as well as the reference to mold, relate at best to the general living conditions. Additionally, Hamilton does not articulate how this constant lighting or growth of mold resulted in the deprivation of an identifiable human need. Even if it could be said that Hamilton satisfied the objective prong, he has not offered facts sufficient to satisfy the subjective element.

**\*17** In any event, Hamilton has not shown in any instance that defendants possessed the requisite culpable state of mind. Defendants did not disregard the multiple prisoner complaints. As demonstrated by the water tests, memoranda circulated throughout the prison, and correspondence with Hamilton, defendants were constantly assessing the quality of the water and air. J. Smith ecl. ¶¶ 10–11, 22; Docket No. 51–5 at 235, 245; Docket No. 53–3 at 64–68; Docket No. 58–3 at 51. Additionally, the windows needed to remain closed during the winter months to retain a comfortable temperature for inmates and staff and the ventilation system was, therefore, regularly inspected. Docket No. 51–1 at 245; Docket No. 58–3 at 51; J. Smith Aff. ¶¶ 10–11; Hamilton Dep. at 36. Furthermore, the lights remained on in the gallery for inmate safety as Hamilton's gallery housed particularly dangerous inmates. Hamilton Dep. 56–58. Finally, with all of the actions taken by defendants, any residual conditions which resulted at worst from defendants' negligence and not from any conscious and deliberate disregard for the inmates' health and safety. As previously stated, negligence is insufficient to sustain an

Eighth Amendment claim. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

Accordingly, defendants' motion for summary judgment on this ground should be granted.

### F. Fourteenth Amendment

#### 1. Due Process

Hamilton contends that defendants violated his due process rights by refusing to allow him to call witnesses in his rehearing, failing to notify him of the death of his son, and improperly placing him in CSU. Additionally, liberally construing the amended complaint, it appears that Hamilton contends that Maly, the hearing officer, was biased.

As a threshold matter, an inmate asserting a violation of his or her right to due process must establish the existence of a protected interest in life, liberty, or property. *See Perry v. McDonald,* 280 F.3d 159, 173 (2d Cir.2001). To establish a protected liberty interest, a prisoner must satisfy the standard set forth in *Sandin v. Conner,* 515 U.S. 472, 483–84 (1995). This standard requires a prisoner to establish that the deprivation was atypical and significant in relation to ordinary prison life. *Id.* at 484; *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999); *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996). The fact that an inmate has been disciplined with a SHU confinement alone is insufficient to establish an atypical and significant deprivation. The Second Circuit has articulated a two-part test whereby the length of time a prisoner was placed in SHU as well as "the conditions of the prisoner's confinement in SHU relative to the conditions of the general prison population" are to be considered. *Vasquez v. Coughlin,* 2 F.Supp.2d 255, 259 (N.D.N.Y.1998) (citing *Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir.1997)).

#### a. Disciplinary Hearing and Rehearing

#### i. Length of Incarceration in SHU

**\*18** The Second Circuit has held "that a sentence of one year in SHU was a sufficient length to be atypical under *Sandin.*" *Gates v. Selsky,* No. 02–CV–496, 2005 WL

Hamilton v. Smith, Not Reported in F.Supp.2d (2009)
Case 9:15-cv-01542-MAD-DEP    Document 79    Filed 02/14/18    Page 96 of 227
2009 WL 3199531

3132725, at *5 (W.D.N.Y. Nov. 22, 2005) (*citing Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000)). As Hamilton ultimately served twelve months in SHU, the duration of his SHU confinement suffices to create an issue of fact on this issue. Am. Compl. ¶ 26.

### ii. Biased Hearing Officers and Prohibition on Calling Witnesses

Prisoners have a constitutional right to have a fair and impartial hearing officer preside over their disciplinary hearings. *See, e.g., Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004). However, "[t]he degree of impartiality required of prison officials does not rise to the level of that required of judges ... [as i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996) (citations omitted). While the Supreme Court held "that the requirements of due process are satisfied if some evidence supports the decision by the [hearing officer] ...." the Second Circuit has held that the test is whether there was " 'reliable evidence' of the inmate's guilt." *Luna v. Pico,* 356 F.3d 481, 487–88 (2d Cir.2004); *see also Superintendent, Mass. Corr. Inst. v. Hill,* 472 U.S. 445, 455 (1985).

To the extent that Hamilton alleges that he was not provided with impartial hearing officers, nothing in the hearing transcripts or either parties' submissions indicate that Davis or Maly was biased in any regard. Additionally, the findings produced during the investigations and drug tests leading to the misbehavior reports, the regulations in question, and the information upon which Davis and Maly relied all serve as reliable evidence supporting Hamilton's convictions and sentences. Selsky Decl. ¶ 8; Docket No. 58–3 at 53.

Additionally, Hamilton's amended complaint alleges that he was precluded from calling additional witnesses during his hearings. "It is well settled that an official may refuse to call witnesses as long as the refusal is justifiable [such as] ... on the basis of irrelevance or lack of necessity." *Scott v. Kelly,* 962 F.2d 145, 146–47 (2d Cir.1992) (internal quotations and citations omitted); *see also Richardson,* 833 F.Supp. at 152. However, Mathis was no longer incarcerated but was specifically identified and allegedly possessed exculpatory evidence regarding

Hamilton's innocence. It appears that Maly's refusal to call him as a witness was unjustified. Mathis Aff. ¶¶ 2, 4, 6; Hamilton Dep. at 96–98, 121–23. Furthermore, it appears that Hamilton has raised a question of fact as to the refusal to call a representative from the substance abuse program to provide mitigating evidence.

Thus, defendants' motion should be denied concerning Hamilton's claim against Maly and Selsky for refusing to allow Hamilton to call Mathis and substance abuse program representatives as witnesses but should otherwise be granted as to all other defendants.

### b. Notification of Death in the Family

**\*19** "It is well-settled that there is no constitutionally protected liberty or property interest in attending the funeral of a family member." *Roman v. Donelli,* No. 06–CV–1071 (GLS/GJD), 2007 WL 2993825, at *4 (N.D.N.Y. Oct. 10, 2007). Therefore, Hamilton had no constitutional right to the notification of or attendance at his son's funeral.

Additionally, while the "state may create liberty or property interests that are not conferred by the constitution ..., [the creation of such interests] must use explicitly mandatory language, must place substantive limitations on official discretion, and must require that a particular result is to be reached upon the finding of substantive predicates." *Id.* (internal quotations and citations omitted).

> The authority for deathbed and funeral visits is articulated in section 113 of the New York Corrections Law [and] ... simply states that the commissioner of correctional services **"may permit"** inmates to attend funerals of certain family members or to visit the individual if "death be imminent." The statute further provides that the power to grant these visits will be governed by rules and regulations promulgated by the commissioner. There is **no mandatory language** in this statute

that would confer a liberty interest in being afforded the opportunity to go on either one of these types of visits.... [Additionally t]he notification of the death ... of an inmate's family member is governed by [DOCS] Directive No. 4206 ... [which] also shows that there is **no mandatory language** in that directive that would assure the approval of a deathbed or funeral visit if certain substantive criteria were met.... [T]he visit is contingent upon both verification of relationship **and Superintendent approval.** There is no mandatory language indicating that the Superintendent must approve any type of visit. Thus, no liberty interest is created by the statute or directives ... and [b]ecause there was no liberty interest created, [Hamilton's] due process claim must fail.

*Id.* (internal quotations and citations omitted) (emphasis in the original).

Thus, Hamilton had no protected liberty interest. Additionally, to the extent that Hamilton alleges that defendants did not comply with the DOCS directive in conducting an adequate investigation into his relationship to his son, Hamilton neither declared Napper as his son in his personal papers filed at the facility nor did Napper declare Hamilton to be his father when he visited the prison. Hamilton Dep. at 124–26, 128–29. Therefore, at best, defendants were negligent in their investigation of Hamilton's relationship to Napper which is insufficient to establish a constitutional violation. *Roman,* 2007 WL 2993825 at *6.

Accordingly, defendants' motion as to this claim should be granted.

### c. Placement in CSU

Hamilton contends that his placement and subsequent hearings affirming the appropriateness of his assignment to CSU violated his due process rights. However, Hamilton has "no liberty interest ... in remaining free from confinement in the CSU." *Frazier v. Coughlin,* 81 F.3d 313, 318 (2d Cir.1996).

> **\*20** [I]nmates in the CSU are confined to their cells for the same amount of time per day as inmates in the general prison population. Moreover, ... the only substantive differences between confinement in the CSU and in the general prison population are (i) that prisoners in the CSU are ineligible for certain prison jobs, and (ii) that additional corrections officers may be assigned to the CSU.

*Id.*

Additionally, to the extent that Hamilton alleges that this placement deprived him of his constitutionally protected right to engage in certain types of employment, that argument also fails. First, "New York law does not give a prisoner any statutory, regulatory or precedential right to his prison job ... [thus] the State commissioner or prison officials may provide jobs for prisoners," but no liberty or property interest results. *Gill v. Mooney,* 824 F.2d 192, 194 (2d Cir.1987). Moreover, inmates have no constitutional right to any particular position or employment. *Hodges v. Jones,* 873 F.Supp. 737, 745 (N.D.N.Y.1995) (citations omitted). Finally, since Hamilton failed to establish a protected liberty interest in remaining free from confinement in CSU, no claim lies for denial of due process. *Frazier,* 81 F.3d at 318.

Accordingly, it is recommended that defendants be granted summary judgment as to any claim on this ground.

### G. RLUIPA Claim

The RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... unless the government demonstrates that imposition of the

2009 WL 3199531

burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc–1. In a RLUIPA claim, "[t]he prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs. The defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct." *Salahuddin v. Goord,* 467 F.3d 263, 274–75 (2d Cir.2006).

As discussed above in subsection C(3), Hamilton has raised questions of fact as to whether defendants substantially burdened his religious beliefs. Defendants have failed to offer facts sufficient to satisfy their burden of identifying a legitimate penological interest. Accordingly, defendants' motion for summary judgment on this ground should be denied.

## H. HIPAA Claim

HIPAA creates a monetary remedy for the wrongful disclosure of medical information. 42 U.S.C. § 1320d–6. However, HIPAA "does not confer a private cause of action to any particular class of individuals ... [or] either explicitly or implicitly, confer to private individuals a right of enforcement." *Barnes v. Glennon,* No. 9:05–CV–0153 (LEK/RFT), 2006 WL 2811821 at *5 (N.D.N.Y. Sept. 28, 2006) (citations omitted). Furthermore, "HIPAA provides for no federal cause of action; instead, HIPAA provides for an enforcement mechanism for the Secretary of Health and Human Services [HHS]." *Id.* at *6 (internal quotations and citations omitted). Therefore, Hamilton cannot sustain his HIPAA claim since there is no private cause of action granted by the statute. Hamilton's only recourse through this statute is to request the State of New York or the Secretary of HHS to bring the action on his behalf.

**\*21** Accordingly, defendants' motion for summary judgment on this ground should be granted.

## I. Personal Involvement

Defendants contend that Hamilton has failed to establish the personal involvement of defendants Gonzalez, Selsky, Genovese, and Davis. " '[P]ersonal involvement of

defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

> (1) [T]he defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)).

### a. Gonzalez

Gonzalez was DOCS Deputy Counsel. Am. Compl. Viewing the record on this motion in the light most favorable to Hamilton, Gonzalez' only personal involvement with Hamilton was as the author of the letter to the Kings County Family Court requesting that Hamilton be allowed to appear telephonically. Docket No. 51–5 at 221. Pursuant to the letter's request, Hamilton was allowed to and did appear telephonically at the date and time arranged by Gonzalez. Am. Compl. ¶ 20. The case was adjourned, although Gonzalez had no involvement or reason to know about the resolution of those proceedings or subsequent developments. Even when construing the amended complaint in the light most favorable to Hamilton, the record contains no

other factual basis for finding personal involvement by Gonzalez. There likewise exists no basis in the record to find that Gonzalez negligently supervised any subordinate, created a hiring or retention policy which allowed constitutional violations to continue, or was grossly negligent in managing subordinates.

Accordingly, defendants' motion for summary judgment in this respect should be granted as to Gonzalez.

### b. Genovese

Genovese, a physician, was involved in the provision of inmate health care and was able to prescribe therapeutic meals to inmates. However, she had no authority to provide an inmate with a religious meal or make a religious meal available to an inmate. Genovese Decl. ¶ 6. Additionally, as a physician, Genovese had no authority to change DOCS policies and procedures for prescribing special inmate diets. *See Hatzfield v. Goord,* No. 04–CV159, 2007 WL 700961, at *3 (N.D.N.Y. Feb. 28, 2007) (dismissing claims against a prison superintendent as there were no allegations that he had the power to create or to terminate the policy in question). Even construing the amended complaint in the light most favorable to Hamilton, any conclusory allegations that Genovese could prescribe both a religious and a therapeutic diet would still lack any factual basis. Additionally, there exists no basis in the record to find that there was any negligent supervision by Genovese, she created a hiring or retention policy which allowed constitutional violations to continue, or she was grossly negligent in managing subordinates.

**\*22** Accordingly, defendants' motion for summary judgment in this respect should be granted.

### c. Selsky

Selsky, DOCS Director of SHU, directly reviewed and ruled on three disciplinary convictions which form the basis of Hamilton's due process claims. Selsky Decl. ¶¶ 8–10. "[A]ffirming the administrative denial of a prison inmate's grievance by a high-level official is insufficient to establish personal involvement under section 1983." *Manley v. Mazzuca,* No. 01–CV–5178 (KMK), 2007 WL 162476, at *10 (S.D.N.Y. Jan. 19, 2007) (*citing*

*Foreman v. Goord,* No. 02–CV–7089 (SAS), 2004 WL 1886928, at *7 (S.D.N.Y. Aug. 23, 2004) ("The fact that [the prison superintendent] affirmed the denial of plaintiff's grievances is insufficient to establish personal involvement.")). However, where a supervisory official receives, reviews, and responds to a prisoner's complaint, personal involvement may be found. *See Bodie,* 342 F.Supp.2d at 203 (citations omitted).

In this case, the record is undisputed that Selsky was a supervisory official. While personal involvement cannot be founded solely on supervision, liability can be found if the official proactively participated in reviewing the administrative appeals as opposed merely to rubber-stamping the results. Selsky was intimately involved with the hearings and rehearing which gave rise to Hamilton's due process claims as Selsky was the individual who signed all administrative findings and ordered the rehearing of Hamilton's disciplinary proceedings. This suffices to raise questions of fact as to Selsky's personal involvement.

Accordingly, defendants' motion for summary judgment in this respect should be denied.

### d. Davis

Davis presided as the hearing officer at Hamilton's first disciplinary proceeding. Davis' finding that Hamilton was guilty and the sentence imposed were reversed by Selsky and the charge was remanded for a rehearing. The rehearing was held before a different hearing officer. Selsky Decl ¶¶ 8–9; Docket No. 58–3 at 53. As the hearing officer, Davis was directly involved in the hearing which is the subject matter of Hamilton's claims of a due process violation. Accordingly, defendants' motion for summary judgment in this respect should be denied.

### J. Qualified Immunity

Defendants claim that even if plaintiffs' constitutional claims are substantiated, they are entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d

211, 229–30 (N.D.N.Y.2002) (McAvoy, J.), *aff'd,* 80 Fed.Appx. 146 (2d Cir. Nov. 10, 2003). However, even if the constitutional privileges "are clearly established, a government actor may still be shielded by qualified immunity if it was objectively reasonable for the ... official to believe that his [or her] acts did not violate those rights." *Smith v. City of Albany,* No. 03–CV–1157, 2006 WL 839525 *16 (N.D.N.Y. Mar. 27, 2006) (quoting *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991); *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990) (internal citations omitted)).

 **\*23** A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights of which a reasonable person would have known were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. Here, the second prong of the inquiry need not be reached concerning any of Hamilton's claims except (1) his First Amendment claims concerning the provision of his religious meals and the interference with the delivery of the Mathis affidavit prior to his disciplinary rehearing, and (2) his due process claims concerning his inability to call witnesses during his disciplinary rehearing.

As to those claims, it was clearly established by November 30, 2006 that inmates had (1) a First Amendment right to be provided with meals that conformed to their religious tenets, *see Ford,* 352 F.3d at 597;(2) a First Amendment right of access to the courts which included access to legal mail, *see David v. Goord,* 320 F.3d 346, 351 (2d Cir.2003);and (3) a Fourteenth Amendment right to a fair and impartial disciplinary hearing including the ability to call witnesses. *See Scott,* 962 F.2d at 145. Thus, accepting all of Hamilton's allegations concerning these claims as true, questions of fact exist precluding summary judgment for defendants on this ground.

Accordingly, defendants should be granted summary judgment on the ground of qualified immunity on all claims except those described above, and defendants' motion on this ground should otherwise be denied.

Footnotes

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion for summary judgment (Docket No. 51) be:

1. **DENIED** as to Hamilton's:

   A. First Amendment claims against Smith regarding the provision of meals which complied with both his health needs and religious tenets;

   B. First Amendment claims against Smith and Maly regarding the tampering with his legal mail, specifically the Mathis affidavit;

   C. Fourteenth Amendment claims against Maly and Selsky regarding the violation of his due process rights during his disciplinary rehearing where he was precluded from calling Mathis and substance abuse counselors during his presentation of evidence;

2. **GRANTED** as to as to all other claims and defendants; and

3. The case be **TERMINATED** in its entirety as to defendants Gonzalez, Genovese, Skies, Parisi, Chiapperino, and Davis.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

### All Citations

Not Reported in F.Supp.2d, 2009 WL 3199531

2009 WL 3199531

1    This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

2    In his memorandum of law, Hamilton concedes that defendant Parisi "should be withdrawn from the complaint ... [as she] was simply following orders from defendant's [sic] Smith and Maly, therefore is not liable in this action." Hamilton Mem. of Law (Docket No. 58) at 34. Defendants' motion as to Parisi should, therefore, be granted.

3    Hamilton mistakenly brings this action pursuant to the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb et seq. ("RFRA"). However, "[t]he [RFRA ... was declared unconstitutional by the ... Supreme Court in 1997 ... [and] was amended by the [RLUIPA]." Hankins v. New York State Dep't of Corr. Serv., No. 07–CV–408 (FJS/GHL), 2008 WL 2019655, at *1 n. 1 (N.D.N.Y. Mar. 10, 2008). "[A] plaintiff's RLUIPA claim may be construed as an extension of its inartfully pleaded RFRA claim," particularly when asserted by a pro se litigant whose pleadings are "construed with [an] extra liberal leniency ...." Id. (citing Phillips v. Girdich, 408 F.3d 124, 130 (2d Cir.2005) ("[T]he court's imagination should be limited only by Phillips' factual allegations, not by the legal claims set out in his pleadings.")). accordingly, Hamilton's claim under the RFRA will be deemed asserted under the RLUIPA.

4    During his deposition, Hamilton withdrew any contentions regarding defendant Genovese's failure to order blood screening. Hamilton Dep. (Docket No. 51–5) at 37–38, 40–41, 75.

5    Hamilton adamantly denies ever smoking marijuana while in prison or being addicted to it prior to his incarceration. Hamilton Dep. at 119–20.

6    SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population...." N.Y. Comp.Codes R. & Regs. tit. 7, § 300.2(b) (1995). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. Id. at pt. 301.

7    Attached as an exhibit are three responses which were difficult to decipher due to poor photocopying quality. Two of the three documents were dated, one May 5, 2006 and the other September 22, 2008. Docket No. 58–5 at 22, 25. Additionally, Hamilton submits an affidavit from a fellow prisoner who discusses "the strange taste of the water and the frequent and often unannounced shut downs of the water system," as well as the "constant complaints from the men around [him] ... regarding drinking water, [specifically] the color, smell and taste of the water." Docket No. 58–5 at 16. This same inmate describes the discoloration and peculiar odor of the drinking water. Id.

8    During Hamilton's deposition, he described this as an exaggeration and testified that the lights were neither blinding nor shining directly on him. Hamilton Dep. at 141–42.

9    See subsection B(2) supra.

10   Rule 113.24 prohibits the use of any controlled substance unless prescribed by facility medical staff. Selsky Decl. ¶ 9.

11   These witnesses included individuals who were aware of the selection and urinalysis testing procedures, counselors from the substance abuse program Hamilton was attending, and Mathis. Hamilton Dep. at 47–48, 96–98.

12   See subsection D supra.

13   Hamilton testified at his deposition that he could not recall to whether Esters or Saunders was the person involved in this mailing. Id. at 27.

14   Hamilton testified that "[I] studied ... [and] affiliated with almost every religion ... [because] you're only limited to go to one religious service at a time, so if [he] wanted to learn about Judaism, I just couldn't go down to the Judaism service to learn. I had to convert first and then go there to learn." Hamilton Dep. at 45–46. Hamilton recently converted to Christianity but continued to assert the religious meals claim. Id . at 70.

15   As the Supreme Court has stated, "it is not within the judicial function and judicial competence to inquire whether the petitioner ... more correctly perceived the commands of [his] faith [as c]ourts are not arbiters of scriptural interpretation." Thomas, 450 U.S. at 715–16; see also Ford, 352 U.S. at 593 (explaining the trepidation of applying the substantial burden test because it "requires courts to distinguish important from unimportant religious beliefs, a task for which [a court is] particularly ill-suited [due to] the danger that courts will make conclusory judgments about the unimportance of the religious practice to the adherent[.]")

16   To determine reasonableness, courts must assess

     whether the challenged regulation or official action has a valid, rational connection to a legitimate governmental objective; whether prisoners have alternative means of exercising the burdened right; the impact on guards, inmates, and prison resources of accommodating the right; and the existence of alternative means of facilitating exercise of the right that have only a de minimis adverse effect on valid penological interests.

     Salahuddin v. Goord, 467 F.3d 263, 274 (2d Cir.2006) (citing Turner v. Safley, 482 U.S. 78, 84 (1987). As previously noted, the challenged regulation is a product of economic and administrative convenience. It could not be circumvented

by prisoners confined to SHU as they had lost their commissary privileges and could not purchase food to supplement their diet. Additionally, the impact on the prison staff, inmates, and prison resources was no greater than that which already existed except that an additional menu option. The effect of offering a diet which was low-sodium, low-cholesterol, and kosher would have had a de minimis effect on DOCS as each inmate had to be provided with a meal and these changes would only involve a small percentage of inmates. Thus, the DOCS policy fails the reasonableness determination.

17    "Hepatitis A is a contagious liver disease ... [that] can range in severity from a mild illness lasting a few weeks to a severe illness lasting several months. Hepatitis A is usually spread when a person ingests fecal matter ... from contact with objects, food or drinks contaminated by the feces ... of an infected person." http:// www.cdc.gov/hepatits/A/aFAQ.htm. Hepatitis is generally spread when a person does not properly wash his or her hands and then handles food or other objects. *Id.* Once an individual recovers from Hepatitis A, the body develops protective antibodies for life, and the individual can never be infected again. *Id.* Thus, "[t]here are no special treatments for hepatitis A. Most people ... will feel sick for a few months before they begin to feel better. A few people will need to be hospitalized ... [R]est, adequate nutrition, and fluids" are the recommended treatment. *Id.*

18    Claims surrounding disclosure of confidential medical information have been analyzed under both the Eighth and Fourteenth Amendments. *See generally Rodriguez v. Ames,* 287 F.Supp.2d 213, 218–221 (S.D.N.Y.2003). Liberally construing the complaint, Hamilton has also alleged a Fourteenth Amendment violation pertaining to the disclosure of his medical records.

As of 1999, prisoners retained a right to privacy for medical information unless (1) that disclosure was reasonably related to legitimate penological interests or (2) the information contained within the medical records was not the type of sensitive medical information contemplated by the courts for constitutional protection. *See Powell v. Schriver,* 175 F.3d 107, 111–13 (2d Cir.1999); *see also Rodriguez v. Ames,* 287 F.Supp.2d 213, 219–20 (W.D.N.Y .2003) (upholding Fourteenth Amendment protection in cases where the prisoner "has an unusual medical problem which, if disclosed unnecessarily to other inmates, would likely expose plaintiff to discrimination, intolerance, or potential violence," or where the information "spread through 'humor or gossip.' ") (quotations omitted); *Webb v. Goldstein,* 117 F.Supp.2d 289, 298–99 (E.D.N.Y.2000) (dismissing a Fourteenth Amendment claim because the prisoner "has not alleged that his prison records contained the sort of sensitive medical information at issue in ... *Powell.*"); *Khalfani v. Sec., Dep't of Veterans Affairs,* No. 94–CV–5720 (JG), 1999 WL 138247, at *6 (E.D.N.Y. Mar. 10, 1999) ("The records at issue in this case contained rather mundane information regarding [plaintiff]'s tendon avulsion, his physical therapy and limitations on his ability to work-not the type of deeply personal information that was at issue in prior cases.").

Here, information surrounding Hamilton's high blood pressure and cholesterol and previous Hepatitis A infection are not the kind of facts expected to invoke discrimination, intolerance, or violence. Additionally, the disclosures were made in conducting an investigation of Hamilton's grievance, a legitimate penological interest. Accordingly, to the extent that Hamilton has alleged a Fourteenth Amendment claim, it is without merit.

**End of Document**                                                      © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 1292235
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Earl HAYES, Plaintiff,
v.
HERB et al., Defendants.

No. 9:11–cv–1271 (GLS/DEP).
|
Signed March 31, 2014.

**Attorneys and Law Firms**

Earl Hayes, Ossining, NY, pro se.

Hon. Eric T. Schneiderman, New York State Attorney General, Laura A. Sprague Assistant Attorney General, of Counsel, Albany, NY, for the Defendants.

**Opinion**

### *MEMORANDUM–DECISION AND ORDER*

GARY L. SHARPE, Chief Judge.

### I. *Introduction*

**\*1** Plaintiff *pro se* Earl Hayes, a New York State prison inmate, commenced this action alleging deprivation of his civil rights pursuant to 42 U.S.C. § 1983 against defendants Brian Fischer, Kenneth Perlman, Correction Officer Herb, Sergeant Soto, and an unidentified John Doe defendant.[1] (Compl. at 1–2, 7, Dkt. No. 1.) Pending before the court are Hayes' motion to amend his complaint, (Dkt. No. 26), and Herb and Soto's motion for summary judgment, (Dkt. No. 30). On December 27, 2013, Magistrate Judge David E. Peebles issued a Report and Recommendation (R & R) recommending that the motion for summary judgment be granted because of Hayes' failure to exhaust his administrative remedies, that Hayes' IFP status remain intact, and that his motion to amend the complaint be denied as moot. (Dkt. No. 41 at 30.) Hayes filed objections to the R & R, which are also pending before the court. (Dkt. Nos.43, 44.) For the following reasons, the R & R is adopted in its entirety.

### II. *Background*

Hayes is currently an inmate under the custody of the New York State Department of Corrections and Community Supervision (DOCCS). (Defs.' Statement of Material Facts (SMF) ¶ 1, Dkt. No. 30, Attach. 27.) During the time relevant to this action, Hayes was confined in the Hale Creek Alcohol and Substance Abuse Treatment Correctional Annex (ASATCA). (*Id.* ¶ 2.) In or about October 2009, Hayes received notice that his merit time allowance had been granted. (Compl. at 5.) In January 2010, Hayes was approved for merit parole by the Parole Board with a release date of May 17, 2010. (*Id.*) In February 2010, Hayes filed a grievance against Herb for abuse of authority. (Defs.' SMF ¶ 12.)

On March 7, 2010, Hayes received a Tier II Misbehavior Report. (*Id.* ¶ 3.) On March 9, Hayes was found guilty after a Tier II Disciplinary Hearing, resulting in an order to serve twenty days "keeplock," removal from the Hale Creek ASATCA program, and transfer to the Marcy Correctional Facility Special Housing Unit (SHU). (*Id.* ¶¶ 4, 8; Compl. at 5.) During this disciplinary hearing, Hayes denied the allegations against him, but produced no witnesses or evidence on his behalf and testified that he did not intend to file a grievance against Herb for filing the misbehavior report. (Defs.' SMF ¶¶ 6, 7, 9; Dkt. No. 30, Attach. 12 at 19–20.) On March 10, Hayes' Merit Time Allowance was rescinded "because of [his] unsatisfactory program participation and removal from the Hale Creek ASATCA ... program." (Compl. at 5.)

### III. *Standard of Review*

Before entering final judgment, this court reviews report and recommendation orders in cases it has referred to a magistrate judge. If a party properly objects to a specific element of the magistrate judge's findings and recommendations, this court reviews those findings and recommendations de novo. See *Almonte v. N.Y. State Div. of Parole,* No. Civ. 904CV484GLS, 2006 WL 149049, at *3, *5 (N.D.N.Y. Jan. 18, 2006). In those cases where no party has filed an objection, only vague or general objections are made, or a party resubmits the same papers and arguments already considered by the magistrate judge, this court reviews the findings and

recommendations of the magistrate judge for clear error. *See id.* at *4–5.

## IV. *Discussion*

**\*2** Hayes' complaint alleges that the Tier II Misbehavior report was issued in retaliation for the grievance he filed against Herb in February 2010. (Compl. at 10.) Hayes claims that Soto and Herb conspired against him and Soto directed Herb to file a fabricated misbehavior report in order to forfeit Hayes' merit time release and to discourage him from filing future grievances. (*Id.*) Hayes also alleges that defendants conspired to deprive him of his equal protection rights under the Fourteenth Amendment. (*Id.*)

In response, defendants assert that Hayes' claims should be dismissed because: (1) Hayes is precluded from litigating this case without payment of filing fees under the "three strikes" provision of 28 U.S.C. § 1915(g); and (2) Hayes failed to exhaust his administrative remedies. (Dkt. No. 30, Attach. 1 at 6–8, 8–11.)[2] In the R & R, Judge Peebles recommended that Hayes' IFP status remain intact because, out of the five strikes defendants allege against Hayes, (Dkt. No. 30, Attach. 1 at 7–8), only two constituted "strikes" under 28 U.S.C. § 1915(g). (Dkt. No. 41 at 21.) Additionally, Judge Peebles found that Hayes failed to exhaust his administrative remedies, declined to reach the merits of Hayes' claims, and recommended that defendants' motion for summary judgment be granted and Hayes' motion for leave to amend his complaint be denied as moot. (*Id.* at 21–30.)

Hayes subsequently filed timely objections. (Dkt.Nos.43, 44.) Hayes' objections are general in part and specific in part. First, Hayes, for the first time, argues that letters he wrote to Superintendent Nichols and Deputy Melecio should be treated as grievances. (Dkt. No. 43 at 7.) Also for the first time, Hayes has included copies of the letters. (*Id.* at 32–40.) This "objection," while specific, is insufficient to compel *de novo* review. As noted, these letters were not mentioned in Hayes' complaint, proposed amended complaint, or opposition to defendants' motion for summary judgment. (Compl.; Dkt. No. 26, Attach. 1; Dkt. No. 37.) "Generally, courts do not consider such 'new arguments' or 'new evidence' 'raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not,' " and this court declines to do so here. *Chalsani v. Daines,*

No. 10–CV–1978, 2011 WL 4465408, at *1 (E.D.N.Y. Sept. 26, 2011) (quoting *Illis v. Artus,* No. 06–civ3077, 2009 WL 2730870, at *1 (E.D.N.Y. Aug. 28, 2009)). Thus, Hayes' objection is without merit.[3] Accordingly, the R & R is adopted with respect to Hayes' failure to exhaust administrative remedies.

Second, Hayes generally objects to Judge Peebles' recommendation that Hayes' failure to exhaust his administrative remedies should not be excused due to his alleged lack of knowledge regarding the availability of the grievance process. (Dkt. No. 43 at 2–3.) This objection repeats arguments previously made by Hayes in response to defendants' motion. (Dkt. No. 37 at 2; Dkt. No. 17 at 2.) Having reviewed this recommendation for clear error, *see Almonte,* 2006 WL 149049, at *3–4, and finding none, this recommendation is adopted.

**\*3** Finally, Hayes generally objects to the portion of the R & R that recommended denying his motion to amend. (Dkt. No. 43 at 15–16.) Judge Peebles concluded that Hayes' motion to amend the complaint should be denied as moot because Hayes failed to exhaust his administrative remedies. (Dkt. No. 41 at 30.) Hayes' proposed amended complaint, however, contains no additional explanation of his failure to exhaust his administrative remedies. (Dkt. No. 26, Attach.1.) Thus, Hayes' motion to amend his complaint is properly denied.

As to the remainder of Hayes' objections, the court, having carefully reviewed the record, finds no clear error in the R & R and adopts it in its entirety.

## V. *Conclusion*

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge David E. Peebles' December 27, 2013 Report and Recommendation (Dkt. No. 41) is **ADOPTED** in its entirety; and it is further

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 30) is **GRANTED;** and it is further

**ORDERED** that Hayes' motion for leave to amend (Dkt. No. 26) is **DENIED** as moot; and it is further

Hayes v. Herb, Not Reported in F.Supp.3d (2014)

2014 WL 1292235

**ORDERED** that Hayes' complaint (Dkt. No. 1) is **DISMISSED;** and it is further

**ORDERED** that the Clerk close this case; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum–Decision and Order to the parties.

**IT IS SO ORDERED.**

### *REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

*Pro se* plaintiff Earl Hayes, a New York State prison inmate, has commenced this action against five New York State Department of Corrections and Community Supervision ("DOCCS") employees, alleging the deprivation of his civil rights pursuant to 42 U.S.C. § 1983. Generally, in his complaint, plaintiff alleges that defendants conspired to, and did, retaliate against him for filing a grievance against them at the facility in which he was confined at the relevant times.

Currently pending before the court is a motion brought by defendants requesting the entry of summary judgment based upon several grounds, and additionally seeking revocation of plaintiff's *in forma pauperis* ("IFP") status in light of his previous accumulation of three strikes pursuant to 28 U.S.C. § 1915(g). For the reasons set forth below, I recommend that plaintiff's IFP status remain intact, but that the defendants' motion for summary judgment be granted on the basis that the plaintiff failed to exhaust his administrative remedies prior to commencing this action.

### I. *BACKGROUND* [1]

Plaintiff is a New York State prison inmate currently being held in the custody of the DOCCS. *See generally Dkt. No. 1.* Although he is now incarcerated at the Sing Sing Correctional Facility, at the times relevant to his claims in this action he was confined in the Hale Creek Correctional Facility ("Hale Creek"), located in Johnstown, New York. *Id.* According to publically available information, inmates located at Hale Creek and who otherwise qualify are enrolled in a Comprehensive Alcohol and Substance Abuse Treatment ("CASAT") program. Department

of Corrections and Community Supervision, Substance Abuse Treatment Services, http://www.doccs.ny.gov/ProgramServices/substanceabuse.html # casat (last visited Dec. 9, 2013).

**\*4** Plaintiff was transferred into Hale Creek in August 2009. *Dkt. No. 30–12 at 17.* On or about February 6, 2010, he filed a grievance complaining of the conduct of Gary Herb, a corrections officer stationed at the facility and a named defendant in this action. *Id.* at 11, 18–19. In his grievance, plaintiff complained that defendant Herb "started coming up with things that didn't make any ... sense," and that he "seemed ... like he was abusing his authority." *Id.* at 18. According to plaintiff, shortly after he filed the grievance, he met with Victor Soto, a corrections sergeant also stationed at Hale Creek and a defendant in this action, to discuss plaintiff's allegations. *Id.* at 11, 19. During that meeting, defendant Soto indicated to plaintiff that he would speak with defendant Herb concerning his behavior. *Id.* at 36–37. Believing that defendant Soto was sincere in his intent to resolve the situation, plaintiff voluntarily withdrew his grievance against defendant Herb. *Id.*

Approximately one month after meeting with defendant Soto, on March 8, 2010, plaintiff received a misbehavior report from defendant Herb. *Dkt. No. 1 at 4; Dkt. No. 30–12 at 19; Dkt. No. 30–20 at 7.* A disciplinary hearing was subsequently conducted on March 9, 2010, to address the charges set forth in the misbehavior report. *Dkt. No. 1 at 5; Dkt. No. 30–12 at 19–20.* At that hearing, plaintiff denied the allegations against him, but called no witnesses and presented no evidence. *Id.* At the conclusion of the hearing, Hayes was found guilty, and ordered to serve twenty days in keeplock confinement. [2] *Dkt. No. 1 at 5; Dkt. No. 30–12 at 20; Dkt. No. 30–14 at 9.*

Because Hale Creek does not have keeplock facilities, on the same day that he was sanctioned, plaintiff was transferred into the Marcy Correctional Facility ("Marcy"), located in Marcy, New York. Dkt. No. 1 at 5; Dkt. No. 30–12 at 20–21. At plaintiff's deposition, he testified that immediately after the disciplinary hearing, but before he was transferred, defendant Soto told plaintiff not to "ever cross his officers," intimating that defendant Herb had issued the misbehavior report against plaintiff in retaliation for plaintiff filing a grievance against defendant Herb. Dkt. No. 1 at 7; *Dkt. No. 30–12 at 48–49.*

In or about October 2009, plaintiff received notice that his merit time allowance had been granted because he had obtained an "Alcohol and Substance Abuse ... certificate and because [he] had successfully completed at least six (6) months of vocational training." *Id.* at 5 (quotation marks omitted). As a result, in January 2010, plaintiff appeared before the parole board for merit parole release consideration. *Id.* The parole board approved plaintiff for merit parole, and his release date was set for May 17, 2010. *Id.* On March 10, 2010, however, plaintiff received a "Merit Time Determination Notice," which indicated that his merit time allowance had been denied. Dkt. No. 1 at 5, 7. That notice, which plaintiff received immediately following his disciplinary hearing regarding the misbehavior report issued by defendant Soto and which is the subject of this litigation, effectively rescinded the parole board's merit parole approval of plaintiff's early release. *Id.*

**\*5** Plaintiff's complaint alleges that defendants Herb and Soto conspired, through the issuance of the misbehavior report, to have his parole rescinded as a result of the grievance plaintiff filed in February 2009 against defendant Herb. *See generally* Dkt. No. 1. In support of this contention, plaintiff further alleges that, before he was placed in the transport vehicle to Marcy to serve his keeplock sanction, defendant Soto

> looked at [plaintiff], smirked, and told him, 'Never file a grievance against an officer, especially here at Hale Creek. You will always lose. I will always back my officers over an inmate, no matter what. You need to learn a lesson. I made sure that you will not be going home any time soon.'

*Id.*

Unrelated to plaintiff's claims regarding retaliation and conspiracy to retaliate, plaintiff alleges that defendants Herb and Soto conspired to violate his equal protection rights under the Fourteenth Amendment. Dkt. *No. 1 at 10.* In support of that claim, plaintiff has identified four fellow inmates confined at Hale Creek who received misbehavior reports, yet were released on parole on their merit parole dates. Dkt. No. 30–12 at 51–54.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on October 26, 2011, by the filing of a complaint and an accompanying application to proceed IFP. Dkt. Nos. 1, 2. Although only the claims asserted against defendants Herb and Soto remain in the case, plaintiff's complaint also named three other defendants, including Brian Fischer, the DOCCS Commissioner; Kenneth Perlman, a DOCCS Deputy Commissioner; and John Doe, an unidentified DOCCS employee. Dkt. No. 1 at 2. On January 23, 2012, Chief District Judge Gary L. Sharpe issued a decision and order granting plaintiff's motion to proceed IFP, but dismissing defendants Fischer and Perlman from the action without leave to replead. *See generally* Dkt. No. 7.

Liberally construed, plaintiff's complaint asserts First Amendment retaliation and conspiracy to retaliate claims arising from allegations that defendants Herb and Soto issued a misbehavior report to Hayes in retaliation for his filing of a grievance against defendant Herb. Dkt. No. 1 at 10. Plaintiff also asserts Fourteenth Amendment equal protection and conspiracy to violate his equal protection rights claims arising from allegations that other inmates who were found guilty of equal or more severe disciplinary infractions while at Hale Creek did not have their merit time parole approval rescinded. *Id.;* Dkt. No. 30–12 at 51–54.

On March 20, 2013, defendants Herb and Soto filed a motion for summary judgment seeking dismissal of plaintiff's complaint on various grounds, including plaintiff's alleged failure to exhaust available administrative remedies before filing suit. *See generally* Dkt. No. 30–1. In their motion, defendants additionally request that plaintiff's IFP status be revoked, arguing that he must first pay the requisite filing fee before proceeding further because he has accumulated three strikes under 28 U.S.C. § 1915(g), and therefore cannot qualify for IFP status. Plaintiff has responded in opposition, addressing only defendants' exhaustion argument. *See generally* Dkt. No. 37.

**\*6** On March 6, 2013, plaintiff filed a motion for leave to amend his complaint. Dkt. No. 26. In that motion, he seeks to substitute Lieutenant Horton for defendant John Doe, and to purportedly "amplif[y] and clarif[y] the causes of action." *Id.* at ¶¶ 2, 4. Defendants have responded in opposition to this motion, generally arguing that any amendment is moot in light of the fact that plaintiff's complaint is subject to dismissal for the

reasons stated in their papers supporting their motion for summary judgment. *See generally* Dkt. No. 32.

Both defendants' motion for summary judgment, as well as plaintiff's motion for leave to amend, which are now fully briefed and ripe for determination, have been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed.R.Civ.P. 72(b).

### III. *DISCUSSION*

#### A. *Plaintiff's IFP Status*

In their motion for summary judgment, defendants first contend that the court should revoke plaintiff's IFP status because, prior to commencing this action, plaintiff had accumulated three strikes within the meaning of 28 U.S.C. § 1915(g). Dkt. No. 30–1 at 7–9. As was noted above, plaintiff has not responded to this argument. *See generally* Dkt. No. 32.

#### 1. *Legal Standard Governing IFP*

When a civil action is commenced in a federal district court, the statutory filing fee, set at $350 at the time plaintiff filed this action, must ordinarily be paid.[3] 28 U.S.C. §§ 1915(a). Although a court is authorized to permit a litigant to proceed IFP if it is determined that he is unable to pay the required filing fee, 28 U.S.C. § 1915(a)(1), section 1915(g) provides that

> [i]n no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury

28 U.S.C. § 1915(g). The manifest intent of Congress in enacting this "three strikes" provision was to deter the filing of multiple, frivolous civil rights suits by prison inmates. *Tafari v. Hues,* 473 F.3d 440, 443–44 (2d Cir.2007) (citing *Nicholas v. Tucker,* 114 F.3d 17, 19 (2d Cir.1997)); *accord, Gill v. Pidlychak,* No. 02–CV–1460, 2006 WL 3751340, at *2 (N.D.N.Y. Dec. 19,

2006) (Scullin, S.J., *adopting report and recommendation by* Treece, M.J.).[4] The prophylactic effect envisioned under section 1915(g) is accomplished by requiring a prisoner who has accumulated three strikes to engage in the same cost-benefit analysis before filing suit as other civil litigants engage in-that is, the provision forces inmates to assess whether the result sought to be achieved justifies the payment of the filing fee in advance, rather than in installments as provided under 28 U.S.C. § 1915(b). *Tafari,* 473 F.3d at 443.

**\*7** The Second Circuit has defined a frivolous claim as one that "lacks an arguable basis either in law or in fact." *Tafari,* 473 F.3d at 442 (citing *Neitzke v. Williams,* 490 U.S. 319, 325 (1989)). *Id.* To determine whether a dismissal satisfies the failure-to-state-a-claim prong of section 1915, courts look to Rule 12(b)(6) of the Federal Rules of Civil Procedure for guidance. *Tafari,* 473 F.3d at 442. The question of whether the dismissal of a prior action constitutes a strike, for purposes of section 1915(g), is a matter of statutory interpretation, and as such presents a question for the court. *Id.*

#### 2. *Analysis*

In this case, defendants argue that plaintiff had accumulated three strikes prior to filing this action, and thus his IFP status should be revoked and the action dismissed unless he advances the required filing fee in full. Dkt. No. 30–1 at 7–9. Defendants have identified the following four cases filed by plaintiff in which, they maintain, Hayes accrued at least one strike for purposes of section 1915(g): (1) *Hayes v. Doe,* No. 99–CV–3961 (S.D.N.Y. filed June 1, 1999) ("*Hayes I* "); (2) *Hayes v. O'Connor,* No. 04–CV–7264 (S.D.N.Y. filed Sept. 13, 2004) ("*Hayes II* "); (3) *Hayes v. United States of America,* No. 08–CV–6525 (S.D.N.Y. filed July 23, 2008) ("*Hayes III*"); and (4) *Hayes v. Cannick,* No. 09–CV–7608 (S.D.N.Y. filed Sept. 1, 2009) ("*Hayes IV* ").

#### i. *Hayes I*

Defendants contend that plaintiff accumulated a strike in *Hayes I,* for purposes of section 1915(g), because the action was dismissed for failure to prosecute. Dkt. No. 30–1 at 7 (citing *Guarneri v. Wood,* No. 08–CV0792, 2011 WL 4592209 (N.D.N.Y. Sept. 2, 2011) (Homer, M.J.)). Assuming that this particular action was, in fact, filed by plaintiff,[5] I nonetheless reject defendants' argument that its dismissal constitutes a strike under section 1915(g), and

2014 WL 1292235

in that respect, I respectfully decline to follow *Guarneri* for substantially the same three reasons cited in my report issued in a previous case, which was adopted by Chief Judge Sharpe in November of this year. *See Herring v. Tabor,* No. 12–CV–1739, 2013 WL 6173775, at \*6–7 (N.D.N.Y. Nov. 20, 2013) (Sharpe, J., *adopting report and recommendation by* Peebles, M.J.). First, the court in *Guarneri* found that the plaintiff's dismissed action at issue—the potential third strike—for failure to prosecute counted as a strike because, at the time the action was dismissed, the plaintiff had "filed a complaint, four notices rejecting proposed amended complaints, an amended complaint, and multiple letter requests over the course of four years before the case was ultimately dismissed for failure to prosecute." *Guarneri,* 2011 WL 4592209, at \*10. The court in *Guarneri* commented that the dismissed action "was not a temporarily infected case with remediable procedural or jurisdictional flaws but one close to Congress' intended policy behind the three-strike provision to prevent the tide of egregiously meritless lawsuits." *Id.* (quotation marks and alterations omitted) (citing *Tafari,* 473 F.3d at 443). The circumstances surrounding the district court's dismissal of *Hayes I,* however, are materially different. Indeed, it appears from the docket sheet that the case was initially dismissed for failure to prosecute as a result of plaintiff's failure to appear at a court ordered conference. *Hayes I,* No. 99–CV–3961, Dkt. Nos. 10, 11. Although the case was reopened at a later date, District Judge John G. Koeltl dismissed the action for a second time, on the defendants' motion, due to plaintiff's failure to prosecute. *Hayes I,* No. 99–CV–3961, Dkt. Nos. 18–21. There is nothing in the sparse docket sheet of *Hayes I* indicating that it was dismissed for the reasons specifically outlined in section 1915(g). Simply stated, I do not find anything in the docket sheet from *Hayes I* to suggest that plaintiff's complaint in the action was frivolous, malicious, or failed to state a claim upon which relief may be granted. *See* 28 U.S.C. § 1915(g).

**\*8** I note, moreover, that although *Guarneri* relied, in part, on *Bermudez v. Rossi,* No. 07–CV–0367, 2008 WL 619170 (N.D.N.Y. Mar. 3, 2008) (Kahn, J.), in finding that a previous dismissal based on a failure to comply with a court order may constitute a strike, the *Bermudez* court explicitly determined that the previous action at issue in that case was "essentially" dismissed for failure to state a claim upon which relief could be granted. *Bermudez,* 2008 WL 619170, at \*3. Accordingly, to the extent that *Guarneri*

relied on *Bermudez* for support of the proposition that a dismissal for failure to prosecute constitutes a strike, that reliance appears to have been misplaced.

Finally, the question of whether a dismissal for failure to prosecute or comply with a court order constitutes a strike under section 1915(g) has not been addressed by the Second Circuit. Several district courts within the circuit, however, have concluded that such a dismissal does not qualify as a strike. *See, e.g., Justice v. Merchant,* No. 12–CV–5103, 2012 WL 6061000, at \*1 (E.D.N .Y. Dec. 5, 2012) ("Dismissals based on a plaintiff's failure to prosecute do not count as strikes." (citing cases)); *Johnson v. Truedo,* No. 11–CV–0627, 2012 WL 3054114, at \*4 (N.D.N.Y. June 15, 2012) (Homer, M.J.), *report and recommendation adopted by* 2012 WL 3062293 (N.D.N.Y. July 26, 2012 (Hurd, J.) ("[D]efendants have failed to demonstrate that the dismissal ... was for failing to state a claim rather than for failing to prosecute or to comply with a court order, neither of which would constitute a 'strike' under [section] 1915(g)."); *Toliver v. Perri,* No. 10–CV–3165, 2011 WL 43461, at \*2 (S.D.N.Y. Jan. 6, 2011) ("While the Second Circuit has not addressed whether a dismissal for failure to prosecute counts as a strike, this and other courts in this Circuit have declined to find that such a dismissal constitutes a strike." (citing cases)). [6]

### ii. *Hayes II*

Turning to *Hayes II,* defendants urge that the district court's dismissal of that action due to plaintiff's failure to timely serve the defendants under Rule 4(m) of the Federal Rules of Civil Procedure constitutes a strike for purposes of section 1915(g). Dkt. No. 30–1 at 8. In support of that contention, defendants rely on *Mullins v. Pramsteller,* No. 08–CV–0038, 2008 WL 4822241 (W.D.Mich. Nov. 3, 2008) and *Wright v. Ozmint,* No. 07–CV–2515, 2008 WL 4542915 (D.S.C. Oct. 7, 2008). *Id.* Once again, I disagree with defendants. As an initial matter, it is far from clear that either *Mullins* or *Wright* stand for the proposition that a dismissal for failing to timely serve under Rule 4(m) constitutes a strike. In *Mullins,* the district court dismissed the plaintiff's action based on two separate grounds: (1) the plaintiff's failure to exhaust administrative remedies before filing suit against three of the four defendants, and (2) the plaintiff's failure to serve the fourth defendant pursuant to Rule 4(m). *Mullins,* 2008 WL 482241, at \*2. The court then explicitly stated, "This dismissal shall count as a STRIKE for purposes of

28 U.S.C. § 1915(g)." *Id.* It is unclear, however, whether the district court considered the dismissal as constituting a strike because of the plaintiff's failure to exhaust, his failure to timely effect service, or some combination of both. *Id.* Similarly, although the district court in *Wright* held that the dismissal in that case should count as a strike against the plaintiff, it is not clear from either the magistrate judge's report or the district judge's order adopting that report whether the dismissal constitutes a strike because (1) the complaint failed to state a claim upon which relief could be granted, (2) defendants were entitled to qualified immunity, or (3) some defendants were not served—all of which were cited by the court as reasons for the dismissal. *Wright,* 2008 WL 4542915 at *1, 5–6.

**\*9** In any event, it should be noted that courts in this circuit have held that a dismissal for failing to effectuate service of process does not count as a strike under section 1915(g). *See, e.g., Chavis v. Curlee,* No. 06–CV0049, 2008 WL 508694, at *4 (N.D.N.Y. Feb. 21, 2008) (Kahn, J.) ("I note that I do not read 42 U.S.C. § 1915(g), or the cases applying it, as suggesting that a dismissal solely because of ... a failure to serve ... constitutes a dismissal for frivolousness, maliciousness or failure to state a claim. Failures ... to serve are failures based on something other than the four corners of a plaintiff's complaint—which is essentially the only thing looked at when determining frivolousness, maliciousness and failure to state a claim."). I agree with the rationale expressed in *Chavis,* and accordingly find that *Hayes II* does not constitute a strike against plaintiff for section 1915(g) purposes.

### iii. *Hayes III*

Defendants next argue that *Hayes III* represents a strike pursuant to section 1915(g) in light of the district court's order, issued on June 29, 2009, dismissing the case based on the plaintiff's filing of the complaint outside the applicable statute of limitations. Dkt. No. 30–1 at 7–8 (citing *Kelly v. City of Dallas,* 288 F. App'x 993 (5th Cir.2008)). Although I agree that a dismissal based on untimeliness may constitute a strike under section 1915(g), *see, e.g., Palmer v. N.Y.S. Dep't of Corr. Greehaven,* No. 06–V–2873, 2007 WL 4258230, at *6 (S.D.N.Y. Dec. 4, 2007), *aff'd* 342 F. App'x 654 (2d Cir.2009), *Hayes III* does not count as a strike in this case because the defendants' motion predicating the dismissal was one for summary judgment. *Hayes III,* No. 08–CV–6525, Dkt. Nos. 19,

20, 23. Courts in this circuit have routinely held that a dismissal at the summary judgment stage generally does not count as strike for purposes of section 1915(g). *See Martin v. Wallis,* No. 07–CV–0175, 2008 WL 3471864, at *4 (D.Vt. Aug. 12, 2008) ("[C]ourts have also held that a case decided at summary judgment generally does not qualify for a strike under [section] 1915."); *Lewis v. Healy,* No. 08–CV–0148, 2008 WL 5157194, at *5 n. 6 (N.D.N.Y. Dec. 8, 2008) (Kahn, J., *adopting report and recommendation by* Peebles, M.J.) (finding that one of the plaintiff's previous dismissals "likely does not qualify as a strike since [his] claims were dismissed on motion for summary judgment, rather than based upon a failure to state a claim upon which relief may be granted"); *Ramsey v. Goord,* No. 05–CV0047A, 2007 WL 1199573, at *2 (W.D.N.Y. Apr. 19, 2007) ("Moreover, a dismissal on summary judgment is generally not considered within the parameters of the three-strikes rule's requirement that the actions be dismissed as frivolous, malicious, or for failure to state a claim."). Indeed, in granting the defendant's motion for summary judgment, the court in *Hayes III* relied on evidence outside the pleadings, which eliminates any doubt that the dismissal could be construed as one for failing to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure and expressly provided for in section 1915(g). *Hayes III,* No. 08–CV–6525, Dkt. Nos. 19, 20, 23. Accordingly, I conclude *Hayes III* does not constitute a strike under section 1915(g).

### iv. *Hayes IV*

**\*10** Finally, defendants argue that *Hayes IV* counts as two strikes against plaintiff in light of the district court's dismissal of plaintiff's complaint in the case based on its failure to state a claim upon which relief may be granted, and the Second Circuit's subsequent dismissal of plaintiff's appeal of that dismissal. Dkt. No. 30–1 at 8 (citing *Chavis v. Chappius,* 618 F.3d 162, 169 (2d Cir.2010)). In *Hayes IV,* now-Chief District Judge Loretta A. Preska issued an order on September 1, 2009, granting plaintiff's motion to proceed IFP, but dismissing the complaint because it "fail[ed] to state a claim on which relief may be granted and/or assert[ed] claims against defendants who are immune from suit." *Hayes IV,* No. 09–CV–7608, Dkt. No. 3. That dismissal clearly constitutes a strike for purposes of section 1915(g), and represents plaintiff's first strike. Despite Judge Preska's certification pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from her order dismissing the case "would not be taken in good faith," *id.,* plaintiff nevertheless appealed the decision to the

Second Circuit, *Hayes IV,* No. 09–CV–7608, Dkt. No. 5. The Second Circuit subsequently dismissed the appeal on September 5, 2010, "because it lacks an arguable basis in law or fact," thereby constituting plaintiff's second strike. *See Chavis,* 618 F.3d at 165 ("[A]n incarcerated plaintiff incurs two strikes when a complaint and a subsequent appeal are independently dismissed for grounds listed in [section] 1915(g)."); *accord, Mills v. Fischer,* 645 F.3d 176, 177 n. 1 (2d Cir.2011).

In summary, because I conclude that the plaintiff had accumulated only two strikes prior to filing this action, I recommend that defendant's request to revoke plaintiff's IFP status be denied.

**B.** *Exhaustion of Available Administrative Remedies*
In support of their motion for summary judgment, defendants contend that plaintiff's complaint is ripe for dismissal at this juncture based upon his failure to exhaust the available administrative remedies prior to commencing suit. Dkt. No. 30–1 at 9–12. In response, plaintiff admits that he did not exhaust before filing this action, but argues that he should be excused from the requirement because he was informed by multiple persons, including DOCCS employees, that he could not file a grievance regarding his retaliation allegations against the defendants. Dkt. No. 37 at 1–2.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Woodford v. Ngo,* 548 U.S. 81, 84 (2006) ("Exhaustion is ... mandatory. Prisoners must now exhaust all 'available' remedies[.]"); *Hargrove v. Riley,* No. 04–CV–4587, 2007 WL 389003, at *5–6 (E.D.N.Y. Jan. 31, 2007) ("The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983."). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002).

**\*11** The failure of a prisoner to satisfy the PLRA's exhaustion requirement is an affirmative defense that must be raised by a defendant in response to an inmate suit. *Jones v. Bock,* 549 U.S. 199, 212 (2007). In the event the defendant establishes that the inmate plaintiff failed "to fully complete [ ] the administrative review process" prior to commencing the action, the plaintiff's complaint is subject to dismissal. *Pettus v. McCoy,* No. 04–CV–0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford,* 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95; *see also Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir.2007) (citing *Woodford* ).[7]

In accordance with the PLRA, the DOCCS has made a grievance procedure, called the Inmate Grievance Program ("IGP"), available to inmates. It is comprised of three steps that inmates must satisfy when they have a grievance regarding prison conditions. 7 N.Y.C.R.R. § 701.5; *Mingues v. Nelson,* No. 96–CV–5396, 2004 WL 234898, at *4 (S.D.N.Y. Feb. 20, 2004). Embodied in 7 N.Y.C.R.R. § 701, the IGP requires that an inmate first file a complaint with the facility's IGP clerk within twenty-one days of the alleged occurrence. 7 N.Y.C .R.R. § 701.5(a)(1). If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. *Id.* A representative of the facility's inmate grievance resolution committee ("IGRC") has up to sixteen days after the grievance is filed to informally resolve the issue. *Id.* at § 701.5(b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen days after receipt of the grievance. *Id.* at § 701.5(b)(2).

A grievant may then appeal the IGRC's decision to the facility's superintendent within seven days after receipt of the IGRC's written decision. *Id.* at § 701.5(c). The superintendent must issue a written decision within a certain number of days of receipt of the grievant's appeal.[8] *Id.* at § 701.5(c)(i), (ii).

The third and final step of the IGP involves an appeal to the CORC, which must be taken within seven days after receipt of the superintendent's written decision. *Id.* at § 701.5(d)(1)(i). The CORC is required to render a written

decision within thirty days of receipt of the appeal. *Id.* at § 701.5(d)(2)(i).

Accordingly, at each step of the IGP process, a decision must be entered within a specified time period. Significantly, "[a]ny failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can—and must—be appealed to the next level, including CORC, to complete the grievance process." *Murray v. Palmer,* No. 03–CV–1010, 2010 WL 1235591, at *2 (N.D.N.Y. Mar. 31, 2010) (Hurd, J., *adopting report and recommendation by* Lowe, M.J.) (citing, *inter alia,* 7 N.Y.C .R.R. § 701.6(g)(2)).

 *12 Generally, if a plaintiff fails to follow each of the required three steps of the above-described IGP prior to commencing litigation, he has failed to exhaust his administrative remedies. *See Ruggerio v. Cnty. of Orange,* 467 F.3d 170, 176 (2d Cir.2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." (quotation marks omitted)).

In addition to the ordinary IGP, and relevant to the facts of this case, there is an expedited process within the DOCCS for the review of complaints of inmate harassment or other misconduct by corrections officers or prison employees. 7 N.Y.C.R.R. § 701.8. In the event the inmate seeks expedited review, he may report the misconduct to the employee's supervisor. *Id.* The inmate then files a grievance under the normal procedures outlined above, but all grievances alleging employee misconduct are given a number, and sent immediately to the superintendent for review. *Id.* at § 701 .8(b). Under the regulations, the superintendent or his designees shall determine immediately whether the allegations, if true, would state a "bona fide" case of harassment, and if so, shall initiate an investigation of the complaint, either "in-house" (by the Office of the New York State Inspector General) or by the New York State Police. *Id.* at § 701.8(c), (d). An appeal of the adverse decision of the superintendent may be taken to the CORC as in the regular grievance procedure. *Id.* at § 701.8(h).

In this case, it is undisputed that plaintiff did not file a grievance related to the allegations that give rise to his claims in this action. There is no record evidence that plaintiff filed a grievance complaining that defendants

Herb and Soto issued the misbehavior report against him on March 8, 2010, in retaliation for plaintiff's filing a grievance against defendant Herb in February 2010. Similarly, there is no evidence that suggests plaintiff filed a grievance regarding the alleged equal protection violations. Rather, in his response to the defendants' motion for summary judgment, plaintiff admitted that he did not file a grievance before filing this action. *See* Dkt. No. 37 at 1 ("My failure to file the grievance should be excused for the following reasons."). Because there is no dispute as to whether plaintiff followed the procedures set forth in the IGP for complaining about the alleged retaliation by defendants Herb and Soto or the alleged equal protection violations prior to filing this action, I will proceed to the next step of the exhaustion inquiry, which asks whether there is any reason that a plaintiff's failure to exhaust may be excused.

In a series of decisions rendered since enactment of the PLRA, the Second Circuit has prescribed a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted for failure to satisfy the PLRA's exhaustion requirement. *See, e.g., Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004); *see also Macias,* 495 F.3d at 41. Those decisions instruct that, before dismissing an action as a result of a plaintiff's failure to exhaust, a court must first determine whether the administrative remedies were available to the plaintiff at the relevant times. *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686. In the event of a finding that a remedy existed and was available, the court must next examine whether the defendant has forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it, or whether, through his own actions preventing the exhaustion of plaintiff's remedies, he should be estopped from asserting failure to exhaust as a defense. *Id.* In the event the exhaustion defense survives these first two levels of scrutiny, the court must examine whether the plaintiff has plausibly alleged special circumstances to justify his failure to comply with the applicable administrative procedure requirements. *Id.*

 *13 In this case, plaintiff asks the court to excuse his failure to exhaust the available administrative remedies prior to commencing this action because (1) "[t]he [Special Housing Unit ("SHU") ] Counselor told [him] that [he] could not file a grievance alleging that Officer Herb's misbehavior report was retaliatory"; (2) "Correction Counselor Fischer ... told [him] the same thing that the SHU Counselor told [him]"; and (3) someone in the

law library "told [him] that [he] could not griev[e] a misbehavior report even if [he] believed that it had been issued in retaliation for a prior grievance that [he] filed against Defendant Officer Herb ." Dkt. No. 37 at 1–2. In essence, plaintiff contends that, because three people told him that he could not file a grievance, he should be excused from the requirement that he do so before commencing this action. *Id.*

These allegations are insufficient to excuse plaintiff's failure under *Hemphill.* Even if it is true that plaintiff was informed by others that he could not grieve defendant Herb's alleged retaliation, that does not render the grievance procedures unavailable to him. *See Yeldon v. Ekpe,* 159 F. App'x 314, 316 (2d Cir.2005) (finding that the plaintiff's excuse for failing to exhaust the available administrative remedies (i.e., a sergeant corrections officer informed him that any appeal of the denial of his grievance would be futile) does not constitute special circumstances "because it does not render the grievance system 'unavailable' to [him]"); *Rodriguez v. Mt. Vernon Hosp.,* No. 09–CV–5691, 2010 WL 3825736, at *15 (S.D.N.Y. Sept. 7, 2010) (holding that a prison official's advice to the plaintiff that appealing the denial of his grievance would be futile does not give rise to special circumstances under the *Hemphill* three-part inquiry). Plaintiff has neither alleged nor set forth any evidence that would support a finding that the grievance procedure was unavailable to him with respect to his complaints that defendants Herb and Soto retaliated against him for filing a grievance against defendant Herb. Moreover, there is no evidence that plaintiff attempted to file a grievance but was prevented from doing so by anyone, including either of the defendants. Because there is no record evidence to suggest that the IGP was unavailable to plaintiff, that defendants' are estopped from asserting the affirmative defense, or special circumstances exist to excuse plaintiff's failure to exhaust the available administrative remedies, I recommend that his complaint in this action be dismissed .[9]

## IV. *SUMMARY AND RECOMMENDATION*

Although plaintiff has proceeded IFP in this case up until this point, defendants have requested that the court review whether he had accumulated three strikes under section 1915(g) prior to commencing this action. After a careful review of plaintiff's previous litigation history, I find that he had only accumulated two strikes at the time he filed his complaint, and therefore revocation of his IFP status is not appropriate. However, because there is nothing in the record now before the court, including any allegations by the plaintiff, to suggest that plaintiff is excused from failing to exhaust the available administrative remedies before filing this action under any of the exceptions listed in *Hemphill,* I recommend that the action be dismissed on the procedural basis of failure to exhaust, without reaching the merits of plaintiff's claims. Accordingly, it is hereby respectfully

**\*14** RECOMMENDED that defendants' motion for summary judgment, Dkt. No. 30, be GRANTED, and that the action be dismissed; and it is further

RECOMMENDED that plaintiff's motion for leave to file an amended complaint, Dkt. No. 26, be dismissed as moot.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Filed Dec. 27, 2013.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 1292235

Footnotes

1    Defendants Fischer and Perlman were dismissed from this action on January 23, 2012. (Dkt. No. 7.)
2    Defendants presented additional arguments in their motion that have not been reached by the court or Judge Peebles. (Dkt. No. 30, Attach. 1 at 12–16.)

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Hayes v. Herb, Not Reported in F.Supp.3d (2014)
Case 9:15-cv-01542-MAD-DEP   Document 79   Filed 02/14/18   Page 113 of 227
2014 WL 1292235

3   Despite Hayes' failure to raise this argument in his proposed amended complaint or his response to defendants' summary judgment motion, the court has reviewed the letters and finds that, even construing them liberally, they are primarily concerned with the merits of Hayes' charged misbehavior and the subsequent disciplinary hearing, and do not establish that he is grieving potential retaliation by defendants. (Dkt. No. 43 at 32–40.) In fact, the letters indicate otherwise, as Hayes explicitly states in the letters that he "decided not to file a grievance" and told others that he "was not going to file a grievance." (*Id.* at 34.)

1   In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003).

2   "Keeplock" is a form of confinement through which an "inmate is confined to his cell, deprived of participation in normal prison routine, and denied contact with other inmates." *Gittens v. LeFevre,* 891 F.2d 38, 39 (2d Cir.1989); *accord, Warburton v. Goord,* 14 F.Supp.2d 289, 293 (W.D.N.Y.1998); *Tinsley v. Greene,* No. 95–CV–1765, 1997 WL 160124, at *2 n. 2 (N.D.N.Y. Mar. 31, 1997) (Pooler, J., *adopting report and recommendation of* Homer, M.J.) (citing *Green v. Bauvi,* 46 F.3d 189, 192 (2d Cir.1995)). "The most significant difference between keeplock and general population inmates is that the former do not leave their cells for out-of-cell programs unless they are a part of mandatory educational programs and general population inmates spend more time out of their cells on weekends." *Lee v. Coughlin,* 26 F.Supp.2d 615, 628 (S.D.N.Y.1998).

3   Effective May 1, 2013, the Judicial Conference increased the fee for commencing an action in a federal district court from $350 to $400 by adding a $50 administrative fee. Because plaintiff commenced this action prior to the effective date of this increase, the filing fee in this case remains $350.

4   All unreported decisions cited in this report have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

5   The plaintiff in *Hayes I* is identified as "Earl Hayes," residing at a private residence. *Hayes I,* No. 99–CV–3961, Docket Sheet. Although the docket sheet indicates that it is a prisoner civil rights action brought pursuant to 42 U.S.C. § 1983, no New York State DIN is noted for the plaintiff. *Id.* In addition, presumably due to the age of the case, the docket sheet is comprised only of docket entries from staff in the clerk's office, rather than the actual filings by the parties and court. *Id.* Accordingly, I am unable to verify that the plaintiff in *Hayes I* is the same person as the plaintiff in this case now before the court. In their memorandum, defendants state that "[t]here are 3 men named 'Earl Hayes' on the record in the DOCCS system. Of those, only the plaintiff was incarcerated at the time of filing and released shortly after filing, which coincides with the change of address to a private residence." Dkt. No. 30–1 at 7 n. 1. Although plaintiff has not disputed this assertion in his response opposing defendants' motion for summary judgment, I note that defendants have failed to submit any evidence to support their position, including, for example, an affidavit from an appropriate person within the DOCCS who could verify this information. *See generally* Dkt. No. 30.

6   At least two other circuits have also ruled that an action dismissed for failure to prosecute does not constitute a strike under section 1915(g). *Torns v. Miss. Dep't of Corrs.,* 317 F. App'x 403, 404 (5th Cir.2009); *Butler v. Dep't of Justice,* 492 F.3d 440, 443 (D.D.C.2007); *but see O'Neal v. Price,* 531 F.3d 1146, 115 (9th Cir.2008) (construing a district court's dismissal of an action "during the screening process for a reason enumerated in [28 U.S.C. § 1915A, 28 U.S.C. § 1915(e) (2)(B) or 42 U.S.C. § 1997e(c) ]" as a strike, "even if the district court styles such dismissal as denial of the prisoner's application to file the action without prepayment of the full filing fee").

7   While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion " 'in a substantive sense,' ' an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias,* 495 F.3d at 43 (quoting *Johnson v. Testman,* 380 F.3d 691, 697–98 (2d Cir.2004) (emphasis omitted).

8   Depending on the type of matter complained of by the grievant, the superintendent has either seven or twenty days after receipt of the grievant's appeal to issue a decision. *Id.* at § 701.5(c) (i), (ii).

9   I also note that plaintiff has failed to address the issue of exhaustion in his proposed amended complaint. *See generally* Dkt. No. 26–1. He neither alleges that he exhausted administrative remedies with respect to his allegations against the defendants, nor argues that his failure should be excused for any reason. *Id.* Indeed, the proposed amended complaint is silent regarding exhaustion. *Id.*

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:15-cv-01542-MAD-DEP    Document 79    Filed 02/14/18    Page 114 of 227

Hodge v. Coughlin, Not Reported in F.Supp. (1994)

1994 WL 519902

1994 WL 519902
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Martin HODGE, Plaintiff,

v.

Thomas A. COUGHLIN III, Commissioner of
the New York State Department of Correctional
Services; Robert Greifinger, Deputy Commissioner
and Chief Medical Officer of the New York State
Department of Correctional Services; Gustav
Gavis, Regional Medical Director of the New
York State Department of Correctional Services;
and Guy Tufau, Director Facility Health Services
of Sullivan Correctional Facility, Defendants.

No. 92 Civ. 0622 (LAP).
|
Sept. 22, 1994.

Opinion

FINDINGS OF FACT AND
CONCLUSIONS OF LAW OPINION

PRESKA, District Judge.

**\*1** Plaintiff brings this action under 42 U.S.C. §
1983 for violation of his Eighth Amendment rights
under the Constitution. Plaintiff alleges that defendants,
officials of the New York State Department of
Correctional Services ("DOCS"), have been deliberately
indifferent to his serious medical needs. The case
centers around the treatment of Mr. Hodge's right eye,
eyelid and surrounding tissue. Plaintiff seeks declaratory
judgment; an injunction directing defendants to provide
constitutional medical care; and compensatory and
punitive damages.

A bench trial was held over six days following which
time the Court reserved judgment. The Court has made
the following findings of fact and conclusions of law
pursuant to Fed.R.Civ.P. 52. The Complaint is dismissed,
and judgment in favor of defendants shall be entered.

I. *Findings of Facts*

A. Plaintiff's Medical Condition

Plaintiff Martin Hodge contracted herpes zoster
ophthalmicus when he was thirteen years old. Tr. at 16. [1]
Herpes zoster ophthalmicus is a viral infection that affects
the first branch of the trigeminal nerve. Tr. at 99. The
trigeminal nerve is one of the cranial nerves affecting the
eye, face and forehead. *Id.* Some of the effects of herpes
zoster ophthalmicus are deep inflammation and scarring
of the skin, neuralgia, [2] corneal scarring, atrophy of the
iris, neurotrophic keratitis, keratouveitis [3] and pain. Tr.
at 99, 100, 377.

Herpes zoster presents one of the most difficult corneal
problems that a corneal specialist can encounter in his
or her practice. Tr. at 362. Very few patients with herpes
zoster ophthalmicus undergo corneal transplant surgery
because of the very high risk involved and due to the
reluctance among many corneal specialists to perform the
surgery. Tr. at 363. For example, between 1941 and 1973
at Johns Hopkins University, approximately 1000 corneal
transplants were performed. Out of that 1000, only three
transplants were performed on patients with herpes zoster
ophthalmicus. Tr. at 362. Similarly, between 1980 and
1985 at the University of Michigan, approximately 1300
transplants were performed. Of the 1300 transplants, only
ten were performed on patients with herpes zoster. Tr. at
362.

One of the risks associated with herpes zoster is that
wounds will not heal properly because of the lack of nerve
stimulation to the cornea. Tr. at 367. Herpes zoster is a
complicated medical condition. While there is corrective
surgery available to treat an eye inflicted with herpes, there
is no treatment for the disease. Surgery is only a remedial
action for something that may occur again and again. Tr.
at 323.

Plaintiff's attack of herpes zoster was acute and severe. He
suffered severe pain, blistering of the right eye, scabbing
and scarring of the internal and external surfaces of the
lid, damage to the tear duct of his eye and scabbing and
scarring to his forehead. As a result of the disease, he was
afflicted with entropion, or a turning in of the eyelid, and
trichiasis, a condition in which the eye lashes rub against
the surface of the eye, resulting in irritation and disease.
Tr. at 16, 17, 54, 55, 100, 101, 320, 323.

Case 9:15-cv-01542-MAD-DEP    Document 79    Filed 02/14/18    Page 115 of 227

Hodge v. Coughlin, Not Reported in F.Supp. (1994)

1994 WL 519902

**\*2** Subsequent to the acute episode of herpes, plaintiff had several skin grafts at Jacobi Hospital to repair his right eyelid. These grafts did not succeed in enabling plaintiff's right eye to close. Tr. at 17. Ultimately, despite the risk involved, plaintiff had plastic and optic surgery from Lester Silver, M.D. and Murray Meltzer, M.D., which included a corneal graft.[4] Tr. at 18, 54, 55.

Notwithstanding the surgery, plaintiff has suffered and continues to suffer pain. For example, he experiences post herpetic neuralgia during weather changes. Pain travels down the right side of his forehead and flares out across the eye. Tr. at 19, 320. He also needs to use artificial tears to lubricate the eye and predforte, a medication to prevent corneal graft rejection.[5] Tr. at 19. However, he has a normal left eye, with perfect vision that may exceed 20/20. Tr. at 68, 351; Trial Exh. 5 ("Exh.—").

B. Plaintiff's Entry into the Prison System
In 1986, plaintiff was incarcerated at Riker's Island, which is part of the New York City Correctional System. At Riker's Island plaintiff's vision in his right eye became blurry due to a cataract, which was probably induced by the steroid medication prescribed to keep the corneal graft from rejecting. Tr. at 105, 106. The cataract was removed in 1986, but a new lens was not inserted. Tr. at 20. A flap of skin created by the cataract surgery caused him discomfort, which plaintiff attempted to relieve with advil and motrin. Tr. at 21. When plaintiff entered the New York State prison system in November 1986, he was still suffering from the effects of this condition. Tr. at 23.

C. Initial Medical Care
Upon becoming an inmate in the prison system of the New York State Department of Correctional Services, plaintiff was referred to ophthalmology and plastic surgery clinics for plastic surgery consultations to treat the ptosis or drooping right eyelid. From June 1987 until the end of 1988, plaintiff was seen intermittently at ophthalmology or plastic surgery clinics. Exh. 27. The surgeons who evaluated Mr. Hodge's condition had differing opinions as to the correct course of treatment and whether plastic surgery was advisable. In July of 1987, a surgeon concluded that the ptosis could be treated, however, plaintiff would risk exposure, infection and possible loss of the globe. Tr. at 359; Exh. 27 at 180, 183. In October of 1987, a plastic surgeon recommended that the eyelid

should not be lifted. Exh. 27 at 183. This doctor noted on a previous visit that plaintiff was "able to close eye completely." *Id.* at 180.

Nonetheless, surgery to correct the ptosis and entropion was performed on December 12, 1988 at the Albany Medical Center ("AMC"). Tr. at 24, 25, 359–362; Exh. 27 at 189–196. After the surgery, plaintiff received numerous follow-up appointments. A few months after the surgery, plaintiff developed bullous keratopathy, which is a swelling of the cornea with blistering, and graft rejection. This was noted during an examination at AMC by Peter Zloty, M.D., who was an attending physician and Director of the AMC Ophthalmology Clinic. Tr. at 360; Exh. 27 at 197. Richard Smith, M.D., former chairman of the ophthalmology department at AMC, confirmed the graft rejection at AMC on January 3, 1989, noting graft failure with exposure keratopathy in his report. Tr. at 360; Exh. 27 at 196, 197, 198, 201. Exposure occurs when the lids do not meet. Tr. at 553.

**\*3** Defendants' expert, Gregory J. Pamel, M.D., a board-certified ophthalmologist, explained that it appeared from the medical records of plaintiff's condition directly after the plastic surgery that "because the eye was exposed, the surface layer broke down," causing graft rejection. Tr. at 360, 552–53. The eye, which apparently had full or near closure before the plastic surgery, may have slightly overcorrected. *Id.* Therefore, the concerns of some of the ocular plastic surgeons who had examined Mr. Hodge prior to the surgery appear to have been realized. Tr. at 360.

However, plaintiff's expert, Dr. Zloty, testified that the graft rejection occurred due to the failure of defendants to treat plaintiff's trichiasis effectively. Tr. at 112, 113. Based on all of the evidence, including observation of the witnesses, this Court found Dr. Pamel's testimony (citing exposure as the probable cause) more credible than that of Dr. Zloty. As noted by Dr. Pamel, the treating doctor listed exposure, and not trichiasis, as the cause of the graft rejection, Tr. at 553. Furthermore, from his review of the medical records, Dr. Pamel noted that plaintiff's trichiasis was documented intermittently and appropriately controlled. Tr. at 412, 553.

After the rejection was diagnosed, plaintiff received frequent examinations and treatments by resident and attending ophthalmologists at AMC, and by

Hodge v. Coughlin, Not Reported in F.Supp. (1994)

1994 WL 519902

Gregory Goldman, M.D., also an ophthalmologist, at Shawangunk Correctional Facility ("Shawangunk"). Tr. at 26–29; Exh. 27 at 196–198, 201. On April 4, 1989, plaintiff was diagnosed at AMC as having an ulcer in his right eye. After being treated, he was scheduled to return to AMC on April 12, 1989.

He was instead referred to the Shawangunk Eye Clinic and treated by Dr. Goldman on April 8, 1989. Tr. at 60–62, 677. Dr. Goldman did not observe an ulcer on the eye, which had evidently healed, and he treated Mr. Hodge for a blep or blister. Tr. at 677; Exh. A at 251. The blep was probably the result of the corneal graft rejection process. Tr. at 678. For follow-up care, Dr. Goldman instructed medical personnel at Sullivan Correctional Facility ("Sullivan") to telephone him on April 14th. Pursuant to his instructions, Dr. Goldman was called on April 14, 1989. Tr. at 678–79, 688–689; Exh. A at 120. Subsequently, plaintiff's eye was examined on many occasions at the Sullivan Clinic, and on May 19, 1989, a provider noted that plaintiff's right eye looks "very good." Exh. 27 at 98.

At times, follow-up care was provided by a general practitioner, who consulted with a corneal specialist. Dr. Pamel testified that under ideal circumstances it is best that a patient be followed by an ophthalmologist, but it is not unreasonable to have a general practitioner provide follow-up care in consultation with an opthalmologist. In fact, Dr. Pamel testified that in his own private practice there are instances when he speaks with a relative and prescribes medication over the phone because the patient is not able to come to his office. Tr. at 386–87.

 **\*4** After plaintiff was diagnosed with corneal graft rejection, physicians began to consider performing a new corneal transplant and lens insertion. Exh. 27 at 222, 224. On July 31, 1989, the ophthalmologist at the AMC ophthalmology clinic recommended that plaintiff be given a follow-up appointment with Dr. Goldman at Shawangunk for a corneal transplant. However, the physician also requested that Mr. Hodge return to AMC in at least six months for "any eye infection/severe pain/ abrupt loss of vision OD." Exh. 27 at 224. Thereafter, Dr. Goldman informed Guy Tufau, M.D., Sullivan's Medical Director and a defendant in this case, that since AMC was able to provide tertiary care, Mr. Hodge should return to AMC for evaluation regarding the proposed corneal transplant rather than to the Shawangunk clinic. Tr.

at 225. Dr. Goldman's practice is limited to general ophthalmology and the treatment of cataracts and glaucoma, and therefore the AMC clinic was the more appropriate place for Mr. Hodge to undergo evaluation. Tr. at 673.

Moreover, plaintiff had a history of continuous treatment at AMC. In the past, he had been treated by Dr. Smith, who was in charge of corneal transplants at AMC, and Mr. Hodge was already on the waiting list at AMC for a corneal transplant. However, AMC could not determine when the procedure would occur. Exh. 27 at 108, addendum to 9/7/89. There was a shortage of corneal tissue in the upstate New York area at that time, Tr. at 242, 578–79, and the waiting list for corneal transplant tissue was twelve to sixteen months. Tr. 578–579. Mr. Hodge believed that he might have to wait as long as two years. Tr. at 333, 461, 716, 720.

### D. Plaintiff's Treatment By Murray Meltzer, M.D.

Frustrated with the waiting list at AMC and Dr. Goldman's reluctance to perform the corneal graft, plaintiff suggested to Sharon Lilly, the nurse administrator at Sullivan, that Dr. Meltzer, the ophthalmologist who performed his original corneal graft in 1983, be contacted. Dr. Tufau concurred with plaintiff's suggestion. Nurse Administrator Lilly, therefore, telephoned Dr. Meltzer and scheduled an appointment. Tr. at 34, 64, 65, 463, 464, 465, 466, 717, 718.

Thereafter, beginning March 16, 1990, plaintiff's ophthalmological problems were treated by Dr. Meltzer. Plaintiff was transported to Dr. Meltzer's office in New York City on approximately five occasions. Tr. at 34, 64, 65, 463 and Exh. 27 at 237 (March 16, 1990); Exh. 27 at 238 (April 4, 1990); Id. at 239 (April 25, 1990); Id. at 240 (June 1, 1990); Id. at 244 (September 21, 1990). It is not the policy of DOCS, and is in fact quite unusual, for correction officers to transport and escort an inmate to the private physician the inmate used prior to incarceration. Tr. at 480. During the period of Dr. Meltzer's treatment, plaintiff was also sent to the ophthalmology clinic at AMC for an examination after an altercation in which Mr. Hodge was struck in the right eye. Exh. 27 at 242.

 **\*5** In a letter to Dr. Tufau dated March 15, 1991, Dr. Meltzer recommended surgery consisting of penetrating keratoplasty (corneal graft) and IOL insertion (lens transplant), to be performed at Elmhurst General

Hodge v. Coughlin, Not Reported in F.Supp. (1994)

1994 WL 519902

Hospital. Tr. at 34, 460; Exh. 27 at 237, 239, 244–245. Dr. Tufau approved the surgical plan, and Nurse Lilly scheduled the appointments and made inquiries about setting up the necessary arrangements for security. Tr. at 336–40, 718. After learning of Dr. Meltzer's surgical plan, Exh. 27 at 245, Deputy Superintendent Clement Capuano, who, as Deputy Superintendent for Administration at Sullivan, has jurisdiction over the administration of the medical department, contacted Gustav Gavis, M.D. Tr. at 516. As Regional Medical Director, Dr. Gavis, who is also a defendant in this case, was the appropriate person to contact in order to coordinate the treatment of plaintiff. Tr. at 523–524.

Initially, Dr. Gavis supported the decision that plaintiff's surgery would be performed in New York City by Dr. Meltzer. Tr. at 308. When he learned that the surgery was scheduled at Elmhurst General Hospital, however, a problem arose because Elmhurst General Hospital does not accept New York State inmates. Tr. at 309. This policy originated in 1984, when a shooting occurred at Elmhurst General Hospital involving a New York State inmate and two corrections officers. Tr. at 310; Exhs. D1, D2. As a result of the shooting, Esta Armstrong, former director of prison services for the New York City Health and Hospital Corporation ("NYCHHC"), barred state inmates from utilizing the services of Elmhurst General Hospital, which is part of NYCHHC. Exh. D1. This policy continues to exist for all NYCHHC hospitals. Tr. at 616, 617, 664, 665.

Dr. Meltzer did not offer to perform surgery at any other of the medical centers at which he is on the staff. This may have been because physicians are often reluctant to perform surgical procedures on prisoners in private hospitals. Tr at 642–43. In any event, it was the NYCHHC policy, and not cost and security arrangements, which was the determinative factor in the decision that the surgery could not take place at Elmhurst General Hospital. Although the need for security and the added cost are always considerations in deciding whether to place an inmate in a nonsecure hospital, security has frequently been arranged to facilitate such a placement. Tr. at 466–67, 493–94, 504–05, 526, 616–18).

E. Plaintiff's Surgical Procedures at Albany Medical Center

Because the surgery could not be performed at Elmhurst General Hospital, and Dr. Meltzer did not propose any

alternate site for the surgery, Dr. Gavis contacted AMC to arrange for the surgery to be performed there after all. Tr. at 315. Although in the past there had been difficulties scheduling some New York State inmates at AMC, there were never problems in scheduling plaintiff for examination and treatment at AMC. This was principally because Mr. Hodge was a former AMC patient with a unit number, which insured that he would remain a patient of AMC. Tr. at 324, 635, 636.[6] The delay experienced by plaintiff in having surgery performed at AMC was no different than that endured by all AMC patients requiring corneal surgery. Tr. at 324, 715.

**\*6** Therefore, shortly after Dr. Gavis' involvement and approximately four months after defendants received notice of Dr. Meltzer's surgical plan and the fact that Dr. Meltzer could not perform the surgery, plaintiff received an appointment at AMC. Exh. 27 at 244; Exh. 25 at 3, 4. On July 29, 1991, plaintiff was evaluated for a corneal transplant and lens insertion by Dr. Zloty. Tr. at 94; Exh. 27 at 247.

Dr. Zloty planned a staged surgical procedure where he would perform a lens implant first and, after allowing the eye to "quiet down," proceed with the corneal transplant in a separate procedure if the initial procedure was sufficiently successful. Tr. at 140–41, 170. On August 22, 1991, he initially performed a corneal photocoagulation (laser treatment) to shrink the blood vessels in the cornea. Exh. 27 at 247. He saw Mr. Hodge on at least two or three other dates before performing a lens insertion on November 5, 1991. Exh. 27 at 251. Finally, additional photocoagulation treatments and a YAG capsulatomy were performed to open up the membrane of the posterior capsule. Exh. 27 at 260; Exh. 25 at 40. During the surgery itself, Dr. Zloty removed a region of blood vessel ingrowth, a small conjunctival tag and three or four of the largest bumps on the upper side of the cornea. Tr. at 139–144; 166–168; Exh. 25; Exh. 27 at 242–273.

Dr. Zloty saw Mr. Hodge six to ten times for post operative care. Tr. at 181–83; Exh. 25. In fact, the medical records show that between his initial consultation on July 29, 1991 through the surgery and follow-up appointments, which apparently concluded on March 4, 1992, plaintiff had fourteen consultations at AMC. Exh. 27 at 242, 247–48, 250–51, 253–558, 260, 262, 264–65. Each time Dr. Zloty scheduled a follow-up appointment, DOCS transported plaintiff to AMC. Tr. at 219.

1994 WL 519902

While Dr. Zloty's surgical procedures did alleviate some of Mr. Hodge's pain, they did not improve his vision and in fact his vision may have deteriorated. Tr. at 144–45, 155–56, 186–97. After the lens was inserted, it displaced. Tr. at 196. In addition, the YAG capsulatomy was not successful, in that the opening in the membrane resealed itself. Tr. at 195–98. Indicative of this lack of success, on November 13, 1991, eight days after the surgery, Dr. Zloty noted "[m]arkedly changed appearance since last visit? Trauma. (Pt. [patient] denies). Wound leaks interiorly." Exh. 27 at 255. Then on June 4, 1992 he noted "no improvement to aphakic correction (+ 12.00 lens)." Exh. 25 at 43.

In actuality, it was unlikely that Dr. Zloty's surgical plan would significantly improve plaintiff's vision. Pre-operatively, plaintiff's vision in the right eye was 20/400, and with a lens placed in front of his eye, the vision only improved to 20/200. Tr. at 364–65; Exh. 25 at 6–7. More importantly, Dr. Zloty's plan of performing the lens implantation and corneal graft during two different surgeries was questionable, as this doubled the risk of hemorrhage, infection, inflammation, and other dangers associated with eye surgery. Tr. at 367–368.

F. Plaintiff's Scheduled Surgery with Richard Smith, M.D.

**7** After Dr. Zloty's surgical procedures, plaintiff was seen almost monthly at either the Fishkill or AMC clinic up until his referral to Dr. Smith for corneal transplant evaluation on February 4, 1993. [7] Dr. Gavis personally contacted Dr. Smith, the former chairman of the ophthalmology department at AMC, to ascertain if he would be willing to see Mr. Hodge in his private practice, and Dr. Smith agreed. Tr. at 315–16, 579, 583, 637–639. At his initial visit, plaintiff was examined at Dr. Smith's private office in Albany. At that time, Dr. Smith recommended a corneal graft, an anterior vitrectomy, a relocation of the displaced lens and possible removal of scar tissue. Tr. at 567–68, 572; Exh. 28 at 36.

Dr. Smith scheduled plaintiff's surgical procedure, including the corneal graft, for September 29, 1993. On September 29, 1993, DOCS transported Mr. Hodge to Memorial Hospital for the surgery. The corneal tissue was in the refrigerator adjacent to the operating room ready to be used in the surgery. Tr. 574–75. Immediately prior

to the surgery, Dr. Smith visited the ambulatory room to see Mr. Hodge and to insure that preoperative procedures had been taken. At this time, Mr. Hodge handed Dr. Smith two very detailed letters from Dr. Zloty addressed to plaintiff's attorney, William D. Rold, Esq., providing Dr. Zloty's prognosis and recommending specific surgical techniques and post operative care. Tr. at 569.

Dr. Smith disagreed with several points of Dr. Zloty's treatment. However, plaintiff informed Dr. Smith that he strongly wished Dr. Smith to treat him according to the procedure outlined in Dr. Zloty's letter. Since Dr. Smith believed that Dr. Zloty's treatment plan was not appropriate, Dr. Smith was compelled to cancel the surgery. Tr. at 569–571, 574–575; Exh. A at 271, 273–276). As testified by Dr. Smith:

> So it put me in the no win position of either going against Dr. Zloty's treatment plan and Mr. Hodge's expressed strong wishes or else going along with it and doing something that I didn't think was appropriate based on my personal clinical judgment.

Tr. at 571. As he further stated in his letter dated October 1, 1993:

> Based on all of the above, I felt that Mr. Hodge's actions had irretrievably broken the doctor/ patient relationship, and I cancelled the surgery because I felt severely threatened by the situation.

Exh. A at 273–274. Dr. Smith's decision not to perform the surgery was a reasonable and appropriate exercise of his professional judgment. Other surgeons in his position would have made the same decision. Tr. at 389, 637–640. Mr. Hodge's own conduct in insisting on a certain surgical procedure caused the surgery, which was moments away from being performed, to be cancelled.

Plaintiff interfered with his medical treatment on other occasions as well by failing to keep medical appointments and refusing medications. Tr. at 71–72, 723; Exh. A at 25, 49, 85, 104, 108, 134, 251. While at least one of Mr. Hodge's failures to appear was due to his being in court, Exh. A at 25, on one occasion he refused to leave for a

Hodge v. Coughlin, Not Reported in F.Supp. (1994)

Case 9:15-cv-01542-MAD-DEP   Document 79   Filed 02/14/18   Page 119 of 227

1994 WL 519902

medical appointment on time because he wanted to finish his lunch. Exh. A at 104. Mr. Hodge also failed to provide the medical department with advance notice that he was going to run out of his medications, which would have permitted the facility to renew his prescriptions in a timely manner. Tr. at 713; Exh. A at 59, 61.

**\*8** Plaintiff contends that not only did he provide sufficient advance notice, many times defendants failed to provide him with the proper artificial tears prescription, and, on one occasion, delayed twelve days before providing him with a graft rejection medication. Tr. at 146. Nurse Lilly testified that when prescribed medicine was out of stock, the inmate's doctor was called and a substitute medicine was provided. Tr. at 711–12.[8] For example, Dr. Pamel testified that there are many substitute medications for Mr. Hodge's prescribed artificial tear medication, celluvisc. Tr. at 394–95, 543. Furthermore, there is no evidence that Mr. Hodge suffered specifically because of the twelve-day delay in receiving the graft rejection medication.

### G. Plaintiff's Overall Medical Care

Since 1989 plaintiff has been transported to a total of 52 consultations by medical specialists. Tr. at 739. This averages to almost one specialty consultation per month. *Id.;* Exh. I. Moreover, from 1989 through 1993, plaintiff has experienced a total of 402 health care encounters with physicians, nurses and physician assistants at the facility clinics.[9] Tr. at 739–749; Exh. I. Altogether, over a five year period, plaintiff averaged 1.7 encounters each week with some kind of health care provider.

Plaintiff argues that while he may have been "seen" by "medical staff" extensively, he did not receive continuous or adequate treatment from specialists. In support of this argument, plaintiff asserts that Dr. Meltzer's treatment plan was aborted, Dr. Smith never treated plaintiff and plaintiff did not receive continuous treatment at AMC, but merely had visits at AMC.

Rather than finding defendants' understanding of the term "treatment" as all-encompassing, however, the Court finds plaintiff's understanding of that term to be overly narrow. In the very least, when a patient is examined and diagnosed, the plaintiff has been "treated" by the physician. Although surgery by Dr. Meltzer was necessarily cancelled, plaintiff had

approximately six appointments with Dr. Meltzer and at each visit he was examined, diagnosed and provided with a recommendation. Exh. 28 at 238–44. Plaintiff was also examined, diagnosed and provided with a recommendation by Dr. Smith. Exh. 28 at 36. As noted above, when Dr. Smith was to perform the surgery, plaintiff required him to adhere to another doctor's treatment plan, causing Dr. Smith, not unreasonably, to cancel the surgery. Tr. at 569–71. Finally, plaintiff's appointments at the AMC clinic are too numerous to document, but the record is replete with evidence of plaintiff's being examined and diagnosed at AMC on numerous occasions.

### H. Current Prognosis and Treatment Plan

Despite the cancellation of Mr. Hodge's surgery with Dr. Smith, he is still under consultation at Albany Medical Center. Tr. at 49, 324, 721–723. Subsequent to the aborted surgery, plaintiff was treated and/or evaluated at AMC on October 25, 1993, November 11, 1993, December 6, 1993, December 22, 1993, January 13, 1994 and February 4, 1994. Exh. 66 at 44–45, 48; Exh. 71 at 44–49; Exh. 72; Exh. V.[10]

**\*9** Mr. Hodge was examined on December 10, 1993 by Dr. Belin, an Associate Professor and Director of Corneal External Disease and Refractive Surgery at Albany Medical College. Tr. at 581. After examining plaintiff, Dr. Belin concluded that plaintiff represents a high-risk corneal transplant patient, given his previous graft rejection and heavy vascularization.

Dr. Belin recommended against surgery for a number of reasons. First, plaintiff has normal vision in his left eye. Therefore, in placing the surgical risks and benefits in perspective, since plaintiff is not in a "professional and/or social environment that requires binocular vision, this is a case that [Dr. Belin] normally would not recommend for surgical intervention." Exh. 70 at 2.

Secondly, the complexity and high risk of regrafting requires multiple and frequent examinations, which is difficult for an incarcerated person. Nevertheless, Dr. Belin's decision to recommend "no further surgical intervention is significantly not different from how [he would] evaluate non-incarcerated patients." Exh. 70 at 1–2. Given the risk-benefit ratio, Dr. Belin strongly urged no

Case 9:15-cv-01542-MAD-DEP    Document 79    Filed 02/14/18    Page 120 of 227

Hodge v. Coughlin, Not Reported in F.Supp. (1994)

1994 WL 519902

further intervention, since Mr. Hodge has only a limited potential benefit. Exh. 70 at 2.

Dr. Smith testified that he believed the conclusions reached by Dr. Belin were medically reasonable. Tr. at 581–82. Although Dr. Smith had originally agreed to perform the surgery, Dr. Smith recognized that there was a very guarded chance of success since plaintiff had a difficult case with a past history of surgeries and lid deformities. Tr. at 572. Additionally, Dr. Smith noted that the herpes zoster had attacked the eye causing loss of sensation in the cornea and affecting the tissue. As a result, the eye, especially the surface of the eye (which is critical in a corneal transplant) would not heal well. Tr. at 580–81. Dr. Smith summed up his prognosis:

> The bottom line is that almost anyone who has a severe enough damage to their cornea from shingles has a very poor prognosis for corneal grafting because of all these factors. They just don't heal well, they don't keep a clean graft, and they don't recover vision. Nevertheless, we try to do things, but we have to tell the patient that the outlook is not good.

Tr. at 581. Therefore, Dr. Smith estimated the chance of success as well below fifty percent. Tr. at 573.

Likewise, Dr. Pamel opined that even if there was a period of quiescence within which to perform surgery, major risks, such as infection and hemorrhage, would still be involved with surgery. Tr. at 547. Additionally, he explained that surgery causes inflammation which promotes graft rejection. He also agreed that Mr. Hodge's herpes zoster would create further wound healing problems. Tr. at 367. He estimated Mr. Hodge's chance of successful surgery at between thirty and forty percent. Tr. at 559.

Dr. Zloty, who was plaintiff's expert witness, also expressed doubt that a new corneal graft would be successful. As stated in his deposition:

> **\*10**  To do more extensive surgery, such as a cornea transplant, has a risk of being counterproductive

in that it can set up more inflammation.

Exh. 61 at 46; Tr. at 206. As further stated in his deposition:

> It would be an option for him if he wanted to take the risk of proceeding with an additional surgical procedure. Anytime you do any surgery, there is risk of infection and bleeding, and, particularly with a corneal transplant, a risk that it would reject it and become uncomfortably painful and make the situation even worse.

Exh. 61 at 50; Tr. at 210. Finally, in Dr. Zloty's letter dated August 26, 1993 to William I. Rold, Esq. he wrote:

> With vessel ingrowth noted 360 degrees, I would be hesitant to perform a repeat transplant. The patient would be at a high risk for rejection as well as a recrudescence of the inflammation often seen in zoster patients. Unfortunately, the posterior capsule is too fibrotic to be adequately incised with the YAG laser, as was my original intention.

Exh. 16 at 3.

Therefore, it seems that, although any type of surgery is inherently risky, with Mr. Hodge's added poor eye condition, more extensive surgery could very likely worsen his condition.

## II. *Conclusions of Law*

Recovery under the Eighth Amendment based on inadequate medical care is limited to those cases in which a prisoner can establish "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). There is an objective component to this standard, "was the deprivation sufficiently serious, violating contemporary standards of decency," *Helling v. McKinney,* 113 S.Ct. 2475, 2480–82 (1993); and a subjective component, "did the officials act with a sufficiently culpable state of mind?"

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:15-cv-01542-MAD-DEP Document 79 Filed 02/14/18 Page 121 of 227
Hodge v. Coughlin, Not Reported in F.Supp. (1994)
1994 WL 519902

*Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321, 2324–26 (1991). In analyzing the objective component, the Supreme Court has stated that "only those deprivations denying 'the minimal civilized measures of life's necessities' are sufficiently grave to form the basis of an Eighth Amendment violation." *Id.* (quoting *Rhodes v. Chapman,* 452 U.S. 337, 347 (1981)).

With respect to the subjective component, a plaintiff must prove that the defendant acted wantonly or with deliberate indifference. *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993). Proper allegations of "deliberate indifference" include allegations of callous indifference to medical needs; intentional denial or delay of an inmate's access to medical care; or intentional interference with treatment. *Estelle,* 429 U.S. at 104–05; *Harding v. Kuhlman,* 588 F.Supp. 1315, 1316 (S.D.N.Y.1984), *aff'd, 762 F.2d 990 (2d Cir.1985).*

Negligence or mere allegations of malpractice on the part of a diagnosing or treating physician will not state a valid Eighth Amendment claim. *Estelle,* 429 U.S. at 106 & n. 14. "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle,* 429 U.S. at 106. Rather, the plaintiff must allege conduct that is " 'repugnant to the conscience of mankind' " or incompatible with the "evolving standards of decency that mark the progress of a maturing society." *Id.* 429 U.S. at 102, 105 (citations omitted).

 **\*11** A prisoner's disagreement with the diagnostic techniques or forms of treatment utilized by prison medical personnel does not give rise to a cognizable Eighth Amendment claim: "A medical decision not to order an x-ray, or like measures, does not represent cruel and unusual punishment." *Estelle,* 429 U.S. at 107; *accord, Tomarkin v. Ward,* 534 F.Supp. 1224, 1230 (S.D.N.Y.1982). Nor does an allegation of "misdiagnosis or faulty [medical] judgment" state a claim. *Tomarkin,* 534 F.Supp. at 1230. Furthermore, a dispute between two doctors as to the proper course of medical treatment will not give rise to an Eighth Amendment violation. *Estelle,* 429 U.S. at 107; *Martinez v. Mancusi,* 443 F.2d 921, 924 (2d Cir.1970), *cert. denied,* 401 U.S. 983 (1971).

The same standards apply to a claim of deliberate indifference to serious medical needs on the part of nonmedical prison personnel. To establish such a claim plaintiff must prove that prison personnel intentionally delayed access to medical care when the inmate was in extreme pain and has made his medical problems known to the attendant prison personnel or that the inmate suffered a complete denial of medical treatment. *Harding v. Kuhlman,* 588 F.Supp. at 1315–16 (quoting, *Archer v. Dutcher,* 733 F.2d 14, 16 (2d Cir.1984) and *Ferranti v. Moran,* 618 F.2d 888, 890 (1st Cir.1980)). "At a minimum, there must be at least some allegations of a conscious or callous indifference to a prisoner's rights." *Zaire v. Dalsheim,* 698 F.Supp. 57, 59 (S.D.N.Y.1988), *aff'd, 904 F.2d 33 (2d Cir.1990).*

In the present case, the facts simply do not support the type of egregious lack of medical care that would establish a claim of "deliberate indifference" to serious medical needs. [11] On the contrary, although there were some short periods of delay in treatment at AMC, Mr. Hodge's eye condition was never ignored. The evidence demonstrates that plaintiff was seen on a regular basis by the health care providers at Green Haven, Sullivan, Newburgh, Fishkill and Shawangunk Correctional Facilities. Plaintiff's treatment was continuous and conformed with good medical judgment.

1. Alleged Delay in Providing Plastic Surgery

Mr. Hodge contends that there was a delay in providing him medical treatment for ptosis, since surgery was first recommended in April or May of 1987 and was not performed until December 12, 1988. As aforementioned, there were differing opinions as to whether plastic surgery to raise plaintiff's eyelid would place plaintiff's eye at risk, and the surgery likely did cause Mr. Hodge's subsequent graft rejection. Furthermore, far from being ignored during this period, plaintiff was seen quite often at ophthalmology and plastic surgery clinics. Therefore, especially due to the difference in medical opinion as to the advisability of the plastic surgery, the delay in performing the actual surgery was not unreasonable and certainly not "repugnant to the conscious of mankind." *Estelle,* 429 U.S. at 102.

2. Alleged Delay in Treating the Ulcer

 **\*12** Mr. Hodge additionally argues that defendants delayed in treating his eye for an ulcer. On April 4, 1989 a doctor at AMC noted that plaintiff had an ulcer. Dr. Goldman testified that he examined plaintiff four days later and plaintiff did not have an ulcer, but a blep, or

Case 9:15-cv-01542-MAD-DEP    Document 79    Filed 02/14/18    Page 122 of 227

Hodge v. Coughlin, Not Reported in F.Supp. (1994)
1994 WL 519902

blister, induced by the graft rejection. In addition to the follow-up treatment by Dr. Goldman, plaintiff was seen and evaluated at Sullivan by Dr. Tufau, who consulted with Dr. Goldman. Evidently, therefore, appropriate care was provided for this condition.

### 3. Alleged Delay in Further Corneal Surgery

In 1989, Dr. Smith placed Mr. Hodge on a twelve- to sixteen-month long waiting list at AMC for a corneal transplant. Tr. at 578–579. Being placed on a waiting list was not a denial of medical care, but normal for a person waiting for a corneal transplant. Tr. at 682. Indeed, Mr. Hodge's own expert, Dr. Zloty, testified that only a limited supply of corneal tissue exists in this country. Tr. at 242. The initial four-month delay in receiving an appointment with Dr. Zloty at AMC for evaluation of corneal transplant surgery (after Dr. Meltzer's surgical plan was aborted) was not sufficiently egregious to constitute an Eighth Amendment violation. Likewise, the seven-month delay in receiving the appointment with Dr. Smith for evaluation of corneal surgery (after Dr. Zloty left New York), especially in light of the intermittent care provided by the AMC and Fishkill clinics during the seven months, was also not sufficiently extreme to constitute deliberate indifference.

Plaintiff has additionally argued throughout the litigation that his claim that defendants' failure to render possible the surgery by Dr. Meltzer constituted an Eighth Amendment violation. Quite to the contrary, the fact that defendants facilitated plaintiff's treatment by his personal physician in the first place demonstrated their concern for plaintiff. Indeed, arranging for a prisoner's treatment by his private physician, with the attendant expense of transporting him under guard to Dr. Meltzer's unsecured private office, is a striking exception to prison protocol. Tr. at 307. In any case, it is not constitutionally required that an inmate be treated by a physician of his own choosing. *See* Ross v. Kelly, 784 F.Supp. 35, 46–47 (W.D.N.Y.), aff'd, 970 F.2d 896 (2d Cir.), cert. denied, 113 S.Ct. 828 (1992); McCloud v. Delaney, 677 F.Supp. 230, 232 (S.D.N.Y.1988). As recently stated by the District Court:

> We reject completely the notion that a prisoner has a constitutional right to select the doctor who treats him —a privilege not normally available even to those who pay for their own

treatment at Health Maintenance Organizations.

Gayle v. Howard, No. 93–3267 (Goettel, J.) (S.D.N.Y. Jan. 11, 1994).

Furthermore, the additional delay in further corneal surgery was caused by Mr. Hodge's own conduct in insisting, on the verge of surgery, that Dr. Smith follow Dr. Zloty's surgical procedure and technique. The failure of defendants to obtain an early date for plaintiff's second corneal transplant, a procedure noted by many experts to be quite risky for Mr. Hodge, does not rise to the level of "deliberate indifference." *Estelle*, 499 U.S. at 104.

### 4. Alleged Shortages of Medication

 **\*13** Plaintiff also alleges that defendants failed to provide him with prescribed medications. This allegation is without merit. The evidence shows that, at times, Sullivan was caught short of medications because plaintiff failed to notify the nurse before he ran out of medications. Nurse Administrator Lilly also facilitated plaintiff's receipt of medications that were difficult to obtain by arranging with AMC to fill prescriptions directly. Finally, as recently stated by the district court:

> The fact that the specific medication sought by plaintiff was merely out of supply belies the intentionality required to sustain an Eighth Amendment claim based on improper medical treatment.

Leroy McBride v. Nurse Sandy Gomez, et al., 1994 WL 37816, at *2 (McKenna, J.) (S.D.N.Y. Feb. 8, 1994). *See also,* United States ex rel. Hyde v. McGinnis, 429 F.2d 864 (2d Cir.1970) (prisoner's preference for pills as opposed to liquid form of medication did not make out an actionable claim).

### 5. Level of Plaintiff's Medical Care

The total number of health care encounters experienced by plaintiff, along with his frequent and steady appointments with ophthalmologists with corneal and anterior specialties hardly constitute a deprivation that denies "the minimal civilized measure of life's necessities." Rhodes v. Chapman, 452 U.S. 337, 347 (1981). Nonetheless, the Second Circuit has recognized that despite receiving extensive medical care, a plaintiff

Hodge v. Coughlin, Not Reported in F.Supp. (1994)

1994 WL 519902

could still have an Eighth Amendment claim where the quality of care is quite low or the care is ineffective. *Kaminsky v. Rosenblum,* 929 F.2d 922, 924 (2d Cir.1991) (proof of three-month gap in care and failure to monitor plaintiff's condition despite alarming deterioration, resulting in death); *Archer v. Dutcher,* 733 F.2d 14, 15–17 (2d Cir.1984) (plaintiff identified intentional efforts of defendant to delay access to medical care when defendant knew that plaintiff was in extreme pain); *see also Williams v. O'Leary,* 805 F.Supp. 634, 638 (N.D.Ill.1992) (prison doctors prescribed ineffective medicine for over two years causing inmate constant pain).

Yet, while incarcerated persons are entitled to quality medical care, the level of care must be seriously low before an Eighth Amendment violation is established. As also recently stated by Judge Goettel:

> As "guests" of the state, prisoners are entitled to receive medical care. While their medical care is not necessarily of the highest quality (although it does exceed that available to many taxpayers who are paying for the prisoner's treatments), it must fall to a low level with serious repercussions before it constitutes a civil rights violation.

*Gayle v. Howard,* No. 93–3267 (Goettel, J.) (S.D.N.Y. Jan. 11, 1994); *Archer,* 733 F.2d 14, 17 ("[w]e have no doubt that the same standards of medical care cannot be imposed upon a prison as are presumed to be realized at a hospital"). After hearing and reviewing the evidence in this case, this Court has found the quality of care to meet standards of reasonableness.

**\*14** Finally, throughout this litigation, plaintiff has also argued that defendants have failed to fund adequately and provide specialty medical consultations to plaintiff and other inmates in the New York State prison system. The care provided to inmates as a class is not at issue in this action. The evidence shows that plaintiff was provided with frequent, continuous and effective treatment with ophthalmologists who specialize in corneal

and anterior eye diseases. Sharon Lilly, R.N., who, as nurse administrator at Sullivan, was responsible for scheduling specialty consults, testified that she never experienced a problem setting up timely consultations for specialty services.

Plaintiff argues, however, that the low rate of reimbursement to medical providers restricts the availability of specialists, especially surgeons, to treat inmates and that it has had a direct impact on his care. Individual providers are as a rule reimbursed at the Medicaid Rate. Presently, the rate for ophthalmology and plastic surgery is twenty-four dollars for initial and follow-up visits. Tr. at 653. As stated previously, however, plaintiff never suffered from the unavailability of ophthalmological services—the evidence clearly shows that the defendants were far from indifferent to the needs of Mr. Hodge for specialty medical services. Thus he has failed to prove the objective component of an Eighth Amendment claim.

Plaintiff has also failed to establish the subjective component of his claim, *i.e.,* that the defendants had the requisite state of mind necessary to show an Eighth Amendment violation. The defendant's conduct, together will all reasonable inferences to be drawn therefrom, does not come remotely close to meeting the standard of deliberate indifference; throughout plaintiff's incarceration in the state system he received good and adequate medical care and continues be provided with such care.

### Conclusion

Plaintiff has not established a claim for violation of his Eighth Amendment rights, and, therefore, the Complaint is dismissed and judgment shall be entered for the defendants.

SO ORDERED.

**All Citations**

Not Reported in F.Supp., 1994 WL 519902

Footnotes

1    The trial transcript is referred to as "Tr. at —".

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.                                          10

Case 9:15-cv-01542-MAD-DEP    Document 79    Filed 02/14/18    Page 124 of 227

Hodge v. Coughlin, Not Reported in F.Supp. (1994)
1994 WL 519902

2    Neuralgia is a pain that occurs after shingles from nerve inflammation. Tr. at 377.

3    Both neurotrophic keratitis and keratouveitis are types of inflammations. Tr. at 100.

4    A corneal graft, or corneal transplant, is a transplant of the front surface of the eye. Tr. at 102.

5    During a corneal transplant, part of the patient's cornea is removed and replaced with donor tissue. Corneal graft rejection occurs when the patient rejects the donor tissue. Such rejection is a risk with any transplant. Tr. at 102, 104.

6    Whether AMC was open to New York State inmates was an issue frequently raised during the trial. However, Nurse Administrator Sharon Lilly testified that she never had a problem scheduling a Sullivan inmate at AMC. Tr. at 332, 715. Hodge had a total of 20 consults at AMC, and was on the waiting list for a transplant as early as September 7, 1989. Exh. 27 at 108; Tr. at 333.

7    Dr. Zloty had left New York and therefore could no longer treat plaintiff. In support of his claim, plaintiff asserts that there was a seven month delay from when he last saw Dr. Zloty at AMC on June 25, 1992 until he saw another ophthalmologist —Dr. Smith—in February 1993. However, this assertion is misleading. Upon review of the records, Mr. Hodge was seen at either the Fishkill or AMC clinic on the following dates in 1992 (unless otherwise noted): July 16, Ex. 28 at 31; August 26, plaintiff requested to see Dr. Tufau only, Ex. 28 at 7; September 17, Ex. 28 at 33; October 23, Ex. 28 at 34; November 18 and 27, a general practitioner consulted with an AMC ophthalmologist, who stated that there was no need for a consultation with Mr. Hodge until his regular check-up, Ex. 28 at 14, 15; January 18, 1993, Ex. 28 at 35. Far from being completely neglected for nine months, plaintiff was seen at least monthly at the plastic or eye clinic outside Sullivan.

   Furthermore, the fact that Mr. Hodge had not seen an ophthalmologist regarding corneal transplant surgery since June 1992 is not unreasonable. After Dr. Zloty's surgery in November 1992, further corneal surgery could not be performed until a sufficiently long period of quiescence existed. The Court credits Dr. Pamel's testimony that for corneal graft surgery, a quiescent period of at least two to three years would be necessary. Tr. at 544. During the seven month period between seeing Dr. Zloty and Dr. Smith, Mr. Hodge's eye was certainly not "quiet." Ex. 28 at 11, 13, 31, 33.

8    Plaintiff also cites inventory problems and inefficiency in providing medication at Sullivan due to the loss of its pharmacist. Plaintiff argues that the pharmacist has not been replaced due to the low, uncompetitive salary offered for the position and that this has had a negative effect on his medical care. Nurse Lilly testified that, to the best of her knowledge, she does not recall a patient suffering because of medications being out of stock. Tr. at 711–12. When the pharmacist was phased out, the facility simply filled prescriptions from a central pharmacy or a local pharmacy. *Id.* She also testified that, although there were times that Mr. Hodge did not receive his necessary medication, this did not occur frequently. Tr. at 712.

9    Approximately 36 of these visits were not eye-related.

10   The latest examination of Mr. Hodge on February 4, 1994, occurred after trial and is therefore not a part of the trial record.

11   The *Estelle* Court illustrated the type of conduct that would give rise to a cause of action under this standard by citing to several Circuit Court decisions:

   *See, e.g., Williams v. Vincent,* 508 F.2d 541 (C.A.2 1974) (doctor's choosing the "easier and less efficacious treatment" of throwing away the prisoner's ear and stitching the stump may be attributable to "deliberate indifference ... rather than an exercise of professional judgment"); *Thomas v. Pate,* 493 F.2d 151, 158 C.A.7), *cert. denied sub nom. Thomas v. Cannon,* 419 U.S. 879, 95 S.Ct. 143, 42 L.Ed.2d 119 (1974) (injection of penicillin with knowledge that prisoner was allergic, and refusal of doctor to treat allergic reaction); *Jones v. Lockhart,* 484 F.2d 1192 (C.A.8 1973) (refusal of paramedic to provide treatment); *Martinez v. Mancusi,* 443 F.2d 921 (C.A.2 1970),* cert. denied, 401 U.S. 983, 91 S.Ct. 1202, 28 L.Ed.2d 335 (1971) (prison physician refuses to administer the prescribed pain killer and renders leg surgery unsuccessful by requiring prisoner to stand despite contrary instructions of surgeon).

   429 U.S. at 104, n. 10.

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment

Distinguished by Young v. Choinski, D.Conn., September 16, 2014

2011 WL 2975218
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Gotfried JEAN, Plaintiff,

v.

C.O. BARBER, Correctional Officer, Auburn
Correctional Facility; Sgt. Christopher, Auburn
Correctional Facility; and Superintendent Graham,
Auburn Correctional Facility, Defendants.

No. 9:09–cv–430 (MAD/GHL).
|
July 21, 2011.

**Attorneys and Law Firms**

Gotfried Jean, Malone, NY, pro se.

Office of the New York State Attorney General, Adrienne
J. Kerwin, AAG, of Counsel, Albany, NY, for defendants.

**Opinion**

**MEMORANDUM–DECISION AND ORDER**

MAE A. D'AGOSTINO, District Judge.

**I. INTRODUCTION**

**\*1** On April 10, 2009, plaintiff *pro se* filed the present
action, alleging that he was denied adequate medical care,
in violation of his Eighth and Fourteenth Amendment
rights, when defendants failed to provide him with mental
health services prior to a suicide attempt. *See* Dkt. No.
1. In a Report–Recommendation and Order dated June
28, 2011, Magistrate Judge Lowe recommended that the
Court grant defendants' motion for summary judgment
and dismiss the complaint. *See* Dkt. No. 52. [1]

Currently before the Court are plaintiff's objections
to Magistrate Judge Lowe's June 28, 2011 Report–
Recommendation and Order. [2]

**II. BACKGROUND**

**A. Factual background**

In his complaint, plaintiff alleges that his Eighth and
Fourteenth Amendment rights were violated during
his confinement at the Auburn Correctional Facility
("Auburn C.F."). *See* Dkt. No. 1 at 4. Specifically,
plaintiff alleges that, on December 16, 2006, while in his
cell, he told defendant Barber that he wanted to commit
suicide. *See id.* Plaintiff alleges that he then saw defendant
Christopher, who told him that there was nothing wrong
with him and that he should "do [his] time like a man."
*See id.* at 4–5. Thereafter, plaintiff alleges that defendant
Christopher told defendant Barber not to call "any mental
health staff." *See id.* One or two hours later, plaintiff again
told defendant Barber that he wanted to commit suicide,
but defendant Barber said nothing and walked away. *See*
Dkt. No. 39–3 at 10.

Later that day, plaintiff attempted to commit suicide by
"trying to sever [his] arm off with a can top." *See* Dkt.
No. 1 at 5. Plaintiff cut his arm five times. *See* Dkt. No.
39–3 at 12. At that point, a non-defendant officer arrived
and took plaintiff to receive medical attention. *See id.* at
13. Plaintiff was placed in a cell in the Mental Health
Unit ("MHU") at Auburn C.F. and later spoke to a non-
defendant individual from the Office of Mental Health
("OMH"). *See id.* at 14. Thereafter, plaintiff was released
to the Special Housing Unit. *See id.* at 16.

In his complaint, plaintiff alleges that defendants acted
with deliberate indifference in violation of his Eighth
Amendment rights by leaving him in his cell after he
threatened to commit suicide. *See* Dkt. No. 1 at 5. Plaintiff
claims that he saw mental health personnel only after he
injured himself. *See id.* Moreover, plaintiff asserts that his
suicide threat and his self-inflicted wounds "are consistent
with a serious medical need."

On October 1, 2010, the remaining defendants moved for
summary judgment. *See* Dkt. No. 39. In their motion,
defendants argued that (1) plaintiff cannot prevail on his
Eighth Amendment claim because defendants were not
deliberately indifferent to plaintiff's serious medical needs;
and (2) they are entitled to qualified immunity as to each
of plaintiff's claims. *See* Dkt. No. 39–7 at 2–6.

## B. Magistrate Judge Lowe's Report–Recommendation and Order

**\*2** In his Report–Recommendation and Order, Magistrate Judge Lowe found that it was unclear whether plaintiff experienced any previous suicidal thoughts. *See* Dkt. No. 52 at 6. Citing to his obligation to resolve all ambiguities and draw all reasonable inferences against the non-moving party, however, Magistrate Judge Lowe still recommended that the Court find that a question of fact has been raised as to whether plaintiff suffered from a sufficiently serious medical need. *See id.*

Regarding deliberate indifference, Magistrate Judge Lowe recommended that the Court find that "there is no indication that Defendants *intentionally* delayed access to medical care. Instead, the record shows that Defendants responded quickly to Plaintiff and took steps to assist him." *See id.* Specifically, Magistrate Judge Lowe set forth the following in support of his conclusion:

> When Plaintiff told Defendant Barber at approximately 7:00 a.m. that he wanted to commit suicide, Defendant Barber "immediately informed the first officer on the shift, who then informed [Defendant] Christopher." Barber Dec. at ¶ 5. The logbook entry confirms that Defendant Barber conveyed this information and that Defendant Christopher was notified at 7:10 a.m. Ex. F. Defendant Christopher saw Plaintiff at approximately 7:50 a.m. Christopher Dec. at ¶ 4. Defendant Barber continued to observe Plaintiff until the conclusion of his shift at 3:00 p.m. Barber Dec. at ¶ 8. Plaintiff cut his arm after Defendant Barber finished his shift. *Id.* at ¶ 7; Jean Dep. at 10.

*See id.* at 7.

Thereafter, Magistrate Judge Lowe recommended that the Court dismiss plaintiff's Fourteenth Amendment claim because it "overlaps" with the Eighth Amendment claims and, therefore, " 'will be subsumed by the Eighth Amendment claim as the Eighth Amendment offers greater protection to prisoners.' " *See id.* at 8 (quotation and other citation omitted). Finally, Magistrate Judge Lowe declined to reach the qualified immunity issue because plaintiff failed to establish any violations of his constitutional rights. *See id.* at 8–9.

## C. Plaintiff's objections to Magistrate Judge Lowe's Report–Recommendation and Order

In his objections to Magistrate Judge Lowe's Report–Recommendation and Order, plaintiff puts forth the following seven arguments:

> 1) Plaintiff objects to the Report and Recommendation that summary judgment be granted to the Defendants.
>
> 2) Plaintiff objects to the deliberate indifference decision rendered by the Judge. There are genuine issues of material fact which include but are not limited to the following:
>
>> A) Defendants presented no proof whatsoever that mental health staff was notified.
>>
>> B) Defendant Barber agrees that Plaintiff notified him on more than one occasion of his suicidal thoughts and need for assistance.
>
> 3) Defendant Barber failed to notify mental health staff as is the policy of DOCS.
>
> 4) Defendant Barber made numerous false and contradictory statements as to the monitoring of the Plaintiff. *See* Affidavit in Opp. of Def. Summary Judgment Motion).
>
> **\*3** 5) Defendant Barber left the Plaintiff in his cell. There is no suicide log book. No monitoring of Plaintiff as per DOCS Directive No. 4101 Section 4A(1), (2), (3), (4).
>
> 6) Defendant Sgt. Christopher never reported Plaintiff or referred Plaintiff to mental health.
>
> 7) The inference was drawn by the Def. Barber (*see* Exhibits I4 Mem. of Law).

*See* Dkt. No. 53 at 2–3. Moreover, plaintiff asserts that he was never taken to a common area for supervision or suicide watch, even after he made defendants aware of his suicidal thoughts. *See id.* at 3. As such, plaintiff asserts that there are questions of material fact precluding summary judgment. *See id.*

## III. DISCUSSION

### A. Standard of review

When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). However, when a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that he presented] to the magistrate judge," the court reviews those recommendations for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL 933846, *1 (N.D.N.Y. Mar. 16, 2011)* (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1). [3]

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36 (2d Cir.1994) (citations omitted). When analyzing a summary judgment motion, the court " 'cannot try issues of fact; it can only determine whether there are issues to be tried.' " *Id.* at 36–37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleading. *See Celotex Corp. v. Catrett,* 477 U .S. 317, 324 (1986) (quoting Fed.R.Civ.P. 56(c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers,* 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.,* 322 F.3d 139, 143 n. 5 (2d Cir.2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

**\*4** "[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (quoting *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)) (other citations omitted). "However, a *pro se* party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (citing *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)).

**B. Deliberate indifference to a serious medical need**

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. This includes the provision of medical care and punishments involving "the unnecessary and wanton infliction of pain." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citations omitted). A prisoner advancing an Eighth Amendment claim for denial of medical care must allege and prove deliberate indifference to a serious medical need. *See Wilson v. Seiter,* 501 U.S. 294, 297 (1991); *Hathaway,* 37 F.3d at 66. More than negligence is required "but less than conduct undertaken for the very purpose of causing harm." *Hathaway,* 37 F.3d at 66.

The test for a § 1983 claim is twofold. First, the prisoner must show that there was a sufficiently serious medical need. *See Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *See id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer v. Brennan,* 511 U.S. 825, 844 (1994).

" 'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quotation omitted). Since there is no distinct litmus test, whether a medical condition is serious depends on certain factors, such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and

2011 WL 2975218

substantial pain." *Brock v. Wright,* 315 F.3d 158, 162–63 (2d Cir.2003) (citing *Chance,* 143 F.3d at 702). The court should also judge the severity of the denial of care within the context of the surrounding facts and circumstances of the case. *See Smith,* 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance,* 143 F.3d at 702. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. 97, 104, (1976). "Mere disagreement over proper treatment does not create a constitutional claim," as long as the treatment was adequate. *Id .* at 703. Furthermore, allegations of negligence or malpractice do not constitute deliberate indifference unless the malpractice involved culpable recklessness. *See Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

### 1. Objective prong

**\*5** Plaintiff did not object to, nor does the Court find error with, Magistrate Judge Lowe's determination that plaintiff has satisfied the objective prong of his Eighth Amendment challenge. *See Hamilton v. Smith,* No. 9:06–cv–805, 2009 WL 3199531, \*14 (N.D.N.Y. Jan. 13, 2003) (citing *Guglielmoni v. Alexander,* 583 F.Supp. 821, 826 (D.Conn.1984)); *see also Loadholt v. Lape,* No. 9:09–CV–658, 2011 WL 1135934, \* 3 (N.D.N.Y. Mar. 3, 2011) (citing cases).

### 2. Subjective prong

Although plaintiff met his burden with respect to the objective prong of his Eighth Amendment claim, the Court finds that Magistrate Judge Lowe correctly determined that there is no genuine issue of material fact showing that defendants were deliberately indifferent to plaintiff's serious medical need.

Non-medical personnel may engage in deliberate indifference if they intentionally deny or delay access to medical care. *See Zimmerman v. Burge,* No. 9:06–cv–176, 2009 WL 3111429, \*8 (N.D.N.Y. Sept. 24, 2009) (citation omitted); *see also Baumann v. Walsh,* 36 F.Supp.2d 508, 512 (N.D.N.Y.1999) (citations omitted). "Courts which have considered the issue have ruled that in the context of suicide, jailers are not required to safeguard every inmate; only those presenting a 'strong likelihood of suicide' are

entitled to protection." *Burke v. Warren County Sheriff's Dept.,* No. 90–CV–597, 1994 WL 6755042, \*6 (citing *Schmelz v. Monroe County,* 954 F.2d 1540, 1545 (11th Cir.1992); *Colburn v. Upper Darby,* 946 F.2d 1017, 1024 (3d Cir.1991) (*Colburn II* ); *Bell v. Stigers,* 937 F.2d 1340, 1343 (8th Cir.1991); *Torraco v. Maloney,* 923 F.2d 231, 236 (1st Cir.1991); *Edwards v. Gilbert,* 867 F.2d 1271, 1276 (11th Cir.1989); *Molton v. City of Cleveland,* 839 F.2d 240, 243 (6th Cir.1988)). "In order to establish a strong likelihood of suicide, a detainee must have made a previous threat or an earlier attempt at suicide." *Id.* (citing *Elliott v. Cheshire County,* 940 F.2d 7, 11 (1st Cir.1991) ("In the absence of a previous threat of or an earlier attempt at suicide, we know of no federal court in the nation that has concluded that failing to prevent a suicide constitutes deliberate indifference"); *Bufington v. Baltimore County,* 913 F .2d 113, 119 (4th Cir.1990) (holding that liability could not be premised on the officers' failure to act on a speculative suicide risk); *Rellergert v. Cape Girardeau County,* 724 F.Supp. 662, 666 (E.D.Mo.1989) ("Obviously, in the absence of a previous threat or an earlier attempt at suicide, official misconduct in failing to prevent a suicide does not constitute deliberate indifference")).

In the present matter, the record does not indicate that plaintiff made any previous suicide threats. Moreover, the record makes clear that defendants promptly responded to plaintiff's suicide threat, and that defendant Barber continued to observe plaintiff until the conclusion of his shift at 3:00 p.m. *See* Dkt. No. 39–4 at ¶ 8. Further, defendant Christopher stated that, when he interviewed plaintiff at 7:50 a.m., plaintiff indicated that he had no intention of harming himself. *See* Dkt. No. 39–5 at ¶ 5. Thereafter, defendant Christopher notified mental health personnel of plaintiff's original suicide threat to defendant Barber and the fact that he also told defendant Christopher that he had no intention of harming himself. *See id.* at ¶ 6. Defendant Christopher finished his shift at 3:00 p.m. and had no other contact with plaintiff on the day in question. *See id.* at ¶ 7.

**\*6** Contrary to plaintiff's assertions, this conduct does not constitute deliberate indifference and is in compliance with DOCS' Directive regarding suicide prevention. *See* Dkt. No. 39–3 at 44. Specifically, the directive requires non-medical personnel to notify mental health staff of an inmate who may be a suicide risk. *See id.* at § IV(A). Once notified, mental health staff must respond with

an evaluation **"within one business day."** *See id.* at §
IV(B). Although such an evaluation had not yet occurred,
defendant Barber continued to monitor plaintiff, despite
the fact that he informed defendant Christopher that he
no longer intended to commit suicide.

As Magistrate Judge Lowe correctly concluded, viewing
the facts in the light most favorable to plaintiff,
defendants' conduct does not rise to the level of deliberate
indifference. [4] *See Kelsey v. City of New York,* 306 Fed.
Appx. 700, 703 (2d Cir.2009) (holding that, in the pretrial
detainee context, "deliberate indifference [is] lacking
where officers take affirmative and reasonable steps to
protect detainees from suicide" (citations omitted)).

### C. Plaintiff's Fourteenth Amendment claim

Plaintiff did not object to Magistrate Judge Lowe's
conclusion that, "[w]here, as here, a plaintiff's Eighth
Amendment and Fourteenth Amendment due process
claims ' "overlap," the due process claim will be
subsumed by the Eighth Amendment claim as the Eighth
Amendment offers greater protections to prisoners.' "
*See*
Dkt. No. 52 at 8 (quotations and other citation omitted).

The Court has reviewed this claim and finds that
Magistrate Judge Lowe correctly determined that the
claim should be dismissed. *See Felix–Torres v. Graham,*
521 F.Supp.2d 157, 164 (N.D.N.Y.2007) (quoting *Graham
v. Connor,* 490 U.S. 386, 106 S.Ct. 1078, 89 L.Ed.2d 251
(1986)).

### IV. CONCLUSION

After carefully considering Magistrate Judge
Lowe's Report–Recommendation and Order, plaintiff's
objections thereto, and the applicable law, and for the
reasons stated herein, the Court hereby

**ORDERS** that Magistrate Judge Lowe's June 28, 2011
Report–Recommendation and Order is **ADOPTED** in
its entirety for the reasons stated therein; and the Court
further

**ORDERS** that defendants' motion for summary
judgment is **GRANTED** and that plaintiff's complaint is
**DISMISSED WITH PREJUDICE;** and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment
in defendants' favor and close this case; and the Court
further

**ORDERS** that the Clerk of the Court shall serve the
parties with a copy of this Memorandum–Decision and
Order in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 2975218

Footnotes

1    By Order dated January 11, 2010, Judge David N. Hurd granted defendant Graham's motion to dismiss and dismissed
     him from the case. *See* Dkt. No. 20.
2    Plaintiff labeled his objections to Magistrate Judge Lowe's Report–Recommendation and Order as a "Notice of Appeal"
     and stated that he is hereby appealing Magistrate Judge Lowe's decision "to the United States Court of Appeal[s] for the
     Second Circuit." *See* Dkt. No. 53 at 1. Throughout the filing, however, plaintiff repeatedly states that he "objects to the
     Report and Recommendation" in general and then "objects" to specific findings made by Magistrate Judge Lowe. *See id.*
     at 2–3. In light of plaintiff's *pro se* status and the fact that "a party's failure to object to any purported error or omission in
     a magistrate judge's report waives further judicial review of the point," *Cephas v. Nash,* 328 F.3d 98, 107 (2d Cir.2003)
     (citation omitted), the Court will treat plaintiff's filing as timely filed objections to Magistrate Judge Lowe's June 28, 2011
     Report–Recommendation and Order.
3    Despite the conclusory nature of most of plaintiff's objections, the Court will still person a *de novo* review.
4    Significantly, plaintiff's suicide attempt did not occur until after defendants were no longer on duty.

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.                                      5

2016 WL 4735364
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Ramesh Khudan, Plaintiff,

v.

Superintendent William Lee, et al., Defendants.

No. 12-cv-8147 (RJS)
|
Signed 09/08/2016

**Attorneys and Law Firms**

Amy L. Bellantoni, The Bellantoni Law Firm, LLP, Scarsdale, NY, for Plaintiff.

Jeb Harben, Office of the Attorney General, New York, NY, for Defendants.

**Opinion**

OPINION AND ORDER

RICHARD J. SULLIVAN, District Judge

Plaintiff brings this action against various officers of the New York State Department of Corrections and Community Supervision ("DOCCS") under 42 U.S.C. § 1983 alleging violations of his Eighth and Fourteenth Amendment rights while he was an inmate at Green Haven Correctional Facility ("Green Haven"). Now before the Court is Defendants' motion for summary judgment on the ground that Plaintiff failed to exhaust his administrative remedies. For the reasons set forth below, Defendants' motion is granted.

I. BACKGROUND [1]

A. Facts

Plaintiff, a New York State prisoner currently housed at the Franklin Correctional Facility, was formerly incarcerated at Green Haven, a prison administered by the DOCCS. Plaintiff alleges that on October 31, 2009, while he was an inmate at Green Haven, he was "violently

attacked and stabbed in the eye" by a fellow inmate in the facility's recreational yard (the "October 31 Incident"). (Counter Stmt. ¶¶ 3, 18, 20-22; see also 56.1 Stmt. ¶¶ 1-3.) Plaintiff attributes his injuries to the fact that Defendants Duane Malark and Jeffrey Erns, Corrections Officers at Green Haven, falsely informed members of a gang that he was a sex offender and rapist, and that Defendants Superintendent William Lee, Lieutenant Neal Greene, and Corrections Officers Rory Hamilton, David Deming, Arthur Andrews, Robert Sherman, and P. Allen failed to provide security in the recreational yard and take other security measures that would have prevented the attack. (Counter Stmt. ¶¶ 3-4.) For several days after the attack, Plaintiff was hospitalized at Putnam County Hospital, where he was treated for his injuries. (Counter Stmt. ¶ 12.)

For purposes of this motion, the parties' dispute centers entirely on whether Plaintiff properly exhausted the administrative remedies available to him with respect to the October 31 Incident. Specifically, DOCCS administers the Inmate Grievance Program ("IGP"), which ordinarily requires prisoners to complete a three-step process in order to exhaust administrative remedies. See N.Y. Comp. Codes R. & Regs., tit. 7, § 701.5; see also Espinal v. Goord, 558 F.3d 119, 125 (2d Cir. 2009) (describing IGP regulations in effect in 2009). [2] At step one, the prisoner is obligated to file a grievance, consisting of, among other things, "a concise, specific description of the problem and the action requested," with the Inmate Grievance Resolution Committee ("IGRC") within twenty-one calendar days of the incident. N.Y. Comp. Codes R. & Regs., tit. 7, § 701.5(a). The IGRC then has sixteen calendar days from receipt of the grievance to informally resolve the issue, and if there is no informal resolution, the IGRC must conduct a hearing within sixteen calendar days of receiving the grievance and issue a written decision within two working days after the hearing concludes. Id. § 701.5(b). At step two, a prisoner may appeal an adverse decision by the IGRC to the superintendent of the facility within seven calendar days by completing and signing the appeal section on his IGRC response form and submitting it to the grievance clerk. Id. § 701.5(c). The superintendent then has twenty calendar days to respond to the prisoner's appeal. Id. Finally, at step three, the prisoner may appeal an adverse decision from the superintendent by submitting a "notice of decision to appeal" form to the Central Officer Review Committee ("CORC") within seven days. [3] Id. § 701.5(d). If at any level of review the decisionmaker fails to timely respond

to the grievance, the inmate may appeal to the next level. *Id.* § 701.6(g); *see also Heyliger v. Gebler,* 624 Fed.Appx. 780, 782 (2d Cir. 2015). While an inmate may also ask the DOCCS Inspector General to investigate a complaint, "such an investigation is not a formal part of the IGP." *Dabney v. Pegano,* 604 Fed.Appx. 1, 3 (2d Cir. 2015).

**\*2** Here, Defendants contend that Plaintiff failed to complete any step of the three-step grievance process, and point to the absence of any records at Green Haven reflecting that Plaintiff ever filed a grievance related to the October 31 Incident. Specifically, Defendants rely on an affidavit from the inmate records coordinator at the facility, Jennifer Hotaling, who attests that a diligent search of Green Haven's records reveals no grievance being filed by Plaintiff in relation to the October 31 Incident, notwithstanding the fact that it is Green Haven's policy to maintain records of all grievances filed within the facility. (Doc. No. 64 ("Hotaling Decl.") ¶ 2.) Significantly, Ms. Hotaling's search did uncover a grievance from Plaintiff in Green Haven's records, filed March 2, 2010, in which Plaintiff made "general complaints about [his] medical care" at the facility and alleged violations of, among other things, the Health Insurance Portability and Accountability Act, but that grievance made no reference to the October 31 Incident. (*Id.* ¶ 2; *see also id.* at 7-12 (enclosing a copy of Plaintiff's grievance regarding medical care at Green Haven)). Defendants also point to the lack of evidence that Plaintiff ever appealed an adverse disposition of his purported grievance at step two or step three. (56.1 Stmt. ¶ 4.) Specifically, Jeffrey Hale, the assistant director of the IGP, attests that, having conducted a diligent search of the CORC's database for records of appeals, he could not locate any grievances relating to the claims presented in this case, even though the CORC maintains computer records of all appeals received from facilities participating in the IGP since 1990. (Doc. No. 63 ("Hale Decl.") ¶¶ 2-3, 9.)

For his part, Plaintiff claims that he completed all three steps of the IGP, although he provides no evidence other than his own declaration and deposition, which, as discussed further below, are insufficient to create a genuine dispute of material fact. Plaintiff also attests that the staff of Green Haven repeatedly interfered with his efforts to have his grievance adjudicated by ransacking his cell, threatening to kill him if he complained to the superintendent, and threatening him whenever he

attempted to learn the status of his grievance. (Counter Stmt. ¶¶ 6, 23-24, 26-28; *see also* Doc. No. 65-2 ("Khudan Dep") 13:12-16, 14:22-15:4, 16:6-9.) However, Plaintiff fails to point to any specific dates when these incidents occurred, does not identify any names of officers who purportedly threatened him, fails to identify the specific locations in Green Haven where these alleged threats took place, and does not provide any other details of the improper conduct.

### B. Procedural History

On October 29, 2012, Plaintiff, then proceeding *pro se* and *in forma pauperis,* submitted his first complaint in this action, which was originally assigned to the Honorable Loretta A. Preska. (Doc. Nos. 2, 6.) In April 2013, then-Chief Judge Preska ordered Plaintiff to file an amended complaint. (Doc. No. 7.) After retaining counsel, Plaintiff filed the first amended complaint on October 7, 2013. (Doc. No. 13.) That same date, this action was reassigned to my docket. On April 23, 2014, Plaintiff filed the operative pleading in this action, the second amended complaint, asserting two distinct violations of his Eighth and Fourteenth Amendment rights pursuant to Section 1983. (Doc. No. 32.) On October 17, 2014, Defendants moved to dismiss the second amended complaint for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) and failure to state a claim pursuant to 12(b)(6). (Doc. Nos. 40, 43.) Specifically, Defendants argued for dismissal based on Plaintiff's failure to exhaust administrative remedies under the PLRA, among other grounds. (Doc. No. 43.) On September 17, 2015, the Court denied the motion to dismiss without prejudice to renewal as a motion for summary judgment on the issue of administrative exhaustion. (Doc. No. 55 at 11.) Nevertheless, because "the question of exhaustion of administrative remedies *must* be addressed before the Court can consider the merits of [P]laintiff's claims" (*id.* at 5) (quoting *Foreman v. Comm. Goord,* No. 02-cv-7089 (SAS), 2004 WL 385114, at *6 (S.D.N.Y. Mar. 2, 2004)), the Court authorized the parties to conduct limited, expedited discovery on the issue of administrative exhaustion and directed Defendants to promptly file the instant motion for summary judgment solely on the issue of administrative exhaustion (*id.* at 10-11). Accordingly, Defendants submitted their motion for summary judgment on November 13, 2015 (Doc. Nos. 59, 60), Plaintiff submitted his opposition on December 3,

Case 9:15-cv-01542-MAD-DEP Document 79 Filed 02/14/18 Page 132 of 227
Khudan v. Lee, Not Reported in F.Supp.3d (2016)
2016 WL 4735364

2015 (Doc. No. 66), and the motion was fully briefed when Defendants submitted their reply on December 29, 2015 (Doc. No. 70).

## II. LEGAL STANDARD

**\*3** Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is "no genuine dispute as to any material fact" where (1) the parties agree on all facts (that is, there are no disputed facts); (2) the parties disagree on some or all facts, but a reasonable fact-finder could never accept the nonmoving party's version of the facts (that is, there are no genuinely disputed facts), *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); or (3) the parties disagree on some or all facts, but even on the nonmoving party's version of the facts, the moving party would win as a matter of law (that is, none of the factual disputes are material), *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

In determining whether a fact is genuinely disputed, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst,* 101 F.3d 845, 854 (2d Cir. 1996). Nevertheless, to show a genuine dispute, the nonmoving party must provide "hard evidence," *D'Amico v. City of N.Y.,* 132 F.3d 145, 149 (2d Cir. 1998), "from which a reasonable inference in [its] favor may be drawn," *Binder & Binder PC v. Barnhart,* 481 F.3d 141, 148 (2d Cir. 2007) (internal quotation marks omitted). "Conclusory allegations, conjecture, and speculation," *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir. 1998), as well as the existence of a mere "scintilla of evidence in support of the [nonmoving party's] position," *Anderson,* 477 U.S. at 252, are insufficient to create a genuinely disputed fact. A moving party is "entitled to judgment as a matter of law" on an issue if (1) it bears the burden of proof on the issue and the undisputed facts meet that burden; or (2) the nonmoving party bears the burden of proof on the issue and the moving party " 'show[s]'– that is, point[s] out ... – that there is an absence of evidence [in the record]

to support the nonmoving party's [position]." *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).

## III. DISCUSSION

Defendants argue that summary judgment should be granted because Plaintiff has failed to comply with the administrative exhaustion requirement of the PLRA. The Court agrees.

Under the PLRA, inmates bringing claims with respect to prison conditions under Section 1983 must exhaust the administrative remedies that are available at that prison before proceeding in federal court. 42 U.S.C. § 1997e(a). The PLRA's exhaustion requirement is "mandatory," thus "foreclosing judicial discretion." *Ross v. Blake,* 136 S. Ct. 1850, 1857 (2016); *see also Woodford v. Ngo,* 548 U.S. 81, 84 (2006) (describing the "invigorated exhaustion provision" as "[a] centerpiece of the PLRA's effort to reduce the quantity of prisoner suits" (internal quotation marks and alterations omitted)). As the Supreme Court and Second Circuit have instructed, "proper exhaustion ... means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." *Hernandez v. Coffey,* 582 F.3d 303, 305 (2d Cir. 2009) (quoting *Woodford,* 548 U.S. at 90). "The exhaustion inquiry thus requires that we look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures." *Espinal,* 558 F.3d at 124. Furthermore, factual disputes related to administrative exhaustion are properly resolved by the Court, not by the jury. *See Messa v. Goord,* 652 F.3d 305, 309 (2d Cir. 2011).

**\*4** Under the IGP, an inmate must exhaust all available administrative remedies by completing all three steps before filing suit in federal court, and "only after CORC has reviewed the appeal and rendered a decision are New York's grievance procedures exhausted." *Laguna v. Kwan,* No. 13-cv-7079 (VB), 2015 WL 872366, at \*3 (S.D.N.Y. Jan. 28, 2015) (quoting *Gardner v. Daddezio,* No. 07-cv-7201 (SAS), 2008 WL 4826025, at \*2 (S.D.N.Y. Nov. 5, 2008)). Here, under the IGP's three-step procedure, Plaintiff was initially required to file a grievance with the IGRC within twenty-one calendar days of the October 31 Incident, that is, no later than November 21, 2009. N.Y. Comp. Codes R. & Regs., tit. 7, § 701.5(a)-(b). Even assuming Plaintiff filed such a grievance, and even

assuming he received no response, as he alleges (Counter Stmt. ¶ 8), Plaintiff was required to complete steps two and three as well – appealing both to the superintendent and to the CORC if the superintendent had adversely disposed of his grievance or failed to timely respond. N.Y. Comp. Codes R. & Regs., tit. 7, §§ 701.5(c)-(d), 701.6(g); *see also* *Heyliger,* 624 Fed.Appx. at 782 (noting that if a decisionmaker fails to timely respond to a grievance under the IGP, the inmate must appeal to the next step in order to properly exhaust).

As noted above, Defendants contend that no grievance was ever filed by Plaintiff regarding the October 31 Incident, and, as proof of that fact, point to the Hotaling Declaration, which indicates that a diligent search found no records of such grievance in Green Haven's records, and the Hale Declaration, which also attests that a diligent search of the CORC's database of appeals turned up no grievances relating to the claims in this case. (Hotaling Decl. ¶ 2; Hale Decl. ¶ 9.)[4] And while Defendants acknowledge that Plaintiff sent a complaint to the Inspector General, Defendants note, correctly, that the submission to the Inspector General did not constitute a proper appeal. *See* *Dabney,* 604 Fed.Appx. at 3. Accordingly, Defendants have "adequately supported the affirmative defense of failure to exhaust." *See, e.g., Bennett v. Onua,* No. 09-cv-7227 (SAS), 2010 WL 2159199, at *3 (S.D.N.Y. May 26, 2010) (finding that defendants discharged their initial burden on summary judgment by producing affidavits that a search of prison records indicated that no grievances were ever filed).

**\*5** For his part, Plaintiff has failed to produce a copy of his grievance and has introduced no other evidence, beyond his own testimony, that his grievance was actually filed pursuant to the IGP. Moreover, even if Plaintiff's testimony were enough to create a disputed issue of fact with respect to whether he filed a grievance form with the IGRC at Green Haven (Counter Stmt. ¶¶ 5, 12; Doc. No. 65-1 ("Khudan Decl.") ¶ 5; Khudan Dep. 7:21-23, 8:9-10), he fails to point to evidence that he properly appealed his grievance to the superintendent at step two. As noted above, Plaintiff was required to complete the appeal section on his IGRC response form and submit it to the grievance clerk. N.Y. Comp. Codes R. & Regs., tit. 7, § 701.5(c). In his deposition, Plaintiff claimed that he "tried to speak with the [s]uperintendent about the grievance," but that unnamed officers in his unit deterred him from doing so through threats. (Counter Stmt. ¶ 27 (citing

Khudan Dep. 15:5-17).) But the law is clear that prisoners "cannot satisfy the PLRA's exhaustion requirement solely by ... making informal complaints" to prison staff. *Macias v. Zenk,* 495 F.3d 37, 44 (2d Cir. 2007); *see also* *Bolton v. City of New York,* No. 13-cv-5749 (RJS), 2015 WL 1822008, at *2 (S.D.N.Y. Apr. 20, 2015) ("The law is well settled that informal means of communicating and pursuing a grievance, even with senior prison officials, are not sufficient" to satisfy the "PLRA exhaustion requirement." (collecting cases)). Furthermore, although Plaintiff asserts that he never received a response to his grievance (Counter Stmt. ¶ 25), he was still required to appeal to the superintendent. N.Y. Comp. Codes R. & Regs., tit. 7, § 701.6(g); *see also* *Heyliger,* 624 Fed.Appx. at 782. Accordingly, the Court concludes, as a matter of law, that Plaintiff failed to complete step two of the three-step IGP.

Plaintiff similarly fails to create a genuine dispute of fact as to whether he completed step three of the IGP – the filing of an appeal to the CORC. In his affidavit, Plaintiff makes no mention of submitting an appeal to the CORC, but curiously characterizes his complaint to the Inspector General's Office as his "effort to appeal to the highest level of the grievance process" (Doc. No. 65-1 ¶ 9), even though appeals to the Inspector General's Office are "not a formal part of the IGP," *Dabney,* 604 Fed.Appx. at 3. At his deposition, Plaintiff asserted that he sent an appeal of his grievance to "Albany" (Khudan Dep: 16:10-14), but Plaintiff fails to specify where in Albany he sent his grievance and fails to provide any other details, including the approximate date he submitted his appeal and whether he properly used a "notice of decision to appeal" form. Relying entirely on this vague and confusing deposition testimony, Plaintiff argues that he submitted his grievance to the CORC, which Plaintiff asserts is located in Albany. (Opp'n 5-6.)

While the Court recognizes that it "cannot resolve issues of credibility on summary judgment," it nonetheless finds that Plaintiff's "self-serving" and "incomplete" testimony that he sent an appeal to "Albany" is insufficient to create a *genuine* dispute of fact, particularly in light of Defendants' evidence that no grievance was ever sent to the CORC and Plaintiff's testimony that his complaint to the Inspector General was his "effort to appeal" his grievance. *See* *Lozada v. Delta Airlines, Inc.,* No. 13-cv-7388 (JPO), 2014 WL 2738529, at *5 (S.D.N.Y. June 17, 2014) (concluding that plaintiff's

"self-serving, incomplete, and inconsistent" deposition testimony was "not sufficient to create a genuine dispute of fact in light of [defendant's] documented evidence"); *see also Deebs v. Alstom Transp., Inc.,* 346 Fed.Appx. 654, 656-57 (2d Cir. 2009) (affirming grant of summary judgment where "plaintiffs rel [ied] almost exclusively upon" their "speculative" and "vague" testimony in the face of defendants' documentary evidence); *Toro v. City of New York*, No. 12-cv-4093 (RRM) (RLM), 2015 WL 1014044, at *5 (E.D.N.Y. Mar. 6, 2015) (granting summary judgment where "there is no evidence – beyond the allegations in his complaint and his own unsupported deposition testimony – that [plaintiff] actually reported such misconduct to the authorities"). Accordingly, the Court concludes as a matter of law that Plaintiff failed to complete step three of the IGP. Because Plaintiff failed to complete steps two and three of the IGP process, the Court thus finds that Plaintiff failed to properly exhaust administrative remedies under the IGP.

Plaintiff fares no better with his argument that the IGP's grievance process was not "available" to him at Green Haven. In June, the Supreme Court forcefully rejected judge-made exceptions to the PLRA's exhaustion requirement, stressing the mandatory language of the statute. *Ross,* 136 S. Ct. at 1858-59. As the Supreme Court clarified, an inmate's failure to exhaust may only be excused when his prison's grievance mechanisms are literally or constructively "unavailable." *Id.* The Supreme Court described three scenarios in which administrative procedures could be "officially on the books," but "not capable of use to obtain relief" and therefore constructively unavailable. *Id.* at 1859. First, an administrative procedure is unavailable when "it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to inmates." *Ross,* 136 S. Ct. at 1859. If prison administrators either lack the necessary authority to provide any relief or possess authority but consistently decline to exercise it, the administrative channels are not "available" within the meaning of the PLRA. *Id.*; *see also Booth v. Churner,* 532 U.S. 731, 738 (2001) ("[T]he modifier 'available' requires the possibility of some relief."). Second, an administrative procedure is unavailable where it is "so opaque that it becomes, practically speaking, incapable of use." *Ross,* 136 S. Ct. at 1859. To meet this high bar, the administrative remedy must be "essentially 'unknowable.'" *Id.* Finally, a grievance process is unavailable "when prison administrators thwart inmates

from taking advantage of [it] through machination, misrepresentation, or intimidation." *Id.* at 1860. While the Second Circuit has suggested that these scenarios are merely illustrative and "not ... exhaustive," these illustrations nonetheless guide the Court's inquiry. *See Williams v. Correction Officer Priatno,* ___ F.3d ____, No. 14-4777, 2016 WL 3729383, at *4 n.2 (2d Cir. July 12, 2016).

**\*6** Here, Plaintiff essentially asserts the third scenario, alleging that prison officials routinely interfered with his attempts to file grievances. However, much of Plaintiff's Rule 56.1 Counterstatement relies on inadmissible hearsay. For example, Plaintiff attests that he "was informed by other [unnamed] inmates that grievances routinely go 'missing' and are not responded to" at Green Haven. (Counter Stmt. ¶ 7 (citing Khudan Decl. ¶ 7).) Plaintiff also maintains that he was warned on November 23, 2009 by an unidentified officer from the Inspector General's Office not to file a grievance because "in this facility, the officers ... will set you up" and "hurt you." (*Id.* ¶ 33 (citing Khudan Dep. 16:14-22).) Because Plaintiff offers these out-of-court statements in order "to prove the truth of the matter asserted" in them, Fed. R. Evid. 801(c)(2), and because these statements do not qualify for any exceptions to the hearsay rules, such testimony is not cognizable on summary judgment and will not be considered by the Court, *see, e.g. ABB Indus. Sys., Inc. v. Prime Tech., Inc.,* 120 F.3d 351, 357 (2d Cir. 1997) (noting that hearsay that is inadmissible at trial is not cognizable on summary judgment motion); *Baity v. Kralik,* 51 F. Supp. 3d 414, 419-20 (S.D.N.Y. 2014) (disregarding plaintiff's affidavit that "contain[ed] a surfeit of improper averments, including statements not based on Plaintiff's personal knowledge and conclusory statements that are nothing more than speculation," including an averment that corrections officer "developed a reputation for missing time during his probationary period").

Plaintiff also claims that certain unnamed officers in Green Haven "ransacked" his room, tampered with his grievances and his mail, and threatened to kill him when he attempted to learn the status of his grievance from the superintendent and other officers. (Counter Stmt. ¶¶ 6, 15-16, 23-24, 26-28, 32; *see also* Khudan Dep. 6:24-7:5, 11:11-12, 11:14-21, 13:12-16.) However, Plaintiff fails to specify the dates of any threats, the names of any officers who threatened him, and the locations in Green

Haven where these alleged threats took place. Courts generally review claims of "retaliation by prisoners 'with skepticism' because of the ease with which a retaliation claim may be fabricated." *Bolton,* 2015 WL 1822008, at *2 (quoting *Nunez v. Goord,* 172 F. Supp. 2d 417, 431 (S.D.N.Y. 2001)). Thus, it is well settled that "[c]onclusory allegations of intimidation are not sufficient" to create a genuine disputed issue of fact regarding the availability of administrative remedies. *See, e.g., Hooks v. Howard,* No. 907-cv-0724 (TJM) (RFT), 2010 WL 1235236, at *5 n.3 (N.D.N.Y. Mar. 30, 2010) (collecting cases). Accordingly, Plaintiff's accusations, which "stand alone" and are "unsupported," are insufficient to withstand summary judgment. *See Bolton,* 2015 WL 1822008, at *2; *accord Heyliger v. Gebler,* No. 06-cv-6220 (FPG), 2014 WL 4923140, at *3 (W.D.N.Y. Sept. 30, 2014) (granting summary judgment, notwithstanding plaintiff's testimony that his "original grievance was discarded by prison officials," where plaintiff "never described or named the individual who allegedly took this action"), *aff'd,* 624 Fed.Appx. 780 (2d Cir. 2015); *Litchmore v. Williams,* No. 11-cv-7546 (DAB) (JCF), 2013 WL 3975956, at *6 (S.D.N.Y. Aug. 5, 2013) (granting summary judgment where there was "no evidence" that "plaintiff's appeal was actually mailed, intercepted, or ignored" and no "evidence of any particular officer's misconduct"); *Bennett v. James,* 737 F. Supp. 2d 219, 226 (S.D.N.Y. 2010) (granting summary judgment where plaintiff provided only "conclusory allegations" regarding unavailability of administrative remedies in his affidavit), *aff'd,* 441 Fed.Appx. 816 (2d Cir. 2011); *Rosado v. Fessetto,* No. 9:09-cv-67 (DNH) (ATB), 2010 WL 3808813, at *7 (N.D.N.Y. Aug. 4, 2010) ("Courts have consistently held ... that an inmate's general claim that his grievance was lost or destroyed does not excuse the exhaustion requirement."), *report and recommendation adopted,* 2010 WL 3809991 (N.D.N.Y. Sept. 21, 2010); *Winston v. Woodward,* No. 05-cv-3385 (RJS), 2008 WL 2263191, at *9 (S.D.N.Y. May 30, 2008) (granting summary judgment where plaintiff failed to "specify the dates of [officers'] alleged misconduct, the details of the particular incidents of threats and harassment, the officers who allegedly made threatening or harassing statements, or a copy of the alleged appeal that Plaintiff claims he sent through the mail that was, as he claims, fraudulently tampered with"); *Veloz v. New York,* 339 F. Supp. 2d 505, 516 (S.D.N.Y. 2004) (granting summary judgment where, "[e]ven assuming [plaintiff] did submit the grievances," plaintiff "offer[ed] no evidence that any particular officer thwarted his attempts to file," and instead, "simply contend[ed] that the practice of destroying or misplacing grievances must have been the cause of his grievances being lost"), *aff'd,* 178 Fed.Appx. 39 (2d Cir. 2006).

**\*7** With respect to the other two "scenarios" identified in *Ross,* Plaintiff has not argued, nor pointed to any admissible evidence, that the IGP operated as a simple dead end – "with officers unable or consistently unwilling to provide any relief to aggrieved inmates" – or that it was "so opaque that it [became], practically speaking, incapable of use" and therefore "essentially 'unknowable.' " *Ross,* 136 S. Ct. at 1859. Although the Second Circuit recently found that certain grievance procedures under the IGP met this latter standard, the court's decision hinged on the "extraordinary circumstances" specific to the case before it, for which the applicable grievance regulations gave "no guidance whatsoever." *See Williams,* 2016 WL 3729383, at *1, *5. Specifically, the plaintiff in *Williams,* who was housed in a special housing unit and segregated from the regular prison population, gave his grievance complaint to a correction officer to file on his behalf. *Williams,* 2016 WL 3729383, at *2. However, the plaintiff in *Williams* alleged that the correction officer to whom he gave his complaint failed to file it, *id.,* and because the Second Circuit concluded that the applicable grievance regulations gave "no guidance whatsoever to an inmate whose grievance was never filed," *id.* at 5, it reversed the district court's dismissal for failure to exhaust. Here, by contrast, Plaintiff asserts that he filed his grievance with Green Haven's IGRC. (Opp'n 4.) And while Plaintiff claims that his grievance received no response, the IGP clearly required him to properly appeal the IGRC's failure to respond to the superintendent and ultimately to the CORC. N.Y. Comp. Codes R. & Regs., tit. 7, § 701.6(g); *Heyliger,* 624 Fed.Appx. at 782. Given this unambiguous directive. Plaintiff has clearly failed to show that the IGP was "essentially unknowable." *See Ross,* 136 S. Ct. at 1859.

In light of the fact that none of the exceptional scenarios outlined by the Supreme Court in *Ross* apply, the Court concludes that Plaintiff has failed to establish a genuine dispute of material fact regarding the availability of administrative remedies at Green Haven. Therefore, the Court grants Defendants' motion for summary judgment.

## IV. CONCLUSION

For the reasons set forth above, IT IS HEREBY ORDERED that Defendants' motion for summary judgment is granted. The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that, in the event Plaintiff seeks to appeal this Order *in forma pauperis,* any appeal would not be taken in good faith. *See Tavarez v. Reno,* 54 F.3d 109, 110 (2d Cir. 1995) (instructing that *in forma pauperis* status should be denied for the purpose of an appeal where the

appeal would "lack ... an arguable basis in law or fact". The Clerk is respectfully directed to terminate the motion pending at docket number 59 and to close this case.

SO ORDERED.

Dated: September 8, 2016.

**All Citations**

Not Reported in F.Supp.3d, 2016 WL 4735364

---

Footnotes

1   The following facts are taken from Defendants' Local Civil Rule 56.1 Statement (Doc. No. 61 ("Rule 56.1 Statement" or "56.1 Stmt.")), and Plaintiff's Counter Rule 56.1 Statement (Doc. No. 67 ("Counter Statement" or "Counter Stmt.")). In deciding Defendants' motion for summary judgment, the Court also has considered Defendants' memorandum of law in support of their motion (Doc. No. 60 ("Mem.")), Plaintiff's memorandum of law in opposition (Doc. No. 66 ("Opp'n")), and Defendants' reply (Doc. No. 70 ("Reply")), as well as the declarations and exhibits submitted in connection with the instant motion.

2   By contrast, grievances that allege "harassment" by prison staff – in other words, "employee misconduct meant to annoy, intimidate or harm an inmate" – may be subject to expedited review and immediately referred to the superintendent, who must make a decision within twenty-five calendar days of receipt of a harassment grievance. N.Y. Comp. Codes R. & Regs., tit. 7, §§ 701.2(e), 701.8(f)-(h); *see also Leer v. Fisher,* No. 13-cv-8529 (JPO), 2015 WL 413253, at *4-5 (S.D.N.Y. Feb. 2, 2015) (describing the procedure for harassment allegations). However, Plaintiff avers, and Defendants do not dispute, that the ordinary three-step review process applied in this case. (Opp'n 3, 5; *see also* Doc. No. 31 at 2.) Accordingly, the Court assumes that Plaintiff's grievance was not eligible for expedited review.

3   Although the superintendent must forward grievances regarding DOCCS-wide policies directly to the CORC, *id.* at § 701.5(c)(3)(i), Plaintiff does not allege that he complained of DOCCS-wide policies.

4   Although Plaintiff urges the Court to disregard Ms. Hotaling's declaration because it is not based on her personal knowledge and contains hearsay (Opp'n 4-5), the Court is unpersuaded by this argument. Here, Defendants may offer Ms. Hotaling's declaration pursuant to Rule 803(10), which exempts from the hearsay bar statements offered to prove the absence of a public record after a diligent search in order to prove that a matter did not occur, where "a public office regularly kept a record or statement for a matter of that kind." Fed. R. Evid. 803(10)(A)(ii). Ms. Hotaling attests to being familiar with Green Haven's grievance record retention system in her capacity as inmate records coordinator. (Hotaling Decl. ¶¶ 1, 3.) She also attests that grievance records were "maintained and kept as records in the ordinary course of operations at Green Haven" pursuant to the facility's "policy and procedure." (*Id.* at ¶ 3.) Accordingly, Defendants may offer Ms. Hotaling's declaration for the purpose of proving that Plaintiff never filed a grievance with the IGRC. The fact that Ms. Hotaling did not herself conduct the search, but merely directed that it be conducted, is also not a basis for striking the declaration. *See Davis v. U.S. Dep't of Homeland Sec.,* No. 11-cv-203 (ARR) (VMS), 2013 WL 3288418, at *7 (E.D.N.Y. June 27, 2013) ("[D]istrict courts within this circuit ... have found an official with broader supervisory authority who is not necessarily involved in the specific search for the records at issue to be capable of submitting a sufficient declaration."(collecting cases)). Furthermore, the fact that Ms. Hotaling did not attest to having been a "custodian" of Green Haven's records also is not reason to exclude her affidavit. *See United States v. Parker,* 761 F.3d 986, 992 (9th Cir. 2014); *United States v. McDonald,* 905 F.2d 871, 875 (5th Cir. 1990).

---

**End of Document**                              © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 1135934
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Ronald LOADHOLT, Plaintiff,

v.

William LAPE, Superintendent of Coxsackie
Corr. Facility; Dr. Miller, Facility Health Services
Director; K. Cavanaugh, Psychological Services
Unit Chief; McDermott, Lieutenant; Dr. Schlenger,
Dental Health Services; J. Smith, Deputy
Superintendent of Health Services, Defendants.

Civ. No. 9:09–CV–0658 (LEK/RFT).
|
March 3, 2011.

**Attorneys and Law Firms**

Ronald Loadholt, Hempstead, NY, pro se.

Hon. Eric T. Schneiderman, New York State Attorney
General, Cathy Y. Sheehan, Esq., Richard Lombardo,
Esq., Assistant Attorney Generals, of Counsel, Albany,
NY, for Defendants.

**Opinion**

***REPORT–RECOMMENDATION and ORDER***

RANDOLPH E. TREECE, United States Magistrate
Judge.

**\*1** *Pro se* Plaintiff Ronald Loadholt filed this civil rights
action, pursuant to 42 U.S.C. § 1983, alleging that the
Defendants violated his constitutional rights under the
Eighth and Fourteenth Amendments. Dkt. No. 9, Second
Am. Compl. Defendants bring a Motion to Dismiss the
Complaint pursuant to Federal Rule of Civil Procedure
12(b)(6), Dkt. No. 28, which Plaintiff opposes, Dkt. No.
36. For the reasons that follow, we recommend that
Defendants' Motion be **granted** and Plantiff's Second
Amended Complaint be dismissed in its entirety.

**I. BACKGROUND**

Plaintiff initiated this action on June 8, 2009, while an
inmate at Coxsackie Correctional Facility, with the filing
of a civil rights Complaint. *See* Dkt. No. 1. The Honorable
Lawrence E. Kahn, Senior United States District Judge,
found that both Plaintiff's Complaint and his subsequent
Amended Complaint (Dkt. No. 7) could not proceed as
drafted, but permitted Plaintiff, in light of his *pro se* status,
the opportunity to amend his pleadings to cure various
deficiencies therein. *See* Dkt. Nos. 6, Order, dated Aug.
12, 2009 & 8, Order, dated Sept. 29, 2009. In accordance
with those Orders, Plaintiff filed his Second Amended
Complaint with this Court on October 10, 2009. Dkt. No.
9.

On a motion to dismiss, the allegations of the complaint
must be accepted as true. *See Cruz v. Beto,* 405 U.S. 319,
322 (1972). In light of the terse, sparse, and vague claims
in Plaintiff's Second Amended Complaint, we now restate
the allegations in full and verbatim:

> defendant McDermott refuse to give Plaintiff hearing
> assistance Plaintiff is Learning disable and refuse OMH
> testment of Plaintiff mental illness Dates 10/20/08,
> 12/5/08, 10/23/08 causing Plaintiff to lose freedom

> defendant K cavanaugh no Psychological crisis
> treatment or suicide prevention when Plaintiff stop eat
> And drink lost alot of weight pacing not sleeping, or
> showering Date 12–23–08 to 1–5–09 causing Plaintiff
> Mental condition to get even more bad coming close to
> dead phyical pain,

> defendant: Dr Schlenger no dental services for tooth
> pain from 10–3–09 to 2–3–09 [1] wait at coxsaxie receive
> no dental services causing Plaintiff more pain and lost
> of tooth

> defendant: J SMITH refuse to remove Plaintiff from
> RMV and place (Plaintiff) in hospital after lose alot of
> weight to be force feeded Date 12–21–09 to 1–05–09 [2]
> causing mental and phyical pain

> defendant: William Lape

>> not given Plaintiff hearing, or grievance or legal
>> assistance from 10–20–08 to 2–3–09 causing mental
>> and phyical pain

>> defendant Dr Miller allow mental ill patients to lose
>> alot of weight 12–23–08 to 1–5–09 place plaintiff

on 3 floor and not on flat 10–5–09–2–2–09 [3] not give better pain medical, cane, mattress, pillow, no medical accomodational better shoe's etc.

Second Am. Compl. at pp. 5–7.

## II. DISCUSSION

### A. Standard of Review

On a motion to dismiss, the allegations of the complaint must be accepted as true. *See Cruz v. Beto,* 405 U.S. 319, 322 (1972). The trial court's function "is merely to assess the legal feasability of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974) (*overruled on other grounds by Davis v. Scherer,* 468 U.S. 183 (1984)).

**\*2** "Generally, in determining a 12(b)(6) motion, the court may only consider those matters alleged in the complaint, documents attached to the complaint, and matters to which the court may take judicial notice." *Spence v. Senkowski,* 1997 WL 394667, at \*2 (N .D.N.Y. July 3, 1997) (citing *Kramer v. Time Warner Inc.,* 937 F.2d 767, 773 (2d Cir.1991)). Moreover, "even if not attached or incorporated by reference, a document 'upon which [the complaint] *solely* relies and which is *integral to the complaint'* may be considered by the court in ruling on such a motion." *Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir.2007) (emphasis in original) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991)).

The court is bound to give the plaintiff the benefit of every reasonable inference to be drawn from the "well-pleaded" allegations of the complaint. *See Retail Clerks Intern. Ass'n, Local 1625, AFL–CIO v. Schermerhorn,* 373 U.S. 746, 754 n. 6 (1963); *see also Arar v. Ashcroft,* 532 F.3d 157, 168 (2d Cir.2008). Nevertheless, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal,* ––– U.S. ––––, 129 S.Ct. 1937, 1949 (2009). Therefore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citation omitted).

A motion to dismiss pursuant to Rule 12(b)(6) may not be granted so long as the plaintiff's complaint includes "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal,* ––– U.S. ––––, 129 S.Ct. at 1960 (citing *Twombly* ). [4] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* ––– U.S. ––––, 129 S.Ct. at 1949. This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* Thus, in spite of the deference the court is bound to give to the plaintiff's allegations, it is not proper for the court to assume that "the [plaintiff] can prove facts [which he or she] has not alleged, or that the defendants have violated the ... laws in ways that have not been alleged." *Assoc. Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 526 (1983). The process of determining whether a plaintiff has "nudged [his] claims ... across the line from conceivable to plausible," entails a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal,* ––– U.S. ––––, 129 S.Ct. at 1950–51.

With this standard in tow, we consider the plausibility of Plaintiff's Second Amended Complaint.

### B. Eighth Amendment

**\*3** Plaintiff claims, albeit in a quite cursory manner, that the Defendants violated his constitutional rights under the Eighth Amendment by their deliberate indifference to his medical needs and by subjecting him to harsh and atypical prison conditions.

To state a claim under § 1983 for deprivation of medical treatment in violation of the Eighth Amendment, a plaintiff must show that the defendant acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). Thus, "[t]he deliberate indifference standard embodies both an objective and a subjective prong" which the plaintiff must establish. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154 (1995). Under the objective prong, the alleged medical need must be "sufficiently serious."

*Id.; Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Under the subjective component, the plaintiff must demonstrate that the defendants acted with "a sufficiently culpable state of mind." *Hathaway v. Coughlin,* 37 F.3d at 66. This standard must be met for each claim against each individual Defendant in this action.

### 1. Defendant Cavanaugh

Plaintiff alleges that Defendant Cavanaugh did not provide "psychological crisis treatment or suicide prevention" after Plaintiff stopped eating, drinking, sleeping, or showering. Second Am. Compl. at p. 5. In accordance with the deliberate indifference standard, we will delve into Plaintiff's allegation to determine if this statement—Plaintiff's only mention of Defendant Cavanaugh—is enough to implicate both an objective substantial risk of serious harm and a sufficiently culpable state of mind.

"A serious medical condition must be 'a condition of urgency, one that may produce death, degeneration, or extreme pain.' " *Osacio v. Greene,* 2009 WL 3698382, at *4 (N.D.N.Y. Nov. 2, 2009) (quoting *Hathaway v. Coughlin,* 37 F.3d at 66). "Factors that have been considered in determining whether a condition is serious include '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.' " *Id.* (quoting *Chance v. Armstrong,* 143 F.3d at 702) (other citations omitted). The "factors listed above, while not the only ones that might be considered, are without a doubt highly relevant to the inquiry into whether a given medical condition is a serious one." *Chance v. Armstrong,* 143 F.3d at 703.

Here, the question is whether the deprivation of psychological treatment or suicide prevention procedures triggers an objectively serious risk of harm within the context of the Eighth Amendment. Taking the Plaintiff's claims as true, it appears he had a need for mental health services that went unmet. This Court, in accord with multiple decisions in this Circuit, recognizes that allegations of mental illness, especially when accompanied with suicidal ideation, state a plausible claim that Plaintiff's mental health needs were sufficiently serious. *See, e.g., Allah v. Kemp,* 2010 WL 1036802, at *6, n. 9 (N.D.N.Y. Feb. 25, 2010) (finding the failure to provide

plaintiff with a mental health evaluation, notwithstanding his attempted suicide three days earlier, was enough to meet the "sufficiently serious" standard); *Hamilton v. Smith,* 2009 WL 3199531, at *14 (N.D.N.Y. Jan. 13, 2009) (finding plaintiff's claimed history of suicidal thoughts sufficient to raise a question of fact as to serious medical need); *Covington v. Westchester Cnty. Dept. of Corrs.,* 2010 WL 572125, at *6 (S.D.N.Y. Jan. 25, 2010) (citing cases where courts have found that depression with suicidal ideation, or severe anxiety attacks, are sufficiently severe conditions to meet the objective prong of deliberate indifference); *see also Zimmerman v. Burge,* 2009 WL 3111429, at *8 (N.D.N.Y. Sept. 24, 2009) (reviewing published case law discussing whether depression either with or without suicidal ideation is a "sufficiently serious" medical condition). Therefore, Plaintiff's statement pertaining to Defendant Cavanaugh, though brief, is enough to satisfy the objective prong of the deliberate indifference standard.

**\*4** Regarding the subjective component, however, Plaintiff does not allege that Defendant Cavanaugh denied him medical services with any ill state of mind, or even that Cavanaugh was aware of the substantial medical risk. An official acts with the requisite deliberate indifference when that official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837 (1994).

Upon reading Plaintiff's Second Amended Complaint liberally, as well as his Opposition to Defendants' Motion to Dismiss, Dkt. No. 36, we conclude that Plaintiff makes no allegation as to Cavanaugh's awareness of Plaintiff's serious health risk. Thus, while mental illness and corresponding suicidal tendencies left untreated can be sufficiently serious to reach an Eighth Amendment claim, there are no facts in Plaintiff's pleading to allow this court to infer, let alone find, that Defendant Cavanaugh possessed the culpable state of mind required to allege deliberate indifference to a medical need. Accordingly, we recommend Plaintiff's claim against Defendant Cavanaugh be **dismissed.**

### 2. Defendant Miller

Plaintiff additionally alleges Eighth Amendment violations against Defendant Miller, who, according to

the best interpretation this Court can muster, violated Plaintiff's constitutional rights by allowing him to lose weight and by failing to give Plaintiff "better pain medica[tion], cane, mattress, pillow ... better shoes," and by placing Plaintiff on "3 floor and not on flat." Second Am. Compl. at p. 7.

This claim against Defendant Miller also fails to allege facts sufficient to survive Defendants' 12(b)(6) Motion to Dismiss. As with Defendant Cavanaugh, Plaintiff does not make any mention that Defendant Miller was aware of any serious risk to the Plaintiff, let alone that he acted with the requisite wantonness. Therefore, Plaintiff cannot claim Miller was deliberately indifferent to his medical needs.

Furthermore, to the extent that Plaintiff is claiming that the conditions of his confinement constituted cruel and unusual punishment in violation of the Eighth Amendment, this claim also falls short. In the context of an Eighth Amendment claim based on prison conditions, the prisoner must demonstrate that the deprivation is objectively sufficiently serious such that the plaintiff was "den[ied] the minimal civilized measure of life's necessities," and that the prison officials subjectively "knew of and disregarded an excessive risk to inmate health or safety." *Branham v. Meachum,* 77 F.3d 626, 630–31 (2d Cir.1996) (internal citations omitted).

Turning to the objective analysis, Plaintiff's allegations do not trigger the conclusion that Plaintiff was denied the minimal civilized measure of life's necessities, as the Constitution "does not mandate comfortable prisons," *Rhodes v. Chapman,* 452 U.S. 337, 349 (1981), but instead only requires that inmates not be deprived of their "basic human needs—*e.g.,* food, clothing, shelter, medical care, and reasonable safety," *Helling v. McKinney,* 509 U.S. 25, 32 (1993) (citation omitted). In accord, courts in this Circuit have found the deprivations of better pain medicine, a cane, a mattress, a pillow, or "better shoes," as the Plaintiff has alleged, do not meet, neither singularly nor collectively, the objective standard under the Eighth Amendment. [5] However, it is more complete to say that Plaintiff's failure to allege any facts indicating that Defendant Miller acted, or did not act, with a wanton state of mind, forecloses any colorable allegation that he was denied his constitutional rights under the Eighth Amendment regarding prison conditions. *See Vaughan v. Erno,* 8 F. App'x 145, 146–47 (2d Cir.2001) (finding

complained conditions of confinement did not constitute an Eighth Amendment violation because plaintiff failed to show defendants acted with deliberate indifference, even assuming that he sufficiently alleged a serious harm); *Carr v. Canty,* 2011 WL 309667, at *2 (S.D.N.Y. Jan. 19, 2011) (finding a plaintiff did not satisfy the deliberate indifference requirement of an Eighth Amendment claim regarding conditions of confinement because defendants responded to complaints of a wet and slippery floor "albeit, not in the manner in which [plaintiff] preferred" and took action to cover the water); *Hughes v. Butt,* 2009 WL 3122952, at *10 (N.D.N.Y. Sept. 28, 2009) (concluding that a defendant, who the plaintiff did not allege to have any visual indication or awareness that plaintiff needed a cane, back brace, or knee brace, did not act deliberately indifferent towards plaintiff); *Savage v. Brue,* 2007 WL 3047110, at *9 (N.D.N.Y. Oct. 18, 2007) (finding a nurse, who refused pain medication to an inmate confined in a special housing unit for forty-eight (48) hours with no mattress and back and neck pain due to a recent injury and who advised the inmate that he would need to "adjust to it," to be possibly negligent in her care, but not deliberately indifferent). Therefore, we recommend Plaintiff's claim against Defendant Miller be **dismissed.**

*3. Defendant Schlenger*

**\*5** Plaintiff also claims that Defendant Schlenger, presumably in his position as a doctor of dental health at Coxsackie, did not give Plaintiff "dental services for tooth pain from 10–3–09 to 2–3–09 ... causing Plaintiff more pain and los[s] of tooth." Second Am. Compl. at p. 6.

"Dental conditions, like other medical conditions, may be of varying severity." *Chance v. Armstrong,* 143 F.3d at 702. Thus, the constitutionality of a decision to leave a dental condition untreated will depend on the facts of the particular case. *Harrison v. Barkley,* 219 F.3d 132, 137–38 (2d Cir.2000). The Second Circuit has held, in the context of failing to treat a dental injury, that a "serious medical condition exists where 'the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.' " *Id.* at 136 (finding that while a tooth cavity is not strictly a serious medical condition, it is a degenerative condition which "is likely to produce agony and to require more invasive and painful treatments" if left untreated) (quoting *Chance v. Armstrong,* 143 F.3d at 702).

However, Plaintiff does not allege any facts regarding any particular type of oral injury or condition that would aid this Court in its 12(b)(6) inquiry, but rather only "tooth pain," which eventually led to the loss of the tooth. Plaintiff also alleges no facts to suggest that Defendant Schlenger or anyone else should have been aware of his tooth pain. [6] This claim against Defendant Schlenger is utterly bereft of factual allegations which would allow for the Court to deduce the plausibility of a cognizable cause of action, *Ashcroft v. Iqbal,* ─── U.S. ───, 129 S.Ct.1937, 1949 & 1960 (2009), or which would permit a defendant "to have a fair understanding of what the plaintiff is complaining about and to know whether there is a legal basis for recovery," *Ricciuti v. New York City Transit Auth.,* 941 F.2d 119, 123 (2d Cir.1991). Thus, because this claim is without factual allegations setting forth that Defendant Schlenger violated Plaintiff's constitutional rights, we recommend that this claim be **dismissed.**

### 4. Defendant Smith

Lastly, Plaintiff alleges that Defendant Smith, Deputy of Health Services, violated his rights under the Eighth Amendment by refusing to place him in a hospital after Plaintiff lost a lot of weight, resulting in "mental and physical pain." Second Am. Compl. at pp. 3 & 6.

In this case, unlike with Plaintiff's allegations against any of the previously considered Defendants, Plaintiff claims that "Smith refuse[d]" to act, which led to the alleged constitutional violation. As this Court is charged with the mandate of construing Plaintiff's claims leniently, we are willing to impute from the use of the word "refuse" enough to satisfy the wanton state of mind requirement of deliberate indifference. In order to "refuse" or decline to do something, one must necessarily be aware of the request or the issue, and subsequently choose not to act, implicating that Defendant Smith acted, or did not act, with a culpable mind set of more than mere negligence. Thus, Plaintiff has alleged enough, in this case, to satisfy the subjective prong of Eighth Amendment deliberate indifference.

**\*6** Regardless, Plaintiff's claim must fail, as he does not allege a sufficiently serious injury or risk of injury. He claims that Defendant Smith failed to place Plaintiff in a hospital due to Plaintiff's loss of weight. Plaintiff does not allege how much weight he lost, if that weight loss was dangerous to his health, or why he lost the weight. [7] Notably, Plaintiff also does not state why hospitalization was warranted or necessary to remedy this weight loss, as opposed to another form of treatment. *See O'Connor v. McArdle,* 2006 WL 436091, at *5 ("It is well-established that mere disagreement over the proper treatment does not create a constitutional issue. So long as the treatment given is adequate, that fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."). Therefore, there are no allegations in the pleading to "conclude that [P]laintiff's ... weight loss concerns represented a condition of urgency or resulted in degeneration or extreme pain sufficient to implicate an Eighth Amendment violation." *Evans v. Albany Cnty. Corr. Facility,* 2009 WL 1401645, at *10 (N.D.N.Y. May 14, 2009) (quoting *Bost v. Bockelmann,* 2007 WL 527320, at *8 (N.D.N.Y. Feb. 20, 2007)). Thus, while Plaintiff has alleged enough to satisfy the subjective prong of the Eighth Amendment deliberate indifference standard, his failure to allege a sufficiently serious medical condition means this claim should be **dismissed.**

### C. Due Process

While not explicitly stated in Plaintiff's pleadings, this Court concludes that, by liberally construing Plaintiff's Second Amended Complaint, some of his allegations concern a violation of his rights under the Due Process clause of the Fourteenth Amendment. Specifically, Plaintiff complains that Defendants Lape and McDermott acted in such a way that they violated his right to procedural due process. We will examine the claims against each Defendant *seriatim.*

### 1. Defendant Lape

Plaintiff claims, in cursory fashion, that Defendant Lape, who Plaintiff describes as the "superintendent" of Coxsackie, did "not give[ ] Plaintiff hearing, or grievance or legal assistance from 10–20–08 to 2–3–09 causing mental and physical pain." Second. Am. Compl. at pp. 1 & 6.

It is well-settled that the personal involvement of a defendant is a prerequisite for the assessment of damages in a § 1983 action. *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977). Furthermore, the doctrine of *respondeat superior* is inapplicable to § 1983 claims. *See Polk County v. Dodson,* 454 U .S. 312, 325 (1981) (internal

**Loadholt v. Lape, Not Reported in F.Supp.2d (2011)**

2011 WL 1135934

citations omitted); *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). Thus, a defendant may not be liable for damages simply by virtue of holding a supervisory position, without more. *See, e.g., Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). Rather, the personal involvement of a supervisory defendant may be shown by evidence that:

> **\*7** (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d at 873.

Plaintiff does not explain what Defendant Lape purportedly did to deny Plaintiff of assistance in any hearing or grievance process, nor suggest facts that Lape himself was involved in any way in any constitutional violation. Rather, Plaintiff appears to be bringing legal action against Lape due to his supervisory position only. Because the "proper focus is the [D]efendant's direct participation in, and connection to, the constitutional deprivation," *McClary v. Coughlin,* 87 F.Supp.2d 205, 215 (W.D .N.Y.2000), and because one cannot be liable solely from holding a supervisory position, we find Plaintiff's claim against Defendant Lape should be **dismissed** for lack of personal involvement.

### 2. Defendant McDermott

Liberally construed, Plaintiff claims that Defendant McDermott refused to give Plaintiff "hearing assistance" or allow the Office of Mental Health to testify that Plaintiff is "learning disable[d]" and has a mental illness,

which caused the Plaintiff to "lose freedom." Second Am. Compl. at p. 5.

In order to state a procedural due process claim pursuant to the Fourteenth Amendment, an inmate must show that he possessed an actual liberty or property interest, and that he was deprived of that interest without sufficient process. *See Shakur v. Selsky,* 391 F.3d 106, 118 (2d Cir.2004). Inmates' liberty interests are typically derived from two sources: the Due Process Clause of the Fourteenth Amendment, and state statute or regulations. *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998) (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989)). With regard to liberty interests arising directly under the Due Process Clause, the Supreme Court has "narrowly circumscribed its scope to protect no more than the 'most basic liberty interests in prisoners.' " *Id.* (quoting *Hewitt v. Helms,* 459 U.S. 460, 467 (1983)). With regard to State created liberty interests, the Supreme Court held in *Sandin v. Conner* that state created liberty interests shall be limited to those deprivations which subject a prisoner to "atypical and significant hardship ... in relation to the ordinary incidents of prison life." 515 U.S. 472, 484 (1995).

Here, Plaintiff has not alleged enough facts to indicate a viable Due Process violation under the Constitution. He argues, in effect, that he did not receive a meaningful hearing because Defendant McDermott denied Plaintiff assistance in some unidentified hearing. The only liberty interest that Plaintiff alleged to have lost was the loss of freedom. *See* Second Am. Compl. at p. 5. Without specifics about the nature and conditions of the alleged loss of freedom, Plaintiff does not state an "atypical and significant hardship ... to which the conditions of the disciplinary segregation differ from other routine prison conditions and the duration of the disciplinary segregation compared to discretionary confinement." *Shuler v. Brown,* 2009 WL 790973, at \*7 (N.D.N.Y. Mar. 23, 2009) (quoting *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004)). The loss of freedom, inherent in the "ordinary incidents of prison life," *Sandin v. Conner,* 515 U.S. at 483–86, does not constitute, without alleging more, an atypical and significant hardship on an inmate. Nor has he shown a deprivation of liberty under the Due Process Clause. Furthermore, this statement is devoid of any factual allegation that this Court could examine to determine if the procedure provided by the State to Plaintiff was in fact insufficient, or what the deprivation exactly was. Plaintiff does not specify what hearing or hearings he is

referring to, or even what the hearings were regarding. Therefore, because Plaintiff's naked assertions do not rise to the pleading standards required to withstand a Motion to Dismiss under Rule 12(b) (6), we recommend that the claim against Defendant McDermott be **dismissed.**

### D. Americans with Disability Act

 **\*8** In his Second Amended Complaint, Plaintiff states that he has a cause of action under the Americans with Disability Act ("ADA"). Second Am. Compl. at p. 7. This claim is not supported with any facts, nor the names of the parties it is purportedly directed. Besides previously stating, with relation to his claims against Defendant McDermott, that he suffers from some type of learning disability, Plaintiff does not specifically allege what disability he suffers from, nor what he was denied. Furthermore, Plaintiff does not allege under which Title of the ADA he is suing under. Thus, for the preceding reasons and because the Plaintiff states no facts, allegations, nor specific discussion of this claim, we find that to the extent that Plaintiff is attempting to assert a claim under the ADA against any individual Defendant, the claim should be **dismissed.**

### III. CONCLUSION

While this Court recognizes the Second Circuit's preference to provide *pro se* plaintiffs with leave to amend their pleadings prior to dismissal, Loadholt has already been afforded two opportunities to amend his Complaint.

For the reasons stated herein, it is hereby

**RECOMMENDED,** that the Defendants' Motion to Dismiss (Dkt. No. 28) be **GRANTED** and Plaintiff's Second Amended Complaint (Dkt. No. 9) be **DISMISSED;** and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

### All Citations

Not Reported in F.Supp.2d, 2011 WL 1135934

Footnotes

1   Without additional supporting facts or clarification, this Court is unsure whether Plaintiff means to claim the pertinent dates were from February 3, 2009 until October 3, 2009, and simply stated in reverse, or rather from October 3, 2008 until February 3, 2009, and simply inserted a typographical error. Regardless, ambiguity on the stated dates does not change this Court's analysis.

2   *See supra* note 1.

3   *See supra* note 1.

4   By its opinion in *Bell Atl. Corp. v. Twombly* and then again in *Ashcroft v. Iqbal,* the Supreme Court abrogated the often-cited language of *Conley v. Gibson* "that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Bell Atl. Corp. v. Twombly,* 550 U.S. 561 (2007) (quoting *Conley,* 355 U.S. 41, 45–46 (1957)). In so doing, the Court found that *Conley* "described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Id.* at 563.

5   *See Brown v. Eagen,* 2009 WL 815724, at \*9 (N.D.N.Y. Mar. 26, 2009) (stating that the prison officials have the broad discretion to determine the nature and character of the medical treatment afforded to inmates, as "[a]n inmate does not have the right to treatment of his choice") (citing, *inter alia, Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986)); *Williams v. Perlman,* 2009 WL 1652193, at \*6–7 (N.D.N.Y. Feb. 5, 2009) (finding a prisoner who specifically complained that his orthopedic shoes created "intense pain on [his] toes and arches" and caused him to develop painful callouses which

2011 WL 1135934

needed to be "lanced from [his] feet" did not adequately suggest in his complaint that his foot, ankle, or arch condition presented an issue of degeneration or extreme pain); *Borges v. McGinnis,* 2007 WL 1232227, at *4–6 (W.D .N.Y. Apr. 26, 2007) (find that an inmate given only a paper gown, slippers, a thin mattress, and no blanket, while confined for three days in a room with an open window that reduced the temperature to approximately 50 degrees, failed to meet the objective element of an Eighth Amendment violation); *Bell v. Artuz,* 1999 WL 253607, at *3–4 (S.D.N.Y. Apr. 29, 1999) (noting that no Eighth Amendment claim is implicated where prisoner alleges no pillows, a lack of space in double-occupancy cell, poor ventilation, asbestos on catwalk behind cells, no bacterial soap, and insufficient lighting); *Veloz v. New York,* 35 F.Supp.2d 305, 309 & 312 (S.D.N.Y.1999) (stating prisoner's foot condition, which involved increasing pain and required surgery, was not sufficiently serious); *Alston v. Howard,* 925 F.Supp. 1034, 1040 (S.D.N.Y.1996) (finding prisoner's ankle condition and resulting foot pain requiring the use of special footwear was not sufficiently serious).

6    Curiously, in opposing Defendants' request for dismissal, Plaintiff fails to mention Defendant Schlenger or allegations of facts supporting his claim of tooth pain, though he references his various other claims. *See* Dkt. No. 36.

7    The Court notes that Plaintiff mentions he "stop[ped] eat[ing] and drink[ing] lost alot [sic] of weight" in relation to a claim separate from his claim against Defendant Smith. Second Am. Compl. at p. 5.

---

**End of Document**                          © 2018 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment

Distinguished by Arnett v. Shojaie, C.D.Cal., November 8, 2011

2010 WL 1235591
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.

James MURRAY, Plaintiff,
v.
R. PALMER; S. Griffin; M. Terry;
F. Englese; Sergeant Edwards; K.
Bump; and K.H. Smith, Defendants.

No. 9:03-CV-1010 (GTS/GHL).
|
March 31, 2010.

**Attorneys and Law Firms**

James Murray, Malone, NY, pro se.

Bosman Law Office, AJ Bosman, Esq., of Counsel, Rome, NY, for Plaintiff.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Timothy Mulvey, Esq., James Seaman, Esq., Assistant Attorneys General, of Counsel, Albany, NY, for Defendants.

**Opinion**

### *DECISION and ORDER*

Hon. GLENN T. SUDDABY, District Judge.

**\*1** The trial in this prisoner civil rights action, filed *pro se* by James Murray ("Plaintiff") pursuant to 42 U.S.C. § 1983, began with an evidentiary hearing before the undersigned on March 1, 2010, regarding the affirmative defense of seven employees of the New York State Department of Correctional Services-R. Palmer, S. Griffin, M. Terry, F. Englese, Sergeant Edwards, K. Bump, and K.H. Smith ("Defendants")-that Plaintiff failed to exhaust his available administrative remedies, as required by the Prison Litigation Reform Act, before filing this action on August 14, 2003. At the hearing,

documentary evidence was admitted, and testimony was taken of Plaintiff as well as Defendants' witnesses (Darin Williams, Sally Reams, and Jeffery Hale), whom Plaintiff was able to cross-examine through *pro bono* trial counsel. At the conclusion of the hearing, the undersigned indicated that a written decision would follow. This is that written decision. For the reasons stated below, Plaintiff's Second Amended Complaint is dismissed because of his failure to exhaust his available administrative remedies.

### I. RELEVANT LEGAL STANDARD

The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U .S.C. § 1997e. The PLRA was enacted "to reduce the quantity and improve the quality of prisoner suits" by "afford[ing] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Porter v. Nussle,* 534 U.S. 516, 524-25, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). In this regard, exhaustion serves two major purposes. First, it protects "administrative agency authority" by giving the agency "an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court, and it discourages disregard of the agency's procedures." *Woodford v. Ngo,* 548 U.S. 81, 89, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). Second, exhaustion promotes efficiency because (a) "[c]laims generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court," and (b) "even where a controversy survives administrative review, exhaustion of the administrative procedure may produce a useful record for subsequent judicial consideration." *Woodford,* 548 U .S. at 89. "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter,* 534 U.S. at 532.

In accordance with the PLRA, the New York State Department of Correctional Services ("DOCS") has made available a well-established inmate grievance program. 7 N.Y.C.R.R. § 701.7. Generally, the DOCS Inmate Grievance Program ("IGP") involves the following three-

Murray v. Palmer, Not Reported in F.Supp.2d (2010)
Case 9:15-cv-01542-MAD-DEP     Document 79     Filed 02/14/18     Page 146 of 227

2010 WL 1235591

step procedure for the filing of grievances. 7 N.Y.C.R.R. §§ 701.5, 701.6(g), 701.7. [1] *First,* an inmate must file a complaint with the facility's IGP clerk within a certain number of days of the alleged occurrence. [2] If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. A representative of the facility's inmate grievance resolution committee ("IGRC") has a certain number of days from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within a certain number of days of receipt of the grievance, and issues a written decision within a certain number of days of the conclusion of the hearing. *Second,* a grievant may appeal the IGRC decision to the facility's superintendent within a certain number of days of receipt of the IGRC's written decision. The superintendent is to issue a written decision within a certain number of days of receipt of the grievant's appeal. *Third,* a grievant may appeal to the central office review committee ("CORC") within a certain number of days of receipt of the superintendent's written decision. CORC is to render a written decision within a certain number of days of receipt of the appeal.

**\*2** Moreover, there is an expedited process for the review of complaints of inmate harassment or other misconduct by corrections officers or prison employees. 7 N.Y.C.R.R. § 701.8. In the event the inmate seeks expedited review, he or she may report the misconduct to the employee's supervisor. The inmate then files a grievance under the normal procedures outlined above, but all grievances alleging employee misconduct are given a grievance number, and sent immediately to the superintendent for review. Under the regulations, the superintendent or his designee shall determine immediately whether the allegations, if true, would state a "bona fide" case of harassment, and if so, shall initiate an investigation of the complaint, either "in-house," by the Inspector General's Office, or by the New York State Police Bureau of Criminal Investigations. An appeal of the adverse decision of the superintendent may be taken to the CORC as in the regular grievance procedure. A similar "special" procedure is provided for claims of discrimination against an inmate. 7 N.Y.C.R.R. § 701.9.

It is important to note that these procedural requirements contain several safeguards. For example, if an inmate could not file such a complaint within the required time period after the alleged occurrence, he or she could apply

to the facility's IGP Supervisor for an exception to the time limit based on mitigating circumstances. If that application was denied, the inmate could file a complaint complaining that the application was wrongfully denied. [3] Moreover, any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can-and must-be appealed to the next level, including CORC, to complete the grievance process. [4] There appears to be a conflict in case law regarding whether the IGRC's nonresponse must be appealed to the superintendent where the plaintiff's grievance was never assigned a grievance number. [5] After carefully reviewing this case law, the Court finds that the weight of authority appears to answer this question in the affirmative. [6] The Court notes that, if the plaintiff adequately describes, in his appeal to the superintendent, the substance of his grievance (or if the plaintiff attaches, to his appeal, a copy of his grievance), it would appear that there is something for the superintendent to review.

It is also important to note that DOCS has a *separate and distinct* administrative appeal process for inmate misbehavior hearings:

> A. For Tier III superintendent hearings, the appeal is to the Commissioner's designee, Donald Selsky, D.O.C.S. Director of Special Housing/Inmate Disciplinary Program, pursuant to 8 N.Y.C.R.R. § 254.8;

> B. For Tier II disciplinary hearings, the appeal is to the facility superintendent pursuant to 7 N.Y.C.R.R. § 253.8; and

> C. For Tier I violation hearings, the appeal is to the facility superintendent or a designee pursuant to 7 N.Y.C.R.R. § 252.6.

**\*3** "An individual decision or disposition of any current or subsequent program or procedure having a written appeal mechanism which extends review to outside the facility shall be considered nongrievable." 7 N.Y.C.R.R. § 701.3(e)(1). Similarly, "an individual decision or disposition resulting from a disciplinary proceeding ... is not grievable." 7 N.Y.C.R.R. § 701.3(e)(2). However, "[t]he policies, rules, and procedures of any program or procedure, including those above, are grievable." 7 N.Y.C.R.R. § 701.3(e)(3); *see also* N.Y. Dep't Corr. Serv. Directive No. 4040 at III.E.

Generally, if a prisoner has failed to follow each of the required three steps of the above-described grievance procedure prior to commencing litigation, he has failed to exhaust his administrative remedies. *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006) (citing *Porter,* 534 U.S. at 524). However, the Second Circuit has held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. *Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004), *accord, Ruggiero,* 467 F.3d at 175. First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* [citations omitted]. Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* [citations and internal quotations omitted].

With regard to this third inquiry, the Court notes that, *under certain circumstances,* an inmate may exhaust his administrative remedies by raising his claim during a related *disciplinary proceeding. Giano v. Goord,* 380 F.3d 670, 678-79 (2d Cir.2004); *Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004).[7] However, in essence, the circumstances in question include instances in which (1) the inmate reasonably believed that his "only available remedy" was to raise his claim as part of a tier disciplinary hearing,[8] *and* (2) the inmate articulated and pursued his claim in the disciplinary proceeding in a manner that afforded prison officials the time and opportunity to thoroughly investigate that claim.[9] Some district courts have found the first requirement not present where (a) there was nothing objectively confusing about the DOCS regulations governing the grievability of his claim,[10] (b) the inmate was specifically informed that the claim

in question was grievable,[11] (c) the inmate separately pursued the proper grievance process by filing a grievance with the IGRC,[12] (d) by initially alleging that he did appeal his claim to CORC (albeit without proof), the inmate has indicated that, during the time in question, he understood the correct procedure for exhaustion,[13] and/or (e) before and after the incident in question, the inmate pursued similar claims through filing a grievance with the IGRC.[14] Other district courts have found the second requirement not present where (a) the inmate's mention of his claim during the disciplinary hearing was so insubstantial that prison officials did not subsequently investigate that claim,[15] and/or (b) the inmate did not appeal his disciplinary hearing conviction.[16]

**\*4** Finally, two points bear mentioning regarding exhaustion. First, given that non-exhaustion is an affirmative defense, the defendant bears the burden of showing that a prisoner has failed to exhaust his available administrative remedies. *See, e.g., Sease v. Phillips,* 06-CV-3663, 2008 WL 2901966, *\*4 (S.D.N.Y. July 25, 2008).* However, once a defendant has adduced reliable evidence that administrative remedies were available to Plaintiff and that Plaintiff nevertheless failed to exhaust those administrative remedies, Plaintiff must then "counter" Defendants' assertion by showing exhaustion, unavailability, estoppel, or "special circumstances."[17]

Second, the Court recognizes that there is case law from within the Second Circuit supporting the view that the exhaustion issue is one of fact, which should be determined by a jury, rather than by the Court.[18] However, there is also case law from within the Second Circuit supporting the view that the exhaustion issue is one of law, which should be determined by the Court, rather than by a jury.[19] After carefully reviewing the case law, the Court finds that the latter case law-which includes cases from the Second Circuit and this District-outweighs the former case law.[20] (The Court notes that the latter case law includes cases from the Second Circuit and this District.)[21] More importantly, the Court finds that the latter cases are better reasoned than are the former cases. In particular, the Court relies on the reasons articulated by the Second Circuit in 1999: "Where administrative remedies are created by statute or regulation affecting the governance of prisons, ... the answer depends on the meaning of the

relevant statute or regulation." *Snider v. Melindez,* 199 F.3d 108, 113-14 (2d Cir.1999). The Court relies also on the several reasons articulated by Judge Richard A. Posner in a recent Seventh Circuit decision: most notably, the fact that the exhaustion-of-administrative-remedies inquiry does not address the merits of, or deadlines governing, the plaintiff's claim but an issue of "judicial traffic control" (i.e., what forum a dispute is to be resolved in), which is never an issue for a jury but always an issue for a judge. *See Pavey v. Conley,* 544 F.3d 739, 740-42 (7th Cir.2008) (en banc), *cert. denied, --- U.S. ----,* 129 S.Ct. 1620, 173 L.Ed.2d 995 (2009). The Court notes that the First, Third, Fourth, Fifth, Sixth, Eighth, Ninth, Tenth and Eleventh Circuits appear to agree with the ultimate conclusion of the Second and Seventh Circuits that the exhaustion issue is properly decided by a judge, not a jury. [22]

## II. ANALYSIS

As an initial matter, Plaintiff argues that he exhausted his administrative remedies regarding the claims at issue in this action, by filing a grievance regarding those claims, and then appealing the non-response to that grievance all the way to CORC. Because the Court rejects this argument based on the evidence adduced at the hearing, the Court proceeds to an analysis of the three-step exhaustion inquiry established by the Second Circuit.

### A. Availability of Administrative Remedies

 **\*5**  New York prison inmates are subject to an Inmate Grievance Program established by DOCS and recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson,* 96-CV-5396, 2004 WL 324898, at \*4 (S.D.N.Y. Feb.20, 2004) (citing *Mojias v. Johnson,* 351 F.3d 606 (2d Cir.2003), and *Snider v. Melindez,* 199 F.3d 108, 112-13 [2d Cir.1999] ). There are different circumstances under which the grievance procedure is deemed not to have been available to an inmate plaintiff. *Hemphill,* 380 F.3d at 687-88. For example, courts have found unavailability "where plaintiff is unaware of the grievance procedures or did not understand it or where defendants' behavior prevents plaintiff from seeking administrative remedies." *Hargrove v. Riley,* 04-CV-4587, 2007 WL 389003, at \*8 (E.D.N.Y. Jan.31, 2007) (internal citations omitted). When testing the availability of administrative remedies in the face of claims that undue influence from prison workers has caused a plaintiff inmate to forego the formal grievance process,

courts employ an objective test, examining whether "a similarly situated individual of ordinary firmness [would] have deemed them available." *Hemphill,* 380 F.3d at 688 (quotations and citations omitted); *see Hargrove,* 2007 WL 389003, at \*8.

Here, after carefully considering the evidence submitted at the hearing in this action on March 1, 2010, the Court finds that administrative remedies were "available" to Plaintiff during the time in question. The Court makes this finding for the following four reasons.

First, in his sworn Complaint (which has the force and effect of an affidavit), Plaintiff stated, "Yes," in response to the question, "Is there a prisoner grievance procedure at this facility ." (Dkt. No. 1, ¶ 4.a.) [23] Second, both Darin Williams (the corrections officer in charge of the special housing unit during the relevant time period) and Sally Reams (the Inmate grievance program supervisor during the relevant time period) testified credibly, at the exhaustion hearing, that there was a working grievance program at Great Meadow Correctional Facility during the time in question. (Hearing Tr. at 10, 12, 14-21, 40-54.) Third, Plaintiff testified, at the exhaustion hearing that, during this approximate time period (the August to November of 2000), he filed at least three other grievances Great Meadow Correctional Facility, to which he received responses from the inmate grievance clerk, the Superintendent, and CORC. (*Id.* at 154, 157-58, 169-70; *see also* Hearing Exs. D-4, D-5, P-8, P-13, P-14.) [24] Fourth, the Court finds the relevant portions of Plaintiff's hearing testimony regarding the grievance at issue in this action to be incredible due to various omissions and inconsistencies in that testimony, and his demeanor during the hearing. (*Id.* at 127-34.) [25]

### B. Estoppel

After carefully considering the evidence submitted at the hearing in this action on March 1, 2010, the Court finds that Defendants did not forfeit the affirmative defense of non-exhaustion by failing to raise or preserve it, or by taking actions that inhibited Plaintiff's exhaustion of remedies. For example, Defendants' Answer timely asserted this affirmative defense. (Dkt. No. 35, ¶ 17.) Moreover, Plaintiff failed to offer any credible evidence at the hearing that *Defendant* s in any way interfered with Plaintiff's ability to file grievances during the time in question. (Hearing Tr. at 127-34, 157-58, 169-70.)

Generally, a defendant in an action may not be estopped from asserting the affirmative defense of failure to exhaust administrative remedies based on the actions (or inactions) of other individuals. [26]

**C. Special Circumstances**

 **\*6**  There are a variety of special circumstances that may excuse a prisoner's failure to exhaust his available administrative remedies, including (but not limited to) the following:

(1) The facility's "failure to provide grievance deposit boxes, denial of forms and writing materials, and a refusal to accept or forward plaintiff's appeals-which effectively rendered the grievance appeal process unavailable to him." *Sandlin v. Poole,* 575 F.Supp.2d 484, 488 (W.D.N.Y.2008) (noting that "[s]uch facts support a finding that defendants are estopped from relying on the exhaustion defense, as well as "special circumstances" excusing plaintiff's failure to exhaust");

(2) Other individuals' "threats [to the plaintiff] of physical retaliation and reasonable misinterpretation of the statutory requirements of the appeals process." *Clarke v. Thornton,* 515 F.Supp.2d 435, 439 (S.D.N.Y.2007) (noting also that "[a] correctional facility's failure to make forms or administrative opinions "available" to the prisoner does not relieve the inmate from this burden."); and

(3) When plaintiff tries "to exhaust prison grievance procedures[, and] although each of his efforts, alone, may not have fully complied, together his efforts sufficiently informed prison officials of his grievance and led to a thorough investigation of the grievance." *Hairston v. LaMarche,* 05-CV-6642, 2006 WL 2309592, at \*8 (S.D.N.Y. Aug.10, 2006).

After carefully considering the issue, the Court finds that there exists, in this action, no "special circumstances" justifying Plaintiff's failure to comply with the administrative procedural requirements. Construed with the utmost of special leniency, Plaintiff's hearing testimony, and his counsel's cross-examination of Defendants' witnesses, raise the specter of two excuses for not having exhausted his available administrative remedies before he (allegedly) mailed his Complaint in this action on August 14, 2003:(1) that exhaustion was not possible because of the administrative procedures that DOCS has implemented regarding inmate grievances; and/or (2) that an unspecified number of unidentified corrections officers (who are not Defendants in this action) somehow interfered with the delivery of his grievance and appeals. For example, Plaintiff testified at the exhaustion hearing that he handed his grievance and appeals to various corrections officers making rounds where he was being housed, and that, if his grievance and/or appeals were never received, it must have been because his letters were not properly delivered. (Hearing Tr. at 126-36.)

With regard to these excuses, the Court finds that, while these excuses could constitute special circumstances justifying an inmate's failure to exhaust his available administrative remedies in certain situations, [27] these excuses are not available to Plaintiff in the current action because, as stated in Part II.A. of this Decision and Order, the credible testimony before the Court indicates that Plaintiff did not hand his grievance and appeals to various corrections officers with regard to the claims in question. *See, supra,* Part II.A. of this Decision and Order. [28]

 **\*7**  For all these reasons, the Court finds that Plaintiff's proffered excuse does not constitute a special circumstance justifying his failure to exhaust his available administrative remedies before filing this action.

**ACCORDINGLY,** it is

**ORDERED** that Plaintiff's Second Amended Complaint (Dkt. No. 10) is ***DISMISSED* in its entirety without prejudice** for failure to exhaust his available administrative remedies before filing this action, pursuant to the PLRA; and it is further

**ORDERED** that the Clerk of the Court shall enter judgment for Defendants and close the file in this action.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 1235591

2010 WL 1235591

Footnotes

1    *See also White v. The State of New York,* 00-CV-3434, 2002 U . S. Dist. LEXIS 18791, at *6 (S.D.N.Y. Oct 3, 2002).

2    The Court uses the term "a certain number of days" rather than a particular time period because (1) since the three-step process was instituted, the time periods imposed by the process have changed, and (2) the time periods governing any particular grievance depend on the regulations and directives pending during the time in question.

3    *Groves v. Knight,* 05-CV-0183, Decision and Order at 3 (N.D.N.Y. filed Aug. 4, 2009) (Suddaby, J.).

4    7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *Hemphill v. New York,* 198 F.Supp.2d 546, 549 (S.D.N.Y.2002), *vacated and remanded on other grounds,* 380 F.3d 680 (2d Cir.2004); *see, e.g .,* DOCS Directive 4040 dated 8/22/03, ¶ VI.G. ("Absent [a time limit extension granted by the grievant], matters not decided within the time limits may be appealed to the next step.); *Pacheco v. Drown,* 06-CV-0020, 2010 WL 144400, at *19 & n. 21 (N.D.N.Y. Jan.11, 2010) (Suddaby, J.) ("It is important to note that any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can be appealed to the next level, including CORC, to complete the grievance process."), *accord, Torres v. Caron,* 08-CV-0416, 2009 WL 5216956, at *5 & n. 28 (N.D.N.Y. Dec.30, 2009) (Mordue, C.J.), *Benitez v. Hamm,* 04-CV-1159, 2009 WL 3486379, at *13 & n. 34 (N.D.N.Y. Oct.21, 2009) (Mordue, C.J.), *Ross v. Wood,* 05-CV-1112, 2009 WL 3199539, at *11 & n. 34 (N.D.N.Y. Sept.30, 2009) (Scullin, J.), *Sheils v. Brannen,* 05-CV-0135, 2008 WL 4371776, at *6 & n. 24 (N.D.N.Y. Sept.18, 2008) (Kahn, J.), *Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *15 & n. 46 (N.D.N.Y. June 20, 2008) (Hurd, J.), *McCloud v. Tureglio,* 07-CV-0650, 2008 WL 17772305, at *10 & n. 25 (N.D.N.Y. Apr. 15, 2008) (Mordue, C.J.), *Shaheen v. McIntyre,* 05-CV-0173, 2007 WL 3274835, at *14 & n. 114 (N.D.N.Y. Nov.5, 2007) (McAvoy, J.); *Nimmons v. Silver,* 03-CV-0671, Report-Recommendation, at 15-16 (N.D.N.Y. filed Aug. 29, 2006) (Lowe, M.J.) (recommending that the Court grant Defendants' motion for summary judgment, in part because plaintiff adduced no evidence that he appealed the lack of a timely decision by the facility's IGRC to the next level, namely to either the facility's superintendent or CORC), *adopted by* Decision and Order (N.D.N.Y. filed Oct. 17, 2006) (Hurd, J.); *Gill v. Frawley,* 02-CV-1380, 2006 WL 1742738, at *11 & n. 66 (N.D.N.Y. June 22, 2006) (McAvoy, J.) ("[A]n inmate's mere attempt to file a grievance (which is subsequently lost or destroyed by a prison official) is not, in and of itself, a reasonable effort to exhaust his administrative remedies since the inmate may still appeal the loss or destruction of that grievance."); *Walters v. Carpenter,* 02-CV-0664, 2004 WL 1403301, at *3 (S.D.N.Y. June 22, 2004) ("[M]atters not decided within the prescribed time limits must be appealed to the next level of review."); *Croswell v. McCoy,* 01-CV-0547, 2003 WL 962534, at *4 (N.D.N.Y. March 11, 2003) (Sharpe, M.J.) ("If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA."); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002) ("Even assuming that plaintiff never received a response to his grievance, he had further administrative avenues of relief open to him.").

5    *Compare Johnson v. Tedford,* 04-CV-0632, 616 F.Supp.2d 321, 326 (N.D.N.Y.2007) (Sharpe, J.) ("[W]hen a prisoner asserts a grievance to which there is no response, *and it is not recorded or assigned a grievance number,* administrative remedies may be completely exhausted, as there is nothing on record for the next administrative level to review.") [emphasis in original, and citations omitted] *with Waters v. Schneider,* 01-CV-5217, 2002 WL 727025, at *2 (S.D.N.Y. Apr.23, 2002) (finding that, in order to exhaust his available administrative remedies, plaintiff had to file an appeal with the superintendent from the IGRC's non-response to his grievance, of which no record existed).

6    *See, e.g., Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *16, 18 (N.D.N.Y. June 20, 2008) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.) (finding that, in order to exhaust his available administrative remedies with regard to his grievance of August 30, 2000, plaintiff had to file an appeal with the superintendent from the IGRC's non-response to that grievance, which included a failure to acknowledge the receipt of the grievance and assign it a number); *Midalgo v. Bass,* 03-CV-1128, 2006 WL 2795332, at *7 (N.D.N.Y. Sept.26, 2006) (Mordue, C.J., adopting Report-Recommendation of Treece, M.J.) (observing that plaintiff was "requir[ed]" to seek an appeal to the superintendent, even though he never received a response to his grievance of April 26, 2003, which was never assigned a grievance number); *Collins v. Cunningham,* 06-CV-0420, 2009 WL 2163214, at *3, 6 (W.D.N.Y. July 20, 2009) (rejecting plaintiff's argument that his administrative remedies were not available to him where his grievance of March 20, 2004, was not assigned a grievance number); *Veloz v. New York,* 339 F.Supp.2d 505, 515-16 (S.D.N.Y.2004) (rejecting inmate's argument that the prison's grievance procedure had been rendered unavailable to him by the practice of prison officials' losing or destroying his grievances, because, *inter alia,* "there was no evidence whatsoever that any of [plaintiff's] grievances were filed with a grievance clerk," and he should have "appeal[ed] these claims to the next level once it became clear to him that a response to his initial filing was not forthcoming"); *cf. Hernandez v. Coffey,* 582 F.3d 303, 305, 309, n. 3 (2d Cir.2009) ("Our ruling in no way suggests that we agree with Hernandez's arguments regarding exhaustion or justification for failure

to exhaust [which included an argument that the Inmate Grievance Program was not available to him because, when he filed a grievance at the first stage of the Program, he received no response and his grievance was not assigned a grievance number].").

7    The Court recognizes that the Supreme Court's decision in *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006), may have changed the law regarding possible exceptions to the exhaustion requirement (and thus the possibility that exhaustion might occur through the disciplinary process). Specifically, in *Woodford,* the Supreme Court held that the PLRA required "proper" exhaustion as a prerequisite to filing a section 1983 action in federal court. *Woodford,* 548 U.S. at 93. "Proper" exhaustion means that the inmate must complete the administrative review process *in accordance with the applicable procedural rules,* as a prerequisite to bringing suit in federal court. *Id.* at 88-103 (emphasis added). It is unclear whether *Woodford* has overruled any decisions that recognize "exceptions" to the exhaustion requirement. Out of special solicitude to Plaintiff, the Court will assume that *Woodford* has not overruled the Second Circuit's *Giano-Testman* line of cases.

8    *Giano,* 380 F.3d at 678 ("[W]hile Giano was required to exhaust available administrative remedies before filing suit, his failure to do so was justified by his reasonable belief that DOCS regulations foreclosed such recourse."); *Testman,* 380 F.3d at 696-98 (remanding case so that district court could consider, *inter alia,* whether prisoner was justified in believing that his complaints in the disciplinary appeal procedurally exhausted his administrative remedies because the prison's remedial system was confusing).

9    *Testman,* 380 F.3d at 696-98 (remanding case so that district court could consider, *inter alia.* whether prisoner's submissions in the disciplinary appeals process exhausted his remedies "in a substantive sense" by "afford[ing] corrections officials time and opportunity to address complaints internally"); *Chavis v. Goord,* 00-CV-1418, 2007 WL 2903950, at *9 (N.D.N.Y. Oct.1, 2007) (Kahn, J.) ("[T]o be considered proper, exhaustion must occur in both a substantive sense, meaning that prison officials are somehow placed on notice of an inmate's complaint, and procedurally, in that it must be presented within the framework of some established procedure that would permit both investigation and, if appropriate, remediation.") [citation omitted]. The Court joins the above-described two requirements in the conjunctive because the Second Circuit has recognized that mere notice to prison officials through informal channels, without more, does not suffice to satisfy the PLRA procedural exhaustion requirement. *See Macias v. Zenk,* No. 04-6131, 495 F.3d 37, at *43-44 (2d Cir.2007) (recognizing that *Woodford v. Ngo,* 548 U.S. 81 [2006], overruled *Braham v. Casey,* 425 F.3d 177 [2d Cir.2005], to the extent that *Braham* held that "informal complaints" would suffice to exhaust a claim).

10   *See, e.g., Reynoso v. Swezey,* 423 F.Supp.2d 73, 75 (W.D.N.Y.2006), *aff'd,* 238 F. App'x 660 (2d Cir.2007) (unpublished order), *cert. denied,* 552 U.S. 1207, 128 S.Ct. 1278, 170 L.Ed.2d 109 (2008); *Holland v. James,* 05-CV-5346, 2009 WL 691946, at *3 (S.D.N.Y. March 6, 2009); *Winston v. Woodward,* 05-CV-3385, 2008 WL 2263191, at *10 (S.D.N.Y. May 30, 2008); *cf. Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *5 & n. 23 (N.D.N.Y. July 11, 2007) (McAvoy, J.) (reciting this point of law in context of failure to appeal grievance determination to CORC).

11   *See, e.g., Johnson v. Barney,* 04-CV-10204, 2007 WL 2597666, at *2 (S.D.N.Y. Aug.30, 2007); *Reynoso,* 423 F.Supp.2d at 75-76.

12   *See, e.g., Reynoso,* 423 F.Supp.2d at 75 ("There is no evidence that plaintiff was confused or misled about the proper method for raising his claims. In fact, the record shows exactly the opposite: plaintiff did file a grievance about the incident. He simply failed to appeal the denial of that grievance to CORC."); *Tapp v. Kitchen,* 02-CV-6658, 2004 WL 2403827, at *9 (W.D.N.Y. Oct.26, 2004) ("In the instant case, however, plaintiff does not and cannot claim to have believed that his only available remedy was to raise his complaint as part of his disciplinary hearing, since he also filed a grievance with the Inspector General, and also claims to have filed both an inmate grievance and a separate complaint with the facility superintendent."); *cf. Muniz,* 2007 WL 2027912, at *5 & n. 23 ("Plaintiff's Complaint alleges facts indicating that he believed it necessary to file a grievance with the Gouverneur C.F. IGRC and to appeal the denial of that grievance to the Gouverneur C.F. Superintendent. Why would he not also believe it necessary to take the next step in the exhaustion process and appeal the Superintendent's decision to CORC?").

13   *See, e.g., Petrusch v. Oliloushi,* 03-CV-6369, 2005 WL 2420352, at *5 (W.D.N.Y. Sept.30, 2005) ("[A]s to his grievance, which is the subject of this lawsuit, plaintiff does not appear to be contending that he believed the Superintendent's denial constituted exhaustion, since by initially claiming that he did appeal to CORC, albeit without proof, he has demonstrated his knowledge of the correct procedure for exhaustion.").

14   *See, e.g., Benjamin v. Comm'r N.Y. State DOCS,* 02-CV-1703, 2007 WL 2319126, at *14 (S.D.N.Y. Aug.10, 2007) ("Benjamin cannot claim that he believed that appealing his disciplinary proceeding was the only available remedy at his disposal in light of the numerous grievances he has filed during his incarceration at Green Haven [both before and after the incident in question]."), *vacated in part on other grounds,* No. 07-3845, 293 F. App'x 69 (2d Cir.2008).

Case 9:15-cv-01542-MAD-DEP    Document 79    Filed 02/14/18    Page 152 of 227
Murray v. Palmer, Not Reported in F.Supp.2d (2010)
2010 WL 1235591

15    *See, e.g., Chavis,* 2007 WL 2903950, at *9 ("The focus of a disciplinary hearing is upon the conduct of the inmate, and not that of prison officials.... While the mention of a constitutional claim during plaintiff's disciplinary hearing could potentially have satisfied his substantive exhaustion requirement by virtue of his having notified prison officials of the nature of his claims, he did not fulfill his procedural exhaustion requirement [under the circumstances due to his] ... mere utterance of his claims during the course of a disciplinary hearing .... [T]here is nothing in the record to suggest that when the issues of interference with plaintiff's religious free exercise rights or alleged retaliation for having voiced his concerns were in any way investigated by prison officials.") [citations omitted].

16    *See, e.g., Colon v. Furlani,* 07-CV-6022, 2008 WL 5000521, at *2 (W.D.N.Y. Nov.19, 2008) ("Colon was found guilty of harassment based on a letter that he wrote to defendant Bordinaro, concerning some of the events giving rise to his failure-to-protect claim, but it does not appear that he appealed that disposition.... While under some circumstances an inmate may be able to satisfy the exhaustion requirement by appealing from a disciplinary hearing decision ..., plaintiff did not do so here, and this claim is therefore barred under the PLRA.") [citations omitted]; *Cassano v. Powers,* 02-CV-6639, 2005 WL 1926013, at *5 (W.D.N.Y. Aug.10, 2005) ("[E]ven assuming plaintiff believed that his proper recourse was to raise [his] complaint at his disciplinary hearing, rather than using the Inmate Grievance Program, he did not exhaust that process. That is, plaintiff has not provided any evidence that he appealed his Tier III hearing conviction. Since plaintiff did not pursue even the disciplinary appeal process, he can not have made submissions in the disciplinary process that were sufficient, in a substantive sense, to exhaust his remedies under § 1997e(a).") [internal quotation marks and citation omitted].

17    *See Hemphill,* 380 F.3d at 686 (describing the three-part inquiry appropriate in cases where a prisoner plaintiff plausibly seeks to "counter" defendants' contention that the prisoner failed to exhaust his available administrative remedies under the PLRA); *Verley v. Wright,* 02-CV-1182, 2007 WL 2822199, at *8 (S.D.N.Y. Sept.27, 2007) ("[P]laintiff has failed to demonstrate that the administrative remedies were not, in fact, 'actually available to him.' "); *Winston v. Woodward,* 05-CV-3385, 2008 WL 2263191, at *10 (S.D.N.Y. May 30, 2008) (finding that the plaintiff "failed to meet his burden under *Hemphill* of demonstrating 'special circumstances' "); *see also Ramirez v. Martinez,* 04-CV-1034, 2009 WL 2496647, at *4 (M.D.Pa. Aug.14, 2009) ("In order to effectively oppose defendants' exhaustion argument, the plaintiff has to make a showing in regard to each of his claims."); *Washington v. Proffit,* 04-CV-0671, 2005 WL 1176587, at *1 (W.D.Va. May 17, 2005) ("[I]t is plaintiff's duty, at an evidentiary hearing, "to establish by a preponderance of the evidence that he had exhausted his administrative remedies or that any defendant had hindered or prevented him from doing so within the period fixed by the Jail's procedures for filing a grievance.").

18    *See, e.g., Lunney v. Brureton,* 04-CV-2438, 2007 WL 1544629, at *10 n. 4 (S.D.N.Y. May 29, 2007) ("There is certainly case law that supports the view that exhaustion should be determined by the Court rather than by a jury. As the Supreme Court has recently affirmed, however, exhaustion is an 'affirmative defense,' much like a statute of limitations defense. Where there are disputed factual questions regarding an affirmative defense such as a statute of limitations defense, the Second Circuit has stated that 'issues of fact as to the application of that defense must be submitted to a jury.' Thus, it is not clear that factual disputes regarding the exhaustion defense should ultimately be decided by the Court."); *Finch v. Servello,* 06-CV-1448, 2008 WL 4527758, at *8 n. 5 (N.D.N.Y. Sept.29, 2008) (McAvoy, J.) (citing *Lunney* and noting that "it is not clear that factual disputes regarding the exhaustion defense should ultimately be decided by the Court").

19    *See, e.g., Harrison v. Goord,* 07-CV-1806, 2009 WL 1605770, at *7 n. 7 (S.D.N.Y. June 9, 2009) (recognizing that "[t]here is authority ... for the position that where questions of fact exist as to whether a plaintiff has exhausted administrative remedies, such fact questions are for the Court, rather than a jury, to decide ...."); *Amador v. Superintend. of. Dept. of Corr. Servs.,* 03-CV-0650, 2007 WL 4326747, at *5 n. 7 (S.D.N.Y. Dec.4, 2007) ("It is unclear whether factual disputes regarding the exhaustion defense should ultimately be decided by the court or by a jury.... [T]here is ... case law ... supporting the view that exhaustion should be determined by the court and not a jury."), *appeal pending,* No. 08-2079-pr (2d Cir. argued July 15, 2009).

20    *See, e.g., Mastroianni v. Reilly,* 602 F.Supp.2d 425, 438 (E.D.N.Y.2009) (noting that the magistrate judge held an evidentiary hearing "on the issue of exhaustion"); *Sease v. Phillips,* 06-CV-3663, 2008 WL 2901966, *3 n. 2 (S.D.N.Y. July 25, 2008) (finding that "the better approach is for the judge, and not the jury, to decide any contested issues of fact relating to the defense of failure to exhaust administrative remedies."); *Amador,* 2007 WL 4326747, at *5 n. 7 ("[T]here is ... case law, which in my view is more persuasive and on point, supporting the view that exhaustion should be determined by the court and not a jury. I find it proper that this issue be decided by the court."); *Enigwe v. Zenk,* 03-CV-0854, 2006 WL 2654985, at *4 (E.D.N.Y. Sept.15, 2006) (finding that, at the summary judgment "stage of the proceedings, a genuine question of fact exists with respect to whether [plaintiff] should be excused from exhausting his administrative remedies with regard to claims relating to his confinement at MDC Brooklyn," and therefore "direct[ing]" that a hearing

be held" before a judge, to resolve this issue); *Dukes v. S.H.U. C.O. John Doe # 1,* 03-CV-4639, 2006 WL 1628487, at *6 (S.D.N.Y. June 12, 2006) (ordering an "evidentiary hearing [before a judge] on the issue of whether prison officials failed to assign grievance numbers to [plaintiff]'s grievances and, if so, whether that rendered further administrative remedies unavailable, estopped the Defendants from asserting non-exhaustion, or justified [plaintiff]'s failure to appeal to the CORC"); *Mingues v. Nelson,* 96-CV-5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb.20, 2004) ("The Court could have *sua sponte* dismiss[ed] this action as the record is unmistakeably clear that an appropriate administrative procedure was available to him, that he was required to exhaust his administrative remedies, and that he failed to do so as required by the PLRA.... In this case, plaintiff has been afforded notice and given an opportunity to respond to the exhaustion issue and his failure remains clear."); *Roland v. Murphy,* 289 F.Supp.2d 321, 323 (E.D.N.Y.2003) "[W]hether the plaintiff has exhausted his administrative remedies is a question for the Court to decide as a matter of law." [internal quotation marks and citation omitted]; *Evans v. Jonathan,* 253 F.Supp.2d 505, 509 (W.D.N.Y.2003) ( "[W]hether the plaintiff has exhausted his administrative remedies is a question for the Court to decide as a matter of law.").

21    *See, e.g., Snider v. Melindez,* 199 F.3d 108, 113-14 (2d Cir.1999) ("Whether an administrative remedy was available to a prisoner in a particular prison or prison system, and whether such remedy was applicable to the grievance underlying the prisoner's suit, are not questions of fact. They either are, or inevitably contain, questions of law. Where administrative remedies are created by statute or regulation affecting the governance of prisons, the existence of the administrative remedy is purely a question of law. The answer depends on the meaning of the relevant statute or regulation."), *accord, Mojias v. Johnson,* 351 F.3d 606, 608-11 (2d Cir.2003) (citing relevant language from *Snider v. Melindez,* and later stating that a district court could *sua sponte* dismiss a prisoner's civil rights complaint for failure to exhaust his available administrative remedies if it gave him notice and an opportunity to be heard); *DeBlasio v. Moriarty,* 05-CV-1143, Minute Entry (N.D.N.Y. filed Dec. 9, 2008) (McCurn, J.) (indicating that judge held pre-trial evidentiary hearing on whether plaintiff had exhausted administrative remedies before filing action); *Pierre v. County of Broome,* 05-CV-0332, 2007 WL 625978, at *1 n. 1 (N.D.N.Y. Feb.23, 2007) (McAvoy, J.) (noting that "[t]he court held an evidentiary hearing on October 25, 2006 concerning the issue of whether Plaintiff had exhausted administrative remedies"); *Hill v. Chanalor,* 419 F.Supp.2d 255, 257-59 (N.D.N.Y. March 8, 2006) (Kahn, J.) (*sua sponte* dismissing a prisoner's civil rights complaint, pretrial, for failure to exhaust his available administrative remedies after it gave him notice and an opportunity to be heard); *Raines v. Pickman,* 103 F.Supp.2d 552, 555 (N.D.N.Y.2000) (Mordue, J.) ("[I]n order for the Court to dismiss for failing to exhaust administrative remedies, the Court must be shown that such a remedy exists for an inmate beating in the grievance context. This is an issue of law for the Court to determine.").

22    *See Casanova v. Dubois,* 289 F.3d 142, 147 (1st Cir.2002); *Hill v. Smith,* 186 F. App'x 271, 273-74 (3d Cir.2006); *Mitchell v. Horn,* 318 F.3d 523, 529 (3d Cir.2003); *Anderson v. XYZ Corr. Health Servs., Inc.,* 407 F.3d 674, 682-83 (4th Cir.2005); *Dillon v. Rogers,* No. 08-30419, 2010 WL 378306, at *7 (5th Cir. Feb.4, 2010); *Taylor v. U.S.,* 161 F. App'x 483, 486 (6th Cir.2005); *Larkins v. Wilkinson,* 172 F.3d 48, at *1 (6th Cir.1998); *Husley v. Belken,* 57 F. App'x 281, 281 (8th Cir.2003); *Ponder v. Wackenhut Corr. Corp.,* 23 F. App'x 631, 631-32 (8th Cir.2002); *Wyatt v. Terhune,* 315 F.3d 1108, 1119-20 (9th Cir.2003), *cert. denied,* 540 U.S. 810 (2003); *Freeman v. Watkins,* 479 F.3d 1257, 1260 (10th Cir.2007); *Alloway v. Ward,* 188 F. App'x 663, 666 (6th Cir.2006); *Bryant v. Rich,* 530 F.3d 1368, 1373-76 (11th Cir.), *cert. denied,* --- U.S. ----, 129 S.Ct. 733, 172 L.Ed.2d 734 (2008).

23    The Court notes that, in his Complaint, Plaintiff also swore that his "grievance was denied." (Dkt. No. 1, ¶ 4.b.ii.) However, during the exhaustion hearing, Plaintiff testified that he never received a response to his grievance from any member of DOCS.

24    In addition, the documentary evidence adduced at the hearing establishes that, in actuality, Plaintiff filed ten other grievances during this time period (and several appeals from the denials of those grievances). The first of these grievances (Grievance Number GM-30651-00), filed on August 25, 2000, regarded Plaintiff's request for medications. (Hearing Exs. D-4, D-5.) The second of these grievances (Grievance Number GM-30691-00), filed on September 1, 2000, regarded Plaintiff's request for copies. (Hearing Ex. D-4.) The third of these grievances (Grievance Number GM-30729-00), filed on September 11, 2000, regarded the use of full restraints against Plaintiff. (*Id.; see also* Hearing Ex. P-14.) The fourth of these grievances, filed on October 19, 2000 (Grievance Number GM-30901-00), regarded Plaintiff's request for the repair of his cell sink. (Hearing Exs. D-4, D-5.) The fifth of these grievances (Grievance Number GM-30901-00), also filed on October 19, 2000, regarded Plaintiff's request for the clean up of his cell. (Hearing Ex. D-4.) The sixth of these grievances (Grievance Number GM-31040-00), filed on November 17, 2000, regarded the review of records. (*Id.*) The seventh of these grievances (Grievance Number GM-31041-00), also filed on November 17, 2000, regarded Plaintiff's request for medical attention. (*Id.; see also* Hearing Ex. P-13) The eighth of these grievances (Grievance Number GM-31048-00), filed on November 20, 2000, regarded the rotation of books. (Hearing Ex. D-14) The ninth of these grievances (Grievance

Case 9:15-cv-01542-MAD-DEP    Document 79    Filed 02/14/18    Page 154 of 227
Murray v. Palmer, Not Reported in F.Supp.2d (2010)

2010 WL 1235591

Number GM-31040-00), filed on November 27, 2000, regarded the review of records (and was consolidated with his earlier grievance on the same subject). (*Id.*) The tenth of these grievances (Grievance Number GM-31070-00), filed on November 27, 2000, regarded Plaintiff's eyeglasses. (*Id.*)

25    For example, Plaintiff was unable to identify the corrections officers to whom he handed his grievance and appeals for mailing. (*Id.* at 127-34.) Moreover, Plaintiff did not convincingly explain why the grievance and appeals at issue in this action did not make it through the mailing process, while his numerous other grievances and appeals did make it through the mailing process. (*Id.* at 154-171.) In addition, Plaintiff acknowledged that it was his belief, during this time period, that an inmate was not required to exhaust his administrative remedies in matters involving the use of excessive force; yet, according to Plaintiff, he decided to exhaust his administrative remedies on his excessive force claim anyway. (*Id.* at 148-49.)

26    See *Ruggiero v. County of Orange,* 467 F.3d 170, 178 (2d Cir.2006) (holding that defendants were not estopped from asserting the affirmative defense of non-exhaustion where the conduct plaintiff alleged kept him from filing a grievance-that he was not given the manual on how to grieve-was not attributable to the defendants and plaintiff "point[ed] to no affirmative act by prison officials that would have prevented him from pursuing administrative remedies"); *Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *19 (N.D.N.Y. June 20, 2008) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.) ("I have found no evidence sufficient to create a genuine issue of triable fact on the issue of whether Defendants, *through their own actions,* have inhibited Plaintiff exhaustion of remedies so as to estop one or more Defendants from raising Plaintiff's failure to exhaust as a defense.") [emphasis in original]; *Shaheen v. McIntyre,* 05-CV-0173, 2007 WL 3274835, at *16 (N.D.N.Y. Nov.5, 2007) (McAvoy, J. adopting Report-Recommendation of Lowe, M.J.) (finding defendants not estopped from raising Plaintiff's non-exhaustion as a defense based on plaintiff's allegation "that [he] was inhibited (through non-responsiveness) by [ ] unnamed officials at Coxsackie C.F.'s Inmate Grievance Program (or perhaps the Grievance Review Committee), and Coxsackie C.F. Deputy Superintendent of Security Graham" because plaintiff's complaint and "opposition papers ... fail to contain any evidence placing blame on Defendants for the (alleged) failure to address his grievances and complaint letters"); *Smith v. Woods,* 03-CV-0480, 2006 WL 1133247, at *16 (N.D.N.Y. Apr.24, 2006) (Hurd, J. adopting Report-Recommendation of Lowe, M.J.) (finding that defendants are not estopped from relying on the defense of non-exhaustion because "no evidence (or even an argument) exists that any Defendant ... inhibit[ed] Plaintiff's exhaustion of remedies; Plaintiff merely argues that a non-party to this action (the IGRC Supervisor) advised him that his allegedly defective bunk bed was not a grievable matter."); *cf. Warren v. Purcell,* 03-CV-8736, 2004 WL 1970642, at *6 (S.D.N.Y. Sept.3, 2004) (finding that conflicting statements [offered by a non-party]-that the prisoner needed to refile [his grievance] and that the prisoner should await the results of DOCS's investigation-estopped the defendants from relying on the defense on non-exhaustion, or "[a]lternatively, ... provided ... a 'special circumstance' under which the plaintiff's failure to pursue the appellate procedures specified in the IGP was amply justified."); *Brown v. Koenigsmann,* 01-CV-10013, 2005 WL 1925649, at *1-2 (S.D.N.Y. Aug.10, 2005) ("Plaintiff does not assert that Dr. Koeingsmann personally was responsible for [the failure of anyone from the Inmate Grievance Program to address plaintiff's appeal. [However,] *Ziemba [v. Wezner,* 366 F.3d 161 (2d Cir.2004) ] does not require a showing that Dr. Koenigsmann is personally responsible for plaintiff's failure to complete exhaustion [in order for Dr. Koenigsmann to be estopped from asserting the affirmative defense of failure to exhaust administrative remedies], as long as someone employed by DOCS is. If that reading of Ziemba is incorrect, however, ... then the circumstances here must be regarded as special, and as justifying the incompleteness of exhaustion, since a decision by CORC is hardly something plaintiff could have accomplished on his own.").

27    See, e.g., *Sandlin v. Poole,* 575 F.Supp.2d 484, 488 (W.D.N.Y.2008) (noting that "refusal to accept or forward plaintiff's appeals ... effectively render[s] the grievance appeal process unavailable to him").

28    The Court notes that, even if Plaintiff did (as he testified) hand to a corrections officer for mailing a letter to the Superintendent on September 13, 2000, appealing from the IGRC's failure to decide his grievance of August 22, 2000, within nine working days (i.e., by September 5, 2000), it appears that such an appeal would have been filed two days too late under DOCS Directive 4040, which requires that appeal to be filed within four working days of the IGRC's failure to decide his grievance (i.e., by September 11, 2000). (*See* Hearing Tr. 127-34; Hearing Ex. P-1, at 5-7 [attaching ¶¶ V.A, V.B. of DOCS Directive 4040, dated 6/8/98].)

---

**End of Document**                                            © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 2847304
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

LaCream NEWMAN, Plaintiff,

v.

George B. DUNCAN, Superintendent of Great
Meadow Correctional Facility; David Carpenter,
Deputy Superintendent; Patrick Vanguilder,
Deputy Superintendent of Security; William
Mazzuca, Superintendent of Fishkill Correctional
Facility; R. Ercole, Deputy Superintendent of
Security; J. Conklin, Corrections Sergeant; and
John Doe, Corrections Officer, Defendants.

No. 04-CV-395 (TJM/DRH).
|
Sept. 26, 2007.

**Attorneys and Law Firms**

LaCream Newman, Auburn, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the
State of New York, Charles J. Quackenbush, Esq.,
Assistant Attorney General, of Counsel, Albany, NY, for
Defendants.

**Opinion**

**DECISION & ORDER**

THOMAS J. McAVOY, Senior United States District
Judge.

**I. INTRODUCTION**

**\*1** This *pro se* action brought pursuant to 42 U.S.C.
§ 1983 was referred to the Hon. David R. Homer,
United States Magistrate Judge, for a Report and
Recommendation pursuant to 28 U.S.C. § 636(b) and
Local Rule 72.3(c). No objections to the Report-
Recommendation and Order dated September 6, 2007
have been filed. Furthermore, after examining the
record, this Court has determined that the Report-
Recommendation and Order is not subject to attack for
plain error or manifest injustice. Accordingly, the Court
adopts the Report-Recommendation and Order for the
reasons stated therein.

It is therefore,

**ORDERED** that

(1) Defendants' motion for summary judgment (Docket
No. 36) is **GRANTED** as to defendants Duncan,
Carpenter, VanGuilder, Mazzuca, Ercole, and Conklin
and as to all of Newman's causes of action;

(2) The complaint is **DISMISSED** without prejudice as to
defendant John Doe; and

(3) This action is **TERMINATED** in its entirety as to all
defendants and all claims.

**IT IS SO ORDERED**

**REPORT-RECOMMENDATION AND ORDER** [1]

DAVID R. HOMER, U.S. Magistrate Judge.

Plaintiff pro se LaCream Newman ("Newman"), an
inmate in the custody of the New York State Department
of Correctional Services ("DOCS"), brings this action
pursuant to 42 U.S.C. § 1983 alleging that defendants,
seven DOCS employees, violated his constitutional rights
under the Eighth and Fourteenth Amendments. [2] *See*
Compl. (Docket No. 1). Presently pending is defendants'
motion for summary judgment pursuant to Fed.R.Civ.P.
56. Docket No. 36. Newman opposes the motion. Docket
No. 41. For the following reasons, it is recommended that
defendants' motion be granted.

**I. Background**

The facts are presented in the light most favorable to
Newman as the non-moving party. *See Ertman v. United
States,* 165 F.3d 204, 206 (2d Cir.1999).

On October 23, 2002, Newman was being transferred from
Great Meadow Correctional Facility ("Great Meadow")
to Fishkill Correctional Facility's ("Fishkill") Special
Housing Unit ("SHU"). [3] *See* Pelc. Aff. (Docket No.
36), Ex. B. Before arriving at Fishkill, Newman was
temporarily housed at Downstate Correctional Facility
("Downstate"). *Id.* While being housed at Downstate,

an inmate attempted to sexually assault Newman. *See* Compl. at ¶ 7. On October 24, 2002, Newman was transferred from Downstate to Fishkill. *See* Pelc. Aff., Ex. B. Upon arrival at Fishkill, Newman was assigned to a double occupancy cell. *See* Compl. at ¶ 10. On October 29, 2002, an inmate again attempted to sexually assault Newman. *See* Compl. at ¶ 12; *see also* Harris Aff. (Docket No. 36) at Ex. A. On November 15, 2002, Newman was transferred to Clinton Correctional Facility ("Clinton"). *See* Pelc. Aff., Ex. B. This action followed.

## II. Discussion

Newman asserts six causes of action, each alleging that defendants' failure to house Newman in a single occupancy cell constituted cruel and unusual punishment under the Eighth Amendment. Defendants seek judgment on all claims.

## A. Standard

**\*2** A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.* 22 F.3d 1219, 1223-24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988). When, as here, a party

seeks summary judgment against a pro se litigant, a court must afford the non-movant special solicitude. *Id.; see also Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U .S. at 247-48.

## B. Exhaustion

Defendants contend that Newman has failed to demonstrate any reasonable excuse for failing to exhaust his administrative remedies as to his Eighth Amendment claim. *See* Defs. Mem. of Law (Docket No. 36) at 6-11. Newman contends that he failed to exhaust his administrative remedies after the attempted sexual assaults because (1) he was threatened by John Doe; (2) he was in transit between DOCS facilities; and (3) he was dealing with the mental and emotional effects of the attempted assaults. *See* Pl. Reply Mem. of Law (Docket No. 41) at 1-3.

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), subjects suits concerning prison conditions brought under federal law to certain prerequisites. Specifically, the PLRA dictates that a prisoner confined to any jail, prison, or correctional facility must exhaust all available administrative remedies prior to bringing any suit concerning prison life, " 'whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.' " *Ziemba v. Wezner,* 366 F.3d 161, 163 (2d Cir.2004) (quoting *Porter v. Nussle,* 534 U.S. 516, 532 (2002)); *see also Jones v. Bock,* 127 S.Ct. 910, 918-19 (2007) ( "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court.") (citation omitted)); *Woodford v. Ngo,* 126 S.Ct. 2378, 2382-83 (2006). Administrative remedies include all appellate remedies provided within the system, not just those that meet federal standards. *Woodford,* 126 S.Ct. at 2382-83. However, the Second Circuit has recognized three exceptions to the PLRA's exhaustion requirement: [4]

**\*3** when (1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as

to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement.

*Ruggiero,* 467 F.3d at 175 (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004))

"The PLRA's exhaustion requirement is designed to 'afford [ ] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " *Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004) (quoting *Porter,* 534 U.S. at 524-25)). " '[A] grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought.' " *Id.* (quoting *Strong v. David,* 297 F.3d 646, 650 (7th Cir.2002)). Inmates must provide sufficient information to "allow prison officials to take appropriate responsive measures." *Id.*

DOCS has established a grievance procedure which includes a three-stage review and appeal process. *See* N.Y. Correct. Law § 139 (McKinney 2003); N.Y. Comp.Codes R. & Regs. tit. 7, § 701.1-.16 (2003);[5] *Hemphill,* 380 F.3d at 682-83. When an inmate files a grievance, it is investigated and reviewed by an Inmate Grievance Resolution Committee ("IGRC"). If the grievance cannot be resolved informally, a hearing is held. The IGRC decision may be appealed to the Superintendent of the facility. Finally, an inmate may appeal the Superintendent's decision to the Central Office Review Committee ("CORC"). N.Y. Comp.Codes R. & Regs. tit.7, § 701.7(c).

Here, it is undisputed that Newman's first attempt to file a grievance regarding the alleged sexual assaults did not occur until September 21, 2003, nearly one year after the alleged assaults. *See* Pl. Reply Statement of Material Facts (Docket No. 41) at Ex. 2; *see also* Newman Dep. (Ullman Decl. at Ex. 1, Docket No. 36) at 85-87. In his complaint, Newman contends that he failed to file a timely complaint due to "fear." *See* Pl. Reply Statement of Material Facts at Ex. 2. However, the Inmate Grievance Program ("IGP") supervisor at Clinton rejected Newman's attempt to file his complaint as a grievance because Newman failed to "expand on what/who caused the 'fear.' " *Id.* The IGP supervisor also noted that Newman had been housed at Clinton for the previous nine months and, thus, had "ample opportunity to file [his] complaint before [September 2003]." *Id.* Newman attempted to file an appeal of the

IGP supervisor's decision to the Superintendent, but the supervisor advised Newman "[t]here is no provision to appeal the IGP Supervisors decision (to not accept a grievance) to the Superintendent. You may file a separate grievance on the determination by submitting it to the IGRC office." *Id.*

**\*4** On or about October 15, 2003, Newman filed a grievance requesting that the October 10, 2003 decision of the IGP supervisor be reversed. *See* Ullman Decl. (Docket No. 36) at Exs. 5 & 6. Newman alleged that the following "mitigating circumstances" prevented him from filing a timely grievance regarding the October 2002 sexual assaults: "1. I was in transit within the 14 days of the incident; to a number of correctional facilities; in addition to MHU within NYS DOCS; 2. I was confronted with fear (threats); which was made by CO's at Fishkill SHU 200 which I wasn't to make mention of the situation and that he could cause me to be placed in the same situation again and no on[e] would help me." *Id.* The IGRC denied Newman's grievance, finding that "[Newman] has been in [Clinton] since Dec. 2002 which gave him adequate time to file complaint which would have been accepted if filed then. Grievant did not provide mitigating circumstances to warrant the acceptance of complaint." Ullman Decl., Ex. 5 at 4. The Superintendent and CORC both denied Newman's appeals, finding that Newman had failed to present mitigating circumstances to excuse his delay in submitting the complaint. *See* Ullman Decl, Exs. 7 & 8.

In claiming that his non-exhaustion should be excused, Newman makes three arguments. First, he contends that a corrections officer at Fishkill (John Doe) threatened him, warning that if Newman reported the October 29, 2002 sexual assault then he would be placed back in the "same predicament" he was in before. *See* Newman Dep. at 83. However, Newman was transferred to Clinton in November 2002 and, thus, could have immediately filed a grievance now that he was separated from the officer who threatened him. *See* Pelc Decl. (Docket No. 36) at Ex. B. Further, Newman testified that he felt "safe" while at Clinton, demonstrating that any fear he may have had surrounding the filing of a grievance was left behind at Fishkill. *See* Newman Dep. at 66. Moreover, Newman ultimately did file a grievance while at Clinton. *See* Ullman Decl., Exs. 5 & 6. Thus, Newman's first argument for failure to properly exhaust is not persuasive.

Second, Newman contends that his frequent transfers between DOCS facilities within fourteen days of the sexual assaults prevented him from timely filing a grievance. However, this argument is not persuasive because DOCS regulations state that "[e]ach correctional facility housing a reception/classification/transit inmate population shall insure all inmates access to the IGP." N.Y. Comp.Codes R. & Regs. tit.7, § 701.14. Further, Newman arrived at Clinton on November 15, 2003 and was not moved to another DOCS facility until November 19, 2003, thus affording him nearly a year where he was not "in transit." See Pelc. Decl. at Ex. B.

Third, Newman contends that this Court should apply the "special circumstances" exception under Hemphill because he was dealing with the mental and emotional effects of the sexual assaults, thus preventing his filing of a grievance. See Newman Dep. at 83-84; Pl. Reply Mem. of Law at 2-3; see also Hemphill, 380 F.3d at 686. However, the special circumstances exception under Hemphill concerned an inmate's justifiable confusion regarding the proper DOCS procedure for filing an expedited grievance, not an inmate's mental or emotional condition. See Hemphill, 380 F.3d at 689-91. Thus, absent any documented mental illness that prevented Newman from filing a grievance, his third argument excusing his failure to timely exhaust his administrative remedies is not persuasive. [6]

**\*5** Therefore, it is recommended that defendants' motion on this ground be granted.

## C. Eighth Amendment [7]

Newman contends that defendants knew or should have know that he was a homosexual and that his placement in a double occupancy cell "facilitated ... the cause for the incident of attempted rape/physical assault that occurred to plaintiff therein at Fishkill SHU 200, on or about 10/29/02." Compl. at ¶¶ 15, 17, 19, 21, 23.

Prison officials have a duty to protect inmates from violence by other inmates. See Farmer v. Brennan, 511 U.S. 825, 833 (1994). When asserting a failure to protect claim, an inmate must establish that he was "incarcerated under conditions posing a substantial risk of serious harm" and that the defendants acted with deliberate indifference to the inmate's safety. Id. at 834. Deliberate indifference is

established when the official knew of and disregarded an excessive risk to inmate health or safety. Id. at 837. However, "the issue is not whether [a plaintiff] identified his enemies by name to prison officials, but whether they were aware of a substantial risk of harm to [him]." Hayes v. New York City Dep't of Corr., 84 F.3d 614, 621 (2d Cir.1991).

Here, Newman contends that on two separate occasions, fellow inmates "attempted to rape/physical[ly] assault" him. See Compl. at ¶¶ 7, 11, 15, 17, 19, 21, 23. However, it is undisputed that Newman did not suffer any actual injury [8] from these attempted assaults. See Defs. Statement of Material Facts (Docket No. 36) at ¶¶ 71-76; Pl. Reply Statement of Facts at ¶¶ 71-76; see also Newman Dep. at 31-32, 35-37, 41-42, 68-74, 95-96; Harris Aff. at Ex. A. The law is clear that an inmate must demonstrate an "actual injury" when alleging a constitutional violation. See Brown v. Saj, No. Civ. 06-6272(DGL), 2007 WL 1063011, at \*2 (W.D.N.Y. Apr. 5, 2007) (citing Lewis v. Casey, 518 U.S. 343, 349 (1996)). These two isolated incidents, coupled with Newman's failure to allege any injury resulting from the attempted sexual assaults, fail to demonstrate a constitutional violation under the Eighth Amendment. See Boddie v. Schnieder, 105 F.3d 857, 861-62 (2d Cir.1997) (holding that isolated incidents of sexual assault, without any injury, fail to state an Eighth Amendment claim); see also Brown, 2007 WL 1063011, at \*2 (dismissing inmate's failure to protect claim for failure to demonstrate an actual injury).

Therefore, in the alternative, it is recommended that defendants' motion on this ground be granted.

## D. Qualified Immunity

Defendants also contend that they are entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability insofar as their conduct does not violate clearly established constitutional law of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Aiken v. Nixon, 236 F.Supp.2d 211, 229 (N.D.N.Y.2002), aff'd, 80 Fed.Appx. 146 (2d Cir. Nov. 10, 2003). A court must first determine that if plaintiff's allegations are accepted as true, there would be a constitutional violation. Only if there is a constitutional violation does a court proceed to determine whether the

constitutional rights were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. Here, as discussed *supra,* accepting all of Newman's allegations as true, he has not shown that defendants violated his constitutional rights.

**\*6** Therefore, in the alternative, defendants' motion for summary judgment on this ground should be granted.

### E. Failure to Serve Defendant John Doe

Newman's complaint asserts a claim against John Doe, a defendant who has neither been identified nor served with the complaint. Rule 4(m) of the Federal Rules of Civil Procedure requires that service of process be effectuated within 120 days of the date of the filing of the complaint. *See also* N.D.N.Y.L.R. 4.1(b). Because defendant John Doe has not been identified by Newman or timely served with process, it is recommended that the complaint be dismissed without prejudice against this defendant.

### III. Conclusion [9]

For the reasons stated above, it is hereby

**RECOMMENDED** that:

1. Defendants' motion for summary judgment (Docket No. 36) be **GRANTED** as to defendants Duncan, Carpenter, VanGuilder, Mazzuca, Ercole, and Conklin and as to all of Newman's causes of action;

2. The complaint be **DISMISSED** without prejudice as to defendant John Doe; and

3. This action therefore be **TERMINATED** in its entirety as to all defendants and all claims.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

### All Citations

Not Reported in F.Supp.2d, 2007 WL 2847304

### Footnotes

1   This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

2   Newman's Fourteenth Amendment claims were previously dismissed. *See* Docket No. 28.

3   SHUs exist in all maximum and certain medium security facilities. The units "consist of single-or double-occupancy cells grouped so as to provide separation from the general population ...." N.Y. Comp.Codes R. & Regs. tit. 7, § 300.2(b) (2004). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

4   It is unclear whether *Woodford* has overruled the Second Circuit's exceptions to the exhaustion requirement. *See Miller v. Covey,* No. Civ. 05-649 (LEK/GJD), 2007 WL 952054, at \*3-4 (N.D.N.Y. Mar. 29, 2007). However, it is not necessary to determine what effect *Woodford* has on the Second Circuit's exceptions to the exhaustion requirement because Newman's contentions cannot prevail even under pre-*Woodford* case law. *See Ruggiero v. County of Orange,* 467 F.3d 170, 176 (2d Cir.2006)

5   The Court is aware that the sections governing the Inmate Grievance Program procedures in the Official Compilation of Codes, Rules & Regulations of the State of New York were re-numbered in June 2006. *See Bell v. Beebe,* No. Civ. 06-544 (NAM/GLD), 2007 WL 1879767, at \*3 n. 4 (N.D.N.Y. June 29, 2007). However, in the interests of clarity, the Court will cite the section numbers of the provisions that were in effect at the time Newman filed his complaint.

6   Moreover, shortly after the second assault, Newman wrote a letter to his counselor requesting that he be able to correspond with another inmate. *See* Newman Dep. at 42-43. Thus, in light of his ability to correspond with his counselor shortly after the incident, Newman's contention that he was too emotionally distraught to file a grievance is without merit.

7   In his complaint, Newman contends that defendants' conduct constituted cruel and unusual punishment in violation of the Eighth Amendment because their failure to comply with DOCS regulations "facilitated ... the cause for the incident

of attempted rape/physical assault that occurred to plaintiff therein at Fishkill SHU 200, on or about 10/29/02." Compl. at ¶¶ 15, 17, 19, 21, 23. Therefore, Newman's cause of action is best addressed under the Eighth Amendment's failure to protect standard.

8    To the extent that Newman contends that the attempted assaults caused him any mental or emotional injury, this claim must fail because "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e) (2003); *see also Thompson v. Carter,* 284 F.3d 411, 417 (2d Cir.2002) (holding that § 1997e(e) "applies to claims in which a plaintiff alleges constitutional violations so that the plaintiff cannot recover damages for mental or emotional injury for a constitutional violation in the absence of a showing of actual physical injury").

9    Defendants also contend that Newman failed to demonstrate that they were personally involved in the alleged constitutional violations. *See* Defs. Mem. of Law at 11-14. However, it is recommended herein that defendants' motion should be granted as to all of Newman's claims on other grounds. Thus, this argument need not be addressed.

---

**End of Document**                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 7050648
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Rickey RAWLS, Plaintiff,
v.
Dr. Joshua ROSENFIELD, Defendant.

No. 9:16-CV-0582 (LEK/CFH)
|
Signed 11/28/2017

**Attorneys and Law Firms**

Rickey Rawls, 92-B-1437, Fishkill Correctional Facility, P.O. Box 1245, Beacon, New York 12508,pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, OF COUNSEL: CHRISTOPHER J. HUMMEL, ESQ.,[1] Assistant Attorney General, The Capitol, Albany, New York 12224, Attorney for Defendant.

**Opinion**

**REPORT-RECOMMENDATION AND ORDER**[2]

Christian F. Hummel, U.S. Magistrate Judge

*1 Plaintiff pro se Rickey Rawls ("plaintiff"), an inmate who was, at all relevant times, in the custody of the New York Department of Corrections and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983, alleging that defendant Dr. Joshua Rosenfield—who, at all relevant times, was employed at Hudson Correctional Facility ("Hudson")—violated his constitutional rights under the Eighth Amendment. Dkt. No. 1 ("Compl."). Presently pending before the Court are plaintiff's Motion for Summary Judgment and defendant's Cross-Motion for Summary Judgment, both filed pursuant to Federal Rules of Civil Procedure ("Fed. R. Civ. P.") 56. Dkt. Nos. 31; 35; 39. Plaintiff and defendant opposed the respective motions, and defendant filed a reply. Dkt. Nos. 40, 46, 47. For the following reasons, it is recommended that defendant's motion be granted, and plaintiff's motion be denied.

**I. Arguments**

**A. Plaintiff's Motion for Summary Judgment**

In support of his Motion for Summary Judgment, plaintiff filed a Statement of Material Facts.[3] Dkt. No. 35. On review of plaintiff's Motion for Summary Judgment, the facts will be related herein in the light most favorable to defendant as the nonmoving party. See subsection II (A) infra; Rattner v. Netburn, 930 F.2d 204, 209 (2d Cir. 1991) ("In assessing the record ... to determine whether there is a genuine issue as to any material fact, the court is required to resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought."). On October 30, 2015, Dr. Rosenfield refused to order plaintiff new compression stockings despite "know[ing] that [he] needed [them] to prevent [his] leg from [breaking] out in painful Ulser's [sic], because [he] told [Dr. Rosenfield] that [he] needed them and because it [was] in [his] medical records that [he] need them." Dkt. No. 35 at 2. After plaintiff developed an ulcer on his left ankle, Dr. Rosenfield refused to send him to a wound clinic. Id. at 2-3. Plaintiff's medical records showed that he "was always sent out immediately when an ulcer [sic] developed, without delay." Id. at 3. Although Dr. Rosenfield knew of plaintiff's complaints about the ulcer, he stopped treating plaintiff, which caused a blood clot. Id. On January 8, 2016, Dr. Rosenfield failed to prescribe plaintiff pain medication, "which had been prescribed for [him] by other [d]octor's [sic] for the same injury for a number of years." Dkt. No. 35 at 2. Plaintiff suffered four months in pain that "interfered with daily activities," and only lessened when the wound healed. Id.

*2 In opposition, defendant argues that the Court should deny plaintiff's motion because: (1) plaintiff failed to provide a complete and accurate statement of material facts pursuant to Local Rule 7.1(a)(3); and (2) plaintiff failed to "establish that there is no genuine dispute as to any material fact and that he is entitled to judgment as a matter of law." Dkt. No. 40-1 at 4-5.

**B. Defendant's Motion for Summary Judgment**

In support of his Motion for Summary Judgment, defendant filed a Statement of Material Facts. Dkt.

No. 39-1. The facts are related herein in the light most favorable to plaintiff as the nonmoving party. See subsection II (A) infra; Rattner, 930 F.2d at 209 ("In assessing the record ... to determine whether there is a genuine issue as to any material fact, the court is required to resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought."). On October 30, 2015, shortly after his transfer to Hudson, plaintiff met with Dr. Rosenfield for an evaluation. Dkt. No. 39-1 ¶¶ 1, 3. Dr. Rosenfield reviewed plaintiff's medical records, observing that "he suffered from previous deep vein thrombosis with venous insufficiency, vein stripping, and venous stasis." Id. ¶ 3. Pursuant to that diagnosis, Dr. Rosenfield determined that the appropriate treatment for plaintiff's medical condition was continued use of compression stockings, refraining from sitting and standing for long periods of time, and abstaining from tobacco use. Id. ¶¶ 4, 5. He also continued a Neurontin prescription to treat neuropathic pain in plaintiff's toes. Id. ¶ 8. Defendant scheduled plaintiff a follow-up appointment for three weeks later. Id. ¶ 6.

At plaintiff's November 24, 2015 appointment, Dr. Rosenfield observed an ulceration on plaintiff's lower left leg, which he described as "a deterioration and breakdown of the skin surface caused by increased venous pressure leading to edema, slowed circulation, and reduced oxygenation." Dkt. No. 39-1 ¶¶ 9-10. Plaintiff complained that his compression stockings were ineffective, but Dr. Rosenfield noted that the stockings were not frayed and were still "sufficient to provide the appropriate amount of pressure against plaintiff's venous pressure in order to reduce build-up of edema and a deterioration of plaintiff's condition." Id. ¶¶ 11-12. Accordingly, he determined that plaintiff's compression stockings did not need to be replaced. Id. ¶ 13. On December 8, 2015, Dr. Rosenfield discontinued plaintiff's pain medication after it was determined that plaintiff was not going to the medication window at distribution time. Id. ¶ 14. He prescribed plaintiff no further pain medication. Id. ¶ 17.

At plaintiff's December 30, 2015 appointment, Dr. Rosenfield observed a two-by-four centimeter ulceration on plaintiff's left ankle. Dkt. No. 39-1 ¶¶ 18-19. He prescribed plaintiff a zinc oxide ointment to be applied daily with a dressing of xeroform wrap and gauze roll as this was "the standard effective treatment for plaintiff's condition." Id. ¶¶ 20, 21. At the January 2, 2016 dressing change, a non-party nurse noticed that plaintiff's wound opening grew larger, "with a slight drainage of serosanguinous fluid and a slight odor." Id. ¶ 22. Plaintiff refused the prescribed zinc oxide ointment and signed a refusal form. Id. ¶ 24.

At plaintiff's next appointment on January 4, 2016, Dr. Rosenfield continued plaintiff on the same course of treatment and scheduled plaintiff for a follow-up appointment the next week. Dkt. No. 39-1 ¶¶ 26-27. On January 6, 2016, plaintiff twice refused the zinc oxide treatment. Id. ¶ 28. On January 8, 2016, Dr. Rosenfield noted a "maceration of the 2 x 4 [centimeter] wound area[,] as well as skin granulation." Id. ¶ 29. He concluded that plaintiff's wound had not healed because he refused the zinc oxide ointment and continued to smoke. Id. Dr. Rosenfield again advised plaintiff to quit smoking, and submitted an order for new compression stockings. Id. ¶¶ 30, 31. He also referred plaintiff to a wound clinic to obtain specialized care. Id. ¶ 32. Plaintiff continued to attend daily dressing changes from January 8, 2016 until January 13, 2016. Id. ¶ 33. On January 9, plaintiff permitted a small amount of zinc oxide ointment on the wound, but refused the application on January 10. Id. ¶ 34.

*3 On January 15, 2016, plaintiff attended an appointment at the wound clinic in Albany Memorial Hospital. Dkt. No. 39-1 ¶ 35. Four days later, Dr. Rosenfield reviewed the consultation notes. Id. ¶ 36. Thereafter, plaintiff attended weekly appointments at the wound clinic at Albany Memorial Hospital. Id. ¶ 38. Dr. Rosenfield met with plaintiff after each wound clinic appointment to further evaluate and treat plaintiff's condition. Id. ¶ 40. On January 22, 2016, at the request of the wound clinic consultant, Dr. Rosenfield ordered an x-ray of plaintiff's left ankle to determine the possibility of a bone infection near the ulcer. Id. ¶ 41. The x-ray showed no "indicate of acute osteomyelitis, or infection of the bone near the ulcer." Id. ¶¶ 42-43. Dr. Rosenfield referred plaintiff for venous ultrasounds for both of his legs to evaluate any circulation problems. Id. ¶ 44. On January 29, 2016, Dr. Rosenfield ordered plaintiff's need for new compression stockings. Id. ¶ 45. He determined that he needed to contact the wound clinic for a recommendation as to the pressure of plaintiff's new stockings. Id. ¶ 46. On February 18, 2016, plaintiff received new compression stockings. Id. ¶ 47. That day, the wound clinic informed Hudson medical staff that

2017 WL 7050648

plaintiff had deep vein thrombosis in his left leg. Id. ¶ 48. Plaintiff was treated at Albany Memorial Hospital. Id. ¶ 49.

On February 22, 2016, Dr. Rosenfield prescribed plaintiff five days worth of Lovenox to prevent further blood clotting until his prescription of Coumadin became effective. Dkt. No. 39-1 ¶¶ 51-52. Plaintiff attended weekly visits at the wound clinic through mid-June 2016, and Dr. Rosenfield provided plaintiff treatment as recommended by the wound clinic staff, including the Coumadin prescription. Id. ¶ 54. Dr. Rosenfield further scheduled plaintiff for a vascular consult for potential vascular surgery, and plaintiff attended that consultation on May 12, 2016. Id. ¶ 55. Dr. Rosenfield arranged for plaintiff to receive treatment to prepare him for the recommended vascular surgery. Id. ¶ 57. On June 17, 2016, plaintiff declined the surgery because his wound had healed. Id. ¶ 58. Dr. Rosenfield cancelled plaintiff's surgery, and the wound clinic deemed his treatment complete. Id. ¶¶ 59, 60.

## II. Discussion [4]

Plaintiff contends that Dr. Rosenfield violated his constitutional rights by denying him medical care and treatment for his vascular disease. See generally Compl. Defendant argues that: (1) plaintiff failed to exhaust his administrative remedies under the Prison Litigation Reform Act ("PLRA"); (2) plaintiff cannot establish a claim of deliberate indifference against Dr. Rosenfield; and (3) defendant is entitled to qualified immunity. See Dkt. No. 39-6.

### A. Legal Standards

#### 1. Summary Judgment Standard

"A court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party has the burden of showing the absence of disputed material facts by providing the Court with portions of "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which support the motion. FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett,

477 U.S. 317, 323 (1986). A fact is material if it may affect the outcome of the case as determined by substantive law, such that "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "In determining whether summary judgment is appropriate, [the Court will] resolve all ambiguities and draw all reasonable inferences against the moving party." Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

To avoid summary judgment, a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Carey v. Crescenzi, 923 F.2d 18, 19 (2d Cir. 1991) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)) (internal quotation marks omitted). A non-moving party must support such assertions by evidence showing the existence of a genuine issue of material fact. Id. "When no rational jury could find in favor of the non-moving party because the evidence to support is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Services, Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

**\*4** Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest," .... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law...."

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191-92 (2d Cir. 2008).

### 2. N.D.N.Y. Local Rule 7.1(a)(3)

Local Rule 7.1(a)(3) requires a party moving for summary judgment to file and serve a Statement of Material Facts. See N.D.N.Y. L.R. 7.1(a)(3). "The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue." Id. The opposing party is required to file a response to the Statement of Material facts "admitting and/or denying each of the movant's assertions in matching numbered paragraphs." Id. "Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion." Id. (emphasis omitted).

Plaintiff failed to submit a Statement of Material Facts in conjunction with his Motion for Summary Judgment. Dkt. No. 31. On April 12, 2017, the Court issued a text order notifying the plaintiff that his submission lacked a Statement of Material Facts and directing him to file the document. Dkt. Entry dated Apr. 12, 2017. On April 26, 2017, plaintiff purported to file Statement of Material Facts in support of his Motion for Summary Judgment. Dkt. No. 35. However, the document, entitled "Affirmation in Support of Motion," is identical to the affirmation plaintiff filed on April 6, 2017, which contains two paragraphs and factual allegations unsupported by citation to evidence. Compare Dkt. No. 35 with Dkt. No. 31-1.

The undersigned is not required to "perform an independent review of the record to find proof of a factual dispute." Amnesty Am. v. Town of W. Hartford, 288 F.3d 467, 470 (2d Cir. 2002). Although defendant argues, and the Local Rules provide, that failure to submit a complete and accurate Statement of Material Facts mandates dismissal, pro se plaintiffs are afforded special solicitude. N.D.N.Y. L.R. 7.1(a)(3); Dkt. No. 40 at 4; see subsection III (A) infra. Accordingly, the undersigned does not recommend dismissal of plaintiff's motion on this ground. See Bulter v. Hyde, No. 9:08-CV-0299 (LEK/GHL), 2009 WL 3164753, at *3 (N.D.N.Y. Sept. 29, 2009) (declining to recommend dismissal of the pro se plaintiff's Motion for Summary Judgment due to the plaintiff's failure to file an accurate and complete Statement of Material Facts); Johnson v. Lew, No. 1:13-CV-1072 (GTS/CFH), 2017 WL 3822047, at *2 (N.D.N.Y. Aug. 30, 2017) ("Out of special solicitude to Plaintiff as a pro se civil rights litigant,

however, the Court will treat his opposition as a response to Defendant's Rule 7.1 Statement, carefully reviewing it for any record-supported disputation of Defendant's Rule 7.1 Statement."). Nevertheless, because defendant has cross-moved for summary judgment, and in light of the special solicitude accorded to plaintiff as a pro se litigant, the undersigned will accept as true the uncontroverted facts in plaintiff's response to defendant's Statement of Material Facts. However, to the extent that those facts are inconsistent with the facts as set forth in defendant's Rule 7.1 Statement of Material Facts, defendant's facts are accepted as true. See N.D.N.Y.L.R. 7.1(a)(3) ("*The Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert.*") (emphasis in original).

### B. Exhaustion

**\*5** As a threshold matter, defendant contends that plaintiff has failed to exhaust his administrative remedies. Dkt. No. 39-6 at 4-11. Plaintiff argues that he exhausted his administrative remedies through a hearing with Inmate Grievance Review Committee ("IGRC"). Dkt. No. 31-1 at 4. In opposition to defendant's Motion for Summary Judgment, plaintiff contends that he was unable to exhaust his administrative remedies because his grievances were "deliberately interfered with on multiple occasions." Dkt. No. 46-1 at 11. DOCCS "deliberately made it impossible for him to fulfill" the grievance process. Id. Plaintiff contends that DOCCS, as defendant's employer, "deliberately made it impossible for him to fulfill" the grievance process. Id. In reply, defendant argues plaintiff's reliance on Williams v. Priatno and Reid v. Marzano "is misplaced, as the situation present in those cases [is] not present here, and the IGP procedures provided plaintiff with clear instructions as to how to proceed to exhaust his administrative remedies in his circumstance." Dkt. No. 47 at 3.

While at Hudson, plaintiff did not appeal any grievances to Central Office Review Committee ("CORC") concerning the allegations raised in the complaint. Dkt. No. 39-1 ¶ 68. CORC received a letter from plaintiff dated February 24, 2016, in which he informed the committee that he wished to appeal a grievance as he had not received a response from the Superintendent. Id. ¶¶ 70-71. The Assistant Director of the Inmate Grievance Program ("IGP") Jeffery Hale responded to plaintiff and told him

that although he had filed two grievances, neither of them were ever appealed to the Superintendent or to CORC. Id. ¶ 74. Hudson received and filed plaintiff's first grievance, HD-2391-16, regarding Dr. Rosenfield's medical care on January 4, 2016. Id. ¶¶ 80-81. Plaintiff alleges that this grievance was not answered within the sixteen-day time frame required in DOCCS Directive 4040. Dkt. No. 31-1 at 3. On January 22, 2016, Hudson IGRC held a grievance hearing in plaintiff's absence, as it was believed he had been transferred to a different facility for medical treatment. Dkt. No. 39-1 ¶ 82. The IGRC denied plaintiff's grievance and sent him a copy of the decision, which included instructions on how to appeal the decision to the Superintendent. Id. ¶¶ 83, 84.

Plaintiff took issue with the fact that the hearing occurred without him present, and wrote a contact slip to non-party Judith Doyle, the Hudson IGP Supervisor, commenting that he was only on a temporary outside medical trip. Id. ¶ 85. In response, Ms. Doyle instructed plaintiff on how to file an appeal to the Superintendent. Id. ¶ 86. Plaintiff wrote Ms. Doyle a second contact slip, reiterating that the hearing should not have occurred in his absence. Id. ¶ 87. Ms. Doyle again instructed plaintiff on how to file an appeal with the Superintendent. Id. The grievance officer never received an appeal of grievance HD-2391-16. Id. ¶ 88.

Hudson IGRC received and filed plaintiff's second grievance, HD-2396-16, which sough redress regarding the grievance hearing held in his absence on February 22, 2016. Dkt. No. 39-1 ¶¶ 90-91. Plaintiff alleges that this grievance was not answered within the sixteen-day time frame required in DOCCS Directive 4040. Dkt. No. 31-1 at 4. The IGRC reached a split decision and automatically forwarded the grievance to the Superintendent, pursuant to IGP policy. Dkt. No. 39-1 ¶ 92. On March 1, 2016, plaintiff signed a statement acknowledging that the deadlocked response would be forwarded to the Superintendent. Id. ¶ 93. The Superintendent directed the IGRC to rehear grievance HD-2391-16 with plaintiff present. Id. ¶ 94. On April 7, 2016, the IGRC conducted a second hearing on grievance HD-2391-16. Id. ¶ 95. Plaintiff briefly attended the hearing, but left without discussing his medical complaints. Id. ¶ 96. Plaintiff's grievance was denied. Id. ¶ 97. Plaintiff did not appeal the IGRC's decision to the Superintendent, nor did the Superintendent receive a letter from plaintiff concerning the appeal of grievance HD-2391-16. Id. ¶¶ 99-100.

**\*6** The Prison Litigation Reform Act ("PLRA") requires that a prisoner exhaust any administrative remedies available to him or her before bringing an action for claims arising out of his or her incarceration. Porter v. Nussle, 534 U.S. 516, 524 (2002); see also Woodford v. Ngo, 548 U.S. 81, 82 (2006). The exhaustion requirement applies "to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter, 534 U.S. at 532. Further, the exhaustion requirement applies even where the prisoner seeks relief not available in the administrative grievance process, such as monetary damages. Porter, 534 U.S. at 524. To exhaust administrative remedies, the inmate must complete the full administrative review process set forth in the rules applicable to the correctional facility in which he or she is incarcerated. Jones v. Bock, 549 U.S. 199, 218 (2007) (internal citation omitted).

Although the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply." Ruggiero v. Cty. of Orange, 467 F.3d 170, 175 (2d Cir. 2006) (citation omitted). Until recently, courts in this District followed a three-part test established by the Second Circuit in Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004). Under the test established in Hemphill, a plaintiff's failure to exhaust could be excused if a plaintiff established that his or her failure to exhaust was justified by "special circumstances." Id. However, the Supreme Court recently held that "[c]ourts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement." Ross v. Blake, — U.S. —, 136 S. Ct. 1850, 1862 (2016). As such, the special circumstances exception in Hemphill is no longer consistent with the statutory requirements of the PLRA. Williams v. Priatno, 829 F.3d 118, 123 (2d Cir. 2016).

Although the Supreme Court's decision in Ross eliminates the "special circumstances" exception, courts must still consider the PLRA's "textual exception to mandatory exhaustion." Ross, 136 S. Ct. at 1858. Under this exception, courts must determine whether administrative remedies were "available" to a prisoner. Id. The Supreme Court identified three circumstances where administrative remedies may be unavailable to a prisoner. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it

operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. at 1859 (citing Booth v. Churner, 532 U.S. 731, 736, 738 (2001)). "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." Id. Lastly, administrative remedies are unavailable where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 1860.

Here, there is no genuine dispute that at all relevant times, DOCCS had in place a three-step inmate grievance program. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5. First, the inmate must file a complaint with an inmate grievance program ("IGP") clerk within twenty-one days of the alleged incident. Id. at § 701.5(a)(1). An IGP representative has sixteen calendar days to informally resolve the issue. Id. at § 701.5(b)(1). If no informal resolution occurs, the IGRC must hold a hearing within sixteen days of receipt of the grievance and must issue a written decision within two working days after the conclusion of the hearing. Id. §§ 701.5(b)(2)(i)-(ii). If the determination is unfavorable to the inmate, the inmate may appeal the IGRC's determination to the facility superintendent within seven calendar days of receipt of the determination. Id. § 701.5(c)(1). If the superintendent's determination is unfavorable, the inmate may appeal to CORC within seven days after receipt of the superintendent's determination. Id. §§ 701.5(d)(i)-(ii). CORC must "review each appeal, render a decision on the grievance, and transmit its decision to the facility, with reasons stated, for the [inmate], the grievance clerk, the superintendent, and any direct parties within thirty (30) calendar days from the time the appeal was received." Id. § 701.5(d)(3)(ii).

### 1. Did Plaintiff Exhaust his Administrative Remedies?

**\*7** Both parties concede that plaintiff completed the first level of the grievance procedure—filing two grievances with the IGRC—which were properly recorded, assigned grievance numbers, and decided. Pl. Dep. at 113-14, 118-19, 120-21; Dkt. No. 39-2. Although plaintiff contends that he sent letters appealing grievance HD-2391-16 to the Superintendent and CORC on February 1, 2016 and February 26, 2016, these letters do not satisfy the exhaustion requirement. See Dkt. No. 39-4

at 9. It is well-established in the Second Circuit that any informal resolution or relief outside of the administrative procedures does not satisfy exhaustion requirements. See, e.g., Macias v. Zenk, 495 F.3d 37, 43 (2d Cir. 2007) (holding that regardless whether prison officials know of the plaintiff's complaints in a "substantive sense," procedural exhaustion of remedies must still occur); Day v. Chaplin, 354 Fed.Appx. 472, 474 (2d Cir. 2009) (summary order) (noting that informal letters sent to prison officials "do not conform to the proper administrative remedy procedures."). Plaintiff did not provide the Court with a copy of the February 1, 2016 letter he contends he sent to the Superintendent. Although plaintiff's complaint contains a letter detailing "attempts by the Superintendent, Ms. Doyle, and non-party Sgt. Alexander to prolong [his] complaint hoping [he] would just let it go," there is no heading, it is undated, and it is unclear to whom the letter is written or whether this is the February 1, 2016 letter to which plaintiff refers. Dkt. No. 1-1 at 21. The letter details plaintiff's interactions with non-party Hudson IGP Supervisor Judith Doyle and non-party Sgt. Alexander, and how plaintiff felt Hudson prison staff "tr[ied] to hinder [him] from getting relief." Id. at 22. There is no mention of plaintiff's desire to appeal any grievance. See id.

Even if the undersigned concluded that plaintiff had sufficiently shown that he sent an appeal to the Superintendent, and, after receiving no response, appealed to CORC, thus following the procedures set forth in 7 N.Y.C.R.R. § 701.6(g)(2), plaintiff's February 24, 2016 letter to CORC does not serve as a sufficient method for exhausting his administrative remedies. Although use of an official grievance form is not required to satisfy exhaustion, plaintiff's February 24 letter to CORC details his procedural complaints with the January 22, 2016 grievance hearing that IGRC held in his absence (HD-2396-16), not Dr. Rosenfield's deliberate indifference to his medical to his medical needs—the subject of the January 4, 2016 grievance (HD-2391-16). Id. at 14. The substance of the February 24 letter fails to put CORC on notice of the issues that plaintiff wished to appeal, depriving CORC the opportunity to fully and fairly consider grievance HD-2396-16. Further, the two contact slips plaintiff delivered to non-party Hudson IGP Supervisor Doyle are not sufficient to exhaust his administrative remedies as Ms. Doyle, in response to both slips, informed plaintiff that if he was dissatisfied with the IGRC decision, he needed to "follow the directions on

the form and appeal the decision to the Superintendent." Cohan Decl. at 22-23.

Moreover, even if the February 24, 2016 letter had put CORC on notice of the subject matter of plaintiff's appeal, notice, in and of itself, is insufficient to satisfy the exhaustion requirement. See Macias, 495 F.3d at 44. In Macias, the Second Circuit analyzed how the Supreme Court's decision in Woodford v. Ngo, 548 U.S. 811 (2006) affected precedent that had allowed inmates "to procedurally exhaust their claims by taking enough informal steps to put prison officials on notice of their concerns, regardless of whether they utilize the prison's formal grievance procedures." Id. (quoting Braham v. Clancy, 425 F.3d 177, 183 (2d Cir. 2005)) (internal quotation marks and citation omitted). The Second Circuit held that, "after Woodford, notice alone is insufficient because '[t]he benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance' and '[t]he prison grievance system will not have such an opportunity unless the grievant complies with the system's critical procedural rules.' " Id. (quoting Woodford, 548 U.S. at 95). The Macias Court determined that the plaintiff did not satisfy the exhaustion requirement by submitting inmate request forms and complaining informally to prison officials. Id. Similarly here, plaintiff's informal correspondence outside of the proper regulatory channels does not satisfy PLRA's exhaustion requirement because even if plaintiff's February 24 letter alerted CORC to the substance of his complaints, notice alone does not satisfy the exhaustion requirement. See Macias, 495 F.3d at 44. Therefore, plaintiff's February 24 letter does not satisfy PLRA's exhaustion requirement. Id.; see Geer v. Chapman, No. 9:15-CV-952 (GLS/ATB), 2016 WL 6091699, at *5 (N.D.N.Y. Sept. 26, 2016), report and recommendation adopted, 2016 WL 6090874 (N.D.N.Y. Oct. 18, 2016) (citing Macias, 495 F.3d at 44-45) ("It is well-settled that writing letters to prison officials, or other officials, is insufficient to properly exhaust administrative remedies."). Because plaintiff has not provided evidence of the February 1, 2016 letter he alleges he sent to the Superintendent, the undated letter he provided does not address the substance of his grievance against Dr. Rosenfield, and notice is insufficient to constitute proper exhaustion, the unprovided February 1 letter and February 24 letter do not suffice to exhaust plaintiff's administrative remedies in relation to his claims against Dr. Rosenfield.

*8 Even if the undersigned were to consider plaintiff's February 24 letter to CORC an attempt to comply with the exhaustion requirements after the Superintendent's nonresponse, Peter Cohan, the grievance coordinator at Hudson, and Karen Bellamy, the Director of the IGP, declared that plaintiff did not properly file any administrative appeals regarding the claims raised in this matter. Dkt. No. 39-4 ("Bellamy Decl.") at 3; Dkt. No. 39-5 ("Cohan Decl.") at 4, 5-6. Moreover, the Assistant Director of the IGP informed plaintiff on July 14, 2016 that he had not appealed grievance HD-2391-16 or HD-2396-16. Bellamy Decl. at 13. Thus, plaintiff's informal correspondence—sending letters to CORC and the Hudson IGP Supervisor—does not satisfy PLRA's exhaustion requirements. As plaintiff has not provided evidence of exhaustion, the undersigned concludes that plaintiff has failed demonstrate that the January 4, 2016 grievance was properly exhausted.

### 2. Availability of Administrative Remedies

Plaintiff further contends that administrative remedies were unavailable to him because the Hudson IGRC failed to provide him with the IGRC Response Form required to appeal his grievance to the Superintendent. Dkt. No. 46-1 at 8-9. Plaintiff's argument must fail because plaintiff had the opportunity to appeal his grievances to the Superintendent and/or CORC on a plain piece of paper. Ceparano v. Cty. of Suffolk, No. 10-CV-2030 (SJF) (AKT), 2013 WL 6576817, at *5 (E.D.N.Y. Dec. 13, 2013) ("Moreover, even if plaintiff was unable to obtain official grievance forms, New York law permits the filing of grievances on any plain piece of paper."); see also 7 N.Y.C.R.R. § 701.5(a)(1) ("If this [grievance] form is not readily available, a complaint may be submitted on plain paper.").

Despite an inmate's ability to file an appeal by using "any place piece of paper" (Ceparano, 2013 WL 6576817, at *5), plaintiff's unprovided February 1 letter and the provided February 24 letter do not serve to exhaust his administrative remedies. Even if the undersigned had determined that plaintiff's February 24 letter to CORC provided prison officials with notice of his complaints, as discussed (see subsection II.B.1. supra) notice alone is insufficient to satisfy PLRA's exhaustion requirements. Macias, 495 F.3d at 44.

### 3. DOCCS Directive 4040/Misunderstanding

Plaintiff contends that he is excused from the exhaustion requirements because (1) his grievances were not answered by the Hudson IGRC within the sixteen-day time frame required in DOCCS Directive 4040, and (2) he misunderstood how to appeal his grievance. Dkt. No. 31-1 at 4; Pl. Dep. at 88. Although both grievances were answered, at most, two days after the time limit in DOCCS Directive 4040, the Hudson IGRC's failure to follow a DOCCS directive does not amount to a constitutional violation. Sanders v. Gifford, No. 11-CV-0326, 2014 WL 5662775, at *4 (N.D.N.Y. Nov. 4, 2014); Dkt. No. 39-5 at 15, 18. Further, plaintiff's apparent argument that he did not know how to appeal or was confused by the process is without force. Pl. Dep. at 88. Non-party Hudson IGP Supervisor Judith Doyle explained to plaintiff in writing on two occasions that he had the option to "follow the directions on the form and appeal the decision to the Superintendent." Cohan Decl. at 22-23; cf. Williams v. Priatno, 829 F.3d 118, 125-26 (2d Cir. 2016) (concluding that because the DOCCS regulations "do not adequately outline the process to appeal or otherwise exhaust" grievances that were never filed, the grievance procedures were technically not available to the plaintiff, and he was excused from the exhaustion requirements); Reid v. Marzano, No. 9:15-CV-761 (MAD/CFH), 2017 WL 1040420, at *3 (N.D.N.Y. Mar. 7, 2017) (finding that "although Plaintiff clearly knew how to file a grievance while in the SHU, ... it is clear that Plaintiff did not know how to proceed when he never received a response. Plaintiff's general knowledge of how to file a grievance was rendered useless if he was not properly informed how to proceed after not receiving a response."); Contino v. City of New York, No. 11 Civ. 8537 (DLC), 2013 WL 4015816, at *7 (S.D.N.Y. Aug. 7, 2013) ("A plaintiff's failure to understand the contours of the PLRA is not a special circumstance excusing compliance with the PLRA's exhaustion requirement"). Because non-party Ms. Doyle explicitly outlined to plaintiff in writing how to appeal an unsatisfactory decision, and because plaintiff does not contend that he did not receive these letters, it cannot be said that the grievance procedures were unavailable to plaintiff.

**\*9** There is no indication in the record that Hudson staff prevented plaintiff from further appeals, made

the grievance process unavailable, or outright ignored his grievances at any step. See Lane v. Doan, 287 F. Supp. 2d 210, 213 (W.D.N.Y. 2003) (concluding that the plaintiff's informal channels of communication constituted "reasonable attempts" at proper exhaustion when DOCCS ignored his prior grievances); Nelson v. Smith, No. 6:12-CV-6581(MAT), 2014 WL 2807557, at *2 (W.D.N.Y. June 20, 2014) (internal quotation marks and citation omitted) ("Where a party makes a clear and positive showing that pursuing available administrative remedies would be futile, the purposes behind the requirement of exhaustion are no longer served, and thus a court will release the [party] from the requirement."). To the extent that plaintiff argues that the unprovided February 1, 2016 letter to the Superintendent was discarded by prison officials (Dkt. No. 46-1 at 9), this argument is insufficient to excuse his failure to comply with PLRA's exhaustion requirements. Plaintiff has not introduced evidence identifying that any Hudson staff member is responsible for throwing away his grievances, and, therefore, has failed to establish that the grievance process was unavailable. Belilie v. Griffin, No. 9:11-CV-0092 (TJM/DEP), 2013 WL 1776086, at *8 (N.D.N.Y. Feb. 12, 2013) (finding that the plaintiff's "mere threadbare allegations that his grievances were intercepted and discarded, without evidence to support such allegation ... are insufficient to excuse his failure to comply with the IGP."); see Veloz v. New York, 339 F. Supp. 2d 505, 514 (S.D.N.Y. 2004) ("Even assuming [the plaintiff] did submit grievances, he offers no evidence that any particular officer thwarted his attempts to file[.]"). On receiving no response from IGRC within sixteen days, plaintiff was required to appeal his grievance to the next level, the Superintendent.[5] Defendant has met his burden of showing that plaintiff has failed to exhaust his administrative remedies. Accordingly, as exhaustion is a prerequisite to filing an action in federal court (Woodford, 548 U.S. at 85), it is recommended that defendant's Motion for Summary Judgment be granted.

### C. Eighth Amendment

As an alternative ground to dismissal for failure to exhaust administrative remedies, defendant argues that plaintiff cannot establish deliberate indifference to his serious medical needs in violation of the Eighth Amendment. Dkt. No. 39-6. Plaintiff contends that Dr. Rosenfield violated his Eighth Amendment rights by refusing to

replace his compression stockings and treat his ulcer with medication, and delaying a referral to a wound clinic. See generally Compl.; Dkt. No. 31. Defendant argues that plaintiff received proper treatment for his vascular disease, and that plaintiff further exacerbated his condition by rejecting the prescribed treatment plan. See Dkt. No. 39-6 at 18.

The Eighth Amendment forbids the infliction of "cruel and unusual punishments" on those convicted of crimes, "which includes punishments that involve the unnecessary and wanton infliction of pain." U.S. CONST. amend. VIII; Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994) (citing Gregg v. Georgia, 428 U.S. 153, 173 (1976)). "In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.' " Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)). The deliberate indifference standard consists of both an objective and subjective component. Hathaway, 37 F.3d at 66. The objective component requires the plaintiff to demonstrate that his alleged medical need is "sufficiently serious." Id. The subjective component requires a showing that the defendant has acted with a "sufficiently culpable state of mind." Id.

### 1. Objective Component

For an inmate to state a cognizable claim of deliberate indifference, he must make a showing of serious illness or injury. Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003). Deprivation of medical treatment is "sufficiently serious" if the injury or illness is one where there is "a condition of urgency, one that may produce death, degeneration, or extreme pain." Hathaway, 37 F.3d at 66 (internal citation omitted). "Determining whether a deprivation is an objectively serious deprivation entails two inquiries." Salahuddin v. Goord, 467 F.3d 263, 279 (2d Cir. 2006). First, the Court must determine "whether the prisoner was actually deprived of adequate medical care." Kucharczyk v. Westchester Cnty., 95 F. Supp. 3d 529, 537 (S.D.N.Y. 2015) (citation and internal quotation marks omitted). "Prison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is reasonable." Jones v. Westchester Cnty. Dep't of Corrs.,

557 F. Supp. 2d 408, 413 (S.D.N.Y. 2008). However, a prison official may be held liable "if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." Farmer v. Brennan, 511 U.S. 825, 847 (1994). Second, the Court must determine "whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or likely will cause the prisoner." Id.

> **\*10** If the inadequate medical care is a complete failure to provide treatment, courts examine whether the inmate's medical condition is sufficiently serious. Factors relevant to the seriousness of a medical condition include whether a reasonable doctor or patient would find [it] important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain. However, [i]n cases where the alleged inadequacy is in the medical treatment given, the seriousness inquiry is narrower. For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone.

Idowu, 2013 WL 4780042, at \*6 (internal citation and quotation marks omitted).

The undersigned will first assess whether plaintiff was actually deprived of adequate medical care. Kucharczyk, 95 F. Supp. 3d at 537. Plaintiff alleges that he was deprived of adequate medical when Dr. Rosenfield (1) refused to give him new compression stockings, and (2) failed to refer him immediately to an outside wound clinic. See Compl. at 6. Plaintiff claims that the deprivations caused him to suffer a constant sharp, "stabbing, burning" pain in his left ankle and foot that led to the formation of an ulceration,

and, ultimately, a blood clot. See Compl. at 5-7; Dkt. No. 31-1 ("Rosenfield Decl.") at 3.

The undersigned finds that plaintiff failed to provide evidence from which a fact-finder could reasonably conclude that Dr. Rosenfield's alleged failures constitute a sufficiently serious deprivation of medical care for the reasons that follow. Salahuddin, 467 F.3d at 279.

### a. Compression Stockings

Plaintiff has not demonstrated that he was deprived of adequate medical care based on a delay in receiving new compression stockings. As plaintiff alleges a delay in ongoing treatment, in assessing the seriousness of plaintiff's medical condition, the Court must focus on the challenged delay, rather than the underlying medical condition itself. Idowu, 2013 WL 4780042, at *6. Plaintiff testified that he first informed Dr. Rosenfield that he needed new compression stockings on October 30, 2015, and that after examining the stockings, Dr. Rosenfield determined that they were not worn out and not in need of replacing. Pl. Dep. at 30, 32. Plaintiff's medical records confirm that Dr. Rosenfield again examined plaintiff's compression stockings on November 24, 2015, noting that "they were not frayed or inelastic, and still sufficient to provide the appropriate amount of pressure against plaintiff's venous pressure in order to reduce build-up of edema and a deterioration of plaintiff's condition." Rosenfield Decl. at 2; Pl. Med. Rec. at 42. On January 8, 2016, Dr. Rosenfield ordered plaintiff new compression stockings, and plaintiff received the stockings on February 18, 2016. Rosenfield Decl. at 4; Pl. Dep. at 33. Plaintiff contends that the nearly three-and-a-half-month delay in receiving compression stockings led to the development of an ulcer that required six months of treatment. See Compl. at 6.

Plaintiff's claim amounts to a disagreement with Dr. Rosenfield's medical judgment, and such disagreement "over ... the timing of intervention [of treatment] are not adequate grounds for a Section 1983 claim." Baumann v. Walsh, 36 F. Supp. 2d 508, 512 (N.D.N.Y. 1999); see Idowu v. Middleton, No. 12 Civ. 01238(LGS), 2013 WL 4780042, at *8 (S.D.N.Y. Aug. 5, 2013) (finding that the plaintiff's claim that the delay in receiving an EEG amounted to a mere disagreement with the defendant doctor's medical judgment, and was not actionable

under Section 1983). On two separate occasions, Dr. Rosenfield examined plaintiff's compression stockings and determined that they did not need to be replaced. Pl. Dep. at 30, 32; Rosenfield Decl. at 2; Pl. Med. Rec. at 42. Dr. Rosenfield determined that the "stockings should be replaced when they no longer provide the appropriate level of compression and, based upon [his] evaluation of plaintiff's compression stockings, they did not need to be replaced at [that] time," thereby, negating plaintiff's contention that his compression stockings needed to be changed ever six months. Rosenfield Decl. at 2. Plaintiff has not presented sufficient evidence to suggest that Dr. Rosenfield's actions were unreasonable. His disagreement with the state of his compression stockings does not amount to an actionable claim under Section 1983. Idowu, 2013 WL 4780042, at *8.

### b. Wound Clinic Transfer

**\*11** Plaintiff also has not demonstrated that he was deprived of adequate medical care based on the delay in transfer to the wound clinic. As plaintiff alleges a delay in ongoing treatment, in assessing the seriousness of plaintiff's medical condition, the Court must focus on the challenged delay, rather than the underlying medical condition itself. Idowu, 2013 WL 4780042, at *6; see Discussion supra Section III.D.1. Dr. Rosenfield first observed an ulceration on plaintiff's left ankle on December 29, 2015. Compl. at 5; Rosenfield Decl. at 3. Dr. Rosenfield implemented a treatment plan that he believed would best treat plaintiff's condition—daily dressing changes and the application of a zinc oxide ointment, as well as abstaining from tobacco use. Rosenfield Decl. at 2, 3. On January 8, 2016, Dr. Rosenfield referred plaintiff for specialized treatment. Id. The record establishes that during the nine days between the formation of the ulceration and the referral to the wound clinic, plaintiff attended daily dressing changes on at least four occasions, and largely refused the prescribed zinc oxide ointment. Rosenfield Decl. at 3-5; Pl. Dep. at 43-49. There is no indication that Dr. Rosenfield denied plaintiff treatment during the nine days; rather, the record demonstrates that plaintiff simply disagreed with Dr. Rosenfield's medical judgment as to the treatment plan. Baumann v. Walsh, 36 F. Supp. 2d at 512. Therefore, because disagreement with a doctor's medical judgment does not amount to a claim under Section 1983, plaintiff has failed to demonstrate that Dr. Rosenfield denied him adequate medical care.

In addition, plaintiff testified that he continued to use tobacco products, despite acknowledging that such use delays an ulcer's healing. Pl. Dep. at 37. Therefore, the record demonstrates that plaintiff's own conduct in declining to comply with the medical treatment plan by refusing zinc oxide and continuing to smoke exacerbated the wound. Nelson v. Deming, 140 F. Supp. 3d 248, 259 (W.D.N.Y. 2015) (granting the defendant's motion for summary judgment where the plaintiff's medical records "reveal that [his] medical issues were created by Plaintiff's own actions in failing to comply with directives relating to the care of his wound," and, therefore, the plaintiff could not satisfy the objective prong of the deliberate indifference analysis). Although plaintiff seems to suggest that Dr. Rosenfield intentionally delayed his medical care because plaintiff smoked cigarettes, there is nothing in the record that substantiates this claim, nor is there any indication that Dr. Rosenfield delayed plaintiff's treatment as a form of punishment. See Compl. at 8; Crique v. Magill, No. 12 Civ. 3345(PAC)(GWG), 2013 WL 3783735, at *3 (S.D.N.Y. July 9, 2013) (internal citation and quotation marks omitted) ("While delays in providing necessary medical care may in some cases demonstrate deliberate indifference, the Second Circuit has reserved those instances to cases when prison officials deliberately delayed care as a form of punishment."). As to plaintiff's contention that because he continued to smoke, Dr. Rosenfield refused to treat him until he complained to the Hudson Deputy of Administration, as indicated, the record establishes that Dr. Rosenfield continued to provide plaintiff with care, despite the fact that plaintiff continued to smoke. Rosenfeld Decl. at 3-4 (detailing plaintiff's treatment); Compl. at 7-8. Plaintiff's mere disagreement with that plan does not amount to a constitutional violation. Idowu, 2013 WL 4780042, at *8

Accordingly, plaintiff has failed to establish that he suffered a sufficiently serious deprivation of medical care.

### 2. Subjective Component

A prison official acts with a sufficiently culpable state of mind when "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer,

511 U.S. at 837. "Deliberate indifference is a mental state equivalent to subjective recklessness" which "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." Id. (quotation marks omitted). A defendant "may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was 'insubstantial or non-existent.' " Wright v. Genovese, 684 F. Supp. 2d 137, 154 (N.D.N.Y. 2010) (citing Farmer, 511 U.S. at 844). Therefore, "the defendant's belief that his conduct posed no risk of serious harm need not be sound so long as it is sincere, and even if objectively unreasonable, a defendant's mental state may be nonculpable." Id. at 154-155 (quoting Salahuddin, 467 F.3d at 281) (internal quotation marks omitted).

**\*12** Further, "[i]t is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment claim." Chance, 143 F.3d at 703. Therefore, any "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of intervention, are not adequate grounds for a Section 1983 claim." Baumann, 36 F. Supp. 2d at 512.

Defendant argues that plaintiff's deliberate indifference claim based on his alleged refusal to order new compression stockings and refer him for specialized treatment amounts to "nothing more than disagreements with his provider as to how to properly treat his condition and are insufficient to support a claim for deliberate indifference to medical need." Dkt. No. 39-6 at 19. The undersigned agrees.

### a. Compression Stockings

Plaintiff fails to establish that Dr. Rosenfield knew of and disregarded an "excessive risk" to his health by declining to immediately replace plaintiff's compression stockings. Farmer, 511 U.S. at 837. Plaintiff testified that at the October 30, 2015 appointment, Dr. Rosenfield "made [him] take [his compression stockings] off[,] looked at [them], [and] played with [them]" before determining that they were not worn out or in need of replacing. Pl. Dep. at 30, 32. Moreover, plaintiff's medical records establish that

2017 WL 7050648

at the November 24, 2015 appointment, Dr. Rosenfield acknowledged plaintiff's concerns about the inadequacy of his compression stockings, but observed the stockings were not frayed or inelastic, and "still sufficient to provide the appropriate amount of pressure against plaintiff's venous pressure in order to reduce build-up of edema and a deterioration of plaintiff's condition." Rosenfield Decl. at 2 (citing Dkt. No. 41 ("Pl. Medical Records") at 42). Thus, based on his direct observation of the compression stockings on October 30, 2015 and November 24, 2015, Dr. Rosenfield was not aware of a substantial risk of harm when he recommended that plaintiff continue using his current compression stockings. Nielsen, 746 F.3d at 63. Further, on January 8, 2016, Dr. Rosenfield determined that plaintiff's compression stockings needed replacement *at that time*, and ordered a new pair. Dkt. No. 39-3 at 4. Plaintiff's belief that Dr. Rosenfield should have ordered him compression stockings earlier or examined him differently does not amount to an Eighth Amendment violation. Baumann, 36 F. Supp. 2d at 512; Chance, 143 F.3d at 703 ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim.").

Plaintiff asserts that his compression stockings must be changed every six months, suggesting that defendant's failure to replace the stockings at or near six months amounted to deliberate indifference. Compl. at 7; Pl. Dep. at 23. However, it cannot be said that Dr. Rosenfield knew of and disregarded an "excessive risk" to plaintiff's health and safety because the only evidence plaintiff proffers in support of this statement is a medical consultant report which states that "plaintiff needs compression stockings at least every six months to help prevent reoccurrence of ulcer." Dkt. No. 1-1 at 30. This consultant report is dated January 29, 2016, fourteen days after Dr. Rosenfield transferred plaintiff to the wound clinic. Id. Therefore, because this consultant report could not have been provided to Dr. Rosenfield on October 30, 2015 or November 24, 2015, when plaintiff demanded new stockings, Dr. Rosenfield could not have been aware of a substantial risk of serious harm if plaintiff's compression stockings were not changed every six months. See Farmer, 511 U.S. at 837. Further, the fact that one medical professional believed compression stockings must be changed biannually does not mean that Dr. Rosenfield's differing view is incorrect or deliberately indifferent to plaintiff's serious medical needs.

*13  In his opposition papers, plaintiff provides a separate consultation report dated September 5, 2012, purporting to establish that his stockings must be changed every six months. Dkt. No. 46-2 at 9. All the September 5, 2012 report establishes is that the author of the report determined that plaintiff needed new stockings *at that time* as they were "too old." Id. The report does not validate plaintiff's claim that his compression stockings must be changed every six months, but instead, details the doctor's own medical opinion after review of plaintiff's stockings *at that time.* See Chance, 143 F.3d at 703 ("[M]ere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment claim.") (internal citation omitted). Plaintiff offers no evidence that the Dr. Rosenfield's decision to continue plaintiff in his compression stockings on October 30, 2015 and November 24, 2015 caused an excessive risk to his health, especially as he obtained new stockings shortly thereafter. Further, Dr. Rosenfield stated that he believes compression stockings need to be replaced when they are worn out and "no longer provide the appropriate level of compression." Rosenfield Decl. at 2. Plaintiff's disagreement, or the differing opinion of another medical provider, does not amount to a constitutional claim. Thus, plaintiff has failed to raise a material question of fact whether Dr. Rosenfield knew of and disregarded an excessive risk to his health or safety when he denied plaintiff new compression stockings on October 30, 2015 and November 24, 2015. See Farmer, 511 U.S. 837.

### b. Wound Clinic Transfer

After he noticed the formation of an ulceration on his left ankle, plaintiff requested that Dr. Rosenfield transfer him to a wound clinic "because the facility [infirmary] [did] not have the proper medical supplies to care for an open wound." Compl. at 5; Dkt. No. 31-1 at 2. Instead, after evaluating plaintiff's condition, Dr. Rosenfield determined that daily application of zinc oxide ointment and a daily dressing of xeroform wrap and gauze roll were the appropriate methods to treat plaintiff's ulceration. Rosenfield Decl. at 3. Plaintiff refused the zinc oxide treatment on at least three occasions before his January 8, 2016 follow-up appointment, and Dr. Rosenfield determined that the ulcer was not healing because plaintiff failed to use the prescribed medication

2017 WL 7050648

and quit smoking. Pl. Dep. at 44-45; Rosenfield Decl. at 3-4. That day, Dr. Rosenfield submitted a referral for a wound clinic. Rosenfield Decl. at 4.

Plaintiff's allegations demonstrate that Dr. Rosenfield adequately examined plaintiff's ulcer and made the discretionary medical decision to treat the condition with zinc oxide ointment rather than immediately refer him to an outside clinic. See Church v. Hegstrom, 416 F.2d 449, 450-51 (2d Cir. 1969) ("[Section] 1983 likewise does not authorize federal courts to interfere in the ordinary medical practices or other matters of internal discipline of state prisons."). Although plaintiff repeatedly informed Dr. Rosenfield that other facilities had immediately transferred him to the wound clinic, Dr. Rosenfield believed that he was providing the "standard effective treatment for plaintiff's condition" in prescribing the zinc oxide ointment. Rosenfield Decl. at 3 (citing Pl. Medical Records at 40). This belief does not automatically amount to a culpable mental state, even if it was objectively unreasonable. Wright, 694 F. Supp. 2d at 154-55. Moreover, it cannot be said that Dr. Rosenfield knew of and disregarded an "excessive risk" to plaintiff's health because once Dr. Rosenfield determined that the wound was not healing under the current medical treatment, he referred plaintiff to specialized care at an outside wound clinic. Rosenfield Decl. at 3. Plaintiff's conclusory allegation that he was "always sent out immediately for treatment when an [ulcer] developed, without delay" does not automatically constitute a constitutional violation because whether or not plaintiff was immediately transferred by other facilities does not mean that immediate transfer was the proper medical treatment. See Dkt. No. 31-1 at 3. Inmates do not have the constitutional right to the treatment of their choice. Wright, 694 F. Supp. 2d at 155. That plaintiff may have "preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation." Id. (citing Dean v. Coughlin, 804 F.2d 207, 215 (2d Cir. 1986)).

*14 Further, even if Dr. Rosenfield's continuing plaintiff on zinc oxide ointment rather than immediately transferring him to the wound clinic caused plaintiff unintended harm, negligence is not actionable under section 1983. Burroughs v. Petrone, 138 F. Supp. 3d 182, 211 (N.D.N.Y. 2015) ("Deliberate indifference requires more than negligence but less than conduct undertaken for

the very purpose of causing harm.") (internal quotation marks and citation omitted); see Daniels v. Williams, 474 U.S. 327 (1986) (concluding that negligence is not a cognizable claim under section 1983); Kucharczyk, 95 F. Supp. 3d at 537 ("[M]ere negligence is not enough to state a claim for deliberate indifference."). That Dr. Rosenfield may have been negligent[6] in "diagnosing or treating" plaintiff's ulcer—or ultimately his vascular disease—does not amount to deliberate indifference. Adams v. Rock, No. 9:12-CV-1400 (GLS/ATB), 2015 WL 1312738, at *7 (N.D.N.Y. Mar. 24, 2015) (citing Farmer, 511 U.S. at 835) ("Even negligence in diagnosing or treating an inmate's medical condition does not constitute deliberate indifference."). Thus, plaintiff has failed to raise a material question of fact whether Dr. Rosenfield knew of and disregarded an excessive risk to his health or safety as to the alleged denial of referral to a wound clinic. Farmer, 511 U.S. 837. Accordingly, plaintiff has failed to demonstrate that Dr. Rosenfield was deliberately indifferent to a serious medical condition, and it is recommended that defendant's motion on this ground be granted.

### 3. Failure to Provide Pain Medication

Although plaintiff does not suggest that Dr. Rosenfield's failure to provide him pain medication ultimately resulted in the formation of the ulceration, he does allege that the denial of pain medication resulted in "four (4) months in intense pain and suffering that interfered with daily activities." Compl. at 6; Dkt. No. 31-1 at 2. Plaintiff contends that prior to his transfer to Hudson, the medical staff at Cayuga Correctional Facility "had automatically prescribed medication for his ankle and foot," and that he received two dosages of Neurontin a day. Compl. at 7. Defendant's declaration and the medical records provide that, during plaintiff's initial visit on October 30, 2015, Dr. Rosenfield continued plaintiff's prescription of Neurontin after he complained of pain in his toes. Rosenfield Decl. at 2. After plaintiff failed to report to the medication window for the administration of the Neurontin, Dr. Rosenfield discontinued the prescription. Id. (citing Pl. Med. Rec. at 41) (stating that plaintiff was a "no show consecutively for Neurontin"). Pursuant to plaintiff's medical records, and Dr. Rosenfield's testimony, plaintiff did not complain about any further pain symptoms during his care at Hudson. Rosenfield Decl. at 2; see Pl. Med. Rec. Plaintiff denies that he was in pain on October 30, 2015, and states

that he was not aware Dr. Rosenfield prescribed him pain medication, which is why he did not come to the medication window. Dkt. No. 46-1 at 2. Plaintiff contends that, in response to his complaints of pain, the Hudson medical staff administered him over-the-counter Motrin. Id.

Plaintiff's conclusory allegations do not create a material issue of fact precluding summary judgment. See Brown v. White, No. 9:08-CV-200 (GLS/ATB), 2010 WL 985184, at *8 (N.D.N.Y. Mar. 15, 2010) ("[P]laintiff's conclusory suggestion that [the defendant] completely refused to provide any medical attention ... is insufficient to create a dispute of fact in the face of the sworn affidavit and supporting documentary evidence in the record."); Benitez v. Pecenco, No. 92 Civ. 7670 (DC), 1995 WL 444352 at *3 n.5, 1995 WL 444352 (S.D.N.Y. July 27, 1995) (finding that the plaintiff's conclusory allegation that he was denied medication was contradicted by his medical records and did not create a material dispute of fact). "Issues of medical judgment cannot be the basis of a deliberate indifference claim where evidence of deliberate indifference is lacking." Hill v. Curcione, 657 F.3d 116, 123 (2d Cir. 2011) (citation omitted). Plaintiff's allegations that he requested and was denied Neurontin do not establish that Dr. Rosenfield deviated from the standard medical treatment plan, or that he "acted with a culpable state of mind in making this decision." Rush, 923 F. Supp. 2d at 555. Plaintiff's claims, at most, amount to a disagreement with Dr. Rosenfield's medical judgment, and do not give rise to an Eighth Amendment claim. Id.; Idowu, 2013 WL 4780042, at *8; Veloz, 339 F. Supp. 2d at 525 (concluding that the plaintiff's contention that the defendant denied him pain medication amounted to a disagreement with a medical provider over a treatment plan, and does not implicate the Eighth Amendment.).

**\*15** Accordingly, insofar as plaintiff claims that the denial of pain medication amounted to deliberate indifference, it is recommended that defendant's motion on this ground be granted.

### D. Qualified Immunity

Defendant argues that, even if plaintiff's constitutional claims are substantiated, he is entitled to qualified immunity. Dkt. No. 39-6 at 21-22. Qualified immunity shields public officials from being sued for conduct

undertaken in the course of their duties so long as that conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) (internal quotation marks and citation omitted); Eng v. Coughlin, 858 F.2d 889, 895 (2d Cir. 1988). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified ... immunity might still be available ... if it was objectively reasonable for the public official to believe that his acts did not violate those rights." Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991); Magnotti v. Kuntz, 918 F.2d 364, 367 (2d Cir. 1990) (internal citations omitted). A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. Saucier v. Katz, 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. Aiken v. Nixon, 236 F. Supp. 2d 211, 230 (N.D.N.Y. 2002).

Here, plaintiff has not established a constitutional violation to satisfy the first prong of the qualified immunity test. See Discussion supra Section III. Moreover, it was objectively reasonable for Dr. Rosenfield to believe that his prescribed course of treatment would effectively treat plaintiff's symptoms. See subsection III.C.2. supra. By prescribing the standard effective treatment for plaintiff's condition, it cannot be said that Dr. Rosenfield objectively knew he was violating plaintiff's constitutional rights. See id. Because there is no constitutional violation, the undersigned does not reach whether the constitutional rights were clearly established at the time of the alleged violation. Aiken, 236 F. Supp. 2d at 230. Accordingly, in the alternative to dismissal for failure to exhaust administrative remedies or failure to demonstrate deliberate indifference to serious medical needs, it is recommended that defendant's motion on this ground be granted.

### III. Conclusion

**WHEREFORE**, for the reasons stated herein, it is hereby:

**RECOMMENDED**, that defendant's Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 (Dkt. No. 39) be **GRANTED**; and it is further

**RECOMMENDED**, that plaintiff's Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 (Dkt. No. 31) be **DENIED**; and it is further

**RECOMMENDED**, that plaintiff's complaint (Dkt. No. 1) be **DISMISSED** in its entirety, with prejudice; and it is

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED**.

**\*16** Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED R. CIV. P. 6(a), 6(e), 72. [7]

**All Citations**

Slip Copy, 2017 WL 7050648

Footnotes

1    The undersigned bears no relation to counsel for defendant.

2    This matter was referred to the undersigned for Report-Recommendation and Order pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

3    Local Rule 7.1(a)(3) states:

     Summary Judgment Motions

     Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits.

     The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute. Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.

     N.D.N.Y. L.R. 7.1(a)(3).

4    All unpublished opinions cited by the Court in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff.

5    Although plaintiff contends that he wrote to the Superintendent, he has failed to offer evidence of such letter. Moreover, to the extent that plaintiff contends that, after the Superintendent's nonresponse, he appealed to CORC, that February 24 letter does not satisfy PLRA's exhaustion requirements. See subsection II.B.1., supra.

6    The undersigned makes no assessment about whether plaintiff can state a claim as to negligence.

7    If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(C).

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 3531897
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Miguel RODRIGUEZ, Plaintiff,

v.

COUNTY OF SUFFOLK, Suffolk County
Correctional Center, P.O. John Does, Defendants.

No. CV 13−2070(SJF)(GRB).
|
Signed June 30, 2014.

**Attorneys and Law Firms**

Nora Constance Marino, Law Office of N. Marino, Great Neck, NY, for Plaintiff.

Jason Bassett, Hauppauge, NY, for Defendants.

**Opinion**

### REPORT & RECOMMENDATION

GARY R. BROWN, United States Magistrate Judge.

**\*1** Plaintiff Miguel Rodriguez ("plaintiff" or "Rodriguez") brought this civil rights action against defendants County of Suffolk, the Suffolk County Correctional Center, and several John Doe correctional officers (collectively, "defendants"), setting forth causes of action under 42 U.S.C. § 1983 and state law, based upon allegations that he was attacked and beaten while in state custody. *See generally* Compl., Apr. 9, 2013, Docket Entry ("DE") [1]. On September 27, 2013, defendants filed a motion for summary judgment predicated upon (1) plaintiff's purported failure to exhaust administrative remedies under the Prison Litigation Reform Act ("PLRA") and (2) his alleged noncompliance with New York's General Municipal Law § 50–h. *See generally* Mot. for Summ. J. ("Mot."), DE [12–1]; Opp'n to Mot. ("Opp'n"), DE [12–12]; Defs.' Reply ("Reply"), Sept. 27, 2013, DE [12–23]. On December 11, 2013, the Honorable Sandra J. Feuerstein referred the motion to the undersigned for a report and recommendation.

For the reasons that follow, I respectfully recommend that defendants' motion for summary judgment be

GRANTED as to the state law claims, and DENIED as to the federal claims.

### BACKGROUND

The relevant facts are generally undisputed for purposes of this motion. *See generally* Defs.' Rule 56.1 Statement ("Defs.' Statement"), Sept. 27, 2013, DE [12–2]; Pl.'s Rule 56.1 Statement ("Pl.'s Statement"), Sept. 27, 2013, DE [12–13]. Because defendants focus on plaintiff's alleged failure to exhaust under the PLRA, they do not dispute the underlying factual allegations regarding the correctional officers' attack on plaintiff. *See generally* Defs.' Statement; Mot.; Reply. The parties also do not dispute the pertinent facts surrounding plaintiff's attempted exhaustion of administrative remedies. *See generally* Defs.' Statement; Pl.'s Statement.

On or about December 14, 2011, plaintiff was arrested and taken to the Suffolk County Correctional Facility. Pl.'s Statement ¶ 2; Aff. of Miguel Rodriguez ("Rodriguez Aff.") ¶ 4, Sept. 27, 2013, DE [12–15]; Defs.' Statement ¶ 2. Upon entry into the correctional facility, plaintiff received the facility's Inmate Handbook ("Inmate Handbook"). Pl.'s Statement ¶ 2; Rodriguez Aff. ¶ 5; Defs.' Statement ¶¶ 2–3. The Handbook contains a section explaining the inmate grievance process: "All inmates are entitled to file legitimate grievances and may do so without fear of punishment or reprisals. An inmate must file a grievance within (5) five days of the date of the act or occurrence giving rise to the grievance." Suffolk County Sheriff's Office Inmate Handbook ("Inmate Handbook") 15–16, Sept. 27, 2013, DE [12–6]. The Handbook provides that inmates "may request and will receive a grievance form to fill out," and "may request and receive assistance in filling out the grievance forms." *Id.*

On January 11, 2012, while plaintiff was incarcerated in the Suffolk County Correctional Facility, several correctional officers attacked and beat him. Pl.'s Statement ¶ 2; Rodriguez Aff. ¶¶ 5–17. The attack began when several correctional officers conducted a "shakedown" of plaintiff's cell. Pl.'s Statement ¶ 2; Rodriguez Aff. ¶ 7. One of the officers, identified as having three stripes on his uniform, entered plaintiff's cell and, "without warning, physically attacked and assaulted" plaintiff. Rodriguez Aff. ¶ 9. The officer sporting three stripes "grabb[ed]" plaintiff by his neck and arm and

"forcefully push[ed][him] onto [his] back on the lower bunk" of the cell. Rodriguez Aff. ¶ 10. That officer then "got on top of [plaintiff and straddled [him] before beginning to strike [him] in the face repeatedly." *Id.* The officer struck plaintiff's face approximately "20 to 30 times." *Id.* Two other correctional officers were in the cell during the beating, but they "did nothing but watch as the officer with the three stripes struck" plaintiff. *Id.* ¶ 11.

**\*2** The officer then removed plaintiff from the cell and took him to an adjacent walkway. *Id.* ¶¶ 13–14. At the walkway, plaintiff was ordered to put his hands against the wall and spread his feet. As plaintiff was doing so, the officer struck him in the right side of his ribs "five or six times." *Id.* ¶¶ 12–14. Plaintiff then "collapsed into [himself]" and could not breathe. *Id.* ¶ 15. He uttered, through gasps, "I can't breathe," to which the officer responded, "That's good." *Id.* ¶¶ 14–16.

Plaintiff was then allowed to return to his cell, where he found that the cell's garbage pail had been dumped on his personal belongings. *Id.* ¶ 16. The correctional officers returned to the cell, and the officer wearing three stripes "gave a threatening warning to all the inmates, that 'this' could happen again, and at any time." *Id.* ¶ 17. Defendants' motion focuses on plaintiff's alleged failure to exhaust under the PLRA; thus, they do not dispute the underlying factual allegations regarding the correctional officers' attack on plaintiff. *See generally* Defs.' Statement; Mot.; Reply.

After the attack, plaintiff "desperately pleaded for someone—anyone, any corrections officer or staff member—to help [him] and get [him] medical attention." Pl.'s Statement ¶ 2; Rodriguez Aff. ¶ 17. These pleas lasted for approximately nine to ten hours, but he was ignored and received no medical attention. Rodriguez Aff. ¶ 17.

Plaintiff finally placed a call, through the correctional facility's phone, to his cousin, telling her that he needed emergency medical assistance. His cousin said that "she would see what she could do." *Id.* ¶ 18. After about one hour, plaintiff was called down to the medical unit of the correctional facility, where it was determined that plaintiff should be taken to an off-grounds hospital. *Id.* ¶¶ 17–18.

Plaintiff was taken to a hospital where he underwent X–Rays and a CAT scan. He had two broken ribs. *Id.* ¶ 20. He had "severe pain in [his] ribs," "swollen spots" on his

lips, and "face and jaw cuts" on his facial area; he also "could not move at all, barely being able to eat or relieve [him]self." *Id.* ¶ 22. After he was released from the hospital, plaintiff was transferred back to the correctional facility, where he stayed in the medical tier for approximately one month. *Id.* ¶¶ 21–22.

During his stay in the medical tier, plaintiff requested a grievance form from one of the correctional officers, but the officer failed to provide a form. Instead, the officer responded by asking plaintiff in an "intimidating" manner, "[W]hat for[?]" *Id.* ¶ 24. Plaintiff "did not answer and did not ask that officer again." *Id.* Plaintiff claims that

> [a]fter hearing the officer with the three stripe's prior threat, and after having been a victim myself of an assault, and after considering this officer [']s intimidating tone and manner, and being that I had already suffered serious injuries including two broken ribs ..., I was in great fear for my safety and feared telling him why I wanted the form, especially because it was to file a grievance against a colleague of his who beat me up and put me in the medical tier in the first place.

**\*3** *Id.* Defendants do not dispute the factual allegations regarding plaintiff's attempt to exhaust administrative remedies; instead, defendants contend that even assuming *arguendo* the factual allegations are true, plaintiff still failed to properly exhaust his administrative remedies. *See generally* Defs.' Statement; Mot. Reply 6.

After about a month and a half, plaintiff conducted research in the prison library and was "finally able to determine the proper form and procedure required to file a grievance," and "requested it from a corrections officer in the law library." *Id.* ¶¶ 28–29. The correctional officer in the library promptly provided the form to plaintiff. *Id.* ¶ 29.

Plaintiff completed the grievance form on March 18, 2012, but the form was returned on March 30, because it was not filed within five days of the alleged January 11 attack. *Id.* ¶¶ 30–32; Pl.'s Statement ¶¶ 12–13; Defs.' Statement ¶¶ 4–6.

On April 9, 2013, plaintiff commenced this action against defendants for "excessive force, deprivation of liberty, physical abuse, and the denial of medical treatment." *See generally* Compl. Defendants moved for summary judgment, arguing that the action should be dismissed because plaintiff failed to properly exhaust all available administrative remedies under the PLRA. *See generally* Mot.

## DISCUSSION

I. Summary Judgment Standard

Under Federal Rule of Civil Procedure ("Rule") 56(c), summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also* Rule 56. To defeat a motion for summary judgment, the non-moving party must produce evidence that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A "material" fact is one that "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248. And a dispute over a material fact is "genuine" if the evidence "is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The Court views all evidence in the light most favorable to the non-moving party, and all reasonable inferences are drawn in the non-moving party's favor. *Isabella v. Koubek,* 733 F.3d 384, 387–88 (2d Cir.2013).

II. Exhaustion of Administrative Remedies under PLRA
The PLRA provides: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "Requiring exhaustion allows prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court. This has the potential to reduce the number of inmate suits, and also to improve the quality of suits that

are filed by producing a useful administrative record." *Jones v. Bock,* 549 U.S. 199, 204, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007).

**\*4** "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). "Once within the discretion of the district court, exhaustion in cases covered by § 1997e(a) is now mandatory." *Id.* at 524.

Failure to exhaust is an affirmative defense, and is not jurisdictional requisite. *Jones,* 549 U.S. at 211–12; *see also Morrow v. Dupont,* 08–CV–3083, 2010 WL 1005856, at \*7 (E.D.N.Y. Mar.15, 2010) ("[E]xhaustion under the PLRA is an affirmative defense, not a jurisdictional requirement[.]"). Whether the PLRA's exhaustion requirement has been satisfied is generally a question for the court rather than for the jury: there is no "right to a jury trial on factual disputes regarding an inmate's failure to exhaust administrative remedies as required by the PLRA." *Messa v. Goord,* 652 F.3d 305, 308–09 (2d Cir.2011) (per curiam).

The PLRA requires "complete" exhaustion in accordance with the prison's applicable procedural rules. *Id.* at 218. An inmate must "compl[y] with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Woodford v. Ngo,* 548 U.S. 81, 90–91, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006).

In *Hemphill v. New York,* the Second Circuit set forth a "three-part inquiry" in cases "where a prisoner plaintiff plausibly seeks to counter defendants' contention that the prisoner has failed to exhaust available administrative remedies as required by the PLRA." 380 F.3d 680, 686 (2d Cir.2004). First, the court must "ask whether administrative remedies were in fact 'available' to the prisoner." *Id.* Second, the court should "inquire as to whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (citations omitted). And third,

"[i]f the court finds that administrative remedies were available to the plaintiff, and that the defendants are not estopped and have not forfeited their non-exhaustion defense, but that the plaintiff nevertheless did not exhaust available remedies," the court should "consider whether 'special circumstances' have been plausibly alleged that justify 'the prisoner's failure to comply with administrative procedural requirements.' " *Id.* (quoting *Giano v. Goord,* 380 F.3d 670 (2d Cir.2004)).

In this instant action, the applicable grievance procedures are set forth in the Inmate Handbook. *See generally* Inmate Handbook 15–16. The Handbook provides that inmates are "entitled" to file grievance forms and that when an inmate requests a grievance form, one will be given to him. *Id.* Grievance forms must also be filed within five days of the relevant occurrence. *Id.*

III. Application

**\*5** Defendants argue that plaintiff's claims must be dismissed because he failed to properly exhaust his administrative remedies in accordance with the PLRA. *See* Mot. 4. Plaintiff does not claim that he properly exhausted all administrative remedies; instead, he argues that he should be excused from the PLRA's exhaustion requirement because the administrative remedies were rendered effectively unavailable. *See generally* Opp'n 3–7, 11–15; Rodriguez Aff. ¶¶ 21–24.

A. Threats Against Plaintiff

Under the first prong of the *Hemphill* test, whether administrative remedies were unavailable is an "objective" test: "would a similarly situated individual of ordinary firmness have deemed them available." 380 F.3d at 688 (internal quotation marks omitted). "[T]hreats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance," thus rendering administrative remedies "unavailable." *Id.* However, "[m]ere allegation[s] of a generalized fear of retaliation [are] insufficient" to excuse a failure to file a grievance. *Brown v. Napoli,* 687 F.Supp.2d 295, 297 (W.D.N.Y.2009).

Courts tend to find mere "generalized fear," *see Brown,* 687 F.Supp.2d at 297, when no actual threat was made. *See, e.g., id* . (inmate merely alleged, without more, that he feared retaliation); *Contino v. City of N.Y.,* 11–CV– 8537, 2013 WL 4015816, at \*6 (S.D.N.Y. Aug 7, 2013)

(plaintiff's "conclusory assertion that he feared retaliation if he completed the grievance process is insufficient to excuse his obligation to exhaust the administrative grievance process."); *Bogard v. Bernal,* 08–CV–1157, 2009 WL 2634483, at \*3 ("Plaintiff speaks of an overall fear of retaliation if he were to file an administrative grievance but provides no specific examples of an actual threat to his physical safety if he were to file such a grievance."); *Harrison v. Stallone,* 06–CV–902, 2007 WL 2789473, at \*5 (N.D.N.Y. Sept.24, 2007) (plaintiff conclusorily claimed he did not file a grievance "due to the fear of retaliation").

After all, every inmate who suffers an attack at the hands of correctional officers has some level of fear of retaliation. *Harrison,* 2007 WL 2789473, at \*6 ("If every plaintiff bringing a retaliation claim could have the exhaustion requirement excused by alleging a fear of further retaliation, it would create a general exception to exhaustion for retaliation claims."); *see also Porter v. Howard,* 10–CV–1817, 2011 WL 3298885, at \*4 (S.D.Cal. June 14, 2011) (rejecting inmate's argument that "any normal thinking person would be reluctant to report").

On the other hand, courts generally find that specific affirmative threats of retaliation are sufficient to "deter a prisoner of 'ordinary firmness' from filing an internal grievance." *Hemphill,* 380 F.3d at 688 ("[Plaintiff's] complaint specifically recounted [officer's] threatening statements, and the plaintiff's acquiescence"); *see also Morrison v. Hartman ("Morrison II"),* 898 F.Supp.2d 577, 581 (W.D.N.Y.2012); *Morrison v. Hartman ("Morrison I"),* 07–CV6633L, 2010 WL 811319, \*2 (W.D.N.Y. Mar.3, 2010) (threat against plaintiff and his family if grievance was filed excused plaintiff from requirement).

**\*6** When prison officials engage in "affirmative misconduct, such as threats or intimidation," administrative remedies are unavailable. *Hill v. Donoghue,* 08–CV–1045, 2010 WL 3924858, at \*1 (E.D.N.Y. Sept.30, 2010). One plaintiff was excused from the exhaustion requirement when a correctional officer responded to plaintiff's initial filing of a grievance by assaulting him and threatening that he would "get [plaintiff] sooner or later." *McCullough v. Burroughs,* 04–CV–3216, 2005 WL 3164248, at \*2–4 (E.D.N.Y. Nov.29, 2005); *see also Hepworth v. Suffolk Cnty.,* 02–CV–6473, 2006 WL 2844408, at \*4–7 (E.D.N.Y. Sept. 29, 2006 (excusing plaintiff from exhaustion requirement when he was

threatened with an additional beating if he attempted to file another grievance form).

In the instant case, following the serious assault of plaintiff, resulting in his hospitalization, a specific threat was issued that the beating could happen again at "any time." While that threat was not specifically tied to the filing of a grievance, this standing threat of additional violence could potentially justify waiver of the exhaustion requirement. This credible threat taken together with the resistance of a second corrections officer in supplying plaintiff with a grievance form gives rise to a set of circumstances that rendered the administrative remedy effectively unavailable to plaintiff. *See Hemphill, 380 F.3d at 688.* When plaintiff asked for the grievance form, the second officer, not only demanded "What for?", but ultimately failed to provide plaintiff with a form, in violation of the County's express policies. *See* Inmate Handbook, 15–16 (inmates "may request and will receive a grievance form to fill out"). Taking all these circumstances together, plaintiff was sufficiently deterred from filing a timely grievance, and the administrative remedies were rendered unavailable. *See Hemphill, 380 F.3d at 688.*

**B. Failure to Provide Grievance Form Upon Request**
Defendants also arguably failed to satisfy the first prong of the *Hemphill* test because defendants did not provide plaintiff with a grievance form upon request. *See 380 F.3d at 688.* Administrative remedies are rendered unavailable if "prison officials refuse to provide the required grievance forms upon request or ignore such a request." *Albino v. Baca, 697 F.3d 1023, 1034 n. 7 (9th Cir.2012); see also Lineberry v. Fed. Bureau of Prisons, 923 F.Supp.2d 284, 293 (D.D.C.2013)* (same). Indeed, administrative remedies are, in a very real way, "unavailable" if prison officials fail "to provide inmates with those [grievance] forms when requested." *Dale v. Lappin, 376 F.3d 652, 656 (7th Cir.2004).* The failure to provide a form upon request need not be deliberate; even an officer's "innocent[ ]" failure to do so makes administrative remedies unavailable and prevents proper exhaustion. *Jefferson v. Perez, 09–CV–3008, 2012 WL 5706299, at \*5 (E.D.Cal. Nov.15, 2012).*

**\*7** Furthermore, the Inmate Handbook mandates that inmates are "entitled" to file grievance forms and *"will receive* a grievance form" upon request. Inmate Handbook 15–16 (emphasis added). The meaning is plain:

when an inmate requests a grievance form, he must receive one. There are no qualifications to this rule. *See id.*

According to plaintiff's Rule 56.1 Statement and his affidavit, when he asked a correctional officer for a grievance form, he did not receive one. *See* Pl.'s Statement ¶ 2; Rodriguez Aff. ¶ 24. After being asked for a grievance form, the officer responded, "What for?" When plaintiff did not reply, the officer neither followed up nor provided a grievance form. *Id.*

In light of the correctional officer's failure to provide a grievance form upon request, defendants rendered their administrative remedies effectively unavailable. A plaintiff's legitimate request for a grievance form should not be ignored. *See Albino, 697 F.3d at 1034 n. 7; Lineberry, 923 F.Supp.2d at 293.* Even if the correctional officer's failure to provide a grievance form was innocent, such a failure effectively renders administrative remedies unavailable. *Jefferson, 2012 WL 5706299, at \*5; see also Albino, 697 F.3d at 1034 n. 7.* If an inmate must properly follow the prescribed grievance procedures, the correctional facility should certainly be held to the same standards when making grievance forms available to inmates who request them. *See Gibson v. Weber, 431 F.3d 339, 341 (8th Cir.2005)* ("We have ... excused inmates from complying with an institution's grievance procedures ... when officials themselves have failed to comply with the grievance procedures."); *Hill v. Anderson, 06–CV–4497, 2008 WL 319898, at \*6 (D.Minn. Feb.5, 2008)* ("if prison officials do not follow their own administrative procedures, a claim may be deemed exhausted.").

The administrative remedies may have been "available" in the "strict sense," in that grievance procedures had been "established and were known to" plaintiff. *Morrison I, 2010 WL 811319, at \*2.* However, the availability test is "not [dependent] upon the mere existence of grievance procedures": if correctional officers fail to provide a grievance form upon request, the administrative remedies cease to be actually available. *See id.* Therefore, defendants also fail on *Hemphill's* first-prong availability requirement because their actions rendered the grievance process effectively unavailable.

**IV. State Law Claims**
Defendants also argue that plaintiff's state law claims should be dismissed because neither plaintiff nor his

counsel appeared at a hearing pursuant to New York's General Municipal Law § 50–h. Mot. 5–6.

Generally, a plaintiff who has failed to comply with a demand for a hearing served pursuant to General Municipal Law § 50–h is "precluded from commencing an action against a municipality." *Coleman v. City of Niagara Falls,* 09–CV–157S, 2010 WL 2869529, at *4 (W.D.N.Y. July 20, 2010) (collecting cases). "The law is well established that, until a potential plaintiff has complied with General Municipal Law § 50–h(1), he is precluded from commencing an action against a municipality." *La Vigna v. Cnty. of Westchester,* 160 A.D.2d 564, 554 N.Y.S.2d 1014 (N.Y.App.Div.1990). The purpose of the statute is to allow the county defendant "an opportunity to depose the claimant before an action is commenced to facilitate the possible resolution of any dispute prior to litigation." *Coleman,* 2010 WL 2869529, at *4. And the plaintiff may request an adjournment of the administrative hearing, and the county defendant should "grant a reasonable request[ ] for adjournment of the administrative hearing." *Id.* However, the burden is on "the plaintiff, not the County defendants," to take the necessary steps to reschedule a § 50–h hearing. *Kemp v. Cnty. of Suffolk,* 61 A.D.3d 937, 878 N.Y.S.2d 135, 136 (N.Y.App.Div.2009); *see also Zapata v. Cnty. of Suffolk,* 23 A.D.3d 553, 806 N.Y.S.2d 597, 598 (N.Y.App.Div.2005); *Scalzo v. Cnty. of Suffolk,* 306 A.D.2d 397, 760 N.Y.S.2d 879 (N.Y.App.Div.2003); *Coleman,* 2010 WL 2869529, at *4.

**\*8** Plaintiff claims that he had a criminal case pending and that he did not attend the § 50–h hearing pursuant to his Fifth Amendment privilege against self-incrimination. Opp'n 16. Plaintiff was well within his rights to do so, *see Coleman,* 2010 WL 2869529, at *4–5; *Cnty. of Orange v. Rodriguez,* 283 A.D.2d 494, 724 N.Y.S.2d 477, 479 (N.Y.App.Div.2001); but where the plaintiff invokes his Fifth Amendment privilege against self-incrimination, the civil plaintiff, not the county defendants, is obligated to reschedule the hearing. *Kemp,* 61 A.D.3d 937, 878 N.Y.S.2d 135; *see also Scalzo,* 306 A.D.2d 397, 760 N.Y.S.2d 879; *Coleman,* 2010 WL 2869529, at *4.

Despite plaintiff's obligation to request an adjournment of the hearing, it is undisputed that plaintiff never submitted, or attempted to submit, a request for adjournment. *See generally* Pl.'s Statement ¶¶ 16–17; Defs.'¶¶ Statement 10–11; Opp'n 15–18. In fact, plaintiff seems to assume that the burden was on defendants to attempt to reschedule the hearing: "Here, defendants never sought to reschedule the hearing, and have provided nothing evidencing same." Opp'n 17; *see also* Pl.'s Statement ¶¶ 16–17; Defs.' ¶¶ Statement 10–11. Plaintiff's assumption is contrary to the law. *See Kemp,* 61 A.D.3d 937, 878 N.Y.S.2d 135; *Scalzo,* 306 A.D.2d 397, 760 N.Y.S.2d 879. Defendants did not have the burden to attempt a rescheduling of the hearing. The burden and responsibility was on plaintiff. *See Kemp,* 61 A.D.3d 937, 878 N.Y.S.2d 135. Thus, the state law claims must be dismissed because plaintiff did not comply with the hearing requirements of § 50–h. *See Kemp,* 61 A.D.3d 937, 878 N.Y.S.2d 135; *Zapata,* 806 N.Y.S.2d at 598; *Coleman,* 2010 WL 2869529, at *4.

## CONCLUSION

For the foregoing reasons, it is respectfully recommended that defendants' motion for summary judgment be GRANTED as to the state law claims, and DENIED as to the federal claims.

## OBJECTIONS

A copy of this Report and Recommendation is being mailed to the representatives of each of the parties. Any written objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this report. 28 U.S.C. § 636(b)(1) (2006 & Supp. V 2011); Fed.R.Civ.P. 6(a), 72(b). Any requests for an extension of time for filing objections must be directed to the district judge assigned to this action prior to the expiration of the fourteen (14) day period for filing objections. **Failure to file objections within fourteen (14) days will preclude further review of this report and recommendation either by the District Court or Court of Appeals.** *Thomas v. Arn,* 474 U.S. 140, 145, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985) ("[A] party shall file objections with the district court or else waive right to appeal."); *Caidor v. Onondaga Cnty.,* 517 F.3d 601, 604 (2d Cir.2008) ("[F]ailure to object timely to a magistrate's report operates as a waiver of any further judicial review of the magistrate's decision.").

Case 9:15-cv-01542-MAD-DEP    Document 79    Filed 02/14/18    Page 182 of 227
Rodriguez v. County of Suffolk, Not Reported in F.Supp.3d (2014)
2014 WL 3531897

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 3531897

---

**End of Document**                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 2791063
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Edy RODRIGUEZ, Plaintiff,
v.
J. CROSS, Sergeant, Clinton
Correctional Facility; et al., Defendants.

No. 15-CV-1079 (GTS/CFH)
|
Signed 05/09/2017

**Attorneys and Law Firms**

Edy Rodriguez, East Elmhurst, NY, pro se.

Ryan E. Manley, Harris, Conway & Donovan, Christopher J. Hummel, New York State Attorney General, Albany, NY, for Defendants.

**Opinion**

**REPORT-RECOMMENDATION AND ORDER** [1]

Christian F. Hummel, U.S. Magistrate Judge

**\*1** Plaintiff pro se Edy Rodriguez ("Plaintiff"), an inmate who was, at all relevant times, in the custody of the New York Department of Corrections and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983, alleging that Sergeant ("Sgt.") J. Cross, Sgt. R. Furnia, Correction Officer ("C.O.") G. Falcon, and C.O. J. Roberts (collectively "Defendants") violated his constitutional rights under the First and Eighth Amendments. Dkt. No. 1 ("Compl."). [2]

Presently pending is defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56(a) for plaintiff's failure to exhaust administrative remedies before commencing this action. Dkt. No. 26. Plaintiff filed a response in opposition to defendants' motion. Dkt. No. 34. Defendants filed a reply. Dkt. No. 39.

**I. Background**

The facts are reviewed in the light most favorable to plaintiff as the non-moving party. See subsection II(A) infra. At the relevant times giving rise to plaintiff's claims, plaintiff was an inmate incarcerated at Clinton Correctional Facility ("Clinton").

On July 10, 2014, plaintiff wrote a letter to Sgt. Cross "complaining about being harassed" by staff at Clinton. Compl. at 4. Plaintiff further alleges that he was taken out of his cell on July 14, 2014, brought to the second floor of the facility's hospital, and subjected to a "beating" by defendants. Compl. at 4-5. Sgt. Cross grabbed him by the hair; Sgt. Furnia punched him; and C.O. Falcon and C.O. Roberts punched him in the face, back, and neck. Id. at 4. Plaintiff alleges "each one of the blows" he suffered was from the named defendants, as well as other officers he cannot identify by name. Id. at 5-6. After the alleged incident, plaintiff was seen by a nurse with "about ten" officers present in the room, where he admits "having no choice," but to tell the nurse that officers had just beat him up. See Affirmation of Christopher J. Hummel ("Hummel Aff."), Dkt. No. 26-1, Exhibit ("Exh.") A [3] at 59-60. [4]

While at Clinton, plaintiff filed five grievances. See Declaration of Christine Gregory ("Gregory Decl."), Dkt. No. 26-3 Exh. A at 6. Only one grievance was appealed. Declaration of Jeffrey Hale ("Hale Decl."), Dkt. No. 26-2 ¶¶ 12-13. The subject matter of the single appealed grievance does not concern the matter before the Court. Id. ¶ 12. The only grievance filed that is pertinent to the pending motion was filed on July 29, 2014. See Gregory Decl. Exh. B at 8. This grievance alleges that plaintiff suffered "an assault by (C.O.)" and, following the assault, did not receive appropriate medical care. Id. The investigation into the July 29, 2014 grievance concluded that plaintiff saw his medical provider, and medicine was given to him without any further action. Id. at 10. The investigation did not mention anything about an assault. Id.

**\*2** Plaintiff alleges that he filed a grievance regarding the incidents described in his complaint, but an unidentified Sergeant destroyed the grievance. Compl. at 2. He also alleges that he was beaten by correction staff for filing the grievance. Id. Plaintiff also states that he filed a handwritten grievance (not on a grievance form) on July 19, 2014, regarding the July 14, 2014 incident. See Hummel Aff. Exh. A at 93. Plaintiff alleges that he sent a copy of this grievance to his mother and instructed her

to send it directly to Clinton "[f]rom outside." Id. at 94. Defendants have no record of this grievance being filed. See Gregory Decl. Exh. A at 6. Plaintiff never inquired further about the July 19, 2014 grievance, but maintains that he has handwritten copies of the grievance since he did not have access to carbon paper when he originally drafted this grievance. See Hummel Aff. Exh. A at 94-95, 96-97. The July 19, 2014 grievance was drafted while plaintiff was in keeplock. Id. at 93.

Plaintiff further alleges, in his response to defendants' motion for summary judgment, that defendants have total control over facility mail and any failure to exhaust administrative remedies occurred because defendants strategically removed grievances from the mailbox to cover up their use of excessive force against plaintiff. See Dkt. No. 34 at 4. Plaintiff further alleges a general belief that there is a pattern of prison officials threatening and retaliating against inmates for filing grievances, thus making administrative remedies unavailable. Id. at 6. Lastly, plaintiff alleges that there is an "unwritten posture" at Clinton where inmates are not given grievance forms unless they provide a clear description of their complaint, or the complaint does not involve staff misconduct. Id. at 8.

## II. Discussion [5]

Plaintiff alleges that defendants retaliated against him in violation of the First Amendment, used excessive force against him in violation of the Eighth Amendment, and violated his Due Process rights under the First and Fourteenth Amendments. See Compl. at 7. Defendants argue that plaintiff's complaint should be dismissed in its entirety as plaintiff failed to exhaust his administrative remedies with respect to the causes of action outlined in the Complaint. See Defendants' Memorandum of Law, Dkt. No. 26-5 at 3.

### A. Legal Standard For Motions Pursuant to Fed. R. Civ. P. 56(a)

"A court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party has the burden of showing the absence of disputed material facts by providing the Court with portions of "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which support the motion. FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A fact is material if it may affect the outcome of the case as determined by substantive law, such that "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "In determining whether summary judgment is appropriate, [the Court] will resolve all ambiguities and draw all reasonable inferences against the moving party." Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

To avoid summary judgment, a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Carey v. Crescenzi, 923 F.2d 18, 19 (2d Cir. 1991) (quoting Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp., 475 U.S. 574, 586 (1986)). A non-moving party must support such assertions by evidence showing the existence of a genuine issue of material fact. Carey, 923 F.2d at 19. "When no rational jury could find in favor of the non-moving party because the evidence to support is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Services, Ltd. Partnership, 22 F.3d, 1219, 1224 (2d Cir. 1994).

**\*3** Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest," .... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law" ....

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191–92 (2d Cir. 2008).

### B. Exhaustion of Administrative Remedies

The Prison Litigation Reform Act ("PLRA") requires that a prisoner exhaust any administrative remedies available to him or her before bringing an action for claims arising out of his or her incarceration. Porter v. Nussle, 534 U.S. 516, 524 (2002); see also Woodford v. Ngo, 548 U.S. 81, 82 (2006). The exhaustion requirement applies " 'to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.' " Mauldin v. Kiff, No. 11-CV-107-A, 2014 WL 2708434, at *4 (W.D.N.Y. June 16, 2014) (quoting Porter, 534 U.S. at 532). Further, the exhaustion requirement applies even where the prisoner seeks relief not available in the administrative grievance process, such as monetary damages. Porter, 534 U.S. at 524. To exhaust administrative remedies, the inmate must complete the full administrative review process set forth in the rules applicable to the correctional facility in which he or she is incarcerated. Jones v. Bock, 549 U.S. 199, 218 (2007) (internal citation omitted).

Although the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply." Ruggiero v. County of Orange, 467 F.3d 170, 175 (2d Cir. 2006) (citation omitted). Until recently, courts in this District followed a three-part test established by the Second Circuit in Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004). Under the test established in Hemphill, a plaintiff's failure to exhaust could be excused if a plaintiff established that his or her failure to exhaust was justified by "special circumstances." Id. However, the Supreme Court recently held that "[c]ourts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement." Ross v. Blake, 136 S. Ct. 1850, 1862 (2016). As such, the special circumstances exception previously promulgated by the Second Circuit in Hemphill is no longer consistent with the statutory requirements of the PLRA. Williams v. Priatno, 829 F.3d 118, 123 (2d Cir. 2016).

*4 Although the Supreme Court's decision in Ross eliminates the "special circumstances" exception promulgated by Hemphill, courts must still consider the PLRA's "textual exception to mandatory exhaustion." Ross, 136 S. Ct. at 1858. Under this exception, courts must determine whether administrative remedies were "available" to a prisoner. Id. The Supreme Court identified three circumstances where administrative remedies may be unavailable to a prisoner. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. at 1859 (citing Booth v. Churner, 532 U.S. 731, 736, 738 (2001)). "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." Id. Lastly, administrative remedies are unavailable where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 1860.

Here, there is no genuine dispute that at all relevant times, DOCCS had in place a three-step inmate grievance program. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5. First, the inmate must file a complaint with an inmate grievance program ("IGP") clerk within twenty-one days of the alleged incident. Id. at § 701.5(a)(1). An IGP representative has sixteen calendar days to informally resolve the issue. Id. at § 701.5(b)(1). If no informal resolution occurs, the Inmate Grievance Review Committee ("IGRC") must hold a hearing within sixteen days of receipt of the grievance and must issue a written decision within two working days after the conclusion of the hearing. Id. §§ 701.5(b)(2)(i)-(ii). If the determination is unfavorable to the inmate, the inmate may appeal the IGRC's determination to the facility superintendent within seven calendar days of receipt of the determination. Id. § 701.5(c)(1). If the superintendent's determination is unfavorable to the inmate, the inmate may appeal to the Central Office Review Committee ("CORC") within seven days after receipt of the superintendent's determination. Id. §§ 701.5(d)(i)-(ii). CORC must "review each appeal, render a decision on the grievance, and transmit its decision to the facility, with reasons stated, for the [inmate], the grievance clerk, the superintendent, and any direct parties within thirty (30) calendar days from the time the appeal was received." Id. § 701.5(d)(3)(ii).

Case 9:15-cv-01542-MAD-DEP   Document 79   Filed 02/14/18   Page 186 of 227

### 1. Application

First, the Court will address whether there is any genuine dispute that plaintiff failed to exhaust his administrative remedies. Courts in the Second Circuit have consistently held that any informal resolutions or relief outside of the administrative procedures do not satisfy exhaustion requirements. See, e.g., Macias v. Zenk, 495 F.3d 37, 43 (2d Cir. 2007) (holding that regardless of whether prison officials know of plaintiff's complaints in a "substantive sense," procedural exhaustion of remedies must still occur); Ruggiero v. Cty. of Orange, 467 F.3d 170, 177-78 (2d Cir. 2006); Perez v. City of N.Y., No. 14 CIV. 07502(LGS), 2015 WL 3652511, at *4 (S.D.N.Y. June 11, 2015) ("Plaintiff's allegation that he advised others of his grievance does not excuse his failure to exhaust the administrative process.").

Here, subsequent to the alleged events giving rise to the matter before the Court, plaintiff states he and family members contacted the Inspector General's Office to complain about prison conditions and concerns of plaintiff's safety. See Hummel Aff. Exh. A at 89, 90. Such correspondence does not satisfy exhaustion and falls outside of the grievance procedures. See Geer v. Chapman, No. 9:15-CV-952(GLS/ATB), 2016 WL 6091699, at *5 (N.D.N.Y. Sept. 26, 2016), report and recommendation adopted, No. 9:15-CV-952 (GLS/ ATB), 2016 WL 6090874 (N.D.N.Y. Oct. 18, 2016) ("It is well-settled that writing letters to prison officials, or other officials, is insufficient to properly exhaust administrative remedies."); Salmon v. Bellinger, No. 9:14-CV-0827(LEK/DJS), 2016 WL 4411338, at *4 (N.D.N.Y. July 5, 2016), report and recommendation adopted by, No. 9:14-CV-0827(LEK/DJS), 2016 WL 4275733 (N.D.N.Y. Aug. 12, 2016) (holding that letters sent to the Inspector General do not satisfy exhaustion procedures).

**\*5** After the alleged incident of excessive force, plaintiff was seen by a nurse in a room with "about ten" officers present, where he admits "having no choice" but to tell the nurse that the officers had beat him up. Hummel Aff. Exh. A at 59-60. Plaintiff alleges filing grievances on July 19, 2014 and July 29, 2014 that mention the assault. See id. at 93; Gregory Decl. Exh. B at 6, 8-10. Defendants state that there is no record of appeal on any grievances pertaining to the alleged assault. Gregory Decl. ¶ 15. While plaintiff's complaints were aired verbally and in

writing, plaintiff failed to utilize the procedures required to exhaust administrative remedies. Timmons v. Schriro, No. 14-CV-6606(RJS), 2015 WL 3901637, at *3 (S.D.N.Y. June 23, 2015) ("[T]he law is well-settled that informal means of communicating and pursuing a grievance, even with senior prison officials, are not sufficient under the PLRA."). Thus, there is no genuine dispute that plaintiff failed to exhaust administrative remedies.

As a result, the Court must determine whether administrative remedies were in fact available to plaintiff. See Ross, 136 S. Ct. at 1858 ("An inmate ... must exhaust available remedies, but need not exhaust unavailable ones"); Mena v. City of New York, No. 13-cv-2430(RJS), 2016 WL 3948100, at *4 (S.D.N.Y. July 19, 2016) (citing Ross, 136 S. Ct. at 1862) ("[T]he lone surviving exception to the PLRA's exhaustion requirement is that embedded in its text: that an inmate need only exhaust those administrative remedies that are 'available' to him."). Plaintiff sets forth three factual arguments as to why administrative remedies were not available to him. First, plaintiff alleges that the grievance procedures were unavailable to him because he was denied access to paper and writing instruments. See Compl. at 3. Next, plaintiff alleges that he was physically beaten when he attempted to take steps to utilize the grievance process. Id. Lastly, plaintiff suggests that he never received a response to his grievance, his mail was tampered with, and his letters were not delivered. See Hummel Aff. Exh. A at 91-92, 94.

### a. Lack of Paper and Pen to
### Complete Grievance Procedures

The third prong of Ross is triggered by plaintiff's argument that he was denied access to pen and paper, as it shows an alleged attempt to stop him from taking part in the grievance process. When a plaintiff-inmate asserts that a defendant-facility withheld pens, courts have granted summary judgment against a plaintiff when "the record does not show that '[p]laintiff indicated to prison officials that he needed a pen so he could file a grievance or that prison officials refused to provide him a pen for this purpose." Mena v. City of N.Y., No. 12 CIV. 6838(GBD), 2013 WL 3580057, at *2 (S.D.N.Y. July 10, 2013). When an inmate argues that a correction officer denies him access to pen or paper, even assuming the allegations are true, courts examine whether the inmate was drafting other documents during the same time period, or whether

they were able to access materials from other sources. See Williams v. Ramos, No. 13 CV 826(VLB), 2015 WL 864888, at *3 (S.D.N.Y. Feb. 9, 2015) ("It is unclear how plaintiff was able to submit [other] grievances if defendants took his pens and paper and threatened him ... Moreover, when defendants allegedly stole his pens and papers, plaintiff testified he was able to file grievances on his commissary sheet."); Lahoz v. Orange Cty. Jail, No. 08 CIV. 4364(RWS), 2010 WL 1789907, at *3 (S.D.N.Y. Apr. 29, 2010) (stating that an inmate was not deprived of writing materials when he drafted a handwritten letter during the same time period as the grievance process).

Here, the Court notes contradictory statements within the complaint pertaining to plaintiff's access to writing instruments or paper. When prompted as to why facts relating to the complaint were not presented in the grievance program, plaintiff asserts that he was denied a paper or pen. Compl. at 3. However, plaintiff also states that he wrote a grievance, the grievance was destroyed by a Sergeant, and he was beaten in retaliation for writing the grievance. See id. at 2. The only time plaintiff asserts that he was denied a paper and pen was when he was taken to the Special Housing Unit ("SHU") [6] on July 14, 2014 after the alleged incident. See id. at 3; Hummel Aff. Exh. A at 68. In fact, records indicate that plaintiff filed grievances on July 19, July 29, August 4, and November 19 of that same year. [7] Gregory Decl. Exh. A at 6. Plaintiff does not allege any difficulties obtaining a pen and paper after the July 2014 SHU stay, but rather, admits having "a piece of paper that an inmate had and a pen" on at least one occasion. See id. at 94.

**\*6** Lastly, in his response to defendants' motion for summary judgment, plaintiff alleges that there is an "unwritten posture" at Clinton where inmates are not given grievance forms unless they provide a clear description of their complaint, or if their complaint does not involve staff misconduct. Dkt. No. 34 at 8. Such general allegations without any factual support are insufficient to show that procedures were unavailable, coupled with the fact that, grievances can and have been submitted by plaintiff on plain paper. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(a)(1) ("If this form is not readily available, a complaint may be submitted on plain paper."); see Veloz v. N.Y., 339 F. Supp. 2d 505, 516 (S.D.N.Y. 2004), aff'd, 178 Fed.Appx. 39 (2d Cir. 2006) (granting summary judgment where plaintiff does

not allege that any specific officer thwarted his efforts to timely file a grievance); Hummel Aff. Exh. A at 94.

Even if the Court assumes that plaintiff was denied access to pen and paper while in the SHU, the grievances filed in July 2014 were filed within the twenty-one calendar days required, and his subsequent failure to exhaust administrative remedies regarding those grievances is unaffected by any denial of pen and paper that occurred in the past. Thus, the Court rejects plaintiff's argument as there is no genuine dispute of fact that administrative remedies were unavailable due a lack of writing instruments or paper.

### b. Allegation that Grievance Was Not Received and Mail Tampering

Courts have long held that where an inmate does not receive a response to a written grievance, the inmate must appeal to the next level of review. See Khudan v. Lee, No. 12-cv-8147(RJS), 2015 WL 5544316, at *5 (S.D.N.Y. Sept. 17, 2015) (dismissing a plaintiff's complaint where plaintiff failed to appeal to the next level of review after not receiving a response to his filed grievance); see also Veloz v. New York, 339 F. Supp. 2d 505, 516 (S.D.N.Y. 2004), aff'd, 178 Fed.Appx. 39 (2d Cir. 2006) ("[P]laintiff's allegation that these particular grievances were misplaced or destroyed by correctional officers ultimately does not relieve him of the requirement to appeal these claims to the next level once it became clear to him that a response to his initial filing was not forthcoming.").

However, recent decisions by courts in the Second Circuit have addressed the availability of administrative remedies when an inmate's grievance is unfiled and unanswered. These cases have focused on the second prong of the Ross test, where a grievance process becomes unusable for an inmate. Ross, 136 S. Ct. at 1859. In Williams v. Priatno, the Second Circuit held that when an inmate's grievance is not filed, "the regulations plainly do not describe a mechanism for appealing a grievance." See 829 F.3d at 126. Thus, "the process to appeal an unfiled and unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it." Id. The Williams ruling relied upon a scenario where an inmate is housed in a SHU and personally gives a grievance to a correction officer, as required by grievance procedures. Id. at 120-21. Additionally, adding to the

"opaque" nature of the procedures, the plaintiff in Williams followed up when he did not receive a response after a week, but was subsequently transferred one week later without any resolution or knowledge of his grievance being filed. Williams, 829 F.3d at 120-21. Ultimately, the Williams Court held that "in giving his grievance to the correction officer, [the plaintiff] exhausted all administrative remedies that were available to him." Id. at 126.

Here, in his September 19, 2016 deposition, plaintiff sets forth facts suggesting prison staff filtered his mail and "when they [saw] grievances" they were thrown to the side, not delivered, "and were never [ ] seen." See Hummel Aff. Exh. A at 91-92. The grievance that plaintiff allegedly filed on July 19, 2014 was sent to the Clinton grievance office by his mother. Id. at 94. Plaintiff never received a response on the grievance or followed up on the status of the grievance. Id. Without concrete facts, plaintiff states that his grievance was not resolved because "no civilian ... picks up your grievances. It's officers." Id. at 91. Plaintiff's allegations of mail tampering are conclusory and weakened by the fact that other correspondence, including complaints, were sent and received during the general time period material to the issues before the Court. Johnson v. Fraizer, No. 16-CV-6096(CJS), 2016 WL 7012961, at *4 (W.D.N.Y. Dec. 1, 2016) ("Plaintiff makes only a conclusory statement that his mailing was not allowed to leave the facility[,] ... his contention ... is belied by his admission that he was able to send other complaints about the matter to various New York State officials at around the same time."); see Hummel Aff. Exh. A at 89, 94 (providing an example where plaintiff successfully sent legal mail to his mother).

**\*7** In plaintiff's response in opposition to defendants' motion for summary judgment, he raises general complaints about defendants having total control over facility mail and defendants strategically removing grievances from the mailbox to cover up their excessive use of force against plaintiff and other inmates. See Dkt. No. 34 at 2. Plaintiff's bare assertions do not excuse exhaustion requirements. Courts in this Circuit have continuously held that mere contentions or speculation of grievances being misplaced by officers do not create a genuine issue of material fact when there is no evidence to support the allegations. Khudan, 2016 WL 4735364, at *6 (citations omitted) (holding that under Ross, mere stand alone contentions of mail tampering without support

and particularity cannot deem administrative remedies unavailable); Veloz, 339 F. Supp. 2d at 516 (holding that summary judgment is proper where the plaintiff contends that officers misplaced his grievances, but offers no evidence to support his claim). In Khudan, the court did not consider or rely upon conclusory allegations when plaintiff attested he "was informed by other [unnamed] inmates that grievances routinely go 'missing.' " Khudan, 2016 WL 4735364, at *6. This is similar to plaintiff's conclusory theory of injustice and displeasure with mail procedures, and other "recurrent pattern[s]" in New York correctional facilities. Dkt. No. 34 at 2, 4; see Khudan, 2016 WL 4735364, at *6 ("Plaintiff's accusations, which 'stand alone' and are 'unsupported,' are insufficient to withstand summary judgment.") (quoting Bolton v. City of N.Y., No. 13-CV-5749(RJS), 2015 WL 1822008, at *2 (S.D.N.Y. Apr. 20, 2015)).

Courts have denied a defendant's motion for summary judgment when faced with an unanswered and unfiled grievance drafted in SHU. See, e.g., Juarbe v. Carnegie, No. 9:15-CV-01485(MAD/DEP), 2016 WL 6901277, at *1, 4 (N.D.N.Y. Nov. 23, 2016). This is distinguishable from plaintiff's alleged July 19, 2014 grievance drafted in keeplock. [8] Such a difference in inmate housing supports the notion that, "the Second Circuit's decision hinged on the 'extraordinary circumstances' specific to the case before it." Mena v. City of N.Y., No. 13-CV-2430(RJS), 2016 WL 3948100, at *5 (S.D.N.Y. July 19, 2016) (quoting Williams, 829 F.3d at 119); see N.Y. COMP. CODES R. & REGS. tit. 7, § 701.7 (explaining that there are different grievance filing procedures for an inmate housed in the SHU). Inmates not housed in the SHU are in a different position to SHU inmates when determining if grievance procedures are "essentially unknowable" or unavailable. Id. at *5 (quoting Ross v. Blake, 136 S. Ct. at 1859).

Plaintiff never followed up on the July 19, 2014 grievance. Hummel Aff. Exh. A at 94-95. However, on July 29, 2014, he filed a grievance in the facility that included medical complaints, but also a reference to the alleged assault on July 14, 2014. See Gregory Decl. Exh. B at 8. The Clinton grievance department received and responded to this grievance. Id. This grievance was not appealed. Id. ¶ 15. Even assuming, as the Court must on this motion, that plaintiff's allegations of mail tampering are true, he did not exhaust his administrative remedies when he failed to appeal the July 29, 2014 grievance to the next level of review. The fact that

this grievance was subsequently filed and not appealed within close proximity to the July 19, 2014 grievance, coupled with three unrelated grievances filed within the next year, demonstrates that plaintiff's situation does not rise to the level where the grievance process is "opaque," unavailable, or unascertainable. See Hill v. Tisch, No. 02CV3901(DRH/AYS), 2016 WL 6991171, at *7 (E.D.N.Y. Nov. 29, 2016) (finding that the plaintiff failed to demonstrate that the grievance "procedures were essentially unknowable"); Gregory Decl. Exh. A at 6.

### c. Allegation that Plaintiff Suffered Retaliation and Physical Beatings

Plaintiff's pleadings also suggest an inquiry under the third prong of Ross, whether "machination, misrepresentation, or intimidation" occurred. See Ross, 136 S. Ct. at 1860. Specifically, plaintiff alleges that he did not comply with the grievance procedures because he was subjected to physical beatings, retaliation, and intimidation after complaining about conditions at Clinton. See Compl. at 3, 4, 7. For these reasons, he believed the grievance procedures were unavailable. See id. at 2-3.

**\*8** Specific threats of retaliation or intimidation by prison employees can render administrative remedies unavailable. Ross, 136 S. Ct. at 1860 & n.3. However, a generalized fear of retaliation is insufficient to overcome a failure to exhaust administrative remedies. Salmon, 2016 WL 4411338, at *5. Estoppel is found where "verbal and physical threats of retaliation, physical assault, denial of grievance forms or writing implements, and transfers" occur showing that defendants acted affirmatively to prevent an inmate from availing him or herself of the grievance procedures. Id. at *5 (quoting Amador v. Andrews, 655 F.3d 89, 103 (2d Cir. 2011)). In Riles, the Second Circuit affirmed a district court's ruling that prison officials' alleged threats did not interfere with exhaustion efforts when plaintiff stated he was threatened "if he pushed the issue," but then subsequently filed a grievance in spite of the alleged threats. See Riles v. Buchanan, 656 Fed.Appx. 577, 581 (2d Cir. 2016) (summary order).

Relying on Ross, courts have carved out factual limitations to the third prong of unavailability concerning fear of retaliation. See, e.g., Aviles v. Tucker, No. 14-CV-08636(NSR), 2016 WL 4619120, at *3-4 (S.D.N.Y. Sept. 1, 2016) (citing Ross, 136 S. Ct. at 1860). In

Aviles, the court noted a longstanding rule that general beliefs of retaliation or fears do not excuse the exhaustion requirement. Aviles, 2016 WL 4619120, at *4 (citations omitted). Circumstances that have met the threshold of unavailability by means of intimidation have included widespread beatings with assertions of fear for one's life, in conjunction with the plaintiff withholding all complaints until he was transferred to a different facility. See, e.g., id. (quoting Thomas v. Cassleberry, No. 03-cv-6394L, 2007 WL 1231485, at *2 (W.D.N.Y. Apr. 24, 2007)). Allegations of threats are conclusory where a plaintiff's allegation "does not indicate who threatened him, when he was threatened, or how he was threatened." See Johnson v. Fraizer, No. 16-CV-6096(CJS), 2016 WL 7012961, at *5 (W.D.N.Y. Dec. 1, 2016). In contrast, this Court has denied a summary judgment motion when a plaintiff alleged he was threatened by a specific correction that the officer would "break [plaintiff's] bones," and another specific correction officer threatened to beat plaintiff "a [sic] inch from life" if he filed a grievance. Galberth v. Durkin, No. 914CV115(BKS/ATB), 2016 WL 3910270, at *3 (N.D.N.Y. July 14, 2016).

Here, plaintiff offers conclusory allegations in his complaint that "[he] was beaten" while attempting to access Clinton's grievance program. Compl. at 2, 3. Plaintiff offers no information of when or how he was threatened or beaten after the July 14, 2014 incident. Some instances of threats alleged by plaintiff refer to a time period before he filed a grievance and he does not state how any specific threat or subsequent act of violence impacted his ability to exhaust administrative remedies related to the events that occurred on July 14, 2014. See Aviles, 2016 WL 4619120, at *4 (finding grievance procedures available where plaintiff offers conclusory allegations of fear and does not substantiate what specific fears or past acts preclude him from advancing in grievance procedures); Harrison v. Stallone, No. 9:06-CV-902(LEK/GJD), 2007 WL 2789473, at *5 (N.D.N.Y. Sept. 24, 2007) ("It has been held that a 'general fear' of retaliation is not sufficient to excuse the exhaustion requirement.... If an inmate could simply state that he feared retaliation, there would no point in having a grievance procedure.") (citations omitted); see, e.g., Hummel Aff. Ex. A at 58. Much of plaintiff's fear is generalized. For instance, he notes that corrections officers become agitated when they see legal mail and "that's when harassment comes." Hummel Aff. Ex. A at 92. By his own admission, plaintiff denies any actual

physical force being used against him that prohibited him from taking part in the grievance program. Hummel Aff. Ex. A at 99; see Salmon, 2016 WL 4411338, at *5 (stating there must be affirmative actions or specific instances of physical assault or threats of retaliation for plaintiff to show unavailability of the grievance process).

**\*9** The Court notes that plaintiff directly contradicted allegations in his complaint by statements made in his deposition. While the complaint alleges conclusory instances of being "beaten by staff," plaintiff admits that other than being cut on his face by an inmate in the yard on October 5, 2015, there has not been any other physical force used against him by inmates or correction officers since July 14, 2014. Hummel Aff. Ex. A at 99; Compl. at 3. This statement contradicts plaintiff's allegations of being beaten by staff. See Williams v. Doe, No. 12-CV-1147(HKS), 2016 WL 4804057, at *5 (W.D.N.Y. Sept. 14, 2016) (granting a motion for summary judgment after noting that any triable issue of fact on exhaustion of administrative remedies can be eliminated when plaintiff's prior representations to the court are "flatly contradict[ed]").

Further, this Court finds that plaintiff's failure to follow the grievance procedures cannot be excused by fears or intimidation, when he simultaneously made his complaints known through other means. After the alleged incident, plaintiff was seen by a nurse in a room with "about ten" officers, where he admits "having no choice," but to tell the nurse that they had beaten him. Hummel Aff. Ex. A at 57-58. Plaintiff also aired his complaints and concerns in writing outside of the grievance procedures, clearly identifying his complaints in full substance, including the identification of those who committed acts against him. See, e.g., Hummel Aff. Ex. A at 93; Gregory Decl. Exh. at 8. Similarly in Johnson v. Fraizer, the Court rejected plaintiff's argument that administrative remedies were unavailable where the plaintiff alleged he was threatened by correction officers but continued to make and send formal complaints to prison officials and other New York State officials. Johnson v. Fraizer, No. 16-CV-6096 (CJS), 2016 WL 7012961, at *5 (W.D.N.Y. Dec. 1, 2016). By plaintiff's own admission, it is clear that he sought to file the initial grievance and tell others about his complaints, which disprove any claim of intimidation or fear of retaliation. Quick v. Omittee, No. 14-CV-1503(TJM/CFH), 2016 WL 5219732, at *4 (N.D.N.Y. Aug. 11, 2016), report and recommendation adopted, No. 914CV1503 (TJM/CFH), 2016 WL 5107125 (N.D.N.Y. Sept. 20, 2016) (holding that fear of physical retaliation or assaults does not deem grievance procedures unavailable when plaintiff continuously sought to file complaints with officials). Like in Quick, where the plaintiff filed formal internal grievances and the grievance procedures were deemed available, here the plaintiff alleges drafting two internal grievances outlining the alleged July 14, 2014 incident. See id. at * 4; Hummel Aff. Ex. A at 93; Gregory Decl. Exh. B at 8. Thus, plaintiff has not shown that administrative remedies were unavailable due to intimidation and threats.

In conclusion, the Court finds that defendants have met their burden in showing that there is no genuine issue of material fact as to plaintiff's failure to exhaust administrative remedies. Accordingly, the Court recommends that defendants' motion be granted.

### III. Conclusion

For the reasons stated above, it is hereby

**RECOMMENDED** that defendants' motion for summary judgment (Dkt. No. 26) on plaintiff Edy Rodriguez's complaint (Dkt. No. 1) be **GRANTED**; and it is further

**RECOMMENDED** that plaintiff Edy Rodriguez's complaint (Dkt. No. 1) be **DISMISSED** in its entirety, without prejudice; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties in this action, pursuant to local rules.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** Roldan v. Racette, 984 F. 2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892 F. 2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), 6(e).

### All Citations

Slip Copy, 2017 WL 2791063

2017 WL 2791063

Footnotes

1    This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

2    On March 27, 2017, this Court granted plaintiff an extension until May 1, 2017 to file a motion to amend his complaint. Dkt. No. 38. The deadline has expired and plaintiff has not filed a motion to amend his complaint.

3    Exhibit A to the Affirmation of Christopher J. Hummel is a transcript of plaintiff's deposition, held on September 19, 2016 at Great Meadow Correctional Facility. See Dkt. No. 26-1.

4    When citing documents within the record, the Court uses the page numbers generated by CM/ECF.

5    All unpublished opinions cited to by the Court in this Report-Recommendation and Order are, unless otherwise noted, attached to this Report-Recommendation and Order.

6    SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population...." N.Y. COMP. CODES R. & REGS . tit. 7, § 300.2(b). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. Id. at pt. 301.

7    Both the August and November grievances are unrelated to the cause of action before the Court. Gregory Decl. Exh. A at 6.

8    "Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities." Green v. Bauvi, 46 F.3s 189, 192 (2d Cir. 1995); N.Y. COMP. CODES R. & REGS. tit. 7, § 301.6.

---

**End of Document**                              © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 2790530
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Edy RODRIGUEZ, Plaintiff,

v.

J. CROSS, Sergeant, Clinton Corr. Fac.; R.
Furnia, Sergeant, Clinton Corr. Fac.; G. Falcon,
Corr. Officer, Clinton Corr. Fac.; and J. Roberts,
Corr. Officer, Clinton Corr. Fac., Defendants.

9:15-CV-1079 (GTS/CFH)
|
Filed 06/27/2017

### Attorneys and Law Firms

EDY RODRIGUEZ, No. 8951602009, Anna M. Kross
Center, 18-18 Hazen Street, East Elmhurst, New York
11370, Pro Se.

HON. ERIC T. SCHNEIDERMAN, OF COUNSEL:
CHRISTOPHER J. HUMMEL, ESQ. Assistant
Attorney General, The Capitol Albany, New York 12224,
Attorney General for the State of New York, Counsel for
Defendants.

### Opinion

### DECISION and ORDER

HON. GLENN T. SUDDABY, Chief United States
District Judge

**\*1** Currently before the Court, in this *pro se*
prisoner civil rights action filed by Edy Rodriguez
("Plaintiff") against the four above-captioned employees
of the New York State Department of Corrections
and Community Supervision at Clinton Correctional
Facility in Dannemora, New York ("Defendants"), are
Defendants' motion for summary judgment seeking

dismissal of Plaintiff's Complaint for failure to exhaust
his administrative remedies, and United States Magistrate
Judge Christian F. Hummel's Report-Recommendation
recommending that Defendants' motion be granted and
that Plaintiff's Complaint be dismissed in its entirety
without prejudice. [1] (Dkt. Nos. 26, 40.) Plaintiff has not
filed an Objection to the Report-Recommendation despite
having received an extension of the filing deadline, which
has expired. (Dkt. No. 42.)

After carefully reviewing the relevant papers herein,
including Magistrate Judge Hummel's thorough Report-
Recommendation, the Court can find no clear-error in the
Report-Recommendation. [2] Magistrate Judge Hummel
employed the proper standards, accurately recited the
facts, and reasonably applied the law to those facts. (Dkt.
No. 40.) As a result, the Report-Recommendation is
accepted and adopted in its entirety for the reasons set
forth therein; Defendants' motion for summary judgment
is granted; and Plaintiff's Complaint is dismissed in its
entirety without prejudice.

**ACCORDINGLY**, it is

**ORDERED** that Magistrate Judge Hummel's Report-
Recommendation (Dkt. No. 40) is **ACCEPTED** and
**ADOPTED** in its entirety; and it is further

**ORDERED** that Defendants' motion for summary
judgment (Dkt. No. 26) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is
**DISMISSED** in its entirety without prejudice; and it is
further

**ORDERED** that the Clerk of the Court shall enter
Judgment for Defendants and close this action.

### All Citations

Slip Copy, 2017 WL 2790530

---

Footnotes

1    The Court notes that Assistant Attorney General Christopher J. Hummel is of no relation to U.S. Magistrate Judge
     Christian F. Hummel.

2    When no objection is made to a report-recommendation, the Court subjects that report-recommendation to only a
     clear error review. Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition. When performing such a "clear
     error" review, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept

**Rodriguez v. Cross, Slip Copy (2017)**

2017 WL 2790530

the recommendation." *Id.*; *see also Batista v. Walker*, 94-CV-2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am permitted to adopt those sections of [a magistrate judge's] report to which no specific objection is made, so long as those sections are not facially erroneous.") (internal quotation marks omitted).

---

**End of Document**                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 3808813

2010 WL 3808813
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jonathan ROSADO, Plaintiff,

v.

P. FESSETTO, [1] Defendant.

No. 9:09–CV–67 (DNH/ATB).
|
Aug. 4, 2010.

**Attorneys and Law Firms**

Jonathan Rosado, pro se.

Dean J. Higgins, Asst. Attorney General for Defendants.

**Opinion**

**REPORT–RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge.

**\*1** This matter has been referred to me for Report and Recommendation by the Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c). [2]

In this civil rights complaint, plaintiff alleges that defendant Fessette failed to protect plaintiff from assault by another inmate. (Compl.) (Dkt. No. 1). [3] Plaintiff seeks substantial monetary relief. (Compl.¶¶ 14–15).

Presently before the court is defendant's motion for summary judgment pursuant to Fed.R.Civ.P. 56, arguing both that plaintiff has failed to exhaust his administrative remedies and that his claim fails on the merits. (Dkt. No. 26). Plaintiff has responded in opposition to the motion. (Dkt. No. 33). For the following reasons, this court agrees with defendant and will recommend dismissal of the complaint.

**I.** *Facts*

**A. Plaintiff's Allegations**

By way of background, plaintiff states that on August 28, 2006, while he was incarcerated at Great Meadow Correctional Facility ("Great Meadow"), he was "cut behind his right ear" by an unknown inmate. (Compl.¶ 1). Plaintiff alleges that the inmate who cut him then pushed plaintiff down the stairs and disappeared so that plaintiff could not identify him. *Id.* As a result, plaintiff was placed in Involuntary Protective Custody ("IPC"). *Id.* Plaintiff states that at the IPC hearing, he told the hearing officer that it was not a "smart idea" to put plaintiff back into General Population because he had "problems with the bloods." (Compl.¶ 2).

Plaintiff was transferred to Clinton Correctional Facility ("Clinton") on September 29, 2006. Plaintiff claims that on October 1, 2006, he approached defendant Sergeant Fessette to inform him that plaintiff believed he was not safe at Clinton because of his conflict with a gang, known as the "Bloods." (Compl.¶ 3). Plaintiff claims that defendant Fessette responded by asking plaintiff for information about the Bloods, but when plaintiff could not come up with any information, defendant Fessette told plaintiff that he could not do anything for him. (Compl.¶ 4). Plaintiff states that he tried to explain to defendant Fessette that plaintiff had been cut at Great Meadow by "members" of the Bloods, and that he wanted to be placed in Protective Custody ("PC") because he did not wish to be cut again. (Compl.¶ 5).

Plaintiff claims that defendant Fessette told plaintiff that if he could not give him any information, he was "on his own." (Compl.¶ 6). Plaintiff alleges that although he pleaded with defendant Fessette, the defendant merely walked away, stating that when plaintiff decided he could come forward with the information that defendant Fessette was "looking for," then he would put plaintiff in PC. *Id.*

Plaintiff claims that after having this discussion with defendant Fessette, plaintiff walked out into the recreation yard to telephone his family so that someone in his family could call the facility in an attempt to get plaintiff into PC. (Compl.¶ 7). When plaintiff reached the yard, all the telephones were being used, and an officer told plaintiff that he could not stand by the telephones to wait. *Id.* Plaintiff claims that while he was "standing around" waiting for a telephone to be available, he was "cut by a light skin [sic] Blood member." *Id.* Plaintiff claims that while he and the other inmate were "fighting,"

someone "yelled police are coming," and the inmates "split up to avoid getting a fighting ticket." *Id.* Plaintiff states that he was examined due to all the blood on his face, [4] but that "the other guy got away." *Id.*

**\*2** Plaintiff claims that he later refused Voluntary Protective Custody ("VPC") because he knew that he would be placed in IPC anyway because of his injury. (Compl.¶ 8). Plaintiff believed that by refusing VPC, he would obtain protection in IPC, without being "labeled a 'snitch.' " *Id.* Plaintiff states that if he were to be labeled a "snitch," he would be in danger throughout the twenty-five years of his sentence. (Compl.¶ 9). Plaintiff states as his "Cause of Action," that defendant Fessette was deliberately indifferent to plaintiff's safety when he failed to institute an IPC proceeding after being notified by plaintiff that his life was in danger. (Compl.¶ 13).

**B. Defendant's Evidence**

Defendant has submitted further information relative to the incident at Great Meadow and to the October 1st incident at Clinton that is the subject of plaintiff's allegations against defendant Fessette. Jeffrey A. Tedford is currently First Deputy Superintendent ("FDS") at Great Meadow, but was the Deputy Superintendent for Security ("DSS") at Clinton in October of 2006. (Tedford Aff. ¶ 2) (Dkt. No. 26–2). FDS [5] Tedford states that on August 28, 2006, plaintiff was cut by an unidentified inmate at Great Meadow. (Tedford Aff. ¶ 5). Following the incident, plaintiff refused to, or could not, identify his assailant and refused VPC. *Id.* Plaintiff signed a waiver stating that he did not need PC, and that he would inform corrections authorities if and when he did need protection. *Id.*

However, because of the injury and because of the uncertain circumstances surrounding the incident, the staff at Great Meadow recommended that plaintiff be placed in IPC. *Id.* Plaintiff was afforded an IPC hearing on September 1, 2006, and the hearing officer upheld the IPC recommendation. *Id.* The Superintendent at Great Meadow approved the placement. *Id.* FDS Tedford explains the difference between VPC and IPC. (Tedford Aff. ¶ 6). Inmates may request VPC and must justify their request by either having been the victim of an assault or if they can identify a known enemy at the facility. *Id.* IPC is provided for inmates who do not request protection, but in the opinion of the corrections staff, are in need

of protection for the same reasons that an inmate may himself request protection. *Id.* (*See also* Def.'s Ex. B, Dkt. No. 26–8). [6]

FDS Tedford states that in accordance with Department of Correctional Services ("DOCS") Directive No. 4948 and DOCS policy, plaintiff's status was reviewed for an "unscheduled transfer," to a facility where he could again be placed in General Population. (Tedford Aff. ¶ 7). After the review, it was determined that Clinton was an appropriate facility for plaintiff. *Id.* Plaintiff was transferred from Great Meadow to Clinton on September 29, 2006. [7] (Tedford Aff. ¶¶ 4, 7; *see also* Def.'s Ex. A, Chronological History Display). FDS Tedford states that when plaintiff arrived at Clinton, his disciplinary history was reviewed, and his IPC status was identified. (Tedford Aff. ¶ 8). The staff at Clinton, under FDS Tedford's supervision, determined that plaintiff could be moved back into General Population. (Tedford Aff. ¶ 9).

**\*3** When he arrived at Clinton, plaintiff had no known enemies at the facility. (Tedford Aff. ¶ 10). FDS Tedford states that the staff at Clinton had no information whatsoever that inmate Ceruti, the inmate who attacked plaintiff at Clinton, posed any threat to plaintiff prior to their altercation on October 1, 2006, only two days after plaintiff arrived at the facility. (Tedford Aff. ¶ 12). If such information had been known to the staff, efforts would have been made to assess the situation and take action, if necessary, to separate the inmates and maintain the security of the facility. *Id.*

Defendant Fessette has also submitted an affidavit. (Fessette Aff., Dkt. No. 26–4). Defendant Fessette is a Corrections Sergeant at Clinton and was employed at Clinton on October 1, 2006. (Fessette Aff. ¶ 1). Defendant Fessette states that on October 1st, he was assigned as a housing sergeant, serving as the area supervisor for the B, C, D, and E Blocks as well as the special housing unit ("SHU") on the 2:00 p.m. to 10:00 p.m. shift. (Fessette Aff. ¶ 5). Defendant Fessette's duties would have included watching inmate movement through the blocks to which he was assigned and that this duty would have brought him into contact with a number of inmates. (Fessette Aff. ¶ 9). However, defendant Fessette does not specifically remember speaking with plaintiff. *Id.*

Defendant Fessette states that he was unaware of any threat to plaintiff prior to the October 1st altercation with

inmate Ceruti. (Fessette Aff. ¶ 10). Prior to the incident, defendant Fessette did not even know inmate Ceruti. *Id.* Defendant Fessette asserts that he was unaware of any threat of harm to plaintiff on October 1st. However, even if plaintiff had expressed his concerns in the manner that he alleges in his complaint, the general fear of the Bloods would not have demonstrated a specific threat of physical harm sufficient to recommend PC. (Fessette Aff. ¶ 11).

There is no dispute that an altercation took place between plaintiff and inmate Ceruti, and that plaintiff sustained a significant cut to the right side of his fact. (Fessette Aff. ¶ 12). After the altercation, defendant Fessette participated in the investigation of the fight and prepared a report of the incident. (Fessette Aff. ¶ 14). Defendant Fessette states that he spoke to plaintiff, and that during the interview, plaintiff stated that he was cut from behind and that the fight was the result of a " 'beef out on the street.' " (Fessette Aff. ¶ 15). Following the fight, plaintiff refused VPC and signed a waiver to that effect. (Fessette Aff. ¶ 16). Based upon the nature of the incident and the injury sustained by plaintiff, defendant Fessette then made a recommendation that plaintiff be admitted to IPC. (Fessette Aff. ¶ 17).

As a result of defendant Fessette's recommendation, plaintiff was afforded an IPC hearing on October 4, 2006. (Def.'s R.7. 1(a)(3) Statement, ¶ 20, Dkt. No. 26–5). A transcript of the hearing has been filed as Defendant's Ex. G. (Dkt. No. 26–13). During the hearing, plaintiff stated that he disagreed with the IPC recommendation because "[I] don't need IPC. It was a fight and I got cut we [sic] in prison. Things like that happen." (Def.'s Ex. G at 3).[8] Plaintiff denied that the person with whom he was fighting was the same person that cut him. *Id.* Plaintiff testified that it "was just a fight," and that he did not know the other inmate's motivation for the altercation. *Id.* at 4. Based on the recommendation and plaintiff's statements at the very short hearing, the hearing officer found that the recommendation for IPC was substantiated. *Id.* The hearing officer also found that, because plaintiff claimed that the person who cut his face was not the inmate with whom he was fighting, and that there was no known motive, it would be difficult for the facility to "arrange for [his] care and custody in the normal course of events." *Id.* It was, therefore, determined that plaintiff needed to be separated from the general population for his own safety. *Id.*

## II. *Summary Judgment*

**\*4** Defendant moves for summary judgment, arguing both that plaintiff has failed to exhaust his administrative remedies regarding the failure to protect, and that his claim fails on the merits. This court agrees with both arguments and finds that summary judgment should be granted in favor of defendant.

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56; *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

In considering a motion for summary judgment, the court does not resolve contested issues of fact, but must rather determine the existence of any disputed issues of material fact. *Salahuddin v. Coughlin,* 999 F.2d 526, 535 (2d Cir.1998) (citations omitted). In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962); *Salahuddin v. Goord,* 467 F.3d at 272. To evaluate a fact's materiality, the substantive law determines which facts are critical and which are irrelevant. *Salahuddin v. Coughlin,* 999 F.2d at 535 (citing *Anderson v. Liberty Lobby,* 477 U.S. at 248). While the court must extend "extra consideration" to pro se parties,

this does not relieve the pro se of his duty to meet the requirements necessary to defeat the motion. *Jorgensen v. Epic/Sony Records,* 351 F.3d 46, 50 (2d Cir.2003). A pro se party's bald assertion, "completely unsupported by the evidence," is not sufficient to overcome a properly supported motion. *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (quoting *Carey v.. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)).

### III. *Exhaustion of Administrative Remedies*

**\*5** The Prison Litigation Reform Act, (PLRA), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal action. This requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes and regardless of the subject matter of the claim. *See e.g. Giano v. Goord,* 380 F.3d 670, 675–76 (2d Cir.2004). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675. The failure to exhaust is an affirmative defense that must be raised by the defendants. *Scott v. Del Signore,* 2005 U.S. Dist. LEXIS 6070, \*12–15 (W.D.N.Y. Feb. 18, 2005) (citing *inter alia Johnson v. Testman,* 380 F.3d 691, 695 (2d Cir.2004)). As an affirmative defense, it is the defendant's burden to establish that plaintiff failed to meet the exhaustion requirements. *Id.* at \*12–13 (citing *Giano,* 380 F.3d at 675).

In *Jones v. Bock,* 549 U.S. 199, 218 (2007), the Supreme Court held that in order to properly exhaust an inmate's administrative remedies, he must complete the administrative review process in accordance with the applicable state rules. *Id.* (citing *Woodford v. Ngo,* 548 U.S. 81, 88 (2006)). In *Woodford,* the Court held that "proper" exhaustion means that the inmate must ***complete*** the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90–103.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee (IGRC). N.Y. COMP.CODES R. & REGS., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id.* § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee (CORC). *Id.*

§ 701.5(d). The court also notes that the regulations governing the Inmate Grievance Program encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility).

The Second Circuit developed a "three part inquiry" to determine whether an inmate fulfilled the PLRA exhaustion requirement. *See Brownell v. Krom,* 446 F.3d 305, 311–12 (2d Cir.2006) (citing *Hemphill,* 380 F.3d at 686). The inquiry asks (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether special circumstances justify the inmate's failure to comply with the exhaustion requirement. *Id.* As discussed below, this court finds that plaintiff has not shown that the exhaustion requirement should be excused, and thus, plaintiff's case should be dismissed regardless of whether exceptions to the exhaustion requirement continue to exist after *Woodford.*

**\*6** In support of his argument that plaintiff has failed to exhaust his administrative remedies with respect to any claim that defendant Fessette failed to protect plaintiff from the October 1st assault, defendant submits the affidavit of Tara Brousseau, the Inmate Grievance Program ("IGP") Supervisor at Clinton. (Brousseau Aff., Dkt. No. 26–3). IGP Supervisor Brousseau states that she has conducted a review of Clinton's Grievance Office Clerk's Log for the months of October, November, and December of 2006. (Brousseau Aff. ¶ 5). This Log contains "all grievances and appeals filed at Clinton ...." *Id.* IGP Supervisor Brousseau found "no record that inmate Rosado filed any grievance" relating to defendant Fessette's failure to protect plaintiff on October 1, 2006, and there was "no record" that plaintiff appealed any grievance determination to the Superintendent or to the CORC for any incident at Clinton. *Id.*

In his response to defendant's motion for summary judgment, plaintiff claims that he filed a grievance on October 3, 2006 with the IGRC, but never received a response. (Dkt. No. 33 at 5). Plaintiff claims that he then wrote a letter to the IGRC on October 22, 2006 and two letters to the Superintendent, one on October 23, 2006, and another dated October 28, 2006, complaining

2010 WL 3808813

that he had not received a response to his grievance. *Id.* Plaintiff claims that he exhausted his administrative remedies when he failed to get a response from the prison officials. *Id.* Plaintiff claims that "Facility officers messed with Plaintiffs [sic] outgoing mail due to the seriousness of the injury and claim caused by Defendant failing to protect Plaintiff and issuing Protective Custody in [sic] which Plaintiff requested." *Id.*

Plaintiff attempts to support his claim by stating that a Southport [9] Correctional Facility IGRC representative, Ms. Vanhagen told plaintiff that "a lot of inmate grievances do not reach her through the mail for some reason," and that she "receives a lot of complaints about the mailroom [sic] interfering and tampering with inmate grievances that go through the mailroom [sic] which occurs in every facility in New York State." *Id.* Thus, plaintiff is attempting to establish that he is entitled to raise the estoppel exception to the exhaustion requirement by stating that someone must have "messed" with his grievance and his mail.

Plaintiff does not attach any copies of the grievance or letters that he allegedly attempted to send. Instead, plaintiff attaches two inmate declarations to his response. (Dkt. No. 33 at 11–12, 13–14). The first statement is from inmate Corey Sloan, who states that he was the plaintiff in another failure-to-protect case against officers at Clinton. (Dkt. No. 33 at 11–12, ¶ 3). Inmate Sloan states that he is making the declaration because he also had his grievances and mail tampered with at Clinton. *Id.* ¶ 2. Inmate Sloan states that the case that he brought against the officers settled before trial. [10] *Id.* The second declaration is from inmate Adrian Lopez, who states that he was incarcerated at Clinton between July 8, 2008 and November 3, 2008. (Dkt. No. 33 at 13–14, ¶ 3). Inmate Lopez claims that during the time he was incarcerated at Clinton, he attempted to file grievances that were "never answered for some apparent reason." *Id.* He states that he has witnessed other inmates having the same problem. *Id.* ¶ 4.

**\*7** Courts have consistently held, however, that an inmate's general claim that his grievance was lost or destroyed does not excuse the exhaustion requirement. *See e.g. Veloz v. New York,* 339 F.Supp.2d 505, 515–16 (S.D.N.Y.2004) (plaintiff's allegations that his grievances were misplaced or destroyed by corrections officers ultimately does not relieve him of the requirement to

appeal those claims to the next level once it became clear that no response was forthcoming) (citing *Martinez v. Williams,* 186 F.Supp.2d 353, 357 (S.D.N.Y.2002) (same). *See also Murray v. Palmer,* 9:03–CV–1010, 2010 WL 1235591, \*2 & nn. 4, 6 (N.D.N.Y. March 31, 2010) (citations omitted). The New York regulations specifically state that if a grievance is not decided within the time limits provided, the inmate may appeal to the next step. 7 N.Y.C.R.R. § 701.6(g)(ii)(2). In *Pacheco v. Drown,* 9:06–CV–20, 2010 WL 144400, at \*19 & n. 21 (N.D.N.Y. Jan. 11, 2010), U.S. District Judge Glenn Suddaby held that the failure by the IGRC or the Superintendent to timely respond to a grievance or first level appeal may be appealed to the next level, including the CORC, in order to properly complete the grievance process.

In this case, therefore, plaintiff's claim that the Clinton officials must have "messed with" his grievance and his letters to the Superintendent is insufficient to excuse the exhaustion requirement. Plaintiff states that he filed a grievance on October 3, 2006. When he did not receive a response, he states he wrote a letter to the IGRC and two letters to the Superintendent, but when he did not hear from the Superintendent, plaintiff does not allege that he attempted to appeal to the CORC. Although plaintiff states that he served "Defendant" with copies of the letters and grievances, apparently plaintiff did not retain copies for himself because he has submitted no documents indicating that he attempted to file anything. The fact that other inmates may have had problems with their grievances does not establish that plaintiff's problems were the same.

Plaintiff has shown no special circumstances to justify his failure to properly appeal to the CORC, even assuming that his attempts to exhaust at the first two levels were impeded by unknown corrections officials. Thus, plaintiff has failed to exhaust his administrative remedies against defendant Fressette, and plaintiff's complaint may be dismissed for failure to exhaust. However, even if the court were to excuse plaintiff's failure to exhaust, his claim also fails on the merits as discussed below.

### IV. *Failure to Protect*

In order to establish an Eighth Amendment claim for failure to protect, the plaintiff must show that he was incarcerated under conditions posing a substantial risk of serious harm, *and* prison officials acted with deliberate indifference to that risk and the inmate's safety. *Farmer*

Rosado v. Fessette, Not Reported in F.Supp.2d (2010)

2010 WL 3808813

*v. Brennan,* 511 U.S. 825, 836 (1994). The plaintiff must show that prison officials *actually knew of and disregarded* an excessive risk of harm to the inmate's health and safety. *Id.* at 837. The defendant must be aware of the facts from which the inference can be drawn that a substantial risk of serious harm exists and the defendant must also draw that inference. *Id.*

**\*8** An isolated omission by corrections officers generally does not support a claim for deliberate indifference absent circumstances involving evil intent, recklessness, or deliberate indifference. *Coronado v. Goord,* 99 Civ. 1674, 2000 U.S. Dist. LEXIS 13876, \*10–11 (citing *Ayers v. Coughlin,* 780 F.2d 205, 209 (2d Cir.1985)). Plaintiff may allege a constitutional claim by alleging that the substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and that the officials being sued were exposed to information concerning the risk and thus, must have known about it. *Id.* (citing *Farmer,* 511 U.S. at 842–43).

In this case, plaintiff claims that defendant Fessette should be liable for failing to protect plaintiff from assault because plaintiff was in IPC at Great Meadow, where plaintiff had agreed to the IPC placement.[11] Thus, defendant Fessette should have taken plaintiff seriously when plaintiff told him that he was in danger. The DOCS Directive 4948 specifically states that inmates who are in IPC will be evaluated for transfer to facilities in which they can be programmed in General Population. (Def.'s Ex. B, DOCS Directive No. 4948(III)(A)). FDS Tedford states that after his placement in IPC at Great Meadow, plaintiff was evaluated, and it was determined that Clinton was an appropriate facility where plaintiff could be placed in General Population. (Tedford Aff. ¶ 7).

Upon plaintiff's arrival at Clinton, his IPC status was noted, but because he had no known enemies at Clinton, the staff, under FDS Tedford's supervision moved plaintiff into General Population. *Id* . ¶ 9. Defendant Fessette had no way of knowing otherwise. Plaintiff had only been at Clinton for two days when he allegedly approached defendant Fessette to inform him of the danger to plaintiff. Plaintiff claims that defendant Fessette asked plaintiff for more information about the potential danger. Although defendant Fessette does not remember such a conversation with plaintiff, even if defendant Fessette asked plaintiff to explain why he believed he was in danger, this does not indicate that defendant Fessette either failed to take plaintiff seriously or was deliberately indifferent to a substantial risk to plaintiff. Plaintiff claims that he was assaulted shortly after his conversation with defendant Fessette, while plaintiff was in the yard waiting to use the telephone.

Based on the undisputed facts, no rational trier of fact could find that defendant Fessette actually knew of and disregarded a risk to plaintiff. According to plaintiff's own description of the facts, so little time passed between the alleged conversation with Fessette and the assault that defendant Fessette would not have had time to confirm what plaintiff was telling him or to take other administrative steps necessary to move plaintiff into protective custody. Thus, even if plaintiff had exhausted his administrative remedies, this court would recommend dismissal on the merits.

**\*9 WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendant's motion for summary judgment (Dkt. No. 26) be **GRANTED,** and the complaint **DISMISSED IN ITS ENTIRETY.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

### All Citations

Not Reported in F.Supp.2d, 2010 WL 3808813

---

Footnotes

1    This defendant's name is actually Paul Fessette, and the court will refer to him by his proper name.

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 3808813

**2**   The case was originally referred to the Honorable Gustave J. Di Bianco and was assigned to me upon Judge Di Bianco's retirement on January 4, 2010. (Dkt. No. 41).

**3**   Plaintiff has attached his five-page, handwritten statement of facts, causes of action, and request for relief to a standard section 1983 complaint form. (Dkt. No. 1). Plaintiff's attachment contains numbered paragraphs, and the court will cite to this document using the paragraph numbers.

**4**   Plaintiff sustained a nine-inch laceration on the right side of his face. (Compl.¶ 10).

**5**   The court will refer to FDS Tedford by his current title.

**6**   Exhibit B is DOCS Directive No. 4948, together with various revisions of that Directive. (Dkt. No. 26–8.Ex. B). The document contains the definitions of VPC and IPC, together with the transfer policy, cited by defendant Fessette, that requires inmates placed in protective custody to be evaluated for transfer to a facility in which they can be placed in General Population. (Ex. B at 2–3).

**7**   Plaintiff's transfer history indicates that plaintiff left Great Meadow and was admitted at Clinton on the same day. (Def.'s Ex. A, Dkt. No. 26–7).

**8**   Defense counsel has numbered the pages of the Exhibit at the bottom right, and the court will use those numbers to refer to the pages of the Exhibit. The transcript itself has numbers at the bottom-center of the page that do not match the page numbers of the exhibit.

**9**   Plaintiff is currently incarcerated at Southport.

**10**   *See Sloan v. Artus,* 9:07–CV–951 (N.D.N.Y.) (DNH/RFT). A review of the docket sheet in Inmate Sloan's case shows that he did receive a settlement of $ 3,000.00 as the result of assisted mediation, supervised by Recalled Magistrate Judge Victor Bianchini. (Dkt. No. 62 in 9:07–CV–951). A review of inmate Sloan's amended complaint shows that in his amended complaint, he alleged that he filed a grievance, but was never given a decision. (Dkt. No. 19 ¶ 4(B)(i) & (ii)).

**11**   Actually, the exhibits establish that plaintiff initially declined VPC, requiring the prison officials to hold an IPC hearing. By the time plaintiff was afforded his IPC hearing, he had changed his mind and elected to remain in protective custody. *Compare* (Tedford Aff. ¶ 5) *with* (Def.'s Ex. C, Dkt. No 26–9 at 4, 8, 9, 10).

---

**End of Document**                                                 © 2018 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.   7

2010 WL 3809991

2010 WL 3809991
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.

Jonathan ROSADO, Plaintiff,

v.

P. FESSETTO, Correctional Sergeant,
Clinton Correctional Facility, Defendants.

No. 9:09–CV–67.
|
Sept. 21, 2010.

**Attorneys and Law Firms**

Jonathan Rosado, Pine City, NY.

Hon. Andrew M. Cuomo, Attorney General of the State of New York, Dean J. Higgins, Esq., Asst. Attorney General, Albany, NY, for Defendant.

**Opinion**

### *DECISION and ORDER*

DAVID N. HURD, District Judge.

**\*1** Plaintiff, Jonathan Rosado, commenced this civil rights action in January 2009, pursuant to 42 U.S.C. § 1983. By Report–Recommendation dated August 4, 2010, the Honorable Andrew T. Baxter, United States Magistrate Judge, recommended that defendant's motion for summary judgment (Docket No. 26) be granted, and the complaint dismissed in its entirety. No objections to the Report–Recommendation have been filed.

Based upon a careful review of the file, and the recommendations of Magistrate Judge Baxter, the Report–Recommendation is accepted and adopted in all respects. *See* 28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that

1. Defendant's motion for summary judgment (Docket No. 26) is GRANTED;

2. The complaint is DISMISSED in its entirety; and

3. The Clerk is directed to enter judgment accordingly and close the file.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 3809991

---

**End of Document** © 2018 Thomson Reuters. No claim to original U.S. Government Works.

 © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 9275001
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jacolby Wallace, a/k/a Jocolby Wallace, Plaintiff,

v.

C.O. Fisher, Watertown Corr. Facility, Defendant.

9:13-CV-1208
|
Signed 12/18/2015

**Attorneys and Law Firms**

Leonard & Curley, PLLC, 205 W. Court Street, Mark C. Curley, Esq., of Counsel, Rome, New York 13440, Pro Bono Trial Counsel for Plaintiff.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, The Capitol, Cathy Y. Sheehan, Esq., Assistant Attorney General, of Counsel, Albany, New York 12224, for Defendant.

**Opinion**

## DECISION and ORDER

GLENN T. SUDDABY, Chief United States District Judge

On December 7, 2015, the Court conducted an evidentiary hearing in the above-captioned prisoner civil rights action, filed *pro se* by Jacolby Wallace, a/k/a Jocolby Wallace ("Plaintiff"), against the above-captioned New York State correctional employee ("Defendant"), pursuant to 42 U.S.C. § 1983, asserting claims of excessive force and retaliation.[1] The hearing regarded Defendant's affirmative defense that Plaintiff failed to exhaust his available administrative remedies, as required by the Prison Litigation Reform Act, before filing his Amended Complaint on October 29, 2013. (Dkt. No. 10.) At the hearing, documentary evidence was admitted, and testimony was taken of Plaintiff as well as Defendants' witnesses (i.e., Watertown Correctional Facility Inmate Grievance Program Coordinator Kathryn Gascon and Inmate Grievance Program Supervisor Sergeant Quinta), whom Plaintiff was able to cross-examine through *pro bono* trial counsel. At the conclusion of the hearing, the undersigned indicated that a written decision would follow. This is that written decision. For the reasons stated below, Plaintiff's Amended Complaint is dismissed because of his failure to exhaust his available administrative remedies before filing this action.

## I. RELEVANT LEGAL STANDARD

The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e. The PLRA was enacted "to reduce the quantity and improve the quality of prisoner suits" by "afford[ing] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Porter v. Nussle*, 534 U.S. 516, 524-25 (2002). In this regard, exhaustion serves two major purposes. First, it protects "administrative agency authority" by giving the agency "an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court, and it discourages disregard of the agency's procedures." *Woodford v. Ngo*, 548 U.S. 81, 89 (2006). Second, exhaustion promotes efficiency because (a) "[c]laims generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court," and (b) "even where a controversy survives administrative review, exhaustion of the administrative procedure may produce a useful record for subsequent judicial consideration." *Woodford*, 548 U.S. at 89. "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter*, 534 U.S. at 532.

**\*2** In accordance with the PLRA, the New York State Department of Corrections and Community Supervision ("DOCCS") has made available a well-established inmate grievance program. 7 N.Y.C.R.R. § 701.7. Generally, the DOCCS Inmate Grievance Program ("IGP") involves the following three-step procedure for the filing of grievances. 7 N.Y.C.R.R. §§ 701.5, 701.6(g), 701.7 ("Directive 4040").[2] *See also* Hrg. Ex. D-3 (attaching copy of Directive 4040 in effect during the time in question in this

action). Underline First, an inmate must file a complaint with the facility's IGP clerk within twenty-one (21) calendar days of the alleged occurrence. If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. A representative of the facility's inmate grievance resolution committee ("IGRC") has sixteen (16) calendar days from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen (16) calendar days of receipt of the grievance, and issues a written decision within two (2) working days of the conclusion of the hearing. Underline Second, a grievant may appeal the IGRC decision to the facility's superintendent within seven (7) calendar days of receipt of the IGRC's written decision. The superintendent is to issue a written decision within twenty (20) calendar days of receipt of the grievant's appeal. Underline Third, a grievant may appeal to the Central Office Review Committee ("CORC") within seven (7) calendar days of receipt of the superintendent's written decision. CORC is to render a written decision within thirty (30) days of receipt of the appeal.

Moreover, there is an expedited process for the review of complaints of inmate harassment or other misconduct by corrections officers or prison employees. 7 N.Y.C.R.R. § 701.8. In the event the inmate seeks expedited review, he or she may report the misconduct to the employee's supervisor. The inmate then files a grievance under the normal procedures outlined above, but all grievances alleging employee misconduct are given a grievance number, and sent immediately to the superintendent for review. Under the regulations, the superintendent or his designee shall determine immediately whether the allegations, if true, would state a "bona fide" case of harassment, and if so, shall initiate an investigation of the complaint "in-house," by the Inspector General's Office, or by the New York State Police Bureau of Criminal Investigations. An appeal of the adverse decision of the superintendent may be taken to the CORC as in the regular grievance procedure. A similar "special" procedure is provided for claims of discrimination against an inmate. 7 N.Y.C.R.R. § 701.9.

It is important to note that these procedural requirements contain several safeguards. For example, if an inmate could not file such a complaint within the required time period after the alleged occurrence, he or she could apply to the facility's IGP Supervisor for an exception to the time limit based on mitigating circumstances. 7 N.Y.C.R.R. §

701.6(g). If that application was denied, the inmate could file a complaint complaining that the application was wrongfully denied. [3] Moreover, any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can–and must–be appealed to the next level, including CORC, to complete the grievance process. [4]

Despite the plain language of 7 N.Y.C.R.R. § 701.6(g), there appears to be some confusion regarding whether the IGRC's nonresponse must be appealed to the superintendent where the plaintiff's grievance was never assigned a grievance number. [5] After carefully reviewing the case law, the Court finds that the weight of authority (and the better-reasoned authority) answers this question in the affirmative. [6] This point of law has been recognized by district courts in the Northern District of New York, [7] Southern District of New York, [8] and Western District of New York. [9] The Court notes that, if the plaintiff attaches to his appeal a copy of his grievance (or even if he adequately describes, in his appeal to the superintendent, the substance of that grievance), there is something for the superintendent to review. [10]

**\*3** Generally, if a prisoner has failed to properly follow each of the required three steps of the above-described grievance procedure prior to commencing litigation, he has failed to exhaust his administrative remedies, and his claims are subject to dismissal. *Woodford*, 548 U.S. at 93; *Porter*, 534 U.S. at 524; *Ruggiero v. Cnty. of Orange*, 467 F.3d 170, 175 (2d Cir. 2006). However, a plaintiff's failure to exhaust does not end the inquiry. The Second Circuit has held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. *Hemphill v. State of New York*, 380 F.3d 680, 686, 691 (2d Cir. 2004); *accord*, *Ruggiero*, 467 F.3d at 175. Underline First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill*, 380 F.3d at 686 (citation omitted). Underline Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the

plaintiff's failure to exhaust as a defense." *Id.* [citations omitted]. Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* [citations and internal quotations omitted].

Finally, two additional points bear mentioning regarding exhaustion hearings. First, the Second Circuit has ruled that a plaintiff in a lawsuit governed by PLRA is not entitled to a jury trial on disputed factual issues relating to his exhaustion of administrative remedies; rather, PLRA exhaustion is a matter of judicial administration. *Messa v. Goord*, 652 F.3d 305, 308-10 (2d Cir. 2011). Second, given that non-exhaustion is an affirmative defense, the defendant bears the burden of showing that a prisoner has failed to exhaust his available administrative remedies. [11] However, once a defendant has adduced reliable evidence that administrative remedies were available to the plaintiff and that the plaintiff nevertheless failed to exhaust those administrative remedies, the plaintiff must then "counter" the defendant's assertion by showing exhaustion, unavailability, estoppel, or "special circumstances." [12] As a result, practically speaking, while the burden on this affirmative defense remains at all times on the defendant, the plaintiff may sometimes have to adduce evidence in order to defeat it. [13]

## II. ANALYSIS

After carefully considering the evidence submitted at the hearing, the Court finds that, before filing this action, Plaintiff failed to follow each of the required three steps described above in Part I of this Decision and Order. The Court bases this finding on (1) the credible hearing testimony of Inmate Grievance Program Coordinator Kathryn Gascon, (2) the credible hearing testimony of Inmate Grievance Program Supervisor Sergeant Dion Quinta, and (3) the hearing exhibits adduced by Defendant. (*See, e.g.,* Hrg. Tr.; Hrg. Exs. D-1, D-2, D-3, D-4, D-5, D-6, D-7.) However, as indicated above in Part I of this Decision and Order, this finding does not end the Court's inquiry; rather, the Court must proceed to the three-part inquiry established by the Second Circuit.

### A. Part One: Availability of Administrative Remedies

New York prison inmates are subject to an Inmate Grievance Program established by DOCCS and recognized as an "available" remedy for purposes of the PLRA. *Murray,* 2010 WL 1235591, at *5 [citations omitted]. There are different circumstances under which the grievance procedure is deemed not to have been available to an inmate plaintiff. *Id.* [citation omitted]. For example, courts have found unavailability "where plaintiff is unaware of the grievance procedures or did not understand it or where defendants' behavior prevents plaintiff from seeking administrative remedies." *Id.* [citation omitted]. When testing the availability of administrative remedies in the face of claims that undue influence from prison workers has caused a plaintiff inmate to forego the formal grievance process, courts employ an objective test, examining whether "a similarly situated individual of ordinary firmness [would] have deemed them available." *Id.* [citations omitted].

**\*4** Here, after carefully considering the evidence submitted at the hearing, the Court finds that administrative remedies were "available" to Plaintiff during the time in question. The Court makes this finding for the following three reasons.

First, in his hearing testimony and Verified Amended Complaint, Plaintiff asserted that, during the time in question, there was a grievance procedure at Watertown Correctional Facility, he submitted a grievance, and he spoke to "the lady civilian grievance coordinator [who] received my grievance" on September 16, 2013. (Hrg. Tr. at 2; Hrg. Ex. D-2, at ¶¶ 4[a],[b][i], 6.) Similarly, Plaintiff asserted that, during the time in question, he "filled out another grievance" at Gouverneur Correctional Facility. (Hrg. Tr. at 5; Hrg. Ex. D-2, at ¶ 6.)

Second, at the hearing, Inmate Grievance Program Coordinator Kathryn Gascon and Inmate Grievance Program Supervisor Sergeant Dion Quinta testified credibly that, during the time in question, there was a working grievance program at Watertown Correctional Facility. (Hrg. Tr. at 14-16, 20-24.) Similarly, the record contains a copy of a grievance Plaintiff filed at Gouverneur Correctional Facility, and a response to that grievance. (Hrg. Ex. D-7.)

Third, the Court finds Plaintiff's hearing testimony on the subject (i.e., that the alleged threats of Ms. Gascon

essentially rendered the Inmate Grievance Program unavailable to Plaintiff, particularly in light of the asserted conduct of other corrections officers) to be incredible due to (a) the credibility of Sergeant Quinta's testimony that he has never seen Ms. Gascon threaten grievants, (b) the credibility of Ms. Gascon's testimony that she has never threatened grievants (and did not threaten Plaintiff), and (c) Plaintiff's demeanor during his testimony. (Hrg. Tr. at 9, 16-17, 26-27.)

The Court notes that, even if Plaintiff's administrative remedies were somehow rendered unavailable at Watertown Correctional Facility between the date of the alleged incident (September 13, 2013) and the date of his transfer to Gouverneur Correctional Facility (October 17, 2013), he has *not* persuaded the Court that those administrative remedies were rendered unavailable at Gouverneur Correctional Facility. This is because, pursuant to Directive 4040, Plaintiff had until 45 days from the incident on September 13, 2013 (or until October 28, 2013) in which to request an extension of the 21-day deadline for filing a grievance. (Hrg. Ex. D-3, at 9 [attaching § 701.6(g)(1)(i)(a)].) However, he did not file such a request at Gouverneur Correctional Facility between October 17, 2013, and October 23, 2013, despite the fact that had been informed of the grievance process numerous times upon his arrival at different correctional facilities. (Hrg. Exs. D-7, Ex. D-4; Hrg. Tr. at 4, 22-23.) Moreover, while he filed a (second) grievance at Gouverneur Correctional Facility on either October 24, 2013, or October 25, 2013,[14] he did not present mitigating circumstances to the IGP Supervisor at Gouverneur Correctional Facility for an extension of the 21-day deadline for filing a grievance, despite having had the opportunity to do so. (Hrg. Tr. at 5-6; Hrg. Ex. D-7.) Indeed, Plaintiff did not even avail himself of the administrative remedies at Gouverneur Correctional Facility, because he signed (and thus filed) his Verified Amended Complaint in this action (which asserted a claim against Defendant for the first time) on October 24, 2014–before he received a response to either his second grievance or any request for leave to file that grievance late.

**B. Part Two: Estoppel**

**\*5**  After carefully considering the evidence submitted at the hearing, the Court finds that Defendant did not forfeit the affirmative defense of non-exhaustion by failing to

raise or preserve it. Defendant's Answer timely asserted this affirmative defense. (Dkt. No. 34, at ¶ 14.)

The Court also finds that Defendant is not estopped from raising the affirmative defense of non-exhaustion by taking actions that inhibited Plaintiff's exhaustion of remedies. In light of the various omissions in Plaintiff's hearing testimony and his demeanor during that testimony, the Court finds that he did not offer persuasive evidence that *Defendant* himself interfered with Plaintiff's ability to file grievances during the time in question.

It is important to note that a defendant in an action may not be estopped from asserting the affirmative defense of failure to exhaust administrative remedies based on the actions (or inactions) of *other* individuals. This point of law is clear from Second Circuit cases.[15] Furthermore, this point of law has been relied on by district courts in the Northern District of New York,[16] Southern District of New York,[17] Eastern District of New York,[18] and Western District of New York.[19]

**\*6**  A contrary interpretation of the second part of the Second Circuit's three-part exhaustion inquiry would turn the ancient doctrine of estoppel on its head, transforming it–in Orwellian fashion–into one of "vicarious estoppel." *See Black's Law Dictionary* at 629 (9th ed) (defining "estoppel" as "[a] bar that prevents one from asserting a claim or right that contradicts what one has said or done before ...."). Moreover, such an invention would be wholly unnecessary: the vicarious conduct sought to be protected against is already protected against by the "special circumstances" inquiry established by the Second Circuit.

Finally, while it may be argued that such an interpretation of the doctrine of estoppel may nonetheless be appropriate because the purpose of the PLRA is to enable the institution to resolve disputes efficiently rather than protect the individual, prisoner civil rights suits are suits against prison officials in their individual capacities rather than suits against them in their official capacities (which would effectively be suits against the State and thus be barred by the Eleventh Amendment). As a result, the crux of the second part of the Second Circuit's three-part exhaustion inquiry is whether the officials may avail themselves of that defense, not whether the institution may avail itself of the defense.

For all these reasons, to the extent that Plaintiff alleges that the conduct of a non-defendant correctional employee (such as Inmate Grievance Program Coordinator Kathryn Gascon) inhibited him from exhausting his administrative remedies with regard to his grievance against Defendant, those allegations cannot estop *Defendant* from asserting failure-to-exhaust as a defense. [20]

### C. Part Three: Special Circumstances

There are a variety of special circumstances that may excuse a prisoner's failure to exhaust his available administrative remedies, such as the following: (1) the facility's "refusal to accept or forward plaintiff's appeals [to CORC]–which effectively rendered the grievance appeal process unavailable to him"; [21] (2) non-defendants' "threats [to the plaintiff] of physical retaliation and reasonable misinterpretation of the statutory requirements of the appeals process"; [22] and (3) when the plaintiff tries "to exhaust prison grievance procedures[, and] although each of his efforts, alone, may not have fully complied, together his efforts sufficiently informed prison officials of his grievance and led to a thorough investigation of the grievance." [23]

Construed with the utmost of special leniency, Plaintiff's Verified Amended Complaint, pre-hearing Exhibit List, hearing argument and cross-examination of Defendant's witnesses raise the specter of four excuses for Plaintiff's failure to exhaust his available administrative remedies before filing this action: (1) on September 16, 2013, Inmate Grievance Program Coordinator Kathryn Gascon deterred Plaintiff from filing his grievance by telling him that "things would only get worse" if he pursued his grievance, because all the staff members at Watertown Correctional Facility "work together" (a cooperation confirmed by, *inter alia*, the fact that Defendant had been motivated by Plaintiff's attempt to sue *another* corrections officer); (2) after he was transferred from Watertown Correctional Facility to Gouverneur Correctional Facility on or about October 17, 2013, Plaintiff sufficiently grieved, or attempted to grieve, the claims in question; (3) on September 13, 2013, Plaintiff complained orally to Corrections Officer J. Largett about Defendant's conduct; and (4) at some point in time, Plaintiff's mother placed a telephone call to the Inspector General's Office.

**\*7** After carefully considering the issue, the Court finds that there exists no "special circumstances" justifying Plaintiff's failure to comply with the administrative procedural requirements. With regard to Plaintiff's first excuse (i.e., that Ms. Gascon threatened him not to file his grievance), the Court finds that this excuse does not constitute special circumstances justifying his failure to exhaust his available administrative remedies for each of two alternative reasons. As an initial matter, as indicated above in Part II.B. of this Decision and Order, the Court finds that the threat simply did not occur based on (a) Plaintiff's demeanor during his testimony, (b) the credibility of Ms. Gascon's testimony that she has never threatened grievants (and did not threaten Plaintiff), and (c) the credibility of Sergeant Quinta's testimony that he has never seen Ms. Gascon threaten grievants. Any argument that Ms. Gascon improperly refused to immediately forward Plaintiff's grievance to the superintendent is belied by the fact that, when it was received by her, the grievance was already signed by Plaintiff as having been "informally resolved." (Hrg. Tr. at 3, 25; Hrg. Ex. D-6.) In any event, even if Plaintiff's administrative remedies were rendered unavailable by Ms. Gascon at Watertown Correctional Facility between the date of the alleged incident (September 13, 2013) and the date of his transfer to Gouverneur Correctional Facility (October 17, 2013), those administrative remedies were *not* rendered unavailable at Gouverneur Correctional Facility between October 17, 2013, and the deadline for an extension request (on October 28, 2013), for the reasons set forth above in Part II.A. of this Decision and Order. [24] The Court finds that Ms. Gascon's asserted statement–even when combined with the other asserted conduct by corrections officers at Watertown Correctional Facility–would not have deterred a similarly situated inmate of ordinary firmness from filing a properly supported extension request at Gouverneur Correctional Facility (i.e., one presenting mitigating circumstances) between October 17, 2013, and October 28, 2013. [25]

With regard to Plaintiff's second excuse (i.e., that he sufficiently grieved, or attempted to grieve, the claims in question after he was transferred to Gouverneur Correctional Facility), the Court finds that this excuse does not constitute special circumstances justifying his failure to exhaust his available administrative remedies for the second reason stated in the preceding paragraph: Plaintiff could have, between October 17, 2013, and October 28, 2013, filed a properly supported request for

2015 WL 9275001

an extension of the 21-day deadline for filing his grievance, but unjustifiably failed to do so. Rather, he waited until three days or four days before the expiration of the 45-day time period under § 701.6(g)(1)(i)(a) to file a one-page grievance stating merely, *inter alia*, that Ms. Gascon placed him in "fear" *at Watertown Correctional Facility*, which was appropriately rejected as being untimely. (Hrg. Ex. D-7.) [26] In short, he did not, in fact, sufficiently grieve, or attempt to grieve, the claims in question, while at Gouverneur Correctional Facility.

**\*8** With regard to Plaintiff's third excuse (i.e., that he submitted the complaints in question orally to another corrections officer, C.O. Largett), the Court finds that this excuse does not constitute special circumstances justifying his failure to exhaust his available administrative remedies for each of two alternative reasons. As an initial matter, an oral complaint to a corrections officer is not a grievance. (Hrg. Ex. D-3 at 1 [attaching § 701.2(a) ].) *See also Martin v. City of New York*, 11-CV-0600, 2012 WL 1392648, at \*6 (S.D.N.Y. Apr. 20, 2012) ("'[O]ral statements to various officials' do not satisfy the PLRA's exhaustion requirement.") (quoting *Simon v. Campos*, 09-CV-6231, 2010 WL 1946871, at \*6 [S.D.N.Y. May 10, 2010]). During the time in question, Plaintiff knew, or reasonably should have known of that fact, given that usually prisoners are advised of the grievance procedure as part of their orientation at every new facility to which they are transferred. (Hrg. Tr. at 23; Hrg. Ex. D-4.) Indeed, he should have been placed on further notice of that fact due to C.O. Largett's having advised Plaintiff that he should "write a grievance." (Hrg. Ex. D-2, at ¶ 6.) In any event, following the making of that alleged complaint, Plaintiff never filed a timely appeal to CORC from either a non-response to that complaint or a finding of unsubstantiation regarding that complaint. (*Id.*; Hrg. Tr.)

With regard to Plaintiff's fourth excuse (i.e., that his mother called the Inspector General's Office), the Court finds that this excuse does not constitute special circumstances justifying his failure to exhaust his available administrative remedies for each of two

alternative reasons. As an initial matter, even assuming that the Inspector General's Office carried out an investigation, the record does not establish that such an investigation was upon a *referral* from the Superintendent of either Watertown Correctional Facility or Gouverneur Correctional Facility, as is required. (*See generally* Hrg. Tr.; Hrg. Ex. D-2.) *See also, supra,* Part I of this Decision and Order. In any event, Plaintiff never appealed a finding of unsubstantiation by the Inspector General's Office to CORC (but rather proceeded directly to this Court). (*Id.*) Both a referral and appeal are required in order for an inmate's contact with the Inspector General's Office, and finding of unsubstantiation, to complete the exhaustion process. [27] Neither of those steps was taken here.

In sum, Plaintiff has proffered no special circumstances justifying his failure to achieve exhaustion of the claims in this action–whether those circumstances are considered individually or in combination. To hold otherwise, in this case, would be to unacceptably frustrate the two major purposes of the exhaustion requirement–to protect the administrative authority of DOCCS (by giving that department an opportunity to correct its own mistakes before being haled into federal court), and to promote judicial efficiency (by resolving disputes more quickly and economically in administrative proceedings, and producing a useful record for subsequent judicial consideration). *See, supra,* Part I of this Decision and Order.

**ACCORDINGLY**, it is

**ORDERED** that Plaintiff's Verified Amended Complaint (Dkt. No. 10) is **DISMISSED in its entirety** for failure to exhaust his available administrative remedies before filing this action, pursuant to the PLRA; and it is further

**ORDERED** that the Clerk of the Court shall enter judgment for Defendants and close this action.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 9275001

---

Footnotes

1    Plaintiff asserted his claims against Defendant for the first time in his Verified Amended Complaint. (Dkt. No. 10 [Verified Am. Compl.].) Plaintiff's Verified Amended Complaint also contained claims against another corrections officer, the facility superintendent, and the New York State Department of Corrections and Community Supervision. (*Id.*) However, those

Wallace v. Fisher, Not Reported in F.Supp.3d (2015)
Case 9:15-cv-01542-MAD-DEP    Document 79    Filed 02/14/18    Page 208 of 227
2015 WL 9275001

claims were dismissed *sua sponte* on the Court's initial review of Plaintiff's Verified Amended Complaint. (Dkt. No. 17 [Decision and Order filed June 4, 2014].)

2    *See also Murray v. Palmer*, 03-CV-1010, 2010 WL 1235591, at *1 & n.1 (N.D.N.Y. Mar. 31, 2010) [citation omitted].

3    *See Murray,* 2010 WL 1235591, at *2 & n.3 (citing *Groves v. Knight*, 05-CV-0183, Decision and Order at 3 [N.D.N.Y. filed Aug. 4, 2009], an appeal from which was subsequently dismissed as frivolous, *see Groves v. Knight*, No. 09-3641, Mandate [2d Cir. filed Jan. 15, 2010].)

4    7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *see also Murray,* 2010 WL 1235591, at *2 & n.4 [collecting cases].

5    *Murray,* 2010 WL 1235591, at *2 & n.5 [citing cases].

6    *Cf. Hernandez v. Coffey*, 582 F.3d 303, 305, 309, n.3 (2d Cir. 2009) ("Our ruling in no way suggests that we agree with Hernandez's arguments regarding exhaustion or justification for failure to exhaust [which included an argument that the Inmate Grievance Program was not available to him because, when he filed a grievance at the first stage of the Program, he received no response and his grievance was not assigned a grievance number].").

7    *See, e.g., Rosado v. Fessetto*, 09-CV-0067, 2010 WL 3808813, at *7 (N.D.N.Y. Aug. 4, 2010) (Baxter, M.J.) ("Courts have consistently held ... that an inmate's general claim that his grievance was lost or destroyed does not excuse the exhaustion requirement."), *adopted by* 2010 WL 3809991 (N.D.N.Y. Sept. 21, 2010) (Hurd, J.); *Murray v. Palmer*, 03-CV-1010, 2008 WL 2522324, at *15, 18 & n.46 (N.D.N.Y. June 20, 2008) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.) ("[E]ven if Great Meadow C.F. did not ... have a functioning grievance-recording process (thus, resulting in Plaintiff's alleged grievance never being responded to), Plaintiff still had the duty to appeal that non-response to the next level."), *accord, Midalgo v. Bass*, 03-CV-1128, 2006 WL 2795332, at *7 (N.D.N.Y. Sept. 26, 2006) (Mordue, C.J., adopting Report-Recommendation of Treece, M.J.) (observing that plaintiff was "requir[ed]" to seek an appeal to the superintendent, even though he never received a response to his grievance of April 26, 2003, which was never assigned a grievance number); *cf. Croswell v. McCoy*, 01-CV-0547, 2003 WL 962534, at *4 (N.D.N.Y. March 11, 2003) (Sharpe, M.J.) ("If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA.").

8    *See, e.g., Walters v. Carpenter*, 02-CV-0664, 2004 WL 1403301, at *3 (S.D.N.Y. June 22, 2004); *Veloz v. New York*, 339 F. Supp. 2d 505, 515-16 (S.D.N.Y. 2004) (rejecting inmate's argument that prison's grievance procedure had been rendered unavailable by the practice of prison officials' losing or destroying his grievances, because, *inter alia*, he should have "appeal[ed] these claims to the next level once it became clear to him that a response to his initial filing was not forthcoming"), *aff'd*, 178 F. App'x 39 (2d Cir. 2006); *Hernandez v. Coffey*, 99-CV-11615, 2003 WL 22241431, at *4 (S.D.N.Y. Sept. 29, 2003) (rejecting plaintiff's argument that he could not have exhausted because he never received a grievance number, finding he could nonetheless have appealed any such non-response to the next level); *cf. Wesley v. Hardy*, 05-CV-6492, 2006 WL 3898199, at *4 (S.D.N.Y. Dec. 12, 2006) ("If a prisoner submits a grievance and receives no response, he cannot be considered to have been actively obstructed or frustrated, as he is free to appeal to the next level of review."), *accord, Sims v. Blot*, 00-CV-2524, 2003 WL 21738766, at *3 (S.D.N.Y. July 25, 2003) ("[E]ven if no response is received by an inmate to his grievance within the allotted time period, he may then appeal that grievance (and the absence of a decision thereon) to the next step in the grievance process."); *Hemphill v. New York*, 198 F. Supp. 2d 546, 549 (S.D.N.Y. 2002) ("Had plaintiff utilized this procedure, any failure by Artuz to render a decision on his matter within twelve working days could have been appealed to Albany, thus completing the grievance cycle and exhausting his remedies in a matter of weeks."), *vacated and remanded on other grounds*, 380 F.3d 680 (2d Cir. 2004); *Martinez v. Williams*, 186 F. Supp. 2d 353, 357 (S.D.N.Y. 2002) ("[P]laintiff now argues in his opposition brief that he filed a grievance in November 1999 and did not receive a response .... Plaintiff's argument that he is excused because defendants failed to act with respect to the grievance is unpersuasive. Plaintiff could have and should have appealed the grievance in accordance with grievance procedures."); *Waters v. Schneider*, 01-CV-5217, 2002 WL 727025, at *2 (S.D.N.Y. Apr. 23, 2002) ("Waters alleges that he attempted to file a grievance with the Inmate Grievance Resolution Committee ... in April 2001 but never received a response. ... In either case, it is undisputed that Waters did not pursue the available appeals within the prison grievance system.").

9    *See, e.g., Collins v. Cunningham*, 06-CV-0420, 2009 WL 2163214, at *3, 6 (W.D.N.Y. July 20, 2009) (rejecting plaintiff's argument that his administrative remedies were not available where his grievance of March 20, 2004, was not assigned a grievance number); *Reyes v. Punzal*, 206 F. Supp. 2d 431, 433 (W.D.N.Y. 2002) ("Even assuming that plaintiff never received a response to his grievance, he had further administrative avenues of relief open to him."); *cf. Williams v. Hupkowicz*, 04-CV-0051, 2007 WL 1774876, at *4 (W.D.N.Y. June 18, 2007) ("Even assuming that an inmate received no timely official response as contemplated by the regulations to a grievance at any stage in the inmate grievance process,

2015 WL 9275001

the inmate could nevertheless appeal such grievance to the next level, and the failure to do so constitutes a failure to exhaust his administrative remedies as required under the PLRA.").

10    This point of law has been explicitly recognized in some cases. *See, e.g., Goodson v. Silver,* 09-CV-0494, 2012 WL 4449937, at *4 (N.D.N.Y. Sept. 25, 2012) (Suddaby, J.); *accord, Murray,* 2010 WL 1235591, at *2. In addition, it has been implicitly recognized in other cases. *See, e.g. Murray,* 2008 WL 2522324, at *15, 18 & n.46 ("[E]ven if Great Meadow C.F. did not ... have a functioning grievance-recording process (thus, resulting in Plaintiff's alleged grievance never being responded to), Plaintiff still had the duty to appeal that non-response to the next level."); *Midalgo,* 2006 WL 2795332, at *7 (observing that plaintiff was "requir[ed]" to seek an appeal to the superintendent, even though he never received a response to his grievance of April 26, 2003, which was never assigned a grievance number); *Hernandez,* 2003 WL 22241431, at *4 (rejecting plaintiff's argument that he could not have exhausted because he never received a grievance number, finding he could nonetheless have appealed any such nonresponse to the next level); *Collins,* 2009 WL 2163214, at *3, 6 (rejecting plaintiff's argument that his administrative remedies were not available where his grievance of March 20, 2004, was not assigned a grievance number).

11    *Murray,* 2010 WL 1235591, at *4 [citation omitted].

12    *Murray,* 2010 WL 1235591, at *4 n.17 [citing cases].

13    *Collins v. Caron,* 10-CV-1529, 2014 WL 296859, at *4 (N.D.N.Y. Jan. 27, 2014) (Suddaby, J.); *Smith v. Kelly,* 06-CV-0505, 2013 WL 6154366, at *4 (N.D.N.Y. Oct. 30, 2013) (Suddaby, J.); *Goodson v. Silver,* 09-CV-0494, 2012 WL 4449937, at *5 (N.D.N.Y. Sept. 25, 2012) (Suddaby, J.).

14    Out of solicitude to Plaintiff, the Court assumes (based on Plaintiff's hearing testimony) that this second grievance was filed on one of the two above-listed dates, even though this second grievance appears to be stamped as having been received on "Oct. 28, 2013." (Hrg. Ex. D-7.)

15    *See Amador v. Andrews,* 655 F.3d 89, 102 (2d Cir. 2011) ("The second part considers whether defendants forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether defendants' *own* actions inhibiting the inmate's exhaustion of remedies estops one or more of the defendants from raising the exhaustion defense.") (emphasis added); *Ruggiero v. Cnty. of Orange,* 467 F.3d 170, 178 (2d Cir. 2006) ("In our prior cases recognizing that *defendants' actions* may estop them from raising non-exhaustion as a defense .... Ruggiero does not allege beatings or threats of retaliation for filing a grievance or that he made any attempt to file a grievance and was denied that opportunity *by Defendants-Appellants.*") (emphasis added); *Hemphill v. New York,* 380 F.3d 680, 689 (2d Cir. 2004) (explaining that, where several defendants played different roles in the acts giving rise to estoppel, "it is possible that some individual defendants may be estopped, *while other may not be*") (emphasis added).

16    *See, e.g., Belile v. Griffin,* 11-CV-0092, 2013 WL 1776086, at *9 (N.D.N.Y. Feb. 12, 2013) (Peebles, M.J.), *adopted by* 2013 WL 1291720 (N.D.N.Y. Mar. 27, 2013) (McAvoy, J.); *Bailey v. Fortier,* 09-CV-0742, 2013 WL 310306, at *2 (N.D.N.Y. Jan. 25, 2013) (Sharpe, J.); *Thompson v. Bellevue Hosp.,* 09-CV-1038, 2011 WL 4369132, at *12 (N.D.N.Y. Aug. 29, 2011) (Lowe, M.J.), *adopted by* 2011 WL 4369132 (N.D.N.Y. Aug. 29, 2011) (Mordue, C.J.); *Calloway v. Grimshaw,* 09-CV-1354, 2011 WL 4345299, at *4 (N.D.N.Y. Aug. 10, 2011) (Lowe, M.J.), *adopted by* 2011 WL 4345296 (N.D.N.Y. Sept.15, 2011) (McAvoy, J.); *Murray v. Palmer,* 03-CV-1010, 2010 WL 1235591, at *5 & n.26 (N.D.N.Y. Mar. 31, 2010) (Suddaby, J.); *Snyder v. Whittier,* 05-CV-1284, 2009 WL 691940, at *9 (N.D.N.Y. Mar. 12, 2009) (Report-Recommendation of Peebles, M.J., adopted by McAvoy, J.); *Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *19 (N.D.N.Y. June 20, 2008) (Report-Recommendation of Lowe, M.J., adopted by Hurd, J.); *McCloud v. Tureglio,* 07-CV-0650, 2008 WL 1772305, at *12 (N.D.N.Y. Apr. 15, 2008) (Report-Recommendation of Lowe, M.J., adopted by Mordue, C.J.); *Shaheen v. McIntyre,* 05-CV-0173, 2007 WL 3274835, at *16 (N.D.N.Y. Nov. 5, 2007) (Report-Recommendation of Lowe, M.J., adopted by McAvoy, J.); *Gill v. Frawley,* 02-CV-1380, 2006 WL 1742378, at *12 (N.D.N.Y. June 22, 2006) (Report-Recommendation of Lowe, M.J., adopted by McAvoy, J.); *Smith v. Woods,* 03-CV-0480, 2006 WL 1133247, at *16 (N.D.N.Y. Apr. 24, 2006) (Report-Recommendation of Lowe, M.J., adopted by Hurd, J.).

17    *See, e.g., Collins v. Goord,* 438 F. Supp. 2d 399, 415, n.16 (S.D.N.Y. 2006).

18    *See, e.g., McCullough v. Burroughs,* 04-CV-3216, 2005 WL 3164248, at *4 (E.D.N.Y. Nov. 29, 2005).

19    *See, e.g., Barad v. Comstock,* 03-CV-0736, 2005 WL 1579794, at *6 (W.D.N.Y. June 30, 2005).

20    The Court notes that, while Plaintiff asserts that, after the alleged assault, Defendant told Plaintiff that he was going to come and search Plaintiff's cube and find a weapon, Plaintiff does not assert that this veiled threat of the planting of a weapon was caused in any way by the prospect of Plaintiff's filing a grievance against Defendant. (Hrg. Ex. D-2, at ¶ 6.) In any event, Plaintiff did not testify that such a veiled threat played any role in his failure to exhaust. (Hrg. Tr.)

21    *Sandlin v. Poole*, 575 F. Supp. 2d 484, 488 (W.D.N.Y. 2008) (noting that "[s]uch facts support a finding that defendants are estopped from relying on the exhaustion defense, as well as 'special circumstances' excusing plaintiff's failure to exhaust").

22    *Clarke v. Thornton*, 515 F. Supp. 2d 435, 439 (S.D.N.Y. 2007) (noting also that "[a] correctional facility's failure to make forms or administrative opinions 'available' to the prisoner does not relieve the inmate from this burden").

23    *Murray,* 2010 WL 1235591, at *5 [citation omitted].

24    The Court notes also that, even if Plaintiff's account of Ms. Gascon's statement(s) were credited, her asserted obstructive conduct was akin to a refusal to process his grievance, which arguably could have been appealed to the next step in the administrative process (instead of being replaced by the filing another grievance at Gouverneur Correctional Facility). *See Collins v. Caron,* 10-CV-1527, 2014 WL 296859, at *3 (N.D.N.Y. Jan. 27, 2014) (Suddaby, J.) ("In light of the plain language of 7 N.Y.C.R.R. § 701.6(g)(2), the Second Circuit has indicated that the IGRC's nonresponse must be appealed to the superintendent even where the plaintiff's grievance was never assigned a grievance number.").

25    "The inquiry with respect to special circumstances is the same as that for unavailability–namely, 'whether a similarly situated individual of ordinary firmness would have been deterred from following regular procedures.'" *Smith v. City of New York,* 12-CV-3303, 2013 WL 5434144, at *8 (S.D.N.Y. Sept. 26, 2013) (quoting *Hemphill,* 380 F.3d at 690). *See also, supra,* Part I of this Decision and Order.

26    The Court notes that the denial of a prisoner's request to file a grievance beyond the 21-day deadline does not, of course, render a prisoner's administrative remedies exhausted with regard to that grievance. *See Woodford v. Ngo,* 548 U.S. 81, 95 (2006) (reversing Ninth Circuit decision holding that prisoner had exhausted his administrative remedies under the PLRA because none remained available to him after his grievance was rejected as untimely by state prison officials); *Smith v. Kelly,* 06-CV-0505, 2013 WL 6154366, at *10 (N.D.N.Y. Oct. 30, 2013) (Suddaby, J.) ("It would eviscerate the exhaustion requirement to deem an inmate to have exhausted his available administrative remedies where he files a grievance four-and-a-half years late ..., then skips the superintendent and appeals the rejection of his grievance (based on untimeliness) to CORC, which never passes on the merits of his grievance. If exhaustion were permissible under such circumstances, every inmate could exhaust his available administrative remedies without fulfilling the functions of the exhaustion requirement ...."), *accord, Collins v. Caron,* 10-CV-1529, 2014 WL 296859, at *8 (N.D.N.Y. Jan. 27, 2014) (Suddaby, J.).

27    *Goodson v. Silver,* 09-CV-0494, 2012 WL 4449937, at *4, 9 & n.17 (N.D.N.Y. Sept. 25, 2012) (Suddaby, J.) (collecting cases); *accord, Collins v. Caron,* 10-CV-1529, 2014 WL 296859, at *8 (N.D.N.Y. Jan. 27, 2014) (Suddaby, J.); *Dabney v. Pegano,* 10-CV-1109, 2013 WL 5464776, at *11-12 (N.D.N.Y. Sept. 30, 2013) (Report-Recommendation of Dancks, M.J., adopted by Suddaby, J.); *Smith v. Kelly,* 06-CV-0505, 2013 WL 6154366, at *5, n.16 (N.D.N.Y. Oct. 30, 2013) (Suddaby, J.) (collecting cases).

---

End of Document                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 4325770
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

John H. WHITE, Plaintiff,
v.
Joey DISHAW, Defendant.

Civ. No. 9:14-CV-0002 (GLS/DJS)
|
Signed 06/20/2017

**Attorneys and Law Firms**

JOHN H. WHITE, 08-A-3366, Southport Correctional
Facility, P.O. Box 2000, Pine City, New York 14871,
Plaintiff, Pro Se.

HON. ERIC T. SCHNEIDERMAN, OF COUNSEL:
BRIAN W. MATULA, ESQ., Assistant Attorney
General, Attorney General of the State of New York,
The Capitol, Albany, New York 12224, Attorney for
Defendants.

**Opinion**

**REPORT-RECOMMENDATION and ORDER**

Daniel J. Stewart, U.S. Magistrate Judge

**\*1** On December 27, 2013, *pro se* Plaintiff John White
commenced this civil rights action, pursuant to 42 U.S.C.
§ 1983, asserting numerous claims arising from his
confinement at Upstate Correctional Facility ("Upstate")
in the custody of the Department of Corrections and
Community Supervision ("DOCCS"). Dkt. No. 1, Compl.
Plaintiff's sole remaining claim is an Eighth Amendment
excessive force claim against Defendant Correctional
Officer ("C.O.") Joey Dishaw based upon an incident
that allegedly occurred on December 11, 2013. *See* Dkt.
Nos. 5 & 83. Presently before the Court is Defendant's
Motion for Summary Judgment, Dkt. No. 196, Def.'s
Mot. Summ. J., to which Plaintiff has responded, Dkt.
No. 210, Pl.'s Resp. Defendant argues that: (1) Plaintiff
has failed to exhaust his administrative remedies; and (2)
Plaintiff cannot establish that Dishaw caused him any
injury. Dkt. No. 196-3, Def.'s Mem. of Law. The Court
finds that the Defendant has established that Plaintiff has

failed to exhaust his administrative remedies and therefore
recommends that Defendant's Motion be **granted**.

**I. LEGAL STANDARD**

Pursuant to FED. R. CIV. P. 56(a), summary judgment is
appropriate only where "there is no genuine dispute as to
any material fact and the movant is entitled to judgment
as a matter of law." The moving party bears the burden
to demonstrate through "pleadings, depositions, answers
to interrogatories, and admissions on file, together with
[ ] affidavits, if any," that there is no genuine issue of
material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d
Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317,
323 (1986)).

To defeat a motion for summary judgment, the non-
movant must set out specific facts showing that there
is a genuine issue for trial, and cannot rest merely
on allegations or denials of the facts submitted by the
movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin*,
344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations
or denials are ordinarily not sufficient to defeat a motion
for summary judgment when the moving party has set
out a documentary case."); *Rexnord Holdings, Inc. v.
Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994). To that
end, sworn statements are "more than mere conclusory
allegations subject to disregard ... they are specific and
detailed allegations of fact, made under penalty of perjury,
and should be treated as evidence in deciding a summary
judgment motion" and the credibility of such statements
is better left to a trier of fact. *Scott v. Coughlin*, 344 F.3d
at 289 (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir.
1983) and *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir.
1995)).

When considering a motion for summary judgment, the
court must resolve all ambiguities and draw all reasonable
inferences in favor of the non-movant. *Nora Beverages,
Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742
(2d Cir. 1998). "[T]he trial court's task at the summary
judgment motion stage of the litigation is carefully limited
to discerning whether there are any genuine issues of
material fact to be tried, not to deciding them. Its duty, in
short, is confined at this point to issue-finding; it does not
extend to issue-resolution." *Gallo v. Prudential Residential
Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).
Furthermore, where a party is proceeding *pro se*, the court

WESTLAW  © 2018 Thomson Reuters. No claim to original U.S. Government Works.    1

2017 WL 4325770

must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994), *accord, Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995). Nonetheless, summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II. EXHAUSTION

### A. Exhaustion Procedure

**\*2** The Prison Litigation Reform Act ("PLRA") provides, in pertinent part, that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002) (citation omitted). Exhaustion in prisoner cases covered by § 1997e(a) is mandatory. *Id.* at 524; *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016) (stating that mandatory language of § 1997e(a) forecloses judicial discretion to craft exceptions to the requirement). Furthermore, § 1997e(a) requires "proper exhaustion," which means using all steps of the administrative process and complying with "deadlines and other critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). The defendant bears the burden of proving that the administrative remedies available to the plaintiff were not exhausted prior to the initiation of a civil action. *Howard v. Goord*, 1999 WL 1288679, at *3 (E.D.N.Y. Dec. 28, 1999). [1]

In New York, the administrative remedies consist of a three-step Inmate Grievance Program ("IGP"). First, a grievance is submitted to the Inmate Grievance Resolution Committee ("IGRC"), a committee comprised of both inmates and facility employees. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(b). An inmate must submit a grievance "within 21 calendar days of the alleged occurrence." *Id.* at § 701.5(a). In addition, an inmate may request an extension of the time limit within forty-five days of the date of the alleged occurrence. *Id.* at § 701.6(g). The IGRC reviews and investigates the formal complaint and then issues a written determination. *Id.* at § 701.5(b). Second, upon appeal of the IGRC decision, the superintendent of the facility reviews the IGRC's determination and issues a decision. *Id.* at § 701.5(c). Finally, upon appeal of the superintendent's decision, the Cental Office Review Committee ("CORC") makes the final administrative determination. *Id.* at § 701.5(d). Only upon exhaustion of all three levels of review may a prisoner seek relief in federal court. *Bridgeforth v. Bartlett*, 686 F. Supp. 2d 238, 239 (W.D.N.Y. 2010) (citing, *inter alia, Porter v. Nussle*, 534 U.S. at 524); *see also Neal v. Goord*, 267 F.3d 116, 121 (2d Cir. 2001), *overruled on other grounds by Porter v. Nussle*, 534 U.S. 516.

### B. Plaintiff's Failure to Exhaust Administrative Remedies

In this case, Plaintiff admits that he did not exhaust his administrative remedies relative to the excessive force incident. *See* Dkt. No. 196-4, Affirm. of Brian Matula, Esq., dated Feb. 28, 2017, Ex. F, Dep. of John White, dated Jan. 10, 2017 ("Pl.'s Dep.") at pp. 45-48. As stated by Plaintiff, the following series of events occurred subsequent to the alleged excessive force incident on December 11, 2013. First, Plaintiff asserts that, on December 13, 2013, he sent a letter to Superintendent Racette, which referred to the assault by Defendant Dishaw. *Id.* at pp. 32 & 37. Then, on December 18, 2013, Plaintiff claims that he filed a grievance complaining about the incident with the IGRC. *Id.* at pp. 28-29. This grievance, however, was returned to Plaintiff through regular mail distribution, without having been filed. *Id.* at pp. 31-32.

Plaintiff additionally refers to a letter, addressed to him from Superintendent Racette, dated December 20, 2013, that advised him to submit any grievances to the IGP office. *Id.* at pp. 44-45. In that letter, Superintendent Racette states that he is "returning your complaint so that you may address your issues *directly to the IGP office.*" [2] Matula Affirm., Ex. B. Notwithstanding that letter, Plaintiff claims that he then had a conversation with Superintendent Racette and Captain Zerniak during from which he understood that it "would not be beneficial" to continue pursuing his grievance. Pl.'s Dep. at p. 38.

According to Plaintiff, Superintendent Racette told him the IGP would be "of no use" and Captain Zerniak told him to "leave it alone" because Plaintiff had filed grievances requesting similar relief—a transfer out of the facility—in the past. *Id.* at pp. 45 & 48. Based upon this conversation and prior experience, Plaintiff determined that it would not be productive for him to pursue his remedies through the IGP. *Id.* at p. 48. Accordingly, Plaintiff drafted his Complaint, which was filed with this Court on December 27, 2013. Compl.

**\*3** Thus, Plaintiff's testimony establishes that he did not exhaust his administrative remedies. The mere fact that senior prison officials were aware of the nature of Plaintiff's complaint is insufficient to constitute "proper exhaustion." *Macias v. Zenk*, 495 F.3d 37, 44 (2d Cir. 2007) ("Alerting the prison officials as to the nature of the wrong for which redress is sought, does not constitute 'proper exhaustion.' " (citation omitted)). The Court will discuss below whether Plaintiff's failure to exhaust his administrative remedies may be excused.

### C. Whether Plaintiff's Failure to Exhaust Administrative Remedies May be Excused

A prisoner's failure to exhaust administrative remedies may nonetheless be excused if remedies were unavailable to the inmate. *Ross v. Blake*, 136 S. Ct. at 1858. As the Supreme Court recently stated, "[a]n inmate ... must exhaust available remedies, but need not exhaust unavailable ones." *Id.* The Court stated three potential circumstances where administrative remedies may be unavailable: (1) where the administrative procedure technically exists but operates as a "dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) where the administrative scheme is "so opaque that it becomes, practically speaking, incapable of use"; and (3) where prison administrators "thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859-60. [3]

At the time of the relevant events of this action, Upstate had a grievance program, through which Plaintiff had filed multiple grievances. Pl.'s Dep. at pp. 16-17. In his opposition papers, Plaintiff makes a number of arguments that this program was unavailable to him on this occasion. None of his arguments, however, are sufficient to raise an issue of material fact as to the availability of administrative remedies that would excuse his failure to exhaust.

Plaintiff first argues that he feared possible retaliation based upon Captain Zerniak's comments to him and his previous experience with the IGP. *See* Pl.'s Resp. at ¶¶ 11 & 13. Plaintiff contends that Captain Zerniak's explanation that he would not receive a transfer out of the facility or separation from staff was an "implied threat." Pl.'s Dep. at pp. 45-46. Plaintiff states that he understood that his grievance would be an "annoyance" in light of his previous grievance filing which had "inflamed the passions of staff." *Id.* Under *Ross*, threats or other intimidation by prison employees may render administrative remedies unavailable. 2016 WL 3128839, at \*8 n.3. Plaintiff's claims, however, amount to nothing more than a "generalized fear of retaliation," which is insufficient to excuse a failure to exhaust. *See Brown v. Napoli*, 687 F. Supp. 2d 295, 297 (W.D.N.Y. 2009) ("[P]laintiff's mere allegation of a generalized fear of retaliation is insufficient to excuse his failure to file a grievance."); *see also Rodriguez v. Cty. of Suffolk*, 2014 WL 3531897, at \*5 (E.D.N.Y. June 30, 2014) ("Courts tend to find mere 'generalized fear' when no actual threat was made."). As the Second Circuit has stated, "[t]he test for deciding whether the ordinary grievance procedures were available must be an objective one: that is, would 'a similarly situated individual of ordinary firmness' have deemed them available." *Hemphill v. New York*, 380 F.3d 680, 688 (2d Cir. 2004). Plaintiff's prior experience filing grievances is not a well-founded basis for him to fear retaliation from filing a grievance relative to the present incident. Nor does Captain Zerniak's explanation that Plaintiff would not be transferred out of the facility, *see* Pl.'s Dep. at p. 39, constitute a threat that would deter a similarly situated inmate of "ordinary firmness" from pursuing a grievance.

**\*4** Plaintiff next argues that he reasonably believed that it would be futile to pursue his grievance because of his conversation with Superintendent Racette. However, "[p]risoners are required to exhaust their administrative remedies 'even if they believe that administrative remedies would be ineffective or futile.' " *Harrison v. Goord*, 2009 WL 1605770, at \*4 (S.D.N.Y. June 9, 2009); *see also Woodford v. Ngo*, 548 U.S. at 89-90 (stating that "exhaustion requirements are designed to deal with parties who do not want to exhaust," including those who

"conclude—correctly or incorrectly—that exhaustion is not efficient in that party's particular case."). Here, it is clear that Plaintiff determined that it would not be efficacious to pursue administrative remedies based upon his conversation with Superintendent Racette, which is insufficient to excuse his failure to exhaust. [4]

Finally, Plaintiff argues that the matter was resolved through informal channels when he was transferred to a different unit. *See* Pl.'s Resp. at ¶¶ 21 & 23. However, a prisoner does not exhaust "his administrative remedies every time he receives his desired relief through informal channels." *Ruggiero v. Cty. of Orange*, 467 F.3d 170, 177 (2d Cir. 2006) (finding that exhaustion was still required where prisoner had been transferred to a different facility away from the officers who allegedly assaulted him). "Regardless of whether ... informal complaints put the prison officials on notice of his grievance '*in a substantive sense*,' ... to satisfy the PLRA a prisoner must also *procedurally* exhaust his available administrative remedies." *Macias v. Zenk*, 495 F.3d at 43.

Accordingly, for the foregoing reasons, the Court finds that Plaintiff has not established an issue of material fact as to the availability of administrative remedies. The Court therefore recommends that the Defendant's Motion be **granted** based upon Plaintiff's failure to exhaust. [5]

## III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that Defendant's Motion for Summary Judgment (Dkt. No. 196) be **GRANTED** and this action **DISMISSED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) [6] days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. __FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.__ *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

**All Citations**

Slip Copy, 2017 WL 4325770

---

Footnotes

1    Exhaustion of administrative remedies is an affirmative defense which must be raised by the defendant. *See Jenkins v. Haubert*, 179 F.3d 19, 28-29 (2d Cir. 1999). Defendant properly raised the affirmative defense in their Answer. Dkt. No. 40 at ¶ 12.

2    It is unclear if the complaint referred to in the letter is the letter Plaintiff claims he sent Superintendent Racette on December 13, 2013, or the grievance that he allegedly attempted to file on December 18, 2013.

3    The Second Circuit previously set forth a three-part inquiry for when a failure to exhaust may be excused: "(1) administrative remedies are not available to the prisoner; (2) defendants have either wived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement." *Ruggiero v. Cty. of Orange*, 467 F.3d 170, 175 (2d Cir. 2006) (citing *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004)). The Second Circuit has stated that "*Ross* largely supplants our *Hemphill* inquiry by framing the exception issue entirely within the context of whether administrative remedies were actually available to the aggrieved inmate." *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 123 (2d Cir. 2016).

4    A different situation would be presented if Superintendent Racette had misled Plaintiff about the availability of administrative remedies. *Williams v. Suffolk Cty.*, 2012 WL 6727160, at *5 (E.D.N.Y. Dec. 28, 2012) ("[I]t is clear that 'an administrative remedy is not available, and therefore need not be exhausted, if prison officials erroneously inform an inmate that the remedy does not exist or inaccurately describe the steps he needs to take to pursue it.") (quoting *Pavey v. Conley*, 663 F.3d 899, 906 (7th Cir. 2011)).

2017 WL 4325770

5    Because the Court recommends that Defendant's Motion be granted based upon Plaintiff's failure to exhaust his administrative remedies, it does not reach Defendant's argument in the alternative on the merits of Plaintiff's excessive force claim.

6    If you are proceeding *pro se* and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. FED. R. CIV. P. 6(a)(1)(C).

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 4326074
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

John H. WHITE, Plaintiff,
v.
Joey DISHAW, Defendant.

9:14-cv-2 (GLS/DJS)
|
Signed 09/27/2017

**Attorneys and Law Firms**

John H. White, 08-A-3366, Mid-State Correctional Facility, P.O. Box 2500, Marcy, NY 13403, Pro Se.

FOR THE DEFENDANT: HON. ERIC T. SCHNEIDERMAN, OF COUNSEL: BRIAN W. MATULA, Assistant Attorney General, New York State Attorney General, The Capitol, Albany, New York 12224.

**Opinion**

### ORDER

Gary L. Sharpe, Senior District Judge

**\*1** On June 20, 2017, Magistrate Judge Daniel J. Stewart filed a Report-Recommendation and Order (R&R), which recommends that defendant's motion for summary judgment be granted for failure to exhaust administrative remedies. (Dkt. No. 212.) White thereafter sought and was granted additional time to file objections. (Dkt. Nos. 213, 214.) Pending before the court are White's objections. (Dkt. No. 217.) [1]

White objections, which consist of both generalized gripes and specific arguments as to why Judge Stewart's recommendation is incorrect, (*id.*), have been carefully reviewed. While the general objections trigger review for clear error only, the specific objections require the court to consider the arguments *de novo. See Almonte v. N.Y.S. Div. of Parole*, No. Civ. 904CV484, 2006 WL 149049, at \*5-\*6 (N.D.N.Y. Jan. 18, 2006). Having also carefully considered the R&R in light of White's objections, the court sees no reason to repeat what is said there in conducting a *de novo* review because this court reaches the same conclusions as those reached by Judge Stewart: White had available remedies to exhaust and failed to do so. *See Ross v. Blake*, 136 S. Ct. 1850, 1858-62 (2016). Accordingly, the R&R, (Dkt. No. 212), is adopted in its entirety.

Accordingly, it is hereby

**ORDERED** that the Report-Recommendation and Order (Dkt. No. 212) is **ADOPTED** in its entirety; and it is further

**ORDERED** that defendant's motion for summary judgment (Dkt. No. 196) is **GRANTED** and the complaint (Dkt. No. 1) is **DISMISSED**; and it is further

**ORDERED** that the Clerk is directed to close this case; and it is further

**ORDERED** that the clerk provide a copy of this Order to the parties in accordance with the Local Rules of Practice.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2017 WL 4326074

Footnotes

1    Within his objections, White seeks recusal of both Judge Stewart and this court "for ongoing falsifications & denials of due process." (Dkt. No. 217 at 4.) Finding no merit whatsoever in White's assertion and in consideration of the appropriate statutes, *see* 28 U.S.C. §§ 144, 455, White's request is DENIED.

2009 WL 3111429
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Nicholas ZIMMERMAN, Plaintiff,
v.
John W. BURGE, Superintendent of Auburn
Correctional Facility, et al., Defendants.

No. 9:06–cv–0176 (GLS/GHL).
|
Sept. 24, 2009.

**Attorneys and Law Firms**

Nicholas Zimmerman, Auburn, NY, pro se.

Hon. Andrew M. Cuomo, New York Attorney General,
Heather R. Rubinstein, Esq., Assistant Attorney General,
of Counsel, Syracuse, NY, for the Defendants.

**Opinion**

## I. *Introduction*

### *MEMORANDUM–DECISION AND ORDER*

GARY L. SHARPE, District Judge.

**\*1** Nicholas Zimmerman, an inmate at Auburn
Correctional Facility, brings this action under 42 U.S.C.
§ 1983 alleging that defendants, Joe Wolczyk, Donald
Selsky, Captain Rourke, Harold Graham, and Thomas
Eagen of the New York State Department of Correctional
Services (DOCS), violated his Eighth Amendment rights
by sentencing Zimmerman to a term of ten years in
solitary confinement with limited visitation privileges
and denying him participation in the Intermediate Care
Program (ICP).[1] (*See* Compl., Dkt. No. 1.) Defendants
moved for partial summary judgment seeking dismissal of
Zimmerman's (1) Eighth Amendment medical care claim
and (2) suit against defendants in their official capacity.
(Dkt. No. 42.) In a Report and Recommendation Order
(R & R) filed April 20, 2009, Magistrate Judge George H.
Lowe recommended that defendants' motion for partial
summary judgment be granted.[2] (Dkt. No. 44.) Pending
are Zimmerman's timely objections to the R & R. (Dkt.

No. 45 .) For the reasons that follow, the R & R is adopted
and defendants motion for partial summary judgment is
granted.

## II. *Discussion*

Before entering final judgment, this court routinely
reviews all report and recommendation orders in cases it
has referred to a magistrate judge. If a party has objected
to specific elements of the magistrate judge's findings and
recommendations, this court reviews those findings and
recommendations de novo. *See Almonte v. New York
State Div. of Parole,* No. 04–cv–484, 2006 WL 149049, at
\*6–7 (N.D.N.Y. Jan.18, 2006). In those cases where no
party has filed an objection, or only a vague or general
objection has been filed, this court reviews the findings and
recommendations of a magistrate judge for clear error. *See
id.*

First, with regards to Zimmerman's Eighth Amendment
claim, Judge Lowe determined that, even if Zimmerman
had a sufficiently serious medical need, defendants
Rourke, Eagen, and Graham were not deliberately
indifferent to such a need. (*See* R & R at 19, Dkt. No. 44.)
Specifically, Judge Lowe explained that while Zimmerman
received monthly care and prescription drugs from
mental health providers, "he was not constitutionally
entitled to his preferred care." (R & R at 19, Dkt. No.
44.) In response, Zimmerman claims that this finding
was incorrect: "this was not only the care that (I)
preferred, but the care that my doctor preferred (by his
recommendation) as well." (Objections at 4, Dkt. No. 45;
*see also id.* at 4–7 (listing Mental Health Unit personnel,
Prisoners' Legal Services representatives, and a number of
publications as further support for his objection).) In light
of Zimmerman's specific objection, the court has reviewed
the relevant portion of the R & R de novo. The court
concurs with Judge Lowe's conclusion, for "[s]o long as
the treatment given is adequate, the fact that a prisoner
might prefer a different treatment does not give rise to an
Eighth Amendment violation." *Chance v. Armstrong,* 143
F.3d 698, 703 (2d Cir.1998) (citation omitted).

**\*2** Zimmerman also generally objects to Judge Lowe's
finding that defendants Rourke, Graham, and Eagen
were not deliberately indifferent. (*See* Objections at 1–2,
Dkt. No. 45.) While he does not object to Judge Lowe's
finding that Rourke, Graham, and Eagen are not medical

personnel, Zimmerman contends that they interfered with his prescribed treatment by failing to transfer him to the ICP. (*See id.* at 2.) Upon de novo review, it is clear that Zimmerman received adequate treatment. Furthermore, Zimmerman has failed to raise a genuine issue of material fact showing that Rourke, Graham, or Eagen intentionally delayed or denied Zimmerman's access to medical care. *See Baumann v. Walsh,* 36 F.Supp.2d 508, 512 (N.D.N.Y.1999). Accordingly, Judge Lowe's recommendation that Zimmerman's medical care claims against Rourke, Graham, and Eagen be dismissed was appropriate.

Lastly, Judge Lowe recommended that the court grant the motion for summary judgment with regards to all claims against all defendants in their official capacities. (*See* R & R at 16, 16 n. 32, Dkt. No. 44.) Zimmerman has failed to raise any objections to these recommendations. Therefore, upon review for clear error, the court finds that the R & R correctly concluded that Zimmerman's claims against all the defendants in their official capacity should be dismissed.

In summary, upon reviewing the remainder of the R & R for clear error, the court finds no error. The R & R is adopted in its entirety, and, for the reasons articulated therein, defendants' motion for partial summary judgment is granted.

### III. *Conclusion*

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge Lowe's Report and Recommendation is adopted and defendants' motion for partial summary judgment is granted, whereby:

1. Zimmerman's Eighth Amendment medical care claims against defendants Rourke, Graham, and Eagen are dismissed;

2. Zimmerman's claims against each remaining defendant in his official capacity is dismissed; and it is further

**ORDERED** that the Clerk provide copies of this Memorandum–Decision and Order to the parties.

**IT IS SO ORDERED.**

### *REPORT–RECOMMENDATION*

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Gary L. Sharpe, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Nicholas Zimmerman alleges that Defendants Joe Wolczyk, Donald Selsky, Captain Rourke, Harold Graham, and Thomas Eagen [1] violated his Eighth Amendment rights by sentencing him to ten years of solitary confinement in the Special Housing Unit ("SHU") and refusing to allow him to participate in the Intermediate Care Program [2]. Currently pending before the Court is Defendants' partial motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. No. 42.) Defendants seek dismissal of (1) Plaintiff's claims against Defendants in their official capacities; and (2) Plaintiff's Eighth Amendment medical care claim. Defendants do not seek dismissal of Plaintiff's Eighth Amendment claim regarding his ten-year SHU confinement. For the reasons that follow, I recommend that Defendants' motion be granted.

### I. BACKGROUND

#### A. Summary of Plaintiff's Complaint

**\*3** Plaintiff's complaint is quite cursory. Regarding his Eighth Amendment medical care claim, Plaintiff alleges that:

On October 25, 2005, Defendant[ ] Captain Rourke violated Plaintiff's Eighth Amendment rights to adequate medical care by refusing to allow Plaintiff to seek mental health by participating in the Intermediate Care Program.

On November 10, 2005, Defendant Superintendent Graham violated Plaintiff's Eighth Amendment rights to adequate medical care by affirming Captain Rourke's decision to deny Plaintiff's admittance to the Intermediate Care Program.

On December 14, 2005, Defendant Thomas Eagen violated Plaintiff's rights to adequate medical care by affirming Superintendent Graham's decision to deny Plaintiff's admittance to the Intermediate Care Program.

(Dkt. No. 1 at 5, ¶¶ 16–18.)

Plaintiff sues Defendants "in their individual capacities and in their official capacities as officials of the New York State Department of Corrections." (Dkt. No. 1 at 2.)

In his prayer for relief Plaintiff requests (1) a declaration that Defendants violated Plaintiff's constitutional rights; (2) an injunction requiring Defendants to place Plaintiff in the Intermediate Care Program; (3) the reversal and expungement or reduction of Plaintiff's ten-year SHU sentence; (4) $1 million in compensatory damages; (5) $200,000 in punitive damages from each Defendant; and (6) costs and attorney fees. (Dkt. No. 1 at 8.)

### B. Summary of Grounds in Support of Defendants' Motion

Defendants argue that (1) the Eleventh Amendment bars Plaintiff's claims against Defendants in their official capacities; (2) Plaintiff does not allege sufficient personal involvement on the part of Defendants Rourke, Graham, or Eagen; (3) Plaintiff cannot prevail on his Eighth Amendment medical care claim because Defendants were not deliberately indifferent to a serious medical need; and (4) Defendants are entitled to qualified immunity. (Dkt. No. 42–4.)

### C. Summary of Plaintiff's Response to Defendants' Arguments

In response, Plaintiff argues that (1) even if the Eleventh Amendment bars his claims against Defendant in their official capacities, he has also sued them in their individual capacities; (2) Defendants were personally involved because they failed to remedy a wrong after learning of it; (3) Plaintiff suffered from depression and suicidal tendencies and Defendants' refusal to allow him to participate in the Intermediate Care Program constituted deliberate indifference; and (4) Defendants are not entitled to qualified immunity. (Dkt. No. 43.)

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Major League Baseball Properties, Inc. v. Salvino,* 542 F.3d 290, 309 (2d Cir.2008). Only after the moving party has met this burden is the non-moving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." [3] Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." [4] In determining whether a genuine issue of material [5] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. [6]

### B. Legal Standard Governing Motion to Dismiss for Failure to State a Claim

**\*4** To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnie General Transatlantique,* 405 F.2d 270, 273–74 (2d Cir.1968) [citations omitted]; *accord, Katz v. Molic,* 128 F.R.D. 35, 37–38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Moreover, even where a defendant has not advanced such a failure-to-state-a-claim argument on a motion for summary judgment, a district court may, *sua sponte,* address whether a *pro se* prisoner has failed to state

a claim upon which relief may be granted. [7] For these reasons, it is appropriate to briefly summarize the recently clarified legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). It has long been understood that a defendant may base such a motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Federal Rule of Civil Procedure 8(a)(2); [8] or (2) a challenge to the legal cognizability of the claim. [9]

Rule 8(a)(2) requires that a pleading contain "a short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. By requiring this "showing," Rule 8(a)(2) requires that the pleading contain a short and plain statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." [10] The main purpose of this rule is to "facilitate a proper decision on the merits." [11] A complaint that fails to comply with this rule "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [12]

The Supreme Court has long characterized this pleading requirement under Rule 8(a)(2) as "simplified" and "liberal," and has repeatedly rejected judicially established pleading requirements that exceed this liberal requirement. [13] However, it is well established that even this liberal notice pleading standard "has its limits." [14] As a result, several Supreme Court and Second Circuit decisions exist, holding that a pleading has failed to meet this liberal notice pleading standard. [15]

Most notably, in *Bell Atlantic Corporation v. Twombly,* the Supreme Court, in reversing an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1, "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."

550 U.S. 544, 127 S.Ct. 1955, 1968–69, 167 L.Ed.2d 929 [16] (2007). [17] Rather than turning on the *conceivability* of an actionable claim, the Court clarified, the Rule 8 "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965–74.

**\*5** More specifically, the Court reasoned that, by requiring that a pleading "show[ ] that the pleader is entitled to relief," Rule 8(a)(2) requires that the pleading give the defendant "fair notice" of (1) the nature of the claim and (2) the "grounds" on which the claim rests. *Id.* at 1965, n. 3 [citation omitted]. While this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id* . [citations omitted]. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.* at 1965 [citations omitted]. What this means, on a practical level, is that there must be "plausible grounds to infer [actionable conduct]," or, in other words, "enough fact to raise a reasonable expectation that discovery will reveal evidence of [actionable conduct]." *Id* .

As have other Circuits, the Second Circuit has repeatedly recognized that the clarified plausibility standard that was articulated by the Supreme Court in *Bell Atlantic* governs *all* claims, not merely antitrust claims brought under 15 U.S.C. § 1 (as were the claims in *Bell Atlantic* ). [18] The Second Circuit has also recognized that this *plausibility* standard governs claims brought even by *pro se* litigants (although the plausibility of those claims is be assessed generously, in light of the special solicitude normally afforded *pro se* litigants). [19]

It should be emphasized that Rule 8's plausibly standard, explained in *Bell Atlantic,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which the Court stated, "Specific facts are not necessary" to successfully state a claim under Rule 8(a) (2). *Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) [citation omitted]. That statement was merely an abbreviation of the often-repeated point of law—first offered in *Conley* and repeated in *Bell Atlantic*—that a pleading need not "set out in detail the facts upon which [the claim is based]" in order to successfully state a claim. *Bell Atlantic,* 127

S.Ct. 1965, n. 3 (citing *Conley v. Gibson,* 355 U.S. 41, 47 [1957] ). That statement in no way meant that all pleadings may achieve the requirement of giving a defendant "fair notice" of the nature of the claim and the "grounds" on which the claim rests without ever having to allege any facts whatsoever. [20] There must still be enough facts alleged to raise a right to relief above the speculative level to a plausible level, so that the defendant may know what the claims are and the grounds on which they rest (in order to shape a defense).

Having said all of that, it should also be emphasized that, "[i]n reviewing a complaint for dismissal under Fed.R.Civ.P. 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." [21] "This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.*" [22] In other words, while all pleadings are to be construed liberally under Rule 8(e), *pro se* civil rights pleadings are to be construed with an *extra* degree of liberality.

**\*6** For example, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint. [23] Moreover, "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest." [24] Furthermore, when addressing a *pro se* complaint, *generally* a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." [25] Of course, an opportunity to amend is not required where the plaintiff has already amended his complaint. [26] In addition, an opportunity to amend is not required where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." [27]

However, while this special leniency may somewhat loosen the procedural rules governing the form of pleadings (as the Second Circuit has observed), [28] it does not completely relieve a *pro se* plaintiff of the duty to satisfy

the pleading standards set forth in Rules 8, 10 and 12. [29] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Rules 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow. [30] Stated more plainly, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." [31]

## III. ANALYSIS

### A. Claims Against Defendants in Their Official Capacities

Plaintiff's complaint names Defendants "in their individual capacities and in their official capacities as officials of the New York State Department of Corrections." (Dkt. No. 1 at 2.) Defendants argue that Plaintiff's claims against them in their official capacities are barred by the Eleventh Amendment. (Dkt. No. 42–4 at 3.) Defendants are correct.

The Eleventh Amendment has long been construed as barring a citizen from bringing a suit against his or her own state in federal court, under the fundamental principle of "sovereign immunity." *See* U.S. Const. amend XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."); *Hans v. Louisiana,* 134 U.S. 1, 10–21, 10 S.Ct. 504, 33 L.Ed. 842 (1890); *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 267, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). State immunity extends not only to the states, but to state agencies and to state officers who act on behalf of the state. *See* *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf,* 506 U.S. 139, 142–47, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 101–06, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). DOCS employees are state officials for the purposes of the Eleventh Amendment. *See e.g. Davis v. New York,* 316 F.3d 93, 101 (2d Cir.2002); *Tolliver v. N.Y. State Correctional Officers,* No. 99 CIV 9555, 2000 WL 1154311, at *2 (S.D.N.Y. Aug.14, 2000) ("All of the defendants in this case are state officials because they are employees of the New York State Department of Correctional Services."). Where it has been successfully demonstrated that a defendant is entitled to sovereign

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

immunity under the Eleventh Amendment, the federal court lacks subject matter jurisdiction over the case, and "the case must be stricken from the docket." *McGinty v. State of New York,* 251 F.3d 84, 100 (2d Cir.2001) (citation omitted); *see also* Fed.R.Civ.P. 12(h)(3).

**\*7** Here, the face of the complaint alleges that Defendants are each "officials of the New York State Department of Corrections." (Dkt. No. 1 at 2.) Therefore, any claims against Defendants in their officials capacities are barred by the Eleventh Amendment. Accordingly, I recommend that the Court grant Defendants' motion and dismiss all claims against Defendants in their official capacities [32].

### B. Medical Care Claims

Plaintiff alleges that Defendants violated his Eighth Amendment right to adequate medical care by refusing to allow him to participate in the Intermediate Care Program. (Dkt. No. 1 at 5.) The Intermediate Care Program is a program for prisoners with mental health issues that provides treatment, medication, group therapy, and other counseling. (Dkt. No. 42–5, P's Depo. at 35:22–36:6.)

To prevail on an Eighth Amendment claim of inadequate medical care, a plaintiff must show two things: (1) that the plaintiff had a *sufficiently serious* medical need; and (2) that the defendant was *deliberately indifferent* to that serious medical need. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

Defendants argue that Plaintiff can establish neither that he suffered from a sufficiently serious medical need nor that Defendants were deliberately indifferent. (Dkt. No. 42–4 at 5–8.) I find that Plaintiff suffered from a sufficiently serious medical need but that Defendants were not deliberately indifferent to that need.

#### 1. Serious Medical Need

Defendants argue that Plaintiff cannot establish that he suffered from a sufficiently serious medical need because "Plaintiff acknowledges that his allegations are only with regard to his mental health treatment and not medical treatment." (Dkt. No. 42–4 at 6–7 .)

To be sufficiently serious for purposes of the Constitution, a medical condition must be "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) [citations omitted], *accord, Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1996), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995); *Chance,* 143 F.3d at 702.

Neither Defendants nor Plaintiff have provided the Court with any of Plaintiff's medical records to establish the precise nature of Plaintiff's mental health diagnosis. The evidence before the Court establishes that Plaintiff was initially prescribed the medication Celexa in February 2005 and has been compliantly taking it. (Dkt. No. 42–5, P's Depo. at 33:18–34:3; Dkt. No. 42–6 at 3, Intermediate Care Program Referral form.) Celexa is prescribed to treat major depression. *The PDR Pocket Guide to Prescription Drugs* 275 (Bette LaGow, ed., 7th ed.2005). Plaintiff states that he began having suicidal thoughts sometime prior to October 25, 2005. (Dkt. No. 43 at 3.) He attempted suicide on July 5, 2008, and October 12, 2008. *Id.* I find, based on the limited information in the record before me, that Plaintiff suffered from major depression with suicidal ideation at the time he was denied entrance into the Intermediate Care Program in September 2005.

**\*8** Neither party has cited any case law discussing whether depression, either with or without suicidal ideation, is a "sufficiently serious" medical condition for Eighth Amendment purposes. I have independently researched the issue and located limited published case law on the subject. The First Circuit has found that depression combined with severe anxiety attacks or suicide attempts is a serious medical need. *Mahan v. Plymouth County House of Corrections,* 64 F.3d 14, 16, 18 (1st Cir.1995); *Torraco v. Maloney,* 923 F.2d 231, 235 n. 4 (1st Cir.1991). A District Court in Delaware has presumed that a combination of depression, anxiety, and post-traumatic stress disorder is a serious medical need. *Simpson v. Penobscot County Sheriff's Dept.,* 285 F.Supp.2d 75 (D.Me.2003). A District Court in North Dakota has held that self-diagnosed depression with suicidal ideation is not a serious medical condition for Eighth Amendment purposes, but depression that actually manifests in attempted suicide is sufficiently serious. *White v. Crow Ghost,* 456 F.Supp.2d 1096, 1102–03 (D.N.D.2006).

2009 WL 3111429

Here, Plaintiff was not merely self-diagnosed: prison officials prescribed Celexa to treat his depression. Although he did not attempt suicide until three years after he was denied admission to the Intermediate Care Program, these later attempts illustrate that his suicidal thoughts in 2005 were not ephemeral. In light of these facts, and because the summary judgment standard requires the Court to resolve all ambiguities and draw all reasonable inferences against the moving party, I will assume that Plaintiff suffered from a sufficiently serious medical need.

### 2. Deliberate Indifference

Defendants argue that even if Plaintiff had a serious medical need, they were not deliberately indifferent to it. (Dkt. No. 42–4 at 7–8.) Defendants are correct.

Defendants Rourke, Eagen, and Graham are not medical personnel. (Dkt. No. 42–5, P's Depo. at 45:25–46:7.) "Non-medical personnel engage in deliberate indifference where they intentionally delayed access to medical care when the inmate was in extreme pain and has made his medical problem known to attendant prison personnel." Baumann v. Walsh, 36 F.Supp.2d 508, 512 (N.D.N.Y.1999) (Scullin, J., adopting Report–Recommendation of Sharpe, M.J.). Here, Plaintiff was not denied access to mental health care. Beginning in February 2005, Plaintiff was seen by mental health providers once a month. (Dkt. No. 42–5, P's Depo. at 18:7–20:14.) As discussed above, he was also prescribed Celexa, an anti-depressant. While Plaintiff may have preferred to receive his mental health treatment through the Intermediate Care Program, he was not constitutionally entitled to his preferred care. "It is well established that mere disagreement over the proper treatment does not create a constitutional claim." Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir.1998). Therefore, I find that there is no genuine issue of material fact showing that Defendants Rourke, Eagen, or Graham

were deliberately indifferent to Plaintiff's serious medical need. Accordingly, I recommend that Defendants' motion for summary judgment dismissing Plaintiff's Eighth Amendment medical care claim be granted.

*9 In light of my finding that Defendants are entitled to summary judgment dismissing Plaintiff's Eighth Amendment medical care claim on the constitutional merits, I decline to address Defendants' arguments regarding personal involvement and qualified immunity.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for partial summary judgment (Dkt. No. 42) be ***GRANTED.*** It is recommended that the Court (1) dismiss Plaintiff's claims against all Defendants in their official capacities; and (2) dismiss Plaintiff's Eighth Amendment medical care claim against Defendants Rourke, Eagen, and Graham, thus terminating those Defendants from this litigation; and it is further

**RECOMMENDED** that this matter be set for a pretrial conference on Plaintiff's Eighth Amendment conditions of confinement claim against Defendants Wolczyk and Selsky.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** Roldan v. Racette, 984 F.2d 85 (2d Cir.1993) (citing Small v. Secretary of Health and Human Services, 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

### All Citations

Not Reported in F.Supp.2d, 2009 WL 3111429

---

Footnotes

1    Plaintiff's additional claims against additional defendants were dismissed on March 28, 2008. (Dkt. No. 35.)
2    The Clerk is directed to append the R & R to this decision, and familiarity therewith is presumed.
1    The caption of Defendants' moving papers refers to this Defendant as "Egan." The body of Defendants' papers refer to him as "Eagan." In light of this discrepancy, I have used the spelling provided by Plaintiff in the complaint.
2    Plaintiff's complaint contained additional claims against additional Defendants. Those claims were dismissed on March 28, 2008. (Dkt. No. 35.)

Case 9:15-cv-01542-MAD-DEP   Document 79   Filed 02/14/18   Page 224 of 227
Zimmerman v. Burge, Not Reported in F.Supp.2d (2009)
2009 WL 3111429

3   *Matsushita,* 475 U.S. at 585–86; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also* Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading ....").

4   *Ross v. McGinnis,* 00–CV–0275, 2004 WL 1125177, at *8 (W.D.N.Y. Mar.29, 2004) [internal quotations omitted] [emphasis added].

5   A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

6   *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

7   The authority to conduct this *sua sponte* analysis is derived from two sources: (1) 28 U.S.C. § 1915(e)(2)(B)(ii), which provides that "the court shall dismiss [a] case [brought by a prisoner proceeding *in forma pauperis* ] at any time if the court determines that ... the action ... is frivolous or malicious[,] ... fails to state a claim on which relief may be granted[,] ... or ... seeks monetary relief against a defendant who is immune from such relief"; and (2) 28 U.S.C. § 1915A(b), which provides that, "[o]n review, the court shall ... dismiss the [prisoner's] complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted ...."

8   *See* 5C Wright & Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") [citations omitted]; *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ("The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

9   *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ( "There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") [citation omitted]; *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12[b][6]'s requirement of stating a cognizable claim and Rule 8 [a]'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348, 370 (S.D.N.Y.2005) ("Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6) ].") [citation omitted]; *Util. Metal Research & Generac Power Sys.,* 02–CV–6205, 2004 U.S. Dist. LEXIS 23314, at *4–5, 2004 WL 2613993 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a] ); *accord, Straker v. Metro Trans. Auth.,* 331 F.Supp.2d 91, 101–102 (E.D.N.Y.2004); *Tangorre v. Mako's, Inc.,* 01–CV–4430, 2002 U.S. Dist. LEXIS 1658, at *6–7, 2002 WL 313156 (S.D.N.Y. Jan. 30, 2002) (identifying two sorts of arguments made on a Rule 12[b][6] motion-one aimed at the sufficiency of the pleadings under Rule 8[a], and the other aimed at the legal sufficiency of the claims).

10  *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (holding that the complaint failed to meet this test) [citation omitted; emphasis added]; *see also Swierkiewicz,* 534 U.S. at 512 [citation omitted]; *Leathernman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) [citation omitted].

11  *Swierkiewicz,* 534 U.S. at 514 (quoting *Conley,* 355 U.S. at 48); *see also Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995) ("Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so that it may be assigned the proper form of trial.") [citation omitted]; *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988) ("[T]he principle function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial.") [citations omitted].

12  *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) [unpublished table opinion]; *accord, Hudson v. Artuz,* 95–CV–4768, 1998 WL 832708, at *2 (S.D.N.Y. Nov.30, 1998), *Flores v. Bessereau,* 98–CV–0293, 1998 WL 315087, at *1 (N.D.N.Y. June 8, 1998) (Pooler, J .). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint*

*Technol., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996] ).

13    *See, e.g., Swierkiewicz,* 534 U.S. at 513–514 (noting that "Rule 8(a)(2)'s simplified pleading standard applies to all civil actions, with limited exceptions [including] averments of fraud or mistake.").

14    2 *Moore's Federal Practice* § 12.34[1][b] at 12–61 (3d ed.2003).

15    *See, e.g., Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1964–1974, 167 L.Ed.2d 929 (2007) (pleading did not meet Rule 8[a][2]'s liberal requirement); *accord, Dura Pharm.,* 125 S.Ct. at 1634–1635, *Christopher v. Harbury,* 536 U.S. 403, 416–422, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002), *Freedom Holdings, Inc. v. Spitzer,* 357 F.3d 205, 234–235 (2d Cir.2004), *Gmurzynska v. Hutton,* 355 F.3d 206, 208–209 (2d Cir.2004). Several unpublished decisions exist from the Second Circuit affirming the Rule 8(a)(2) dismissal of a complaint after *Swierkiewicz. See, e.g., Salvador v. Adirondack Park Agency of the State of N.Y.,* No. 01–7539, 2002 WL 741835, at *5 (2d Cir. Apr.26, 2002) (affirming pre-*Swierkiewicz* decision from Northern District of New York interpreting Rule 8[a][2] ). Although these decisions are not themselves precedential authority, *see* Rules of the U.S. Court of Appeals for the Second Circuit, § 0.23, they appear to acknowledge the continued precedential effect, after *Swierkiewicz,* of certain cases from within the Second Circuit interpreting Rule 8(a)(2). *See Khan v. Ashcroft,* 352 F.3d 521, 525 (2d Cir.2003) (relying on summary affirmances because "they clearly acknowledge the continued precedential effect" of *Domond v. INS,* 244 F.3d 81 [2d Cir.2001], after that case was "implicitly overruled by the Supreme Court" in *INS v. St. Cyr,* 533 U.S. 289 [2001] ).

16    All references to *Bell Atlantic* will cite the Supreme Court Reporter rather than the United States Reports. The United States Reports version of the case does not include page numbers at this time.

17    The Court in *Bell Atlantic* further explained: "The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been adequately stated, it may be supported by showing any set of facts consistent with the allegations in the complaint.... *Conley,* then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Bell Atlantic,* 127 S.Ct. at 1969.

18    *See, e.g., Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (in civil rights action, stating that "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.' ") [citation omitted]; *Goldstein v. Pataki,* 07–CV–2537, 2008 U.S.App. LEXIS 2241, at *14, 2008 WL 269100 (2d Cir. Feb. 1, 2008) (in civil rights action, stating that "*Twombly* requires ... that the complaint's '[f]actual allegations be enough to raise a right to relief above the speculative level ....' ") [internal citation omitted]; *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98, n. 2 (2d Cir.2007) ("We have declined to read Twombly's flexible 'plausibility standard' as relating only to antitrust cases.") [citation omitted]; *Iqbal v. Hasty,* 490 F.3d 143, 157–58 (2d Cir.2007) (in prisoner civil rights action, stating, "[W]e believe the [Supreme] Court [in *Bell Atlantic Corp. v. Twombly* ] is ... requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible."* ) [emphasis in original].

19    *See, e.g., Jacobs v. Mostow,* 281 F. App'x 85, 87 (2d Cir. March 27, 2008) (in pro se action, stating, "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.' ") [citation omitted] (summary order, cited in accordance with Local Rule 32.1[c][1] ); *Boykin v. KeyCorp.,* 521 F.3d 202, 215–16 (2d Cir.2008) (finding that borrower's *pro se* complaint sufficiently presented a *"plausible* claim of disparate treatment," under Fair Housing Act, to give lenders fair notice of her discrimination claim based on lenders' denial of her home equity loan application) [emphasis added].

20    For example, in *Erickson,* a district court had dismissed a *pro se* prisoner's civil rights complaint because, although the complaint was otherwise factually specific as to how the prisoner's hepatis C medication had been wrongfully terminated by prison officials for a period of approximately 18 months, the complaint (according to the district court) failed to allege facts plausibly suggesting that the termination caused the prisoner "substantial harm." 127 S.Ct. at 2199. The Supreme Court vacated and remanded the case because (1) under Fed.R.Civ.P. 8 and *Bell Atlantic,* all that is required is "a short and plain statement of the claim" sufficient to "give the defendant fair notice" of the claim and "the grounds upon which it rests," and (2) the plaintiff had alleged that the termination of his hepatitis C medication for 18 months was "endangering [his] life" and that he was still in need of treatment for [the] disease." *Id.* at 2200. While *Erickson* does not elaborate much further on its rationale, a careful reading of the decision (and the dissent by Justice Thomas) reveals a point that is perhaps so obvious that it did not need mentioning in the short decision: a claim of deliberate indifference to a serious medical need under the Eighth Amendment involves two elements, i.e., the existence of a sufficiently serious medical need possessed by the plaintiff, and the existence of a deliberately indifferent mental state possessed by prison officials with regard to that sufficiently serious medical need. The *Erickson* decision had to do with only the first element, not the

2009 WL 3111429

second element. *Id.* at 2199–2200. In particular, the decision was merely recognizing that an allegation by a plaintiff that, during the relevant time period, he suffered from hepatis C is, in and of itself, a factual allegation plausibly suggesting that he possessed a sufficiently serious medical need; the plaintiff need not *also* allege that he suffered an independent and "substantial injury" as a result of the termination of his hepatis C medication. *Id.* This point of law is hardly a novel one. For example, numerous decisions, from district courts within the Second Circuit alone, have found that suffering from hepatitis C constitutes having a serious medical need for purposes of the Eighth Amendment. *See, e .g., Rose v. Alvees,* 01–CV–0648, 2004 WL 2026481, at *6 (W.D.N.Y. Sept.9, 2004); *Verley v. Goord,* 02–CV–1182, 2004 WL 526740, at *10 n. 11 (S.D.N.Y. Jan.23, 2004); *Johnson v. Wright,* 234 F.Supp.2d 352, 360 (S.D.N.Y.2002); *McKenna v. Wright,* 01–CV–6571, 2002 WL 338375, at *6 (S.D.N.Y. March 4, 2002); *Carbonell v. Goord,* 99–CV–3208, 2000 WL 760751, at *9 (S.D.N.Y. June 13, 2000).

21   *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) [citation omitted]; *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

22   *Hernandez,* 18 F.3d at 136 [citation omitted]; *Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) [citations omitted]; *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) [citation omitted].

23   "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum." *Gadson v. Goord,* 96–CV–7544, 1997 WL 714878, at *1, n. 2 (S.D.N.Y. Nov.17, 1997) (citing, *inter alia, Gil v. Mooney,* 824 F.2d 192, 195 [2d Cir.1987] [considering plaintiff's response affidavit on motion to dismiss] ). Stated another way, "in cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they 'are consistent with the allegations in the complaint.' " *Donhauser v. Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.2004) (considering factual allegations contained in plaintiff's opposition papers) [citations omitted], *vacated in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004). This authority is premised, not only on case law, but on Rule 15 of the Federal Rules of Civil Procedure, which permits a plaintiff, as a matter of right, to amend his complaint once at any time before the service of a responsive pleading—which a motion to dismiss is not. *See Washington v. James,* 782 F.2d 1134, 1138–39 (2d Cir.1986) (considering subsequent affidavit as amending *pro se* complaint, on motion to dismiss) [citations omitted].

24   *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) [internal quotation and citation omitted].

25   *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) [internal quotation and citation omitted]; *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

26   *Yang v. New York City Trans. Auth.,* 01–CV–3933, 2002 WL 31399119, at *2 (E.D.N.Y. Oct.24, 2002) (denying leave to amend where plaintiff had already amended complaint once); *Advanced Marine Tech. v. Burnham Sec., Inc.,* 16 F.Supp.2d 375, 384 (S.D.N.Y.1998) (denying leave to amend where plaintiff had already amended complaint once).

27   *Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) [citation omitted]; *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) [citation omitted]; *see, e.g., See Rhodes v. Hoy,* 05–CV–0836, 2007 WL 1343649, at *3, 7 (N.D.N.Y. May 5, 2007) (Scullin, J., adopting Report–Recommendation of Peebles, M.J.) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint because the error in his complaint—the fact that plaintiff enjoyed no constitutional right of access to DOCS' established grievance process—was substantive and not formal in nature, rendering repleading futile); *Thabault v. Sorrell,* 07–CV–0166, 2008 WL 3582743, at *2 (D.Vt. Aug.13, 2008) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint because the errors in his complaint—lack of subject-matter jurisdiction and lack of standing —were substantive and not formal in nature, rendering repleading futile) [citations omitted]; *Hylton v. All Island Cob Co.,* 05–CV–2355, 2005 WL 1541049, at *2 (E.D.N.Y. June 29, 2005) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the errors in his complaint—which included the fact that plaintiff alleged no violation of either the Constitution or laws of the United States, but only negligence—were substantive and not formal in nature, rendering repleading futile); *Sundwall v. Leuba,* 00–CV–1309, 2001 WL 58834, at *11 (D.Conn. Jan.23, 2001) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the error in his complaint—the fact that the defendants were protected from liability by Eleventh Amendment immunity—was substantive and not formal in nature, rendering repleading futile).

28   *Sealed Plaintiff v. Sealed Defendant # 1,* No. 06–1590, 2008 WL 3294864, at *5 (2d Cir. Aug.12, 2008) ("[The obligation to construe the pleadings of *pro se* litigants liberally] entails, at the very least, a permissive application of the rules governing the form of pleadings.") [internal quotation marks and citation omitted]; *see also Traguth v. Zuck,* 710 F.2d 90, 95 (2d

Cir.1983) ("[R]easonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training ... should not be impaired by harsh application of technical rules.") [citation omitted].

29   *See Prezzi v. Schelter,* 469 F.2d 691, 692 (2d Cir.1972) (extra liberal pleading standard set forth in *Haines v. Kerner,* 404 U.S. 519 [1972], did not save *pro se* complaint from dismissal for failing to comply with Fed.R.Civ.P. 8] ); *accord, Shoemaker v. State of Cal.,* 101 F.3d 108 (2d Cir.1996) (citing *Prezzi v. Schelter,* 469 F.2d 691) [unpublished disposition cited only to acknowledge the continued precedential effect of *Prezzi v. Schelter,* 469 F.2d 691, within the Second Circuit]; *accord, Praseuth v. Werbe,* 99 F.3d 402 (2d Cir.1995).

30   *See McNeil v. U.S.,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Faretta v. California,* 422 U.S. 806, 834, n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *cf. Phillips v. Girdich,* 408 F.3d 124, 128, 130 (2d Cir.2005) (acknowledging that *pro se* plaintiff's complaint could be dismissed for failing to comply with Rules 8 and 10 if his mistakes either "undermine the purpose of notice pleading [ ] or prejudice the adverse party").

31   *Stinson v. Sheriff's Dep't of Sullivan Cty.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980).

32   It is not clear from Defendants' papers whether they intended to move for summary judgment dismissing the claims against *all* of the remaining Defendants in their official capacities or whether they moved solely on behalf of Defendants Rourke, Eagen, and Graham. To the extent that Defendants neglected to explicitly move on behalf of Defendants Wolcyzk and Selsky, I recommend that the Court *sua sponte* dismiss any claims against those Defendants in their official capacities pursuant to 28 U.S.C. § 1915(e)(2)(B).

**End of Document**                                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.